## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| KATHLEEN P. MULLINIX,       ) | |
|                     ) | |
|      Plaintiff,        ) | |
|                     ) | Civil Action No. 04-12684-WGY |
|         v.          ) | |
|                     ) | |
| KIKI BOGORAD-GROSS and    ) | |
| LEONARD P. BOGORAD, As They  ) | |
| Are Executors of the Will of     ) | |
| Lawrence Bogorad,       ) | |
|                     ) | |
|      Defendants.      ) | |

## MEMORANDUM IN SUPPORT OF
## DEFENDANTS' MOTION FOR A PROTECTIVE ORDER

Defendants Kiki Bogorad-Gross and Leonard Bogorad, as they are Executors of the Will of Lawrence Bogorad (collectively, "Defendants"), by their attorneys, Sullivan & Worcester LLP, respectfully move this Court, pursuant to Fed. R. Civ. P. 26(c) and 30(d), for the entry of a protective order. Specifically, Defendants request that this Court issue an order precluding (1) further depositions by Plaintiff Kathleen P. Mullinix ("Plaintiff") absent a certification from Plaintiff's counsel or an affidavit from the Plaintiff that all documents responsive to Defendants' First Set of Document Requests ("Defendants' Document Requests") have been produced; (2) hurtful and harassing inquiries related to the extent and duration of the personal relationship between Plaintiff and the late Professor Lawrence Bogorad ("Bogorad"); and (3) the discovery of confidential and irrelevant documents belonging to Bogorad's estate ("Estate Documents"). The proposed protective order properly limits the scope of discovery and protects the Defendants from discovery tactics designed to hurt and harass the Defendants.

A.    **Background and Need for a Protective Order**

Plaintiff has asserted claims against Defendants for breach of contract and estoppel based on Bogorad's alleged commitment to pay (1) one-half the capital gains tax consequence incurred as a result of the sale of her Manhattan apartment located at 170 East 87th Street in New York City ("87th Street Apartment"); (2) the cost of the renovations and the architect's fee for her new Manhattan apartment located at 1050 Fifth Avenue in New York City ("Apartment"); (3) past and future monthly maintenance charges for the Apartment; and (4) one-half the storage fees incurred as a result of the renovations of the Apartment. Plaintiff also seeks damages for the Defendants' alleged breach of the purported terms of the oral contract by selling Bogorad's home in Lexington, Massachusetts, which required the Plaintiff to assume temporary housing during the renovations of the Apartment. Defendants vigorously deny the validity of any of these claims.

There is no dispute that the Plaintiff was Bogorad's mistress. Bogorad's wife, Rosalyn Bogorad, developed Alzheimer's Disease that required her admission into a residential nursing facility in early 1998. Bogorad then introduced the extra-marital relationship to the Defendants and other family members and, subsequently, the Plaintiff attended various family functions and vacations. Out of respect for their mother and father, Defendants never inquired about the extent or duration of the relationship.

Defendants' Document Requests were served on October 5, 2005. Defendants received Plaintiff's responses to the Defendants' Document Requests on November 22, 2005. Plaintiff

produced, among other items and in duplicate, real estate documents,[1] checks from Bogorad to Plaintiff and Bogorad's check registers evidencing such gifts to the Plaintiff, proposals, contracts and payments by Plaintiff related to the renovation of the Apartment,[2] and various amicable emails among Defendants and Plaintiff related to the disposal of Bogorad's professional and personal effects.

Defendants' depositions were scheduled for January 19, 2006 and January 20, 2006. Prior to the Defendants' depositions, Plaintiff's counsel informed Defendants' counsel that two days might be required to complete questioning. Defendants agreed to be available for additional questioning if necessary.

On January 18, 2006, the day before the deposition of Leonard Bogorad ("L. Bogorad") and two days before the deposition of his sister, Kiki Bogorad-Gross ("K. Bogorad-Gross"), Plaintiff served a belated document production, guised as a "supplemental" document production, consisting of two documents that are, together, five pages thick. The first document is a two-page love letter dated March 11, 1998, from Bogorad to Plaintiff ("March 11 Letter"), which, out of respect for all parties to this case and the Bogorad family, Defendants are not annexing to this memorandum. The second document appears to be a list of apartment-related expenses from 2000, well before any of the alleged claims in this case arose. The latter document, clearly irrelevant to this action, served as an unwitting accomplice to the production of the March 11 Letter, where, among other amorous rhetoric, Bogorad purportedly confesses to

---

[1] Included within the real estate documents is Plaintiff's application to 1050 Fifth Avenue, Inc., the cooperative board of the Apartment, where Plaintiff avers that she is the sole purchaser of the Apartment, the sole applicant to the board, the sole shareholder of the cooperative shares, and the sole intended occupant of the Apartment.

[2] Notably, all contracts and proposals related to the renovation of the Apartment are directed solely to Plaintiff.

Plaintiff that his "life began when he found [Plaintiff]." Defendants had not seen or heard of the March 11 Letter before its production on the eve of their depositions.

On January 19, 2006, at L. Bogorad's deposition, despite his acknowledgment of the authenticity of the March 11 Letter and his multiple declarations of his sadness upon reading it, Plaintiff's counsel persisted in directing annoying, harassing, embarrassing and oppressive questions to L. Bogorad related to the March 11 Letter. The relevant portions of L. Bogorad's deposition are attached hereto as **Exhibit A.** Nothing in the March 11 Letter, of course, has anything to do with the issues framed by the pleadings in this case.

Similarly, on January 20, 2006, at K. Bogorad-Gross' deposition, despite her acknowledgement as to its authenticity and multiple declarations of its emotionally disturbing and destructive contents, Plaintiff's counsel also persisted in directing a litany of annoying, harassing, embarrassing, oppressive and very personally distressing questions to K. Bogorad-Gross relating to the March 11 Letter. The relevant portions of K. Bogorad-Gross' deposition are attached hereto as **Exhibit B.**

Following the Defendants' depositions, Plaintiff noticed Defendants that additional time was needed to complete their depositions. In addition, Plaintiff noticed the depositions of L. Bogorad's wife, Cynthia Bogorad, and K. Bogorad-Gross' husband, James Gross. Defendants tentatively agreed, pending the early completion of Defendants' principal counsel's trial on another matter, to make L. Bogorad and Cynthia Bogorad available on February 13, 2006 and K. Bogorad-Gross and James Gross available on February 15, 2006.

During a February 3, 2006 telephone call between the parties, Plaintiff's counsel expressed concern that certain Estate Documents had not been produced. Prior to the commencement of this action, Defendants' prior counsel had sent Plaintiff's counsel various

Estate Documents. The only Estate Document relating to Plaintiff, the Third Amendment to the 1997 Lawrence Bogorad Revocable Trust,[3] was produced to Plaintiff on November 30, 2005. All other Estate Documents are irrelevant to this action. During this same phone call, Defendants learned that the Plaintiff had yet additional belated document productions. Specifically, the third belated document production would contain various Estate Documents (the same Estate Documents that Plaintiff alleged the Defendants were required to produce) and Plaintiff's fourth belated production would contain photographs of the family vacations that Plaintiff attended. Plaintiff also noted that three boxes, contents unknown, were being stored at a friend's house "in Massachusetts" ("Boxes"). Plaintiff maintained that the Boxes were not in her possession, custody or control because the homeowners are away for the winter and all attempts to contact them had not been successful.[4] Plaintiff believes that the Boxes contain items belonging to her deceased parents, but refuses to provide any assurance that the contents do not contain documents responsive to Defendants' Document Requests.

Following the conversation of February 3, Defendants' counsel instructed Plaintiff's counsel by email to "[p]encil in 2/13/06 for Cindy/Len and 2/15/06 for Jim/Kiki on the condition that there will no more surprise document productions the day before a deposition." A true and accurate copy of the February 3 email is attached hereto as **Exhibit C.** Plaintiff's counsel responded on February 7, 2006 that "[a]lthough I do not expect any additional documents, I will

---

[3] The Third Amendment to the Lawrence Bogorad Revocable Trust provides the Plaintiff with a 1/6 interest in the Lawrence Bogorad Revocable Trust. Plaintiff's 1/6 interest, which vests upon the death of Bogorad's wife, is believed to be worth approximately $600,000.

[4] Plaintiff's counsel notified Defendants' counsel on February 10, 2006, that Plaintiff had reached the homeowners and secured arrangements to have another family member make the documents available to Plaintiff "as soon as possible." This development does not change the scope of this motion as Defendants still request that this Court preclude further depositions until the Plaintiff can guarantee that there will be no further surprise document productions.

make any supplemental productions as I receive them pursuant to our discovery obligations." A true and accurate copy of the February 7 response is attached hereto as **Exhibit D**.

On February 3, 2006, Plaintiff served the third belated document production, again masked as a "supplemental" document production, which included two more love letters between Bogorad and Plaintiff and two love poems from Bogorad to Plaintiff. The letter, dated March 27, 1998, from Bogorad to Plaintiff ("March 27 Letter") contains coquetries similar to the March 11 Letter, with the addition of Bogorad's admiration of a part of Plaintiff's anatomy. The posthumous letter, dated June 14, 2004, from Plaintiff to Bogorad ("June 14 Letter") - six months <u>after</u> his death - contains Plaintiff's own lovelorn warblings.

Again, out of respect for the Defendants,' their families, and others who knew Bogorad, neither the March 27 Letter nor the June 14 Letter are being annexed to this memorandum. Suffice it to say, however, that there is nothing in either letter that has one whit of relevance to the legal issues – contract, promissory estoppel, and so forth – that are to be resolved in this case. Instead, their production can have but a single, intended purpose: to bring additional grief, embarrassment, pain and anguish to the Defendants and their families, who still mourn the passing of a great man who was their father, their father-in-law and, in the case of the Defendants' children, their beloved grandfather.

Subsequent to the review of the third belated document production, Defendants' counsel again requested a firm assurance that all responsive documents had been produced. Plaintiff's counsel refused, in part because the Plaintiff still intended to make the family photographs available for inspection[5] and Plaintiff could not recall the contents of the Boxes. Consequently,

---

[5] Such family photographs, while responsive to Defendants' Document Requests, also bear no relation to Plaintiff's claims and their production comports with Plaintiff's scheme to produce, in a piecemeal fashion, documents that are hurtful and intended to harass the Defendants.

Defendants' counsel informed Plaintiff's counsel that no more witnesses would be made available for depositions until all responsive documents had been produced.

**B.    Requested Relief**

The circumstances giving rise to parts of this motion are similar to those in <u>Circle Group Internet, Inc. v. Atlas, Pearlman, Trop & Borkson, P.A.</u>, No. 03 C 9004, 2004 WL 406988 (N.D. Ill. 2004) [hereinafter "<u>Circle Group</u>"].[6] In <u>Circle Group</u>, the district court found defendants' counsel's persistence in asking personal capacity questions that were outside the scope of the Rule 30(b)(6) notice oppressive. <u>See id.</u> at *2. The Rule 30(b)(6) notice identified three areas of questioning: (1) the accounts held in the plaintiff's name; (2) the receipt by the bank of a certain draft; and (3) the policies and rules governing the receipt of checks and drafts for deposits. <u>See id.</u> at *1. Defendants' counsel asked a line of questioning relating to the witness' personal relationship with a principal of the plaintiff corporation. <u>Id.</u> In its decision, the district court admonished counsel for <u>not</u> seeking a protective order pursuant to the harassing line of inquiry. <u>Id.</u> at *2.

The line of questioning that Plaintiff's counsel posed to the Defendants similarly exceeds the bounds of relevance. Therefore, Defendants respectfully request that the Court enter a protective order of the type attached as **Exhibit A** to Defendants' Motion for a Protective Order. The key features of the proposed order are as follows:

a.    Absent a certification from Plaintiff's counsel or an affidavit from the Plaintiff that all documents responsive to Defendants' Document Requests have been produced, further depositions by Plaintiff are precluded.

---

[6] <u>See also</u> <u>Wheeles v. Human Res. Sys., Inc.</u>, 179 F.R.D. 635 (S.D. Ala. 1998) (precluding plaintiff from inquiring into the sexual conduct of witnesses where plaintiff not prejudiced by discovery limitation and whatever little prejudice incurred could be cured by stipulation).

b.    Inquiries related to the extent and duration of the personal relationship between Plaintiff and Bogorad are precluded.

c.    Other than the Third Amendment to the 1997 Lawrence Bogorad Revocable Trust, any Estate Documents are confidential and irrelevant to this action and, therefore, discovery as to these documents is precluded.

Defendants' proposed protective order properly limits the scope of discovery and protects the Defendants from a piecemeal document production that is designed by the Plaintiff to hurt and harass the Defendants and their families. Such an arrangement is necessary and practical provided that Defendants have no way of knowing how unduly burdensome additional document productions might be. Furthermore, the proposed protective order seeks to shield Defendants and their spouses from annoying, embarrassing and oppressive questions relating to the relationship between Bogorad and the Plaintiff, an issue that is irrelevant to this action and one to which they have little knowledge. Plaintiff's right to seek information related to her breach of contract and estoppel action against the Defendants is in no way prejudiced by the relief requested.

REQUEST FOR ORAL ARGUMENT

KIKI BOGORAD-GROSS and
LEONARD P. BOGORAD, as
they are the Executors of the Will
of Lawrence Bogorad
By their attorneys,

February 10, 2006

/s/ Larry L. Varn_____
Larry L. Varn (BBO # 508130)
Lisa M. Hodes (BBO # 660444)
SULLIVAN & WORCESTER LLP
One Post Office Square
Boston, Massachusetts 02109
(617) 338-2800
lvarn@sandw.com
lhodes@sandw.com

<u>Certificate of Service</u>

I hereby certify that this document(s) filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non registered participants on February 10, 2006.

/s/  Lisa M. Hodes

# EXHIBIT A

L.Bogorad

1

Volume: I
Pages: 254
Exhibits: 1-15

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

CIVIL ACTION No. 04-12684-WGY

---------------------------------X
KATHLEEN P. MULLINIX,
                Plaintiff,
    Vs.

KIKI BOGORAD-GROSS and LEONARD P.
BOGORAD, as They are Executors
of the Will of Lawrence Bogorad,
                Defendants.
---------------------------------X

DEPOSITION of:  LEONARD P. BOGORAD
Date: Thursday, January 19, 2006
Time: 10:00 a.m.
Location: Choate, Hall & Stewart, LLP
            Two International Place
            Boston, MA  02110

--- REPORTER: Evelyn M. Slicius, CSR, RPR ---

K. L. GOOD & ASSOCIATES
Registered Professional Reporters
P.O. BOX 367
Swampscott, Massachusetts 01907
Tel. 781-598-6405  *  Fax. 781-598-0815

⬜K.L. Good & Associates

2

1        APPEARANCES:

2

3            CHOATE, HALL & STEWART, LLP
            (By Michelle L. Dineen Jerrett, Esq.)
                    Page 1

L.Bogorad

8    General Hospital, and at some point subsequent

9    to that he had, what you termed, a mental

10   breakdown.  Do you recall those questions?

11  A.   Yes.

12  Q.   And I believe that you also referenced a letter

13       that you saw last evening presumably with your

14       counsel?

15  A.   It was not with my counsel.  It had been sent

16       over to the counsel for the estate, and my

17       brother-in-law I guess received it yesterday

18       afternoon from the counsel, and I stayed at my

19       brother-in-law's house last night and so I saw

20       it from my brother-in-law.

21  Q.   Mr. Bogorad, I'm handing you what's been marked

22       as Exhibit 3 and ask you if you recognize this

23       document?

24  A.   Yes.

K.L. Good & Associates

59

1   Q.   What is it?

2   A.   It appears to be a handwritten letter from my

3        father to Kathy and dated March 11, 1998, at

4        5:20 a.m.

5   Q.   Is this the letter that you were just referring

6        to that you saw at your brother-in-law's house?

7   A.   Yes, it is.

8   Q.   Do you recognize the handwriting in the letter?

9   A.   Yes.  In general terms, it seems like my

10       father's handwriting.

11  Q.   Do you have any information that this is not

Page 51

L.Bogorad

12       your father's handwriting?

13   A.  No, I'm sure it is.

14   Q.  The letterhead on the photocopy, tell me if I'm

15       reading it correctly, is says the Department of

16       Molecular and Cellular Biology at Harvard

17       University?

18   A.  Correct.

19   Q.  Is that where your father worked?

20   A.  Yes.

21   Q.  And on the right side of the crest, underneath

22       that heading, it says, "Lawrence Bogorad" and

23       another individual's name with some contact

24       information for -- it appears -- an e-mail for

K.L. Good & Associates

K.L. Good & Associates

60

1        Mr. Bogorad; is that correct?

2    A.  Yes.

3            MR. VARN:  Actually, I don't think

4        that is --

5    A.  The other individual is the name of his chair.

6    Q.  So does this to your knowledge is this the

7        letterhead that your father used in his position

8        at Harvard University?

9    A.  I assume so, I'm not sure I ever saw it but I'm

10       sure it is correct.

11   Q.  Did you read this letter when you saw it last

12       night?

13   A.  Yes, I did.

14   Q.  Had you seen the letter before last night?

15   A.  No, I hadn't.

Page 52

L.Bogorad

16  Q.   What was your reaction after reading the letter?

17           MR. VARN:  Objection.

18           MS. DINEEN JERRETT:  Basis?

19           MR. VARN:  What possible relevance

20      does his reaction on January 19, 2006, have to

21      do with anything in this case?  I'm not

22      preventing him from answering, but I would like

23      to get to the issues in this case.

24  Q.   Mr. Bogorad --

K.L. Good & Associates        K.L. Good & Associates

61

1   A.   My reaction, I guess, I was somewhat taken aback

2        that this was received on the night before my

3        deposition; but other than that, I wasn't

4        particularly surprised by it, I guess.

5             You know, it certainly was

6        potentially, at least, consistent with

7        information that Ms. Mullinix had provided

8        and potentially indicating a longer term

9        relationship before the date that we had earlier

10       been aware of.

11            When I saw the date, it was obvious to

12       me that this was written at a time when he was

13       in the midst of quite a bit of emotional trauma

14       and roughly around the time of his breakdown and

15       so on, so it was a little hard to know how much

16       weight to give it.  But, you know, I was

17       certainly not happy to see something like this

18       in that respect, but that's not all that

19       surprising.

                    Page 53

L.Bogorad

20  Q.  When you say you weren't happy to see it in that
21      respect, what do you mean by that?
22  A.  I think it wouldn't be surprising for anyone to
23      think that as a child of two parents -- although
24      I was happy that my father had a nice

K.L. Good & Associates            K.L. Good & Associates

62

1       relationship after my mother was no longer
2       capable of doing that, even though she was still
3       alive, you know -- you always like to think of
4       your parents as being happily married and
5       faithful to each other and so on.
6               And the original letter from -- the
7       document from Kathy in the case, which I guess
8       was maybe August or something like that, and
9       then this letter, which was sort of consistent
10      with that, at least in part, you know, doesn't
11      make a child all that happy probably in normal
12      terms.  But I'm sure I am not the first child
13      who has had parents that were doing things that
14      he wouldn't want them to do.
15  Q.  After reading this letter, did you have a sense
16      that the relationship between your father and
17      Ms. Mullinix was a longer term relationship than
18      what you originally thought?
19              MR. VARN:  Objection.
20  A.  I mean, I think anybody can interpret the letter
21      as well as I could, it is supposition.  He does
22      refer to 22 plus years of memories, and I'm sure
23      that they knew each other for that long as she

Page 54

L.Bogorad

24          was a student of his originally.  At least that

☐K.L. Good & Associates

63

1     was my understanding from various sources,

2     particularly from her own documentation.  And I

3     think I probably heard at one point since we

4     were aware of their relationship that they first

5     met when she was a student.

6               But, you know, I think it is somewhat

7     ambiguous.  I don't know when this dance in

8     Puerto Rico was.  It sounded like that was the

9     time when they made the relationship known to

10    each other in a full-fledged fashion.  And if

11    that was a long time ago, then that would

12    indicate that it was a long-term relationship.

13    If not, it might have indicated that they had

14    affection for each other that they were not

15    revealing to each other, perhaps they were both

16    still married, but that is just supposition on

17    my part, anybody else's would probably be just

18    as accurate as mine would be, just trying to

19    read the words in.

20  Q.  Other than what you have testified to, did you

21      have any other reaction to reading this letter

22      that you haven't previously indicated?

23  A.  You know, obviously, it was a very passionate

24      letter and that he was, I think, trying to win

☐K.L. Good & Associates

64

Page 55

L. Bogorad

1      back her affections, it seemed like, just trying

2      to read between the lines.

3  Q.  Had you ever seen any letter that you described

4      as passionate from your father during his

5      lifetime?

6  A.  At some point, I guess after he died, I believe

7      we came upon letters, sort of love letters from

8      him to my mother, and I suppose you could say

9      they were of similar tone.

10  Q.  Would you characterize this as a love letter?

11            MR. VARN:  Objection.

12  A.  Yes.

13  Q.  And you previously indicated that, at least with

14      respect to your relationship with your father,

15      you did not routinely discuss feelings or

16      emotions.  Is that a fair characterization of

17      what you previously said?

18  A.  Yes.

19  Q.  Did this letter -- did you have a reaction to

20      this letter in the sense that it described

21      feelings and emotions?

22  A.  I mean, it certainly described feelings and

23      emotions, I would assume, that when he was in

24      love with someone he would have been a lot more

☐K.L. Good & Associates        K.L. Good & Associates

65

1      open about things like that than he was with

2      a son of his.  And, again, reminiscent of the

3      letters that we had seen to my mother which,

L.Bogorad

4    again, were of similar tone.

5    Q.    Did you have an understanding while your father

6          was alive that he was in love with Kathy

7          Mullinix?

8    A.    That would have been my assumption.  The

9          question is how you define that, I guess, but I

10         would say so, yes.

11   Q.    The letters that you found after your father's

12         death between your father and your mother, do

13         you have any recollection as to the dates of

14         those letters?

15   A.    I believe these were all before they were

16         married, when they were living with each other.

17         I suppose they didn't have much occasion to

18         write letters to each other, but this would have

19         been before they were married in the early

20         1940's, I guess.

21   Q.    We discussed a bit earlier that you became aware

22         in, I believe you said, December of 2002 that

23         your father wished to provide for Ms. Mullinix

24         in his estate plan; is that correct?

K.L. Good & Associates

OK.L. Good & Associates

66

1    A.    Correct.

2    Q.    And I believe you testified that it was an

3          e-mail that you received from your father?

4    A.    Correct.

5                MS. DINEEN JERRETT:  And this will be

6          marked as Exhibit No. 4.

7                (Exhibit No. 4, E-mail of 12-19-02

Page 57

EXHIBIT B

Kiki

1

Volume: I
Pages: 207
Exhibits: 1-13

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

CIVIL ACTION No. 04-12684-WGY


---------------------------------X
KATHLEEN P. MULLINIX,
              Plaintiff,
    Vs.

KIKI BOGORAD-GROSS and LEONARD P.
BOGORAD, as They are Executors
of the Will of Lawrence Bogorad,
              Defendants.
---------------------------------X


DEPOSITION of:  KIKI BOGORAD-GROSS
Date:  Friday, January 20, 2006
Time:  10:00 a.m.
Location:  Choate, Hall & Stewart, LLP
           Two International Place
           Boston, MA  02110


--- REPORTER: Evelyn M. Slicius, CSR, RPR ---


K. L. GOOD & ASSOCIATES
Registered Professional Reporters
P.O. BOX 367
Swampscott, Massachusetts 01907
Tel. 781-598-6405  *  Fax. 781-598-0815

ⓒK.L. Good & Associates

2

1        APPEARANCES:

2

3              CHOATE, HALL & STEWART, LLP
            (By Michelle L. Dineen Jerrett, Esq.)
                      Page 1

Kiki

10    Q.    What was your reaction to the letter?

11            MR. VARN:  Objection.

12    A.    I was surprised to see it, I guess, I don't know

13          why.  I guess I was disturbed by the idea that

14          the length of Kathy and my father's relationship

15          may have been longer than I would like to think.

16          And I would say dismayed that it was volunteered

17          at the time that it was, that it was presented

18          to us.

19    Q.    With respect to the last portion of your

20          comment, just so the record is clear, that was

21          my error in not disclosing that previously.  I

22          can understand that it is upsetting in that

23          respect, but I ask that you not attribute that

24          to my client and attribute that to me and I

K.L. Good & Associates

198

1          apologize for that.

2            MR. VARN:  You don't have to convert

3          yourself into an air raid shelter.

4    Q.    With respect to your first two statements, I'd

5          like to talk to you a little bit about those.

6            At any point prior to your father's

7          death, did you have an understanding as to the

8          length of his relationship with Ms. Mullinix?

9    A.    An understanding?  No.

10    Q.    What did you think was the length of your

11          father's relationship with Ms. Mullinix prior

12          to his death?

13    A.    I was -- I speculated what it was.  I don't know

14          what it actually was.

15    Q.    What was your speculation?

Kiki

16  A.  That they had known each other since they were
17      student and professor, so I knew that that was
18      the length of the relationship.  But I did not
19      know at what point it became a romantic
20      relationship.
21  Q.  Did you have any speculation as to the point
22      when it became a romantic relationship prior to
23      your father's death??
24  A.  No, I didn't have an exact time frame.

K.L. Good & Associates

199

1   Q.  I believe your brother testified yesterday that
2       he assumed that the romantic involvement between
3       your father and Ms. Mullinix occurred sometime
4       after your mother became ill; is that fairly how
5       he characterized it?
6   A.  Yes.
7   Q.  Did you share that assumption?
8   A.  I suppose so, yes.
9   Q.  At some point after your father passed away,
10      you became aware -- did you become aware that
11      Ms. Mullinix claimed that the relationship on
12      a romantic level was longer term than that?
13  A.  From the documents she produced, yes.
14  Q.  Other than from Ms. Mullinix's documents, or any
15      statements Ms. Mullinix may have made prior to
16      or subsequent to your father's death, did you
17      have any other source of information related to
18      the length of their romantic relationship?
19  A.  No.
20  Q.  Is it fair to say that based upon what

Page 170

Kiki

21      Ms. Mullinix claimed after your father's death,

22      that she and your father began a romantic

23      relationship in 1975?

24   A.   I don't know if that is what she said.

K.L. Good & Associates

200

1   Q.   Do you recall a date --

2   A.   I don't recall the exact date, but that seems to

3      be in keeping with what she said.

4   Q.   I will make a representation to you, if my

5      statement is incorrect it will subsequently be

6      born out in documents, but my representation to

7      you is that Ms. Mullinix has claimed that her

8      romantic relationship with your father began in

9      November of 1975.

10   A.   Okay.

11   Q.   And you were aware of that allegation prior to

12      receiving this letter, correct?

13   A.   Correct.

14   Q.   When you indicated that you were surprised by

15      the length of the relationship upon reading this

16      letter, explain why you were surprised?

17   A.   I guess I was surprised -- surprised maybe is

18      not the correct word -- the -- for my father --

19      to see it in my father's handwriting was

20      disturbing to me.

21   Q.   And based upon the letter that has now been

22      marked as Exhibit 10 and the atatements that

23      Ms. Mullinix has made, do you dispute that they

24      had a long-term romantic involvement sometime in

K.L. Good & Associates

201

Page 171

Kiki

1    the 1970s forward?

2             MR. VARN:  Objection.

3    A.   No.

4    Q.   Is the disturbed part of your reaction to

5         Exhibit 10 because, as your father's daughter,

6         you didn't want to believe that he had such a

7         long-term relationship with someone other than

8         your mother?

9             MR. VARN:  Objection.  You really

10        don't need to answer that, that has nothing to

11        do with this case.

12             If you're going to pursue this line

13        of questioning, this has one and only one

14        calculated purpose, as was the belated

15        production of that document on the eve of

16        these depositions.  We are not going there

17        any more.

18             MS. DINEEN JERRETT:  There was no

19        purpose in being a little late for the

20        production of the documents.  I have explained

21        on and off of the record that of the belated

22        production was my error, and it had nothing to

23        do other than that.  I'm entitled to ask

24        questions about your client's reaction to the

OK.L. Good & Associates

202

1    document.

2             MR. VARN:  And you have and she has

3         given it to you.  We are not going to do this

4         any more.  If we have to go to Judge Young,

5         we'll go.  But this has zero relevance and I'm

Page 172

Kiki

6     not going to argue with you about it.

7              MS. DINEEN JERRETT:  I'm not going to

8     argue about it either.  If you are instructing

9     your client not to answer the question and you

10    are intending to go to Judge Young, then we'll

11    suspend the deposition right now.

12             MR. VARN:  Well, it is about our

13    agreed-upon quitting time anyway.

14             MS. DINEEN JERRETT:  Is it your

15    intention to suspend the deposition and go to

16    Judge Young.

17             MR. VARN:  If you're going to ask any

18    more queston along this line, absolutely.

19             MS. DINEEN JERRETT:  Okay.  I intend

20    to ask questions about this letter, which is

21    what I'm doing.

22             MR. VARN:  Then we'll take it up with

23    Judge Young in due course.

24             MS. DINEEN JERRETT:  Okay.  The

OK.L. Good & Associates

203

1     deposition is suspended.

2              (Discussion off the record.)

3              MS. DINEEN JERRETT:  Back on the

4     record.

5              I have just indicated, based upon a

6     conversation on the record with Mr. Varn, that

7     the deposition would be suspended.  Mr. Varn has

8     indicated that he would seek intervention from

9     Judge Young and we'll address that issue

10    obviously once we suspend.

11             I want it clear on the record,

Page 173

Kiki

12      however, that not only do I have continuing

13      questions about Exhibit 10, but I have marked

14      three additional Exhibits that I have not yet

15      questioned the witness about and that I do have

16      other questions for the witness that are

17      unrelated to Exhibit 10.

18              MS. DINEEN JERRETT:  Is there anything

19      you want to add, Mr. Varn?

20              MR. VARN:  No.  We reserve all of our

21      rights and privileges.

22

23              (Whereupon, the deposition was

24      suspended at 2:50 p.m.)

K.L. Good & Associates

                                                    204

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

EXHIBIT C

## Hodes, Lisa M.

**From:** Hodes, Lisa M.
**Sent:** Friday, February 03, 2006 5:57 PM
**To:** 'Dineen Jerrett, Michelle L.'
**Subject:** Mullinix v. Bogorad-Gross, et al.

Michelle:

Regarding the action items from our phone call this morning:

1. Pencil in 2/13/06 for Cindy/Len and 2/15/06 for Jim/Kiki on the condition that there will no more surprise document productions the day before a deposition;

2. Per Paragraph 5 of the Protective Order, we will agree to our clients and yours signing a nondisclosure agreement. I assume you will want Cindy and Jim to sign one as well. We can re-store your paragraph 5.

I will be in touch with Kiki and Len shortly to discuss any supplemental document production they may have, but, as I said earlier, I don't expect much.

Thanks,
Lisa

## Lisa M. Hodes
**Attorney At Law**

Sullivan & Worcester LLP
One Post Office Square
Boston, MA 02109

T  617 338 2426
F  617 338 2880
lhodes@sandw.com
www.sandw.com

**BOSTON  NEW YORK  WASHINGTON, DC**

# EXHIBIT D

**Hodes, Lisa M.**

| | |
|---|---|
| **From:** | Dineen Jerrett, Michelle L. [MDineenJerrett@choate.com] |
| **Sent:** | Tuesday, February 07, 2006 2:49 PM |
| **To:** | Hodes, Lisa M. |
| **Subject:** | Re: Mullinix v. Bogorad-Gross, et al. |

Lisa-
Sorry I have not had a chance to respond to this yet.  I am planning for Cynthia's deposition on Monday 2/13 (with the continuation, hopefully, of Leonard thereafter), and Jim's on 2/15 (with the same hopeful continuation of Kiki thereafter).  Although I do not expect any additional documents, I will make any supplemental productions as I receive them pursuant to our discovery obligations.

I will be in touch tomorrow regarding the confidentiality agreement.  As an initial response, however, I do not see any reason why Cynthia or Jim need to see Confidential Materials.  Perhaps you could provide a justification?

I'll be in touch tomorrow.  Thanks.
Michelle


-----Original Message-----
From: Hodes, Lisa M. <lhodes@sandw.com>
To: Dineen Jerrett, Michelle L. <MDineenJerrett@choate.com>
Sent: Fri Feb 03 17:56:51 2006
Subject: Mullinix v. Bogorad-Gross, et al.


Michelle:

Regarding the action items from our phone call this morning:

1. Pencil in 2/13/06 for Cindy/Len and 2/15/06 for Jim/Kiki on the condition that there will no more surprise document productions the day before a deposition;

2. Per Paragraph 5 of the Protective Order, we will agree to our clients and yours signing a nondisclosure agreement. I assume you will want Cindy and Jim to sign one as well. We can re-store your paragraph 5.

I will be in touch with Kiki and Len shortly to discuss any supplemental document production they may have, but, as I said earlier, I don't expect much.

Thanks,
Lisa

Lisa M. Hodes
Attorney At Law

Sullivan & Worcester LLP
One Post Office Square
Boston, MA 02109

T     617 338 2426
F     617 338 2880
lhodes@sandw.com
www.sandw.com

BOSTON   NEW YORK   WASHINGTON, DC


This message is intended to be confidential and may be legally privileged.  It is intended solely for the addressee.  If you are not the intended recipient, please delete this

1

message from your system and notify us immediately.  Any disclosure, copying, distribution or action taken or omitted to be taken by an unintended recipient in reliance on this message is prohibited and may be unlawful.

Communications from our firm may contain or incorporate federal tax advice.  Under recently promulgated US Internal Revenue Service (IRS) standards, we are required to inform you that only formal, written tax opinions meeting IRS requirements may be relied upon by taxpayers for the purpose of avoiding tax-related penalties.  Accordingly, this communication is not intended or written to be used, and it cannot be used, for the purpose of avoiding tax-related penalties under the Internal Revenue Code.  Please contact a member of our law firm's Tax Department if you require a formal, written tax opinion that satisfies applicable IRS requirements, or if you have any other questions regarding federal tax advice.

*************************************************************************
This Message is transmitted to you by the law firm of Choate, Hall & Stewart LLP.  The substance of this message, along with any attachments, may be confidential and legally privileged.  If you are not the designated recipient of this message, please destroy it and notify the sender of the error by return e-mail or by calling 1-800-520-2427.

Under regulations of the Treasury Department, we are required to include the following statement in this message: Any advice contained herein (or in any attachment hereto) regarding federal tax matters was not intended or written by the sender to be used, and it cannot be used by any taxpayer, for the purpose of avoiding penalties that may be imposed on the taxpayer.

For more information about Choate, Hall & Stewart LLP, please visit us at choate.com
*************************************************************************