UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____

| | |
|---|---|
| KATHLEEN P. MULLINIX, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civil Action No. 04-12684-WGY |
| | ) |
| KIKI BOGORAD-GROSS and LEONARD P. | ) |
| BOGORAD, As They Are Executors of the Will of | ) |
| Lawrence Bogorad, | ) |
| | ) |
| Defendants. | ) |
| | ) |

_____

## PLAINTIFF KATHLEEN P. MULLINIX' OPPOSITION TO DEFENDANTS' MOTION FOR PROTECTIVE ORDER

### I. Introduction

Plaintiff Kathleen P. Mullinix ("Mullinix" or the "Plaintiff"), by and through her counsel, hereby submits this opposition to Defendants' Motion for a Protective Order (the "Motion").  The Motion should be denied because Defendants have identified no reason warranting an exemption from the normal rules of discovery.  Rather, Defendants' Motion is an attempt to extract a certification from counsel, or an affidavit from counsel's client, regarding the completeness of document productions in this case – a request which is entirely without support or foundation.  Moreover, Defendants make this request in the face of their own incomplete document production.

The Defendants also seek a protective order precluding counsel from asking particular questions of the Defendants (and presumably other witnesses) regarding the nature and extent of the relationship between the Plaintiff and Lawrence Bogorad ("Bogorad"), the Defendants' deceased father.  Much as the Defendants would like to excise the Plaintiff's relationship with Bogorad from this litigation, the fact remains that their relationship is an integral part of the facts of this case.

Finally, the Defendants seek a protective order to avoid the production of relevant, non-privileged and responsive documents relating to the Bogorad's estate.  Defendants offer no support for their assertion that such documents are irrelevant to this litigation.  Moreover, Defendants' claim that the only "Estate Document" relating to the Plaintiff was produced is untrue, given that at least one other document relating to Bogorad's estate – namely, a health care proxy designating the Plaintiff as Bogorad's health care agent – has not been produced by Defendants.  Given the omission of at least one document relating to Mullinix, the Plaintiff is forced to question how many more non-privileged, responsive documents exist that the Defendants have refused to produce.

Defendants' Motion is nothing more than a blatant attempt to block Plaintiff's legitimate discovery efforts, and should be denied in its entirety.  The deadline for the close of fact discovery is quickly approaching and Defendants' attempts to frustrate Plaintiff's efforts to meet that deadline should not be tolerated.

## II. <u>Factual Background</u>

As Defendants concede in the Motion, there is no dispute that the Plaintiff and Bogorad were involved in a romantic relationship.  The Defendants indicate that "[o]ut of respect for their mother and father, [they] never inquired about the extent or duration of the relationship." Memorandum in Support of Motion for Protective Order ("Mem.") at p. 2.  Nevertheless, the Plaintiff asserts, and documents produced in discovery support, that she and Bogorad maintained a romantic relationship for over two decades.  Subsequent to Bogorad's wife's admission into a residential nursing facility in early 1998, Bogorad and the Plaintiff publicly disclosed their relationship, considered themselves to be and lived as if husband and wife – living together, traveling together, and attending family functions together.  It is precisely the nature, duration and

4046136_1

extent of the relationship between Bogorad and the Plaintiff that supports why Bogorad made certain commitments to the Plaintiff that are the subject of this lawsuit. That the Defendants would like to believe otherwise does not change that fact.

After March of 1998, the couple began living together, both at Bogorad's home in Lexington, Massachusetts and at the Plaintiff's apartment in New York City. Id. ¶ 9. The couple considered themselves to be, and lived as if, in a marital relationship with one another. Id. On or about July 1, 1999, the couple moved in together to a different apartment, on East 87th Street, in New York City that the Plaintiff purchased. Id. ¶ 11. Bogorad was instrumental in the Plaintiff's decision to purchase that apartment. Id. ¶ 10. During the entire time the couple lived at this apartment (and the entire time the Plaintiff owned it), Bogorad paid the monthly maintenance fees for the apartment. Id. ¶ 11. In or around the fall of 2002, the couple began discussing the Plaintiff selling her then-current apartment and purchasing another apartment closer to Fifth Avenue in New York City. Id. ¶ 13. In or around November 2002, the Plaintiff first saw an apartment located at 1050 Fifth Avenue in New York City (hereinafter, the "Apartment"). Id. ¶ 14. Bogorad wanted to look at the Apartment with the Plaintiff, but she declined because she felt the Apartment was too expensive, and would need extensive renovations. Bogorad told Mullinix that he would pay for the cost of the renovations. Id.

On or about February 7, 2003, after having learned that the price of the Apartment had been reduced, the couple visited the Apartment together. Ms. Mullinix continued to believe that the cost of the Apartment and the renovations was too expensive. Id. ¶ 16. Bogorad wanted the Plaintiff to purchase the Apartment and reiterated his commitment to pay for the cost of the renovations. Bogorad also told Mullinix that he would pay the monthly maintenance fees for the Apartment, just

3

as he had done with the East 87th Street apartment.  Id. ¶ 17.  During their first visit to the
Apartment together, Bogorad told the Plaintiff that he (1) believed it was a wonderful Apartment,
(2) wanted her to purchase it, and (3) would feel very reassured if she were living there in case
anything happened to him.  See Plaintiff's Responses and Objections to Defendants' First Set of
Interrogatories at Response to Interrogatory No. 3, attached hereto as Exhibit 1.

Despite the fact that Mullinix did not want to purchase the Apartment because of the costs
involved, Bogorad convinced her to do so by committing to her that he would (i) split evenly with
her the tax consequences that resulted from the sale of her prior apartment by reimbursing her for
one-half of that amount upon completion of her 2003 taxes; (ii) pay the monthly maintenance fees
for the Apartment by reimbursing her on a monthly basis; (iii) pay for the cost of the renovations to
the Apartment, by reimbursing her for the cost of the work and for the architect's fee as she incurred
those costs and fees; and (iv) split evenly with her the costs she incurred for storing the belongings
from the East 87th Street apartment until those belongings could be moved to the Apartment upon
completion of the renovations, by reimbursing her for one-half of the total storage costs, once a
final amount was determined.  Comp. ¶ 18.

Bogorad's commitment to pay for the monthly maintenance fees, as he had paid with respect
to the Plaintiff's East 87th Street apartment, the cost of the renovations, and to split the total storage
fee cost and the tax consequences was an integral part of the couple's decision to have Mullinix
purchase the Apartment.  Mullinix executed the Contract for Sale for the Apartment on or about
February 7, 2003, and closed on the purchase on or about June 10, 2003.  Id. ¶¶ 18, 22.  The couple
planned for renovations to the Apartment together, meeting with architects, discussing the plans and

4046136_1

shopping for ideas.  Id. ¶¶ 23-24, 27.  Bogorad was an active participant in the planning phase of the renovations to the Apartment.  Id. ¶ 27.

Unfortunately, prior to the completion of the renovation project to the Apartment, Bogorad passed away unexpectedly while on vacation with the Plaintiff, the Defendants and the Defendants' children.  The claims at issue in the Complaint arise from the commitments relating to the Apartment Bogorad made to the Plaintiff during his lifetime.

### III.  Procedural History

The Plaintiff filed this lawsuit on or about December 22, 2004, after a lengthy and unsuccessful attempt to resolve her claims against the estate with the Defendants.  Prior to filing her Complaint, and at the request of Defendants' prior counsel, the Plaintiff provided documentation in the form of copies of a small number of Bogorad's check registers and checks reflecting payments from him to the Plaintiff, as well as documents detailing the nature and extent of her claims with respect to the Apartment (hereinafter, the "Pre-Complaint Documents").  On or about October 5, 2005, the Defendants served Document Requests on the Plaintiff, and on or about October 7, 2005, the Plaintiff served Document Requests on the Defendants.  All parties responded to the opposing Document Requests on or about November 22, 2005.  The Plaintiff produced non-privileged documents responsive to Defendants' Discovery Requests, including without limitation all of the Pre-Complaint Documents she previously provided voluntarily to Defendants' prior counsel.  Interestingly, Defendants produced, inter alia, these same Pre-Complaint Documents that they had received from the Plaintiff prior to the start of litigation.

Thereafter, consistent with her continuing discovery obligations, the Plaintiff located a small number of additional responsive, non-privileged documents that she provided to her counsel.

4046136_1

Sometime during December 2005, Plaintiff's counsel verbally notified counsel for Defendants that a small number of additional documents would be produced.  <u>See</u> Affidavit of Michelle L. Dineen Jerrett, Esq. ("Aff.") ¶ 3 (attached hereto as <u>Exhibit 2</u>).  Plaintiff's counsel inadvertently did not produce these documents to Defendants' counsel.  <u>Id.</u> ¶ 5.  Defendants' depositions were scheduled for January 19 and 20, 2006.  In preparing for those depositions, Plaintiff's counsel realized that she had not previously produced two documents, consisting of 6 total pages, to Defendants.  <u>Id.</u> ¶ 6. Plaintiff's counsel immediately produced those documents to counsel for Defendants as soon as she recognized that the documents had not previously been produced.  <u>Id.</u> ¶ 7.  As described in Defendants' Memorandum, the first document is a two-page, handwritten love letter dated March 11, 1998 from Bogorad to Mullinix; the second document is a handwritten list of expenses.[1]  Upon receiving this supplemental document production, the Defendants neither requested a continuance of their depositions nor any additional time in which to review the documents.  <u>Id.</u> ¶ 8.

Subsequent to the Defendants' depositions, and again consistent with the Plaintiff's continuing discovery obligations, on February 3, 2006, the Plaintiff served another supplemental document production, consisting of various estate documents relating to Bogorad's estate that Plaintiff's counsel had received from Defendants' prior counsel, love letters and inscriptions in books from Bogorad to the Plaintiff, a letter written by the Plaintiff after Bogorad's death, and

---

[1]    Although Defendants contend that the latter document is "clearly irrelevant to this action," <u>see</u> Mem. at p. 3, Defendants requested production of "All Documents, including Electronic Data, upon which You rely to support, or that contain any evidence or other information Concerning, the allegation in paragraph 12 of the Complaint that '[i]n addition, [Bogorad] paid for one-half of the cost of purchasing new furniture for the [East 87th Street Apartment] and [You] paid the other one-half of the cost.'"  <u>See</u> Defendants' First Request for Production of Documents by Plaintiff ("Defendants' Document Request") at Request No. 6, attached hereto as <u>Exhibit 3</u>.  The Plaintiff complied with her discovery obligations and produced responsive, non-privileged documents, including the list of expenses, pursuant to the request made by the Defendants.

various email communications and other documents relating to Bogorad.[2]  As with the other

documents produced by the Plaintiff in this case, all of the documents are responsive to Defendants'

Document Requests, including without limitation, the request calling for "All documents, including

Electronic Data, concerning Bogorad."  See Exhibit 3 at Request No. 36.

During a telephone conversation with Defendants' counsel just prior to the February 3, 2006

supplemental production, counsel for the Plaintiff explained that, given the volume of photographs

of Bogorad and various of his family members, copies of the photographs would not be produced to

the Defendants but that they would be made available for inspection.[3]  During this same telephone

call, Plaintiff's counsel also explained that there were a small number of boxes, then outside of the

Plaintiff's possession, custody, or control, that the Plaintiff had been unable to review to determine

if they contained any responsive, non-privileged documents.  Plaintiff's counsel represented to

Defendants' counsel, however, that the boxes were believed to contain items from the Plaintiff's

mother (who had passed away a few months prior to Bogorad) and that they were highly unlikely to

contain any responsive, non-privileged documents.  Plaintiff's counsel formalized these

representations in a cover letter accompanying the February 3, 2006 supplemental production.  See

Cover letter dated February 3, 2006 from Michelle L. Dineen Jerrett, attached hereto as Exhibit 4.

---

[2]     Defendants fail to mention in the Motion or Memorandum that, prior to February 3, 2006, Plaintiff's counsel had alerted their counsel that additional responsive, non-privileged documents were located and would be produced. Defendants repeatedly mischaracterize this February 3, 2006 supplemental document production as "the third belated document production."  In fact, the Plaintiff has made two supplemental document productions – one on January 18, 2006 and the second on February 3, 2006.  As Defendants' counsel well knows, parties are under a continuing obligation to supplement discovery pursuant to Fed. R. Civ. P. 26(e), and the Plaintiff has complied – and will continue to comply – in all respects with those requirements.

[3]     Although recognizing that photographs are "responsive to Defendants' Document Requests," Defendants nevertheless argue that they "bear no relation to Plaintiff's claims and their production comports with Plaintiff's scheme to produce, in a piecemeal fashion, documents that are hurtful and intended to harass the Defendants."  See Mem. at p. 6, n.5.  If the Defendants did not want photographs to be produced, then they should not have requested them in their Document Requests.  More importantly, Defendants have articulated no basis for their outrageous claim that the Plaintiff is engaged in any "scheme to produce, in a piecemeal fashion" hurtful and harassing documents.

During the February 3, 2006 telephone call, and in the follow-up letter of the same date, Plaintiff's counsel expressed concern as to why certain of the documents being produced by the Plaintiff had not also been produced by the Defendants, namely the documents relating to Bogorad's estate. Plaintiff's counsel also inquired about the existence of photographs that would be responsive to the Plaintiff's discovery requests,[4] and sought confirmation that all non-privileged documents relating to the Plaintiff had been produced.[5]

Despite the representations from the Plaintiff's counsel regarding document production, Defendants' counsel thereafter refused to produce for depositions the Defendants (for continued depositions) and their spouses whose depositions had been subpoenaed, "absent a certification from [counsel] or an affidavit from [the Plaintiff] that all documents responsive to our defendants' document requests have been produced." See email communication between Lisa M. Hodes and Michelle L. Dineen Jerrett, attached hereto as Exhibit 5. Thereafter, Plaintiff's counsel also updated Defendants' counsel on Plaintiff's efforts to reach the homeowners where the boxes were located, and indicated on February 10, 2006 that Plaintiff had reached the homeowners (who were in Florida) and made arrangements with the homeowners to have another family member permit Mullinix access to the home over the coming days. Plaintiff's counsel memorialized this representation – along with yet another representation that all responsive, non-privileged documents then in the Plaintiff's possession, custody, or control, with the exception of the photographs which

---

[4]     At some later point, Defendants' counsel indicated that her clients would have to begin reviewing photographs and inquired whether she should have them do so. For counsel so concerned about casting stones regarding document production, the Defendants' production to date has been deficient at best.

[5]     Notably, the Plaintiff is not seeking any "certification" from counsel nor an affidavit from Defendants regarding their document production; rather, given the documents that were in the Plaintiff's possession, custody or control that would appear to also be in the Defendants' possession, custody or control, the Plaintiff simply has requested confirmation that all non-privileged documents relating to the Plaintiff have been produced. To date, Defendants have not responded to this request.

would be made available for inspection had been produced – in an email from the same date.  See email from Michelle L. Dineen Jerrett to Lisa M. Hodes dated February 10, 2006, attached hereto as Exhibit 6.

### III.  Argument

Fed.R.Civ.P. 26(1) "'confers broad discretion on the trial court to decide when a protective order is appropriate and what degree of protection is required.'"  Beals v. General Motors Corp., 1989 WL 384829 *1 (D. Mass.) (quoting Seattle Times Co. v. Rhinehart, 467 U.S. 20, 36 (1984)). As specified in Fed. R. Civ. P. 26(c), however, a showing of good cause is required to justify any protective order.  Anderson v. Cryovac, Inc., 805 F.2d 1, 7 (1st Cir.1986).  "A finding of good cause must be based on a particular factual demonstration of potential harm, not on conclusory statements."  Id.  The Defendants have failed to carry this burden.

The fact discovery deadline in this case is March 10, 2006.  Defendants' refusal to permit Plaintiff to take the depositions of individuals identified in their initial disclosures as well as the continued depositions of Defendants serves only to frustrate the discovery process.  In addition, Defendants' attempts to limit discovery – either by questioning of the Defendants regarding the duration and extent of the relationship between Bogorad and Mullinix, or by unilaterally determining that responsive, non-privileged documents relating to Bogorad's estate are irrelevant to this action – are equally unjustifiable attempts to block legitimate discovery by the Plaintiff.

**A.     The Motion Does Not Provide A Basis For Certification from Counsel or an Affidavit from the Plaintiff Regarding Compliance with Discovery Obligations.**

The Defendants' first argument in favor of a protective order is that further depositions of additional witnesses – including those identified by Defendants' in their Initial Disclosures – as well as the continued depositions of the Defendants, should be precluded "absent a certification from

9

Plaintiff's counsel or an affidavit from the Plaintiff that all documents responsive to Defendants' First Set of Document Requests . . . have been produced." Mem. p. 1. Defendants have provided not one single case or reference under which such a certification or affidavit is appropriate. In fact, it is unheard of.

Plaintiff's counsel repeatedly has acknowledged that the 5 pieces of paper constituting the first supplemental production were inadvertently not produced prior to January 18, 2006. In no way was the production designed as a way to "hurt and harass," "bring additional grief, embarrassment, pain and anguish to the Defendants and their families" (see Mem. at pp. 1, 6) or to gain some undefined strategic advantage as Defendants have alleged. See Exhibit 2 ¶ 9. Moreover, and more importantly, Plaintiff's counsel has represented repeatedly that all responsive, non-privileged documents in Plaintiff's possession, custody or control have been produced or, in the case of photographs, are available for inspection.[6] Despite these representations from Plaintiff's counsel, and the efforts by Plaintiff to gain access to the boxes outside of her possession, custody or control to ensure that there were no responsive, non-privileged documents therein, Defendants' counsel has refused to permit Plaintiff to conduct further deposition discovery.[7]

Defendants have failed to provide even one case, rule, regulation or other citation wherein such a request for certification is appropriate. Their request, and the Motion for a Protective Order on such a basis, is outrageous. Such actions should result in sanctions against them. Moreover, as noted above, Defendants' own document production has been questionable at best. The Plaintiff

---

[6]    Since the time of the filing of the Defendants' Motion, Plaintiff has reviewed the contents of the boxes previously outside of her possession, custody or control. As had been indicated all along, the boxes contained items from the Plaintiff's mother and, more importantly, did not contain any responsive, non-privileged documents.

[7]    Moreover, even if Defendants' request were not so outrageous (which the Plaintiff denies), the Defendants sought certification of something that they knew neither counsel nor the Plaintiff could provide, given the existence of the boxes then-outside her possession, custody or control. In short, Defendants were asking for an impossibility.

has not demanded any type of certification or an affidavit from Defendants, but has requested confirmation that all responsive, non-privileged documents relating to the Plaintiff have been produced.  The Plaintiff submits that such a request is the appropriate protocol.

More importantly, unlike the Defendants, the Plaintiff has not hijacked the discovery process.  Recognizing the approaching fact discovery deadline, the Plaintiff has rearranged her schedule to accommodate the taking of her own deposition next week.  The Defendants, on the other hand, have refused to appear for continued deposition, or apparently to make any additional witnesses available for deposition, without any legitimate basis for doing so.  Accordingly, the Plaintiff requests not only that the Defendants' Motion be denied in its entirety, but also that the Court extend the fact discovery deadline to April 10, 2006 (to coincide with the expert discovery deadline in this case).

**B.     The Motion Does Not Provide A Basis For Limiting Questioning of the Defendants Regarding the Extent and Duration of the Relationship Between Bogorad and the Plaintiff.**

Defendants also seek to limit questioning regarding the extent and duration of the relationship between the couple.  Contrary to the Defendants' assertions, the extent and duration of the couple's relationship is at the very heart of the litigation.  It is precisely because of the nature, extent and duration of the relationship between the couple that Bogorad made the commitments with respect to the Apartment.  As Defendants are well aware, the duration of Bogorad's relationship with the Plaintiff is contained within at least one allegation in the Complaint.  That the Defendants could assert that the Plaintiff should be precluded from inquiring as to the Defendants' knowledge, understanding, and feelings about the extent and duration of the relationship is nothing less than absurd.

4046136_1

Even the case cited by Defendants in support of their Motion completely misses the mark. In Circle Group Internet, Inc. v. Atlas, Pearlman, Trop & Borkson, P.A., No. 03 C 9004, 2004 WL 406988 (N.D. Ill. 2004) (not a reported decision), **a case dealing with a witness subpoenaed for deposition pursuant to Fed. R. Civ. P. 30(b)(6)**, the court concluded that inquiring into a witness' personal or business relationship with the plaintiff company or one of its principals was outside the scope of the areas noticed for the deposition.  No such similar argument can be made here.  First, neither the Defendants nor their spouses who were subpoenaed for deposition are witnesses pursuant to Rule 30(b)(6).  In fact, the Defendants listed their spouses as fact witnesses in both their initial disclosures and discovery responses.  Second, this case is not a business dispute as was apparently the case in Circle Group.  Rather, this case arises out of the personal relationship between the Plaintiff and Bogorad, the commitments Bogorad made in the context of that relationship, and the Defendants' refusal to honor those commitments.  The Plaintiff is entitled to inquire about the Defendants' knowledge and feelings about her relationship with Bogorad, as those issues are central to this case as well as to any biases that may exist on the part of the Defendants. Accordingly, the Defendants' Motion on this basis should be denied in its entirety.

**C.     The Motion Does Not Provide A Basis For Limiting Production of Responsive, Non-Privileged Documents Relating to Bogorad's Estate.**

The Defendants' third component of their Motion seeks a protective order precluding the Defendants from having to produce responsive, non-privileged documents relating to Bogorad's estate.  The Defendants erroneously assert that (1) the *only* document in Bogorad's estate documents relating to the Plaintiff was the Third Amendment to the 1997 Lawrence Bogorad Revocable Trust, and (2) all other documents in Bogorad's estate are irrelevant to this case.  Mem. at p. 5.  First, the Plaintiff produced at least one other document relating to her – a health care proxy

4046136_1

designating the Plaintiff as Bogorad's agent for purposes of health care decisions – that to date has not been produced by the Defendants. See Health Care Proxy dated December 21, 2001, attached hereto as Exhibit 7. Certainly the Defendants cannot argue that this document does not relate to the Plaintiff. Yet, they have not produced it.

Second, especially in light of this omission, the Defendants' claim that all other documents relating to Bogorad's estate are irrelevant to this action is disingenuous at best. Frankly, the Defendants' unilateral assessment of what is "relevant" to this case – as evidenced by their Motion – is seriously flawed. The Defendants should not be permitted unilaterally to determine what is or is not relevant to this action in light of their apparent approach of sticking their heads in the sand as to the issues in the case. This third basis for attempting to thwart the Plaintiff's legitimate discovery efforts should not be tolerated.

## IV.    Conclusion

For the reasons stated above, the Plaintiff respectfully requests that the Motion for Protective Order be denied in its entirety, the court extend the fact discovery deadline to April 10, and award costs as appropriate.

Respectfully submitted,

KATHLEEN P. MULLINIX,
By her attorneys,

/s/ Michelle L. Dineen Jerrett
Larry C. Kenna (BBO # 267760)
Michelle L. Dineen Jerrett (BBO #634930)
CHOATE, HALL & STEWART
Two International Place
Boston, Massachusetts 02110
Tel: (617) 248-5000

Date:    February 24, 2006

4046136_1

## **CERTIFICATE OF SERVICE**

I hereby certify that on February 24, 2006, a copy of Plaintiff's Opposition to Defendants' Motion for Protective Order was served by email and first-class mail upon the attorney of record for the defendants.

/s/ Michelle L. Dineen Jerrett
Michelle L. Dineen Jerrett

14

4046136_1

# Exhibit 1

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| KATHLEEN P. MULLINIX,<br><br>Plaintiff,<br><br>v.<br><br>KIKI BOGORAD-GROSS and LEONARD P.<br>BOGORAD, As They Are Executors of the Will of<br>Lawrence Bogorad,<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Civil Action No. 04-12684-WGY |

## PLAINTIFF'S RESPONSES AND OBJECTIONS
## TO DEFENDANTS' FIRST SET OF INTERROGATORIES

Plaintiff Kathleen P. Mullinix ("Ms. Mullinix") responds as follows to Defendants' First

Set of Interrogatories to be Answered under Oath by Plaintiff (the "Interrogatories").

### GENERAL OBJECTIONS

1.      Ms. Mullinix objects to the "Definitions" and "Instructions" set forth in the

Interrogatories to the extent that those definitions and instructions purport to impose obligations

upon her greater than or inconsistent with the obligations imposed by the Federal Rules of Civil

Procedure.

2.      Ms. Mullinix objects to each specific interrogatory set forth in the Interrogatories

to the extent that it seeks information protected by the attorney-client privilege, the work product

privilege or any other privilege.  Ms. Mullinix relies upon and asserts any such privilege, and any

production of privileged information is inadvertent and is not to be deemed as a waiver thereof.

3.    Ms. Mullinix objects to each specific interrogatory set forth in the Interrogatories to the extent that they seek disclosure of financial information, including but not limited to federal or state tax returns, that enjoy a privilege under state and federal law. *See Town Taxi Inc. v. Police Comm'r of Boston*, 377 Mass. 576 (1979); *Cadrin v. Trans Spec Truck Serv., Inc.*, 17 Mass. L. Rptr. 121 (Mass. Super. 2003).

4.    Ms. Mullinix objects to the Interrogatories to the extent that they seek information not relevant to the subject matter of this litigation and not reasonably calculated to lead to the discovery of evidence admissible at trial.

5.    Ms. Mullinix generally objects to each individual Interrogatory to the extent that the time period covered by the Interrogatory is unlimited, arbitrary, overly broad or unduly burdensome.

6.    Except where specifically noted, Ms. Mullinix incorporates each of these general objections into each of her responses below as if set forth fully therein.

## SPECIFIC OBJECTIONS AND RESPONSES

**Interrogatory No. 1:**

Please identify each Person You intend to call as a fact witness at any hearing or trial of this action, including a summary of the information to which the Person is expected to testify.

**Response to Interrogatory No. 1:**

Ms. Mullinix states that discovery has just begun and she has not yet identified or confirmed fact witnesses. Subject to and without waiving the General Objections set forth above, Ms. Mullinix refers the Defendants to the individuals identified in her initial disclosures.

**Interrogatory No. 2:**

Please identify each Person You intend to call as an expert witness at the trial of this action, including (a) the name, home address, business address, and field of expertise; (b) the subject

2

matter on which he or she is expected to testify; (c) the substance of all facts and opinions to which he or she is expected to testify; and (d) a summary of the grounds for each such opinion.

**Response to Interrogatory No. 2:**

      Subject to and without waiving the General Objections set forth above, Ms. Mullinix

states that discovery has just begun and that she has neither confirmed that expert testimony will

be a part of her presentation, nor identified a suitable expert witness. Ms. Mullinix will amend

this Response when necessary in accordance with Federal Rules of Civil Procedure, and with the

scheduling order entered in this case.

**Interrogatory No. 3:**

Please describe the sequence of events Concerning the sale of the East 87th Street Apartment, including (a) a full and complete description of each Communication on this topic including the date it occurred, (b) the identity of each and every Person with whom You had any Communication Concerning, or who was involved in, the sale of the East 87th Street Apartment, and (c) the identity of each Document Concerning any of the foregoing.

**Response to Interrogatory No. 3:**

      Ms. Mullinix objects to Interrogatory No. 3 on the grounds that it is over broad, unduly

burdensome, and neither relevant to the subject matter of this action nor reasonably calculated to

lead to the discovery of admissible evidence. Ms. Mullinix further objects to the Interrogatory to

the extent it seeks information protected by the attorney-client privilege, the work-product

doctrine and other applicable privileges. Subject to and without waiving these objections and the

General Objections set forth above, Ms. Mullinix states that the following is her best present

recollection of the details asked for by these Interrogatories: In August or September of 2002,

Jeffrey Ascherman, M.D., who lived in the same building on East 87th Street as the couple, rang

the doorbell on a Saturday morning. Although the couple had never seen or met Dr. Ascherman

before, they invited him inside. Dr. Ascherman asked if the couple if they would consider

selling the apartment because he thought the apartment next door to theirs might come on the

3

market and if he could buy both of them, he would combine them and have much more space for his family than he had at the time. Ms. Mullinix told him that the apartment was not for sale, and he left. At that time, Mr. Bogorad told Ms. Mullinix that he thought it might be an interesting idea to sell the East 87th Street Apartment. Mr. Bogorad told Ms. Mullinix that he was not entirely comfortable with her being so close to 86th and Lexington Avenue.

The next time the couple was with Ms. Mullinix's sons, Mr. Bogorad described Dr. Ascherman's visit and asked Brendan Mullinix his opinion. Brendan said, and Mr. Bogorad agreed, that Ms. Mullinix should call Dr. Ascherman and inquire further about his interest in purchasing the East 87th Street Apartment. In or around October 2002, after several reminders from Mr. Bogorad, Ms. Mullinix called the Aschermans and said she would like to discuss the possible sale of the apartment to them. Dr. Ascherman may have visited the apartment another time when Mr. Bogorad was present, and Dr. Ascherman and/or his wife visited it several times between October 2002 and February 2003.

Mr. Bogorad talked again to Ms. Mullinix during this same time period about his desire for her to move between Park and Fifth because the neighborhood was safer and he wanted to be assured that she was in a safe place in case anything happened to him. He suggested that the couple talk with Brendan about it again and that Ms. Mullinix talk with Judith Durham, the realtor who assisted the couple when Ms. Mullinix purchased the East 87th Street Apartment. Thereafter, the couple spoke with Brendan who agreed that an apartment between Park and Fifth would be a much better location. In addition, Ms. Mullinix spoke with Ms. Durham and sought her advice about selling the East 87th Street Apartment.

In early November 2002, Ms. Mullinix and Ms. Durham began looking at apartments on the market. They went out a couple of times, and saw several apartments, including an

4

apartment at 1050 Fifth Avenue different from the one Ms. Mullinix ultimately purchased. At around the same time, Ms. Durham discussed with Ms. Mullinix that the apartment she eventually purchased was listed on the market. Both, however, agreed that it was out of Ms. Mullinix' price range and Ms. Mullinix indicated she did not want to look at it.

Just prior to Thanksgiving, Ms. Mullinix spoke again with the Ashermans and they began discussing price in general terms. Mr. Bogorad was very enthusiastic about Ms. Mullinix selling the apartment and encouraged her to continue the discussions with the Aschermans regarding price. At around the same time, Brendan Mullinix viewed the Apartment on the Internet and suggested that Ms. Mullinix go see it to compare it to the other apartment Ms. Mullinix saw in the building. On the day before Thanksgiving, Ms. Mullinix and Brendan saw the Apartment. Ms. Mullinix recognized it needed extensive renovations (in addition to the replacement of the windows and air conditioning units), and given the listing price, determined it was not something she was interested in pursuing. Mr. Bogorad told Ms. Mullinix he wanted to see the Apartment, but Ms. Mullinix declined indicating that the Apartment would be too expensive. Mr. Bogorad advised Ms. Mullinix to separate her thinking about purchasing the Apartment from the cost of the renovations because he would pay for the renovations and would continue to pay for the maintenance fees as he had done for the East 87th Street Apartment. Mr. Bogorad told Ms. Mullinix that if she were to use all of the proceeds from the sale of the East 87th Street Apartment, she could on her own fund the 50% down-payment (typically required by co-operative buildings) if she purchased an apartment in the range of $1 million to $1.5 million. He assured her that he would pay for the monthly maintenance fees and any renovations. Mr. Bogorad told Ms. Mullinix that he thought she should seriously consider the Apartment because it was at a great location, and expressly stated that (1) Ms. Mullinix should apply the proceeds of

5

the sale of the East 87th Street apartment to supply the cash down payment that was required, (2) he would pay the monthly maintenance fees as he had done with the East 87th Street Apartment, and (3) he would pay for the renovations, so she would only need to pay the mortgage.

Between Thanksgiving and Christmas, Ms. Mullinix met with the Aschermans a couple of times to continue discussions on price. When they could not reach an agreement, Ms. Mullinix informed Mr. Bogorad that she did not want to go forward, but Mr. Bogorad told her he thought she was making a mistake. The couple then went away on vacation and returned January 11, 2003. Several times during the trip, Mr. Bogorad reiterated to Ms. Mullinix his desire for her to sell the East 87th Street Apartment and move. When the couple returned from their trip, the Aschermans and Ms. Mullinix resumed discussions about the possible sale of the East 87th Street Apartment. On or about February 5, 2003, Ms. Mullinix entered into a contract for the purchase and sale of the East 87th Street Apartment with the Aschermans. Ms. Mullinix and the Aschermans subsequently closed on that sale on March 31, 2003. Under an agreement with the Aschermans, the couple continued to occupy the apartment until April 8, 2003, at which point their furniture was moved to a storage facility and the couple returned to the Lexington Home. Once the couple decided to sell the East 87th Street Apartment, they determined that they would have to store many of their belongings. Mr. Bogorad offered to pay the storage charges and Ms. Mullinix suggested that the couple split them evenly. Once the East 87th Street Apartment was sold and the couple made arrangements to store their belongings, Mr. Bogorad reiterated his promise to pay for half of the storage charges.

Shortly after the couple returned from their vacation, Ms. Durham informed Ms. Mullinix that the seller of the Apartment had changed real estate brokers, and reduced the price of the Apartment. Ms. Mullinix still believed the total cost of the Apartment was too much given the

6

needed renovations. Ms. Durham spoke with Ms. Mullinix again in early February 2003, indicated that there was another buyer interested in the Apartment, and suggested Ms. Mullinix make a decision quickly about whether to look at it again. When Ms. Mullinix informed Mr. Bogorad of those developments, he indicated he was coming to New York the next day to look at the Apartment.

On or about February 7, Mr. Bogorad and Ms. Mullinix met Ms. Durham at the Apartment to look at it together. When Mr. Bogorad walked into the living room and looked across the foyer to the dining room, he stated to Ms. Mullinix, in Ms. Durham's presence, "I want you to buy this apartment." At that point, he had not even seen the other rooms. The couple and Ms. Durham walked around the rest of the apartment, and Mr. Bogorad stated to Ms. Mullinix, "Let's go into the bedroom and talk." In the bedroom, Mr. Bogorad repeated that he thought it was a wonderful apartment, he would feel very reassured if Ms. Mullinix were living there in case anything happened to him. He said, "Let's face it, something is going to happen to me, and I want to know that you are in a really nice and safe place." Ms. Mullinix reiterated her belief that it would be too expensive by the time the renovations were done. Mr. Bogorad reiterated, "If you sell your apartment you can put the proceeds from the sale into the purchase and I'll pay for the renovations and the maintenance and all you will need to do is pay the mortgage."

The couple went back into the living room and began discussing the economics of the purchase and necessary renovation with Ms. Durham. Ms. Durham indicated that the seller's broker thought the renovation would cost approximately $250,000, but both Mr. Bogorad and Ms. Durham stated that they thought it was an unrealistically low estimate. Ms. Durham inquired whether the couple would consider purchasing the Apartment together, but Mr. Bogorad

7

indicated that he wanted the Apartment to be owned solely by Ms. Mullinix. Mr. Bogorad indicated, however, that he would pay the maintenance fees and would pay for the renovations. Ms. Durham indicated that they could decide whether or not to include Mr. Bogorad in some way on the co-op application if the offer was accepted.

In the couple's presence, Ms. Durham called the seller's broker and learned that another offer had been made, and possibly accepted, on the Apartment. Mr. Bogorad told Ms. Mullinix he believed she should increase her offer and Ms. Durham indicated that it was worth trying. Ms. Mullinix again expressed her concern about the cost of the Apartment and the needed renovations and Mr. Bogorad responded, "That's silly, if you wind up spending and additional $100,000 or $200,000, it doesn't make that much difference." Ms. Durham called the seller's broker and conveyed the increased offer. After multiple telephone calls between Ms. Durham and the seller's broker, during which Ms. Durham learned that the other prospective buyers had increased their bid, the seller's broker told Ms. Durham that the couple should submit a signed contract. Mr. Bogorad wanted to meet with an attorney as quickly as possible to prepare a contract. The attorney who handled Ms. Mullinix's purchase of the East 87th Street Apartment was out sick that day, so Ms. Durham recommended another attorney, Alan Kroll. The couple met with him that afternoon to prepare a contract. Mr. Kroll called the seller's attorney, Avron Brog, who indicated that Ms. Mullinix should assemble all of her financial information and meet him in his office a few days later, so that he could meet both prospective buyers individually and make a recommendation to his client. Mr. Bogorad was thrilled about the progress and reassured Ms. Mullinix throughout the weekend that the attorney would recommend her. On or about February 10, Ms. Mullinix met with Mr. Brog. That same day, Mr. Brog called Mr. Kroll and

8

indicated that Ms. Mullinix's offer had been accepted. Ms. Mullinix closed on the sale of the Apartment on or about June 10, 2003.

On or about February 27, 2003, Ms. Mullinix executed a document acknowledging that as a prospective purchaser of the Apartment, she was responsible for replacing all old windows with windows conforming to the building's master plan. In addition, the couple was made aware that the building had received approval to replace and enlarge the through-the-wall air conditioning units to be able to replace them with units that also provided a heating mechanism. The couple arranged for the replacement of the windows and air conditioning / HVAC units on their own and hired contractors to perform the work outside of the larger renovation project they anticipated. These projects were completed during the fall of 2003 by Skyline Windows, LLC and Hamilton Air. Ms. Mullinix paid for this work and Mr. Bogorad reimbursed her. The couple agreed that the $400,000 budget for the renovation project did not include the replacement of the windows and air conditioning / HVAC units.

Shortly after Ms. Mullinix's offer was accepted, when Ms. Durham and the couple prepared the Board package, Ms. Durham stated that she believed the couple should include Mr. Bogorad on the application as an occupant of the Apartment. To that end, Ms. Durham asked Mr. Bogorad for a copy of his curriculum vitae to be included in the package, which he supplied. The financial statements were prepared, however, with only Ms. Mullinix's assets as she was to be the sole owner of the Apartment. In reviewing the Board package with her supervisor, Ms. Durham and the supervisor discussed whether to include Mr. Bogorad as an occupant of the Apartment. After that discussion, Mr. Bogorad's name was removed from the Board application package because of the fact that Mr. Bogorad was married.

9

Shortly after Ms. Mullinix's offer was accepted, Mr. Bogorad suggested to Ms. Mullinix that they discuss the renovations with his friends, Raynor and Ranne Warner. Thereafter, in late February, the couple met the Warners at a restaurant in Arlington, MA to discuss the project. Everyone was very enthusiastic about the project; Mr. Warner said he would like to help if that were possible, and Mrs. Warner said that it would be great if the couple could somehow purchase Siematic kitchen cabinets from the same vendor as was doing her development project in Pawtucket, Rhode Island. The four agreed that Ms. Mullinix would take as exact measurements of the Apartment as she could, and Mrs. Warner suggested that they go to the Siematic showroom in Boston. Mr. Bogorad called Ms. Bogorad-Gross and asked her if she could arrange for the couple to get into the Boston Design Center. Ms. Bogorad-Gross made the arrangements and also arranged for them to visit two or three additional showrooms. When they visited the Boston Design Center, the couple met with Ms. Bogorad-Gross briefly in her office and discussed the project. The couple also went back to Siematic two or three additional times after the first visit.

Mr. Bogorad told Ms. Mullinix he thought she should identify construction people and/or architects in New York to look at the apartment and give advice about design and costs. During the time from March 2003 on, the couple spent a significant amount of time investigating various options for the design and materials for the renovation. They went to New Jersey with Brendan Mullinix to look at kitchen cabinets in a kitchen design place and went to a bathroom fixture place; they went to Expo in Burlington many times; they went to several kitchen places around Boston, and Mr. Bogorad went alone to a showroom on Route 9 in Framingham or Wellesley to look at cabinets that he had seen in one of the brochures that the couple had collected; and in March or April, the couple went to the design show at the Javits convention Center in New York.

10

As the spring went on, Ms. Mullinix arranged for several contractors who had been recommended by various acquaintances to come to look at the Apartment. Included among those individuals were Rudy Masupust Construction, Advanced Construction, Edward Dew, Howard Elliot, Todd Swigard, Bill Berg, Ronald Bently, and Joan Craig. In addition, Ms. Mullinix met with Hamilton Air Conditioning and Skyline Windows. By May 2003, the couple estimated that they should be able to get the renovations completed for $400,000, excluding the windows that were required by the co-operative board and the replacement of the heating/air conditioning units. Mr. Bogorad told Ms. Mullinix that they could take their time with the planning and the renovations because they could stay in the Lexington Home until the Apartment was ready. This was discussed by the couple in conversations with Kiki Bogorad-Gross' family over the months.

As the couple reviewed the information provided by the various people who had looked at the Apartment, a consensus was developing that the job would cost at least $400,000, in addition to the replacement of the windows and air conditioners that the couple arranged for independent of a contractor. Mr. Bogorad committed to pay for the renovation up to $400,000, although recognizing that constructions projects always cost more than initially agreed, Mr. Bogorad also told Ms. Mullinix that they would discuss additional costs. The couple also agreed that they would select all of the items for the renovation before the contract went to bid.

In or around June or July 2003, Mr. Warner traveled to New York to look at the Apartment and to think about the design. During this same time period, the couple had several conversations with Mrs. Warner about the kitchen cabinets, although due to delays in Mrs. Warner's project, it became clear that the cabinets for that project would not arrive in time for the couple's renovation project. Thereafter, Mr. Warner visited the couple in Lexington and

11

brought drawings and talked about design concepts. During his work it became clear that, due to the huge complexities of building anything in New York, it would not be possible for him to run the project from Boston and he suggested that the couple find a NY architect who would be primarily responsible for the job and he would act as an advisor. On or about July 11, 2003, Mr. Warner sent a proposal to Ms. Mullinix outlining the scope of his schematic design services for renovations to the Apartment. In addition, Mr. Warner contacted an architect friend in New York who recommended Heather Aman. Mr. Warner spoke with her by phone about the project about which she was very enthusiastic and arranged for her to meet with the couple, Brendan Mullinix and him at the Apartment. At Mr. Warner's suggestion, Ms. Mullinix checked out some of Ms. Aman's work in New York. Thereafter, the couple met with Mr. Warner, Ms. Aman and Brendan Mullinix to discuss the renovation plans. Prior to the meeting, and based upon the original projections and schematic from Mr. Warner, Ms. Aman estimated her fees based upon a total construction cost of approximately $300,000. When Ms. Aman first saw the Apartment and discussed the project with the couple, however, she discussed with the couple that the construction costs would be greater than $300,000 and informed them that with the more costly renovation project, her fee would also increase. Mr. Bogorad questioned her extensively about this and Ms. Aman explained that her construction estimate was roughly based upon a square footage calculation and that her fee was based upon the construction costs. Mr. Bogorad seemed particularly concerned about the corresponding increase in the architectural design service fee and questioned Ms. Aman about it. Ms. Aman indicted to Mr. Bogorad that when a construction cost increases by one-third, there is also an increase in the architectural design services fee. Mr. Bogorad was much more involved in these discussions with Ms. Aman than Ms. Mullinix was. On or about July 25, 2003, Ms. Mullinix and Ms. Aman signed a contract for

12

architectural design services to the Apartment and Ms. Mullinix paid $1,500 as a retainer for the project. Mr. Bogorad reimbursed Ms. Mullinix for this payment. Ms. Mullinix later paid an additional $1,500 retainer to Ms. Aman and Mr. Bogorad likewise reimbursed Ms. Mullinix for this payment.

During the course of the planning Ms. Aman had sent documents to the couple at the Lexington Home, and sent a final copy of the plans to Lexington via Federal Express. The couple took the plans to Mexico and planned to study them during the trip. On or about December 17, 2003, Ms. Aman sent the renovation plans to bid to three contractors, two of whom Ms. Aman previously had worked with and another with whom Ms. Mullinix had met. A contractor was ultimately selected and a contract was executed in or around March 2004.

Ms. Mullinix further refers the Defendants to her initial disclosures and the documents produced in response to Defendants First Set of Requests for Production of Documents by Plaintiff.

**Interrogatory No. 4:**

Please describe the sequence of events Concerning the purchase of the Fifth Avenue Apartment, including (a) a full and complete description of each Communication on this topic including the date it occurred, (b) the identity of each and every Person with whom You had any Communication Concerning, or who was involved in, the purchase of the Fifth Avenue Apartment, and (c) the identity of each Document Concerning any of the foregoing.

**Response to Interrogatory No. 4:**

Ms. Mullinix objects to Interrogatory No. 4 on the grounds that it is over broad, unduly burdensome and to the extent it seeks information protected by the attorney-client privilege, the work-product doctrine and other applicable privileges. Subject to and without waiving these objections and the General Objections set forth above, Ms. Mullinix refers the Defendants to Response to Interrogatory No. 3.

13

**Response to Interrogatory No. 13:**

Ms. Mullinix objects to Interrogatory No. 13 on the grounds that it is over broad, unduly burdensome and to the extent it seeks information protected by the attorney-client privilege, the work-product doctrine and other applicable privileges. Subject to and without waiving these objections and the General Objections set forth above, Mullinix refers the Defendants to the Complaint, specifically, paragraphs 18-34. Mullinix further refers the Defendants to documents produced in response to Defendants First Set of Requests for Production of Documents by Plaintiff.

KATHLEEN P. MULLINIX,

*Kathleen P. Mullinix*

As to objections:

Larry C. Kenna (BBO # 267760)
Michelle L. Dineen Jerrett (BBO # 634930)
Sara E. Solfanelli (BBO # 658018)
CHOATE, HALL & STEWART LLP
Two International Place
Boston, Massachusetts 02110
Tel: (617) 248-5000

Dated: November 22, 2005

I HEREBY CERTIFY THAT A TRUE COPY OF
THE ABOVE DOCUMENT WAS SERVED
UPON THE ATTORNEY OF RECORD FOR
EACH OTHER PARTY BY MAIL HAND ON:
November 22, 2005

Formatted: Font: 9 pt
Deleted: 4006212v3

4006212v3

# Exhibit 2

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

———————————————————————
|                                                          | )
| KATHLEEN P. MULLINIX,                                    | )
|                                                          | )
|         Plaintiff,                                       | )
|                                                          | )
|         v.                                               | )    Civil Action No. 04-12684-WGY
|                                                          | )
| KIKI BOGORAD-GROSS and LEONARD P.                        | )
| BOGORAD, As They Are Executors of the Will of            | )
| Lawrence Bogorad,                                        | )
|                                                          | )
|         Defendants.                                      | )
|                                                          | )
———————————————————————

## AFFIDAVIT OF MICHELLE L. DINEEN JERRETT

I, Michelle L. Dineen Jerrett, on oath depose as follows:

1.    I am an attorney licensed to practice law in the Commonwealth of Massachusetts.

2.    I am counsel for the Plaintiff, Kathleen P. Mullinix.

3.    Sometime during December 2005, I verbally notified Lisa Hodes, counsel for the Defendants, that my client had provided to me a small number of responsive, non-privileged documents that she had located subsequent to our initial document production on or about November 22, 2005.

4.    These documents consisted of a total of 6 pages.

5.    I inadvertently did not produce these documents to Defendants at that time.

−1−

4016775v1

6.     On January 18, 2006, during preparations for the upcoming depositions of the Defendants, I discovered that I had not produced the aforementioned documents that I had discussed with Attorney Hodes.

7.     I immediately had the 6 pages of documents Bates labeled and produced them via email and by regular mail to Defendants' counsel.

8.     At no time on January 18, or during the depositions of the Defendants during the two subsequent days, did Defendants' counsel request to postpone the depositions or request to have any additional time to review the documents.

9.     The supplemental production of the documents on January 18, 2006 was in no way designed to hurt, harass, bring additional grief, embarrassment, pain and/or anguish to the Defendants and/or their families, nor was it designed to gain some tactical advantage over the Defendants.

Signed under the pains and penalties of perjury this 24th day of February 2006.

/s/ Michelle L. Dineen Jerrett_____
Michelle L. Dineen Jerrett

4016775v1

# Exhibit 3

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| KATHLEEN P. MULLINIX,<br><br>　　　　Plaintiff,<br><br>　　　　v.<br><br>KIKI BOGORAD-GROSS and<br>LEONARD P. BOGORAD, as They<br>Are Executors of the Will of<br>Lawrence Bogorad,<br><br>　　　　Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

Civil Action
No. 04-12684-WGY

## DEFENDANTS' FIRST REQUEST FOR
## PRODUCTION OF DOCUMENTS BY PLAINTIFF

To:    Larry C. Kenna, Esq.
       Choate, Hall & Stewart LLP
       Two International Place
       Boston, MA 02110
          Attorney for Plaintiff

Pursuant to Fed. R. Civ. P. 34 and Local Rule 34.1 of this Court, Defendants and Counter-Plaintiffs Kiki Bogorad-Gross and Leonard P. Bogorad, as they are Executors of the Will of Lawrence Bogorad (collectively, "Defendants"), hereby request that Plaintiff, Kathleen P. Mullinix ("Plaintiff"), in accordance with the Instructions and Definitions set forth below, produce for inspection and copying all of the documents in her possession, custody or control that are identified or described below, at the offices of Sullivan & Worcester LLP, One Post Office Square, Boston, Massachusetts 02109 (Atten.: Larry L. Varn, Esq.), within thirty (30) days after service of this request.

## DEFINITIONS

Unless otherwise defined, all capitalized terms not otherwise defined herein shall have the meanings ascribed to such terms in Local Rule 26.5(C).

1.     "Mullinix" means and refers to Plaintiff, Kathleen P. Mullinix, and includes her attorneys, agents and other representatives.

2.     "You" or "Your" means and refers to Mullinix.

11.    These requests are continuing in nature. Any new or different Documents or tangible things discovered after the production of Documents in response to these requests should be produced thereafter within a reasonable time following such discovery.

12.    This request for production of Documents covers all Documents within Your possession, custody or control and includes Documents in the possession, custody or control of Your employees, agents, and attorneys.

## DOCUMENTS REQUESTED

1.    All Documents Concerning the purchase and sale of the apartment located at 975 Park Avenue to which reference is made in paragraph 9 of the Complaint.

2.    All Documents, including Electronic Data, Concerning the purchase and sale of the East 87th Street Apartment.

3.    All Documents, including Electronic Data, upon which You rely to support, or that contain any evidence or other information Concerning, the allegation in paragraph 10 of the Complaint that "[Bogorad] was instrumental in [Your] decision to purchase the [East 87th Street Apartment] and advised [You] on financial matters pertaining to the purchase."

4.    All Documents, including Electronic Data, upon which You rely to support, or that contain any evidence or other information Concerning, the allegation in paragraph 11 of the Complaint that "[Bogorad] paid the monthly maintenance fees on the [East 87th Street Apartment] during the entire time [You] owned it."

5.    All Documents, including Electronic Data, upon which You rely to support, or that contain any evidence or other information concerning, the allegation in paragraph 12 of the Complaint that "[Bogorad] paid for renovations to the [East 87th Street Apartment], which included refinishing the floors and some electrical work."

6.    All Documents, including Electronic Data, upon which You rely to support, or that contain any evidence or other information Concerning, the allegation in paragraph 12 of the Complaint that "[i]n addition, [Bogorad] paid for one-half of the coast of purchasing new furniture for the [East 87th Street Apartment] and [You] paid the other one-half of the cost."

7.    All Documents that identify the "neighbor" to whom reference is made in paragraph 13 of the Complaint

8.    All Documents, including Electronic Data, upon which You rely to support, or that contain any evidence or other information Concerning, the allegation in paragraph 13 of the Complaint that "[Bogorad] encouraged [You] to pursue those discussions."

9.    All Documents, including Electronic Data, upon which You rely to support, or that contain any evidence or other information Concerning, the allegation in paragraph 12 of the Complaint that "[Bogorad] told [You] that he wanted [You] to purchase an apartment closer to Fifth Avenue.

- 4 -

30. All Documents, including Electronic Data, Concerning the involvement of and Your Communications and dealings with, Heather Aman, in connection with the Fifth Avenue Apartment, including all Documents upon which You rely to support, or that contain any evidence or other information Concerning, the allegations in paragraphs 24 and 25 of the Complaint.

31. All Documents, including Electronic Data, upon which You rely to support, or that contain any evidence or other information Concerning, the allegation in paragraph 25 of the Complaint that "[Bogorad] committed to paying for the renovation project and the architect's fee, up to [$400,000.00]."

32. All Documents Concerning the "architecture plans" to which reference is made in paragraph 26 of the Complaint.

33. All Documents Concerning the "final architecture design plans" to which reference is made in paragraph 29 of the Complaint, including but not limited to all Documents Concerning Your and Bogorad's approval of such plans.

34. All Documents, including Electronic Data, Concerning, the involvement of and Your Communications and dealings with, McGraine Woodworking, Inc., in connection with the Fifth Avenue Apartment, including all Documents upon which You rely to support, or that contain any evidence or other information Concerning, the allegations in paragraph 32 of the Complaint.

35. All Documents, including Electronic Data, Concerning any and all payments made to You, on Your behalf or for Your benefit by the Defendants or by Bogorad.

36. All Documents, including Electronic Data, Concerning Bogorad.

37. All Documents, including Electronic Data, Concerning each Communication between You on the one hand, and Bogorad on the other.

38. All Documents, including Electronic Data, Concerning each Communication between You on the one hand, and either or both of the Defendants on the other.

39. All Documents, including Electronic Data, upon which You rely to support, or that certain any evidence or other information Concerning, each and every element of Your claims for damages in this action.

40. All Documents, including Electronic Data, Concerning each Communication to or from You on the one hand, and any Person on the other, relating to any of the subject matters of the preceding requests for Documents.

41. All Documents Concerning each litigation or arbitration proceeding to which You have been a party.

42. All Documents identified in response to Defendants' interrogatories served herewith.

KIKI BOGORAD-GROSS and
LEONARD P. BOGORAD, as
they are the Executors of the Will
of Lawrence Bogorad

By their attorneys,

October 5, 2005

_____

Larry L. Varn (BBO # 508130)
Lisa M. Hodes (BBO # 660444)
SULLIVAN & WORCESTER LLP
One Post Office Square
Boston, Massachusetts 02109
lvarn@sandw.com
(617) 338-2800

I HEREBY CERTIFY THAT A COPY OF THE ABOVE
DOCUMENT WAS SERVED UPON THE ATTORNEY OF RECORD
FOR EACH PARTY BY MAIL/HAND ON    10/5/05
_____
LARRY L. VARN (BBO # 508130)

- 8 -

# Exhibit 4

Michelle L. Dineen Jerrett
(617) 248-5261
mdineenjerrett@choate.com

February 3, 2006

**BY HAND DELIVERY**

Lisa M. Hodes, Esq.
Sullivan & Worcester LLP
One Post Office Square
Boston, Massachusetts 02109

      **RE:**   **Plaintiff's Supplemental Discovery -- <u>Mullinix v. Bogorad-Gross, et al.</u>**

Dear Lisa:

Enclosed please find the following supplemental documents produced in response to Defendants' First Request for Production of Documents, bearing bates labels "KPM 0166" through "KPM 0501." In addition, I have included a Privilege Log for a small number of documents withheld from production.

As I explained on the telephone, the volume of this supplemental production is a bit deceiving as many of the documents relate to Mr. Bogorad's estate and had been received by Choate, Hall & Stewart from attorneys at Rubin & Rudman prior to the filing of the action in federal court. You indicated you would get back to me to discuss why the same or similar documents have not been produced by your clients to date.

Also, as I mentioned during our discussion, the enclosed supplemental document production does <u>not</u> include photographs in my client's possession, custody or control that may be responsive to your clients' request for production of documents. Given the volume of photographs my client has, we will instead make those photographs available for your inspection at our offices. As I do not yet have possession of those photographs, kindly let me know whether you anticipate wanting to inspect them so that I can make arrangements to have my client send them to me. You also indicated during our telephone call that you would inquire with your clients about the existence of any photographs of Ms. Mullinix and Mr. Bogorad, including photographs from the vacations they took with your clients during the last few years of Mr. Bogorad's life. You also indicated you would confirm with your clients that they have produced <u>all</u> information relating to Ms. Mullinix that is in their possession, custody or control.

Finally, also as discussed, there are a small number of boxes presently not within my client's possession, custody or control that, accordingly, she has not had a chance to review to determine whether any responsive documents exist. I explained to you that the boxes are located in the basement of a friend's home in Massachusetts and that Ms. Mullinix has been

Two International Place l Boston MA 02110 l t 617-248-5000 l f 617-248-4000 l choate.com

Lisa M. Hodes, Esq.
February 3, 2006
Page 2

unable to reach the homeowners to obtain access to the boxes.  Although I do not expect that
the boxes contain any responsive, non-privileged material, I wanted you to be aware of this
issue.  My client will review the boxes as soon as she has access to do so; any responsive, non-
privileged documents will be produced as quickly thereafter as possible.

If I have misunderstood any part of our conversation, please let me know.  Also, feel free to
contact me if you should have any questions.  I look forward to hearing from you.

Sincerely,

Michelle L. Dineen Jerrett

Enclosures

cc:     Larry C. Kenna
        Sara E. Solfanelli

4015312v1

# Exhibit 5

**Dineen Jerrett, Michelle L.**

| | |
|---|---|
| **From:** | Dineen Jerrett, Michelle L. |
| **Sent:** | Thursday, February 09, 2006 2:13 PM |
| **To:** | 'Hodes, Lisa M.' |
| **Cc:** | Varn, Larry; Kenna, Larry |
| **Subject:** | RE: Mullinix v. Bogorad-Gross, et al. |

Lisa-

If you want to file a motion for a protective order regarding the depositions of Cynthia Bogorad and Jim Gross and/or the continued depositions of your clients, that's your prerogative.  Our document productions have in no way been "designed for the hurt and harassment" of your clients.  I cannot and will not provide you any certification, or have my client provide an affidavit, regarding the document production.  As I explained in my February 3 cover letter accompanying our supplemental document production, documents in the form of photographs have not been included in the production (although I have made the offer to have them available for inspection, as is permitted under the Federal Rules of Civil Procedure, to which I have received no response).  I also explained that there are a small number of boxes presently outside of my client's possession, custody or control that may -- although it is highly unlikely -- contain responsive, non-privileged documents.  Finally, before you continue to make accusations regarding my client's document productions, I would suggest that you look to your own clients' productions and the notable absence of certain responsive, non-privileged documents such as photographs, documents pertaining to Lawrence Bogorad's estate, and all documents relating to Ms. Mullinix, just to name a few.  As you know, I have requested an explanation as to why such documents have not been provided by your clients, and have yet to receive any substantive response.

I expect next week's depositions to proceed unless you file a motion for a protective order.  And, absent a motion for a protective order, I expect this issue to be dropped.

With respect to the Stipulated Protective Order, I fail to see how restrictions regarding Ms. Bogorad's or Mr. Gross' access to CONFIDENTIAL MATERIALS "does not allow [your] clients to talk with their spouses on this case."  It does no such thing.  Your clients' spouses do not need to review confidential materials, discuss them with your clients, or provide legal advice with respect thereto.  Nothing in your purported explanation suggests otherwise.  If there is a specific, articulable need for your clients' spouses to review such material in the future, I suggest we could address the issue then.

Michelle

-----Original Message-----
From: Hodes, Lisa M. [mailto:lhodes@sandw.com]
Sent: Wednesday, February 08, 2006 5:31 PM
To: Dineen Jerrett, Michelle L.
Cc: Varn, Larry
Subject: Mullinix v. Bogorad-Gross, et al.


Michelle:

Larry's trial just concluded today and we spoke about a number of issues regarding this case.

First, absent a certification from you or an affidavit from Kathy that all documents responsive to our defendants' document requests have been produced, we will not be making any witnesses available for depositions. We simply cannot allow a piecemeal document production that is designed for the hurt and harassment of our clients.

Second, we will not sign off on any protective order that does not allow our clients to talk with their spouses on this case. Both Jim Gross and Cindy Bogorad are lawyers that are subject to the rigorous ethical requirements of the Bar. In addition, both assist us

in providing legal advice on this case.

I look forward to seeking a resolution on these matters.

Thanks,
Lisa

Lisa M. Hodes
Attorney At Law

Sullivan & Worcester LLP
One Post Office Square
Boston, MA 02109

T       617 338 2426
F       617 338 2880
lhodes@sandw.com
www.sandw.com

BOSTON    NEW YORK    WASHINGTON, DC


This message is intended to be confidential and may be legally privileged.  It is intended
solely for the addressee.  If you are not the intended recipient, please delete this
message from your system and notify us immediately.  Any disclosure, copying, distribution
or action taken or omitted to be taken by an unintended recipient in reliance on this
message is prohibited and may be unlawful.

Communications from our firm may contain or incorporate federal tax advice.  Under
recently promulgated US Internal Revenue Service (IRS) standards, we are required to
inform you that only formal, written tax opinions meeting IRS requirements may be relied
upon by taxpayers for the purpose of avoiding tax-related penalties.  Accordingly, this
communication is not intended or written to be used, and it cannot be used, for the
purpose of avoiding tax-related penalties under the Internal Revenue Code.  Please contact
a member of our law firm's Tax Department if you require a formal, written tax opinion
that satisfies applicable IRS requirements, or if you have any other questions regarding
federal tax advice.

# Exhibit 6

**Dineen Jerrett, Michelle L.**

| | |
|---|---|
| **From:** | Dineen Jerrett, Michelle L. |
| **Sent:** | Friday, February 10, 2006 12:56 PM |
| **To:** | 'Hodes, Lisa M.' |
| **Cc:** | Varn, Larry; Kenna, Larry |
| **Subject:** | RE: Motion for a Protective Order |

Lisa-
We will not assent to your proposed Motion for a Protective Order.  As you know, our
position is that we have produced all responsive, non-privileged documents, or offered to
make available all such documents, presently within our client's possession, custody or
control.  We are mindful of our discovery obligations, including the obligation to
supplement document productions, and will continue to comply with those obligations.  This
morning, I also informed you that my client expects within the coming week or so to be
able to have access to documents presently outside of her possession, custody, or control
and that once she undertakes a review of those documents, we will produce any responsive,
non-privileged documents pursuant to our discovery obligations.  I have repeatedly
indicated, however, that I do not anticipate that search to yield any such responsive,
non-privileged documents.
With respect to your second assertion, we maintain that our questioning about the extent
and duration of the relationship between Lawrence Bogorad and our client is directly
relevant to the case and corresponds to allegations in the complaint.
Finally, with respect to the estate planning documents requested in our first request for
production of documents, as you know, the parties have been engaged in negotiating the
terms of a stipulated protective order and confidentiality agreement which would encompass
any objection you have to the production of such materials on the basis of
confidentiality.  I am still awaiting a response from you on that point.  As for relevance
of the estate planning documents, they are directly relevant to the issues in the case.
Please let me know when I can expect a copy of your motion.
Thank you,
Michelle

-----Original Message-----
From: Hodes, Lisa M. [mailto:lhodes@sandw.com]
Sent: Friday, February 10, 2006 12:14 PM
To: Dineen Jerrett, Michelle L.
Cc: Varn, Larry
Subject: Motion for a Protective Order


Michelle:

In accordance with Local Rule 7.1(A)(2), I am writing to ask whether you will assent to
our Motion for a Protective Order. The scope of the Motion has not changed since we last
spoke. In our papers, Defendants request that the Court issue an order precluding (1)
further depositions by Plaintiff absent a certification from Plaintiff's counsel or an
affidavit from the Plaintiff that all documents responsive to Defendants' First Set of
Document Requests have been produced, (2) hurtful and harassing inquiries related to the
extent and duration of the personal relationship between Plaintiff and the late Professor
Lawrence Bogorad and (3) the discovery of confidential and irrelevant documents belonging
to Bogorad's estate.


Regards,
Lisa

Lisa M. Hodes
Attorney At Law

Sullivan & Worcester LLP
One Post Office Square
Boston, MA 02109

```
T      617 338 2426
F      617 338 2880
lhodes@sandw.com
www.sandw.com
```

BOSTON   NEW YORK   WASHINGTON, DC

This message is intended to be confidential and may be legally privileged.  It is intended
solely for the addressee.  If you are not the intended recipient, please delete this
message from your system and notify us immediately.  Any disclosure, copying, distribution
or action taken or omitted to be taken by an unintended recipient in reliance on this
message is prohibited and may be unlawful.

Communications from our firm may contain or incorporate federal tax advice.  Under
recently promulgated US Internal Revenue Service (IRS) standards, we are required to
inform you that only formal, written tax opinions meeting IRS requirements may be relied
upon by taxpayers for the purpose of avoiding tax-related penalties.  Accordingly, this
communication is not intended or written to be used, and it cannot be used, for the
purpose of avoiding tax-related penalties under the Internal Revenue Code.  Please contact
a member of our law firm's Tax Department if you require a formal, written tax opinion
that satisfies applicable IRS requirements, or if you have any other questions regarding
federal tax advice.

# Exhibit 7

## HEALTH CARE PROXY

If my attending physician determines that I am unable to make my own health care decisions, I, **Lawrence Bogorad** designate and appoint **Kathleen P. Mullinix**, residing at170 E. 87th St., New York, NY 10128, telephone 212-828-1595, as my agent to make all health care decisions for me except as otherwise provided in this document, including decisions to accept or refuse any treatment, service or procedure used to diagnose, treat or care for me, and to withhold or withdraw life-sustaining measures and to direct that artificially provided fluids and nutrition, such as by feeding tube or intravenous infusion, be withheld or withdrawn. This document shall be construed in the broadest possible manner and my agent may act or fail to act to the same extent as I could if I were able to make my own health care decisions, provided that my agent shall do so in accordance with my wishes and instructions as known to my agent or, in the absence thereof, in accordance with my best interests.

If my attending physician shall determine that my agent is unable, unwilling or unavailable to act, I appoint **Kiki Bogorad-Gross**, residing at 80 Highland Ave., Newton, Massachusetts, telephone 617-332-5042, as my health care agent.

Unless revoked, this proxy shall remain in effect indefinitely, even though a guardian or other representative shall be appointed to act on my behalf.

Any invalid or unenforceable power or provision shall not affect the other powers and provisions or the appointment of my health care agent.

I understand the purpose and effect of this document and sign it after careful deliberation, this _21 st_ day of _November_ 2001.

_Lawrence Bogorad_
**Lawrence Bogorad**

Residing at: 2 White Pine Lane, Lexington, Massachusetts, 02421

Each of the undersigned declares that the person who signed this document did so in his or her presence: that said person is personally known to him or her and appears to be of sound mind and acting willingly and free from duress or undue influence and that he or she is 18 years of age or older and is not designated as the person's health care proxy.

_Christine W Bird_                    residing at _995 Mass. Ave, #305,_
**Witness**                                         _Arlington, MA 02476_

_Nancy Branew_                    residing at _6 Wellington Lane_
                                                        _Cambridge, MA 02141_

**KPM 0183**