UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| KATHLEEN P. MULLINIX, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Civil Action No. 04-12684-WGY |
| v. | ) | |
| | ) | |
| KIKI BOGORAD-GROSS and LEONARD P. | ) | |
| BOGORAD, As They Are Executors of the Will of | ) | |
| Lawrence Bogorad, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF
## MOTION FOR ENTRY OF PROTECTIVE ORDER
## GOVERNING THE DISCLOSURE AND USE OF
## CONFIDENTIAL DOCUMENTS AND OTHER CONFIDENTIAL INFORMATION

### I. Introduction

Pursuant to Fed. R. Civ. P. 26, Plaintiff, Kathleen P. Mullinix ("Mullinix" or the "Plaintiff"), by her attorneys, Choate, Hall & Stewart, LLP, respectfully submits this memorandum of law in support of her Motion for Entry of Protective Order Governing the Disclosure and Use of Confidential Documents (the "Motion"). The Defendants have unreasonably withheld agreement to the terms of the proposed Protective Order Governing the Disclosure and Use of Confidential Documents and Other Confidential Information (the "Protective Order") (attached to the Plaintiff's Motion as Exhibit 1). The Defendants' sole reason for refusing to agree to the proposed Protective Order is that they unreasonably insist that

1

Confidential Information be made available to the Defendants' spouses, who, though they happen to be attorneys, have not entered appearances in this case and indeed likely cannot do so since they have been identified as potential fact witnesses by the Defendants. In addition, the need for a Protective Order is further exhibited by Defendants' withholding of documents during discovery based, in part, on an objection to the confidential nature of the documents sought.

## II. Factual Background

The Plaintiff previously set forth many of the pertinent facts in her Opposition to Defendants' Motion for Protective Order, upon which she expressly relies herein. In essence, this case arises out of the romantic relationship between the Plaintiff and Lawrence Bogorad ("Bogorad"), the decedent. That relationship spanned over two decades – a fact which the Defendants cannot dispute. Bogorad remained married during the entire course of his relationship with the Plaintiff. Mullinix likewise was married, until she and her ex-husband separated in 1997 and ultimately divorced. The Plaintiff's separation occurred shortly prior to Bogorad's wife's admission to a residential nursing facility in or around 1998, due to the debilitating effects of Alzheimer's Disease. Thereafter, Bogorad and the Plaintiff publicly disclosed their relationship, considered themselves to be and lived as if husband and wife – living together, traveling together, and attending family functions together.

In late 2002 and early 2003, the Plaintiff and Bogorad discussed the Plaintiff selling her apartment located on East 87th Street in New York City and moving to someplace closer to Fifth Avenue in New York City, where Bogorad felt the Plaintiff would be safer. Ultimately, the Plaintiff purchased a cooperative apartment located at 1050 Fifth Avenue (the "Apartment").

2

Bogorad made certain commitments respecting the Apartment, which are the subject of the lawsuit.

### III. Procedural Background

The Plaintiff filed this lawsuit on or about December 22, 2004, after a lengthy and unsuccessful attempt to resolve her claims against the estate with the Defendants. On or about October 5, 2005, the Defendants served Document Requests on the Plaintiff, and on or about October 7, 2005, the Plaintiff served Document Requests on the Defendants. All parties responded to the opposing Document Requests on or about November 22, 2005. The Plaintiff produced non-privileged documents responsive to Defendants' Discovery Requests, including without limitation a number of documents she previously provided voluntarily to Defendants' prior counsel.

The Defendants produced documents in response to the Plaintiff's Document Request, but objected to a number of such requests on relevancy and confidentiality grounds. See Defendant Kiki Bogorad-Gross' Response to Plaintiff's First Request for Production of Documents, at Response to Document Request Nos. 12, 14, 15, 17, 18, 19 (attached hereto as Exhibit 2); Defendant Leonard P. Bogorad's Response to Plaintiff's First Request for Production of Documents, at Response to Document Request Nos. 17, 18, 19 (attached hereto as Exhibit 3).

On or about October 5, 2005, the Defendants served two subpoenas *duces tecum* on both 1050 Fifth Avenue, Inc., the cooperative housing corporation of the building where the Apartment is located, and Prudential Douglas Elliman, the real estate brokerage firm for the 1050 Fifth Avenue building. In response to these subpoenas, each of the entities produced documents relating to the Plaintiff and/or her purchase of he Apartment, including documents containing

personal, private and confidential information relating to the Plaintiff such as tax returns and
other financial information.  At the time these documents were produced, the Plaintiff informed
the Defendants that she viewed many of these materials to be confidential and the parties agreed
to treat the documents as "For Attorneys' Eyes Only" until such time as they could enter into a
stipulated protective order.

Counsel for the Plaintiff has attempted to negotiate with counsel for the Defendants the
terms of such a Protective Order.  The parties have not reached final agreement with respect to
the terms of the Protective Order, although they have agreed to most of its terms.  The only
significant point about which a disagreement exists relates to access to "Confidential
Information" by non-parties to this case, specifically the Defendants' spouses, James Gross and
Cynthia Bogorad.  Under the proposed Protective Order submitted herewith, the named parties to
this action would be permitted access to "Confidential Information."  In addition, among others,
counsel to the parties would be permitted access to "Confidential Information."  The spouses of
the Defendants (who happen to be attorneys), however, would not be permitted access to
"Confidential Information."

In or around January 25, 2006, the Defendants served notice pursuant to Federal Rules of
Civil Procedure 34 of an intent to enter and inspect the Apartment, purportedly to conduct an
appraisal.  In the notice, the Defendants asserted a right to enter the Apartment for the purposes
of inspecting, measuring, surveying, photographing, and videotaping the premises.  Notably, the
right to videotape is not contemplated by Rule 34.  See Fed. R. Civ. P. 34(a).  The Plaintiff
proposed a number of reasonable restrictions on this inspection, many of which are based on her
recognizable privacy interest in her home.  Among her proposed restrictions, the Plaintiff

4

informed the Defendants of her intention to designate as "Confidential Information" the photographs and the appraisal. See Email from Michelle L. Dineen Jerrett dated February 16, 2006 (attached hereto as Exhibit 4). Defendants' counsel responded that they would not agree to these specific restrictions because, *inter alia*, the spouses of the Defendants, who happen to be attorneys, would not be permitted access to these materials. See Email from Lisa M. Hodes dated February 17, 2006 (attached hereto as Exhibit 5).

## IV. Argument

A.    A Protective Order is Necessary to Protect Confidential, Private and Personal Information in this Case.

The district court may issue a protective order, including an order fixing the terms of disclosure, to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense. See Fed. R. Civ. P. 26(c).

During discovery, including during her deposition on March 1, 2006, the Plaintiff provided documents and testimony concerning very personal, confidential information. In addition, the Defendants subpoenaed documents from non-party witnesses which contain personal, financial information related to the Plaintiff, including without limitation financial records and tax return filings.[1] Presumably, if the Defendants were to produce certain additional documents called for in Plaintiff's Document Requests, purportedly withheld in part on the basis of confidentiality and relevance grounds, these materials may also contain personal, private and

---

[1]    Given the Defendants' unreasonable position vis-à-vis access by their spouses to confidential information, the Plaintiff is forced to question whether the confidentiality of these materials already has been breached by permitting access to them by Mr. Gross and/or Ms. Bogorad.

confidential information related to Bogorad and/or his estate.[2]  Given that the Defendants have

refused to produce certain of these materials to date, however, the Plaintiff can only speculate

that the documents may contain confidential information.

Although the courts do not bar its production entirely, Massachusetts and New York law

acknowledge the sensitive nature of an individual's financial information.  See Town Taxi Inc. v.

Police Comm'r of Boston, 377 Mass. 576 (1979); Cadrin v. Trans Spec Truck Serv., Inc., 17

Mass. L. Rptr. 121 (Mass. Super. 2003); Williams v. N.Y. City Hous. Auth., 802 N.Y.S.2d 55,

56 (2005).  Massachusetts and New York law also recognize that an individual has a privacy

interest in his or her home.  See Commonwealth v. Balicki, 436 Mass. 1, 12 n.14 (2002); Anobile

v. Pelligrino, 303 F.3d 107, 119-20 (2d Cir. 2002).

On account of the personal nature of this action, all parties—including the Defendants as

evidenced by their unsuccessful Motion for a Protective Order—have been sensitive to issues of

privacy.  Portions of the discovery in this case involve highly-sensitive, private, confidential

information of the parties involved, including but not limited to the tax returns, financial

statements, and anticipated appraisal and photographs of the interior of Plaintiff's Apartment.

Indeed, the need for this Protective Order is further bolstered by Defendants' own admissions,

during their depositions, that they have discussed the issues in this case with numerous family

---

[2]       Interestingly, despite this court's denial last week of the Defendants' Motion for a Protective Order, in
which they relied on a relevance argument, the Defendants apparently still maintain that they have a valid relevancy
objection to producing materials sought in the Plaintiff's Document Requests.  See Email from Larry Varn dated
March 3, 2006 (attached hereto as Exhibit 6) ("We are reviewing the import of the Court's recent order.  As you
know, our view of the attorneys is that it extends to Jim Gross and Cynthia Bogorad, upon whom both the executors
and I rely and who are members in good standing of various bars.").  The Plaintiff may well be forced to seek court
intervention on this issue if the Defendants continue to refuse to produce responsive, non-privileged documents
pursuant to the Plaintiff's Document Requests.

members and friends. <u>See</u> Bogorad-Gross Dep. 172:2-185:7 (attached hereto as <u>Exhibit 7</u>);

Bogorad Dep. 207:1-219:6 (attached hereto as <u>Exhibit 8</u>).

     To protect adequately the privacy of the parties involved in this case, the proposed

Protective Order should be entered. The Plaintiff seeks to ensure that all financial, private and

personal information remains confidential, while agreeing to provide the same benefit to

Defendants. The entry of the attached Protective Order will permit discovery while protecting

the confidential and personal information of all parties involved in this action.

B.    <u>The Defendants Have Unreasonably Asserted that their Spouses should have Access to</u>
<u>"Confidential Information."</u>

     The only significant point about which a disagreement exists relates to access to

"Confidential Information" by non-parties to this case, specifically the Defendants' spouses.

This issue alone – whether the Defendants' spouses, who happen to be attorneys, should be

allowed access to Confidential Materials – appears to be the sole basis for the alleged "gridlock"

in negotiations over a stipulated protective order that Defendants refer to in their Motion to

Compel Plaintiff's Compliance with Defendants' Rule 34 Request for Entry upon Land filed

with this court last week.[3] The issue has arisen as a result of the Defendants' refusal to agree to

any Protective Order that does not permit Mr. Gross and Ms. Bogorad access to "Confidential

Information."

     The Defendants have failed to articulate any sufficient justification for such a position

except to assert that:

---

[3]     The Plaintiff anticipates filing an Opposition to Defendants' Motion which will address in greater detail her proposed restrictions and the Defendants' unreasonable refusal to agree to such restrictions.

> [W]e will not sign off on any protective order that does not allow
> our clients to talk with their spouses on this case. Both Jim Gross
> and Cindy Bogorad are lawyers that are subject to the rigorous
> ethical requirements of the Bar. In addition, both assist us in
> providing legal advice on this case.

See Email from Lisa Hodes dated February 8, 2006 (attached hereto as Exhibit 9). In response to

Defendants' refusal on those grounds, Counsel for the Plaintiff responded as follows:

> With respect to the Stipulated Protective Order, I fail to see how
> restrictions regarding Ms. Bogorad's or Mr. Gross' access to
> CONFIDENTIAL MATERIALS 'does not allow [your] clients to
> talk with their spouses on this case.' It does no such thing. Your
> clients' spouses do not need to review confidential materials,
> discuss them with your clients, or provide legal advice with respect
> thereto. Nothing in your purported explanation suggests otherwise.
> If there is a specific, articulable need for your clients' spouses to
> review such material in the future, I suggest we could address the
> issue then.

See Email from Michelle L. Dineen Jerrett dated February 9, 2006 (attached hereto as Exhibit
10).

      With respect to the Plaintiff's Apartment, the Defendants filed a notice under Fed. R.

Civ. P. 34 requesting entry into the Apartment for purposes of conducting an appraisal of the

property. The Plaintiff proposed reasonable restrictions on that proposed entry and inspection,

but the parties have been unable to reach an agreement with respect to particular aspects of those

proposed restrictions. The Defendants have refused to agree to restrictions (1) requiring the

appraiser – designated by the Defendants as an expert witness in this case – to sign an agreement

acknowledging the confidentiality of the appraisal materials and photographs and (2) relating to

access to the anticipated photographs and appraisal report and other appraisal. Apparently, the

8

Defendants believe that restricting non-parties' access to such materials effectively gags them from talking with Mr. Gross and/or Ms. Bogorad on this case. Such a suggestion is preposterous.

Despite numerous requests to do so from counsel for the Plaintiff, Defendants have offered no support for the assertion that Mr. Gross and/or Ms. Bogorad are – or should be – entitled to see Confidential Information related to this case. The fact that Defendants' spouses happen to be attorneys does not grant them access to such Confidential Information. Neither has filed a Notice of Appearance or is listed as an attorney of record in this case. Despite this fact, when Plaintiff arrived for her deposition at the offices of Defendants' counsel, on March 1, 2006, James Gross was present. When Plaintiff's counsel inquired of Larry Varn as to the reason for Mr. Gross's presence during the Plaintiff's deposition, Mr. Varn indicated that Mr. Gross was entitled to be present because he was Mr. Varn's "co-counsel." Plaintiff's counsel pointed out to Mr. Varn that Mr. Gross has not filed a Notice of Appearance in this matter.[4]

Moreover, both Mr. Gross and Ms. Bogorad are listed as potential fact witnesses in the initial disclosures, which raises a myriad of potential conflict of interest issues. Case law, the ABA Model Code of Professional Responsibility and the ABA Model Rules of Professional Conduct highlight the hazards of counsel providing representation in cases for which they may be a witness, and provides a basis for disqualification of the attorney as counsel. See, e.g., Siguel v. Allstate Life Ins. Co., 141 F.R.D. 393, 396 (D. Mass. 1992) (noting that the existence of a familial relationship of the attorney with the client, in addition to the fact that the attorney may be a witness, "is all the more suspect"); ABA Model Rules of Professional Conduct 3.7

---

[4]     Not surprisingly, Mr. Gross did not remain for the deposition.

(2004); ABA Model Code of Professional Responsibility, Disciplinary Rules 5-101 and 5-102 (1983).

In light of the amorphous – and potentially conflicted – role of the Defendants' spouses in this litigation, the Plaintiff asserts that Defendants' position that their spouses should be permitted unfettered access to confidential documents and information in this case is unreasonable, wholly without support, and raises potential conflict of interest issues. In short, the Defendants have offered no justifiable explanation as to why access to such confidential information and material should be given to non-party witnesses.[5]

## V. Conclusion

Since Defendants obstinately refuse to agree to a stipulated protective order, the Plaintiff is forced to ask this Court to enter the attached Protective Order Governing the Disclosure and Use of Confidential Documents and Other Confidential Information. The attached Protective Order will allow the parties to conduct discovery, with the assurance that their highly-sensitive, private, confidential information will remain protected. Equally importantly, it will ensure that the parties to this action, and their counsel – who have filed Notices of Appearance in this case and who can properly serve as counsel in this litigation – will have access to confidential, private, personal information that justifiably should not be shared with others.

---

[5] Indeed, the Plaintiff has indicated that if such an articulable need arises in the future, the parties can revisit the issue. The Defendants failed to respond to this suggestion.

**WHEREFORE**, Plaintiff respectfully requests that this Court enter the attached Protective Order Governing the Disclosure and Use of Confidential Documents and Other Confidential Information.

Respectfully submitted,

KATHLEEN P. MULLINIX,
By her attorneys,

/s/ Michelle L. Dineen Jerrett
Larry C. Kenna (BBO # 267760)
Michelle L. Dineen Jerrett (BBO #634930)
CHOATE, HALL & STEWART
Two International Place
Boston, Massachusetts 02110
Tel: (617) 248-5000

Date:    March 6, 2006

## CERTIFICATE OF SERVICE

I hereby certify that on March 6, 2006, a copy of Plaintiff's Motion for Protective Order Governing the Disclosure and Use of Confidential Documents and Other Confidential Information was served by email and first-class mail upon the attorney of record for the defendants.

/s/ Michelle L. Dineen Jerrett
Michelle L. Dineen Jerrett

## LOCAL RULE 7.1(A)(2) CERTIFICATION

Pursuant to Local Rule 7.1(A)(2), counsel for Kathleen P. Mullinix certifies that she has made a good faith effort to resolve this dispute without court intervention. Counsel for the parties have exchanged emails and have had multiple telephone conferences but have been unable to reach an agreement with respect to the issues contained herein.

/s/ Michelle L. Dineen Jerrett
Michelle L. Dineen Jerrett

11

# Exhibit 2

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

KATHLEEN P. MULLINIX,      )
                           )
        Plaintiff,         )
                           )
    v.                     )         Civil Action
                           )         No. 04-12684-WGY
KIKI BOGORAD-GROSS and     )
LEONARD P. BOGORAD, as They )
Are Executors of the Will of )
Lawrence Bogorad,          )
                           )
        Defendants.        )

## DEFENDANT KIKI BOGORAD-GROSS' RESPONSE TO PLAINTIFF'S FIRST REQUEST FOR PRODUCTION OF DOCUMENTS

Pursuant to Mass. R. Civ. P. 34, defendant Kiki Bogorad-Gross ("K. Bogorad-Gross), after exercising due diligence to secure the requested information, responds as follows to Plaintiff Kathleen P. Mullinix's First Request For Production of Documents to Defendant Kiki Bogorad-Gross, dated October 7, 2005 ("Plaintiff's Document Request").

### A.  GENERAL RESPONSE

K. Bogorad-Gross has not completed the investigation into facts relating to this proceeding, has not completed the discovery in this proceeding, and has not completed the preparation for trial. The responses contained herein, therefore, are based only upon such information and documents presently available to and known by K. Bogorad-Gross and her counsel. K. Bogorad-Gross anticipates that further discovery, independent investigation, legal research and analysis may supply additional facts and additional meaning to the facts presently known. Accordingly, K. Bogorad-Gross reserves the right to supplement and/or amend any and

all responses herein as additional documents are located or produced by any parties or witnesses, and as additional analyses and contentions are formulated. The following responses are therefore given without prejudice to K. Bogorad-Gross' right to produce to plaintiff Kathleen P. Mullinix ("Plaintiff") evidence of subsequently discovered documents, facts, or information.

Subject to the rule of reason and the general and specific objections set forth in Sections B and C below, K. Bogorad-Gross will produce the non-privileged documents described in Plaintiff's Document Request for inspection and copying by Plaintiff or her counsel at one or more mutually convenient dates, times and places. K. Bogorad-Gross is producing documents in response to Plaintiff's Document Request without admitting their relevance or admissibility, and hereby reserves all rights to object to the introduction or use of any such document in any trial or proceeding. Any reference to documents herein or statements made herein of any intent to produce documents is not, and shall not be deemed, an admission of any factual or legal contention contained in or implied by any individual request.

### B. GENERAL OBJECTIONS

In addition to specific objections contained within the K. Bogorad-Gross' responses to Plaintiff's Document Request, each of those responses is made subject to the following General Objections A through E and, to the extent applicable, each of the General Objections is incorporated as if set forth in full in each of K. Bogorad-Gross' responses, whether or not specifically referred to therein. No waiver, express or implied, of any of K. Bogorad-Gross' General Objections is intended or should be inferred by the nature of any individual response.

A.    K. Bogorad-Gross objects to Plaintiff's Document Request generally and to certain individual requests contained therein and refuses to produce documents in response thereto, on the grounds and to the extent that Plaintiff's Document Request, or any individual

- 2 -

request contained therein, calls for the production of any documents containing information protected from disclosure by operation of the attorney-client privilege, the work product doctrine, the privilege accorded material prepared in anticipation of litigation or for trial, the provisions of Fed. R. Civ. P. 26(c), the joint defense privilege, and/or any other applicable privilege protection. As interposed in response to specific requests contained within Plaintiff's Document Request, this General Objection A is referred to as the "Privilege Objection."

B.    K. Bogorad-Gross objects to Plaintiff's Document Requests generally and to certain individual requests contained therein, and refuses to produce documents in response thereto, on the grounds and to the extent that they are overly broad and call for the production of documents that are neither relevant to the subject matter of this action, nor reasonably calculated to lead to the discovery of admissible evidence. As interposed in response to specific requests contained within Plaintiff's Document Request, this General Objection B is referred to as the "Relevance Objection."

C.    K. Bogorad-Gross objects to Plaintiff's Document Request generally and to certain individual requests contained therein on the grounds that they are unduly and impermissibly vague so as to render it impossible for K. Bogorad-Gross to determine with any reasonable degree of certainty the documents intended to be encompassed thereby. As interposed in response to specific requests contained within Plaintiff's Document Request, this General Objection C is referred to as the "Vagueness Objection."

D.    K. Bogorad-Gross objects to Plaintiff's Document Request generally and to certain individual requests contained therein, and refuses to produce documents in response thereto, on the grounds that any attempt to respond thereto would be unreasonably and impermissibly time-consuming, burdensome and oppressive to K. Bogorad-Gross. As interposed

- 3 -

in response to specific requests contained within Plaintiff's Document Request, this General

Objection D is referred to as the "Burdensomeness Objection."

      E.      K. Bogorad-Gross objects to furnishing in response to Plaintiff's Document

Request any documents containing personal, private, confidential or material non-public

information, except pursuant to an appropriate protective order preventing the unauthorized use

or dissemination thereof. As interposed in response to specific requests contained within

Plaintiff's Document Request, this General Objection E is referred to as the "Confidentiality

Objection."

## C. RESPONSES TO DOCUMENT REQUESTS

Document Request No. 1:

      Any and all documents upon which you relied or used in any manner to prepare or assist
in preparing answers or otherwise provide responses to Plaintiff Kathleen P. Mullinix's First Set
of Interrogatories to the Defendant Kiki Bogorad-Gross.

Response to Document Request No. 1: K. Bogorad-Gross will produce the non-privileged

documents described in Document Request No. 1 that, to her knowledge, are currently in her

possession, custody or control.

Document Request No. 2:

      Any and all documents concerning any of the matters alleged by the Plaintiff in the
Complaint or by you in the Counterclaim.

Response to Document Request No. 2: K. Bogorad-Gross will produce the non-privileged

documents described in Document Request No. 2 that, to her knowledge, are currently in her

possession, custody or control.

Document Request No. 3:

      Any and all documents concerning or relating to the apartment located at 1050 5th
Avenue in New York City (hereinafter, the "Apartment"), including without limitation,
documents relating to the purchase of the Apartment by any person, costs of renovations,
renovations and plans to renovate the Apartment.

- 4 -

Document Request No. 11:

Any and all documents concerning payments made by Mr. Bogorad to the Plaintiff or on her behalf on or after January 1, 1999, including without limitation, letters, emails, bank account statements, cancelled check, check registers, invoices and receipts.

Response to Document Request No. 11: K. Bogorad-Gross will produce the non-privileged

documents described in Document Request No. 11 that, to her knowledge, are currently in her

possession, custody or control.

Document Request No. 12:

Any and all documents concerning taxes related to the Apartment, the East 87th Street Apartment and the Lexington Home, including without limitation, letters, notices, spreadsheets, bank account statements, invoices receipts, cancelled checks and check registers.

Response to Document Request No. 12: K. Bogorad-Gross objects to Document Request No. 12

on the grounds set forth in the Relevance Objection and the Confidentiality Objection.

Document Request No. 13:

Any and all documents concerning renovations, plans to renovate or discussions about renovations to the Apartment or the East 87th Street Apartment, including without limitation, contracts with Raynor Warner, Heather Aman or any other architect or person involved in the renovations, letters, notices, spreadsheets, bank account statements, invoices, receipts, cancelled checks and check registers.

Response to Document Request No. 13: K. Bogorad-Gross will produce the non-privileged

documents described in Document Request No. 13 that, to her knowledge, are currently in her

possession, custody or control.

Document Request No. 14:

Any and all documents concerning Mr. Bogorad's interest in real estate, including without limitation, the Apartment, the East 87th Street Apartment and the Lexington Home.

Response to Document Request No. 14: K. Bogorad-Gross objects to Document Request No. 14

on the grounds set forth in the Relevance Objection, Vagueness Objection and the

Confidentiality Objection.

- 7 -

{B0463988; 3}

Document Request No. 15:

Any and all documents representing locations where Mr. Bogorad received mail on or after January 1, 1999, including without limitation, utility bills, credit card bills, bank account statements, driver's license and information concerning memberships.

Response to Document Request No. 15:  K. Bogorad-Gross objects to Document Request No. 15

on the grounds set forth in the Relevance Objection and the Confidentiality Objection.

Document Request No. 16:

Any and all documents, statements or other writings obtained from any person who has, or claims to have, any knowledge of or information about any of the matters alleged by the Plaintiff in the Complaint or by you in the Counterclaim.

Response to Document Request No. 16:  K. Bogorad-Gross does not have any documents

described in Document Request No. 16 in her possession, custody or control.

Document Request No. 17:

Any and all tax returns filed by or on behalf on Mr. Bogorad from 1999 to the date of his death, including any personal, corporate or partnership tax returns.

Response to Document Request No. 17:  K. Bogorad-Gross objects to Document Request No. 17

on the grounds set forth in the Relevance Objection and the Confidentiality Objection.

Document Request No. 18:

Any and all documents relating to the financial worth of Mr. Bogorad from January 1, 1999 to the date of his death, including without limitation, tax returns, invoices, receipts, bank account statements, money market statements, retirement account statements or other investment account statements.

Response to Document Request No. 18:  K. Bogorad-Gross objects to Document Request No. 18

on the grounds set forth in the Relevance Objection and the Confidentiality Objection.

Document Request No. 19:

Any and all documents relating to the Estate, including without limitation, tax returns, invoices, receipts, bank account statements, money market statements, retirement account statements or other investment account statements.

- 8 -

Response to Document Request No. 19: K. Bogorad-Gross objects to Document Request No. 19

on the grounds set forth in the Relevance Objection and the Confidentiality Objection.

Document Request No. 20:

Any and all documents relating to or reflecting the present fair market value of the
Apartment.

Response to Document Request No. 20: K. Bogorad-Gross does not have any documents

described in Document Request No. 20 in her possession, custody or control.

Document Request No. 21:

Any and all documents relating to or reflecting any agreement or discussion between
Mr. Bogorad and the Plaintiff with respect to payment of maintenance fees for or renovations to
the Apartment or the East 87th Street Apartment.

Response to Document Request No. 21: K. Bogorad-Gross does not have any documents

described in Document Request No. 21 in her possession, custody or control.

Document Request No. 22:

Any and all documents relating to or reflecting any agreement or discussion between
Mr. Bogorad and the Plaintiff with respect to payment of any amount of the Plaintiff's capital
gains tax on the sale of the East 87th Street Apartment or storage fees during the time of the
renovations to the Apartment.

Response to Document Request No. 22: K. Bogorad-Gross does not have any documents

described in Document Request No. 22 in her possession, custody or control.

Document Request No. 23:

Any and all documents relating to or reflecting any vacations, trips, or holidays
Mr. Bogorad and the Plaintiff took together, with or without other people, including without
limitation, letters, emails, bank account statements, cancelled checks, check registers, invoices
and receipts.

Response to Document Request No. 23: K. Bogorad-Gross objects to Document Request No. 23

on the grounds set forth in the Relevance Objection.  Without waiving her objections,

K. Bogorad-Gross will produce the non-privileged documents relating to any vacations, trips or

# Exhibit 3

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| KATHLEEN P. MULLINIX,         ) | |
|          ) | |
|      Plaintiff,      ) | |
|          ) | Civil Action |
|      v.          ) | No. 04-12684-WGY |

KATHLEEN P. MULLINIX, )

    Plaintiff, )

              )      Civil Action

    v.          )      No. 04-12684-WGY

KIKI BOGORAD-GROSS and )
LEONARD P. BOGORAD, as They )
Are Executors of the Will of )
Lawrence Bogorad, )

    Defendants. )

## DEFENDANT LEONARD P. BOGORAD'S RESPONSE TO PLAINTIFF'S FIRST REQUEST FOR PRODUCTION OF DOCUMENTS

Pursuant to Fed. R. Civ. P. 34, defendant Leonard P. Bogorad ("L. Bogorad"), after exercising due diligence to secure the requested information, responds as follows to Plaintiff Kathleen P. Mullinix's First Request For Production of Documents to Defendant Leonard P. Bogorad, dated October 7, 2005 ("Plaintiff's Document Request").

### A. GENERAL RESPONSE

L. Bogorad has not completed the investigation into facts relating to this proceeding, has not completed the discovery in this proceeding, and has not completed the preparation for trial. The responses contained herein, therefore, are based only upon such information and documents presently available to and known by L. Bogorad and his counsel. L. Bogorad anticipates that further discovery, independent investigation, legal research and analysis may supply additional facts and additional meaning to the facts presently known. Accordingly, L. Bogorad reserves the right to supplement and/or amend any and all responses herein as additional documents are

located or produced by any parties or witnesses, and as additional analyses and contentions are formulated. The following responses are therefore given without prejudice to L. Bogorad's right to produce to plaintiff Kathleen P. Mullinix ("Plaintiff") evidence of subsequently discovered documents, facts, or information.

Subject to the rule of reason and the general and specific objections set forth in Sections B and C below, L. Bogorad will produce the non-privileged documents described in Plaintiff's Document Request for inspection and copying by Plaintiff or his counsel at one or more mutually convenient dates, times and places. L. Bogorad is producing documents in response to Plaintiff's Document Request without admitting their relevance or admissibility, and hereby reserves all rights to object to the introduction or use of any such document in any trial or proceeding. Any reference to documents herein or statements made herein of any intent to produce documents is not, and shall not be deemed, an admission of any factual or legal contention contained in or implied by any individual request.

## B. GENERAL OBJECTIONS

In addition to specific objections contained within L. Bogorad's responses to Plaintiff's Document Request, each of those responses is made subject to the following General Objections A through E and, to the extent applicable, each of the General Objections is incorporated as if set forth in full in each of L. Bogorad's responses, whether or not specifically referred to therein. No waiver, express or implied, of any of L. Bogorad's General Objections is intended or should be inferred by the nature of any individual response.

A.    L. Bogorad objects to Plaintiff's Document Request generally and to certain individual requests contained therein and refuses to produce documents in response thereto, on the grounds and to the extent that Plaintiff's Document Request, or any individual request

- 2 -

contained therein, call for the production of any documents containing information protected from disclosure by operation of the attorney-client privilege, the work product doctrine, the privilege accorded material prepared in anticipation of litigation or for trial, the provisions of Fed. R. Civ. P. 26(c), the joint defense privilege, and/or any other applicable privilege protection. As interposed in response to specific requests contained within Plaintiff's Document Request, this General Objection A is referred to as the "Privilege Objection."

B.     L. Bogorad objects to Plaintiff's Document Requests generally and to certain individual requests contained therein, and refuses to produce documents in response thereto, on the grounds and to the extent that they are overly broad and call for the production of documents that are neither relevant to the subject matter of this action, nor reasonably calculated to lead to the discovery of admissible evidence. As interposed in response to specific requests contained within Plaintiff's Document Request, this General Objection B is referred to as the "Relevance Objection."

C.     L. Bogorad objects to Plaintiff's Document Request generally and to certain individual requests contained therein on the grounds that they are unduly and impermissibly vague so as to render it impossible for L. Bogorad to determine with any reasonable degree of certainty the documents intended to be encompassed thereby. As interposed in response to specific requests contained within Plaintiff's Document Request, this General Objection C is referred to as the "Vagueness Objection."

D.     L. Bogorad objects to Plaintiff's Document Request generally and to certain individual requests contained therein, and refuses to produce documents in response thereto, on the grounds that any attempt to respond thereto would be unreasonably and impermissibly time-consuming, burdensome and oppressive to L. Bogorad. As interposed in response to specific

- 3 -

requests contained within Plaintiff's Document Request, this General Objection D is referred to

as the "Burdensomeness Objection."

   E.  L. Bogorad objects to furnishing in response to Plaintiff's Document Request any

documents containing personal, private, confidential or material non-public information, except

pursuant to an appropriate protective order preventing the unauthorized use or dissemination

thereof. As interposed in response to specific requests contained within Plaintiff's Document

Request, this General Objection E is referred to as the "Confidentiality Objection."

## C. RESPONSES TO DOCUMENT REQUESTS

Document Request No. 1:

   Any and all documents upon which you relied or used in any manner to prepare or assist
in preparing answers or otherwise provide responses to Plaintiff Kathleen P. Mullinix's First Set
of Interrogatories to the Defendant Leonard P. Bogorad.

Response to Document Request No. 1: L. Bogorad will produce the non-privileged documents

described in Document Request No. 1 that, to his knowledge, are currently in his possession,

custody or control.

Document Request No. 2:

   Any and all documents concerning any of the matters alleged by the Plaintiff in the
Complaint or by you in the Counterclaim.

Response to Document Request No. 2: L. Bogorad will produce the non-privileged documents

described in Document Request No. 2 that, to his knowledge, are currently in his possession,

custody or control.

Document Request No. 3:

   Any and all documents concerning or relating to the apartment located at 1050 5th
Avenue in New York City (hereinafter, the "Apartment"), including without limitation,
documents relating to the purchase of the Apartment by any person, costs of renovations,
renovations and plans to renovate the Apartment.

- 4 -

objections, L. Bogorad will produce the non-privileged documents reflecting Mr. Bogorad's

interest in real estate, which the due and diligent searches of L. Bogorad have located, that, to his

knowledge, are currently in his possession, custody or control.

Document Request No. 15:

      Any and all documents representing locations where Mr. Bogorad received mail on or
after January 1, 1999, including without limitation, utility bills, credit card bills, bank account
statements, driver's license and information concerning memberships.

Response to Document Request No. 15:  L. Bogorad does not have any documents described in

Document Request No. 15 in his possession, custody or control.

Document Request No. 16:

      Any and all documents, statements or other writings obtained from any person who has,
or claims to have, any knowledge of or information about any of the matters alleged by the
Plaintiff in the Complaint or by you in the Counterclaim.

Response to Document Request No. 16:  L. Bogorad does not have any documents described in

Document Request No. 16 in his possession, custody or control.

Document Request No. 17:

      Any and all tax returns filed by or on behalf on Mr. Bogorad from 1999 to the date of his
death, including any personal, corporate or partnership tax returns.

Response to Document Request No. 17:  L. Bogorad objects to Document Request No. 17 on the

grounds set forth in the Relevance Objection and the Confidentiality Objection.  Without

waiving his objections, L. Bogorad states that he does not have any documents described in

Document Request No. 17 in his possession, custody or control.

Document Request No. 18:

      Any and all documents relating to the financial worth of Mr. Bogorad from January 1,
1999 to the date of his death, including without limitation, tax returns, invoices, receipts, bank
account statements, money market statements, retirement account statements or other investment
account statements.

{B0463993; 2}

Response to Document Request No. 18: L. Bogorad objects to Document Request No. 18 on the

grounds set forth in the Relevance Objection and the Confidentiality Objection.

Document Request No. 19:

Any and all documents relating to the Estate, including without limitation, tax returns, invoices, receipts, bank account statements, money market statements, retirement account statements or other investment account statements.

Response to Document Request No. 19: L. Bogorad objects to Document Request No. 19 on the

grounds set forth in the Privilege Objection, Relevance Objection and the Confidentiality

Objection.

Document Request No. 20:

Any and all documents relating to or reflecting the present fair market value of the Apartment.

Response to Document Request No. 20: L. Bogorad does not have any documents described in

Document Request No. 20 in his possession, custody or control.

Document Request No. 21:

Any and all documents relating to or reflecting any agreement or discussion between Mr. Bogorad and the Plaintiff with respect to payment of maintenance fees for or renovations to the Apartment or the East 87th Street Apartment.

Response to Document Request No. 21: L. Bogorad does not have any documents described in

Document Request No. 21 in his possession, custody or control.

Document Request No. 22:

Any and all documents relating to or reflecting any agreement or discussion between Mr. Bogorad and the Plaintiff with respect to payment of any amount of the Plaintiff's capital gains tax on the sale of the East 87th Street Apartment or storage fees during the time of the renovations to the Apartment.

Response to Document Request No. 22: L. Bogorad does not have any documents described in

Document Request No. 22 in his possession, custody or control.

{B0463993; 2}

# Exhibit 4

**From:** Dineen Jerrett, Michelle L.

**Sent:** Thursday, February 16, 2006 2:40 PM

**To:** Lisa M. Hodes (lhodes@sandw.com)

**Cc:** Kenna, Larry

**Subject:** Mullinix - Rule 34 Notice restrictions

Lisa-

As a follow-up to our conversation, I write respecting reasonable limitations to be placed on Defendants' Request for Entry Upon Land For Inspection of Premises.

1. Based on our conversation, I understand that you will agree that neither your clients nor their spouses will be present for the inspection. If I have misunderstood our conversation, please let me know immediately. We will not agree to have either of your clients or their spouses enter the premises, as their presence would serve no useful purpose.

2. If either you, Larry or other counsel from Sullivan & Worcester plan to be there, you must advise me of that fact immediately. If I don't hear from you, I will assume that the only person entering the apartment will be Chris Devine from Mitchell, Maxwell & Jackson and I will instruct my client not to permit any other individuals access to the apartment. If someone other than Mr. Devine is the Mitchell, Maxwell & Jackson representative, please provide me with the name of the individual who will be entering and inspecting the premises. Mr. Devine (or the other named individual) will be required to show identification before being allowed access to my client's apartment.

3. We will agree to have a representative from Mitchell, Maxwell & Jackson enter and inspect the premises for a total of one (1) hour.

4. You have indicated that the sole purpose of the inspection is to appraise the property. Accordingly, all actions during the inspection must be consistent with that purpose. During the entry and inspection, the Mitchell, Maxwell & Jackson representative is not to open cabinets, drawers, bureaus, closets, desks or other such areas. The representative may take measurements of the room sizes for purposes of appraising the property but may not take any other actions which would interfere with my client's privacy.

5. Mitchell, Maxwell & Jackson and its representative must sign the Agreement to Comply with Protective Order form attached to the most recent version of the draft stipulated protective order. Given our client's privacy interests, we intend to designate all materials relating to the appraisal as CONFIDENTIAL MATERIAL and Mitchell, Maxwell & Jackson and its representative, must sign the Agreement. Pending final negotiation and/or resolution of the Stipulated Protective Order, you agree that all appraisal materials, including photographs, written documents, reports, notes, memoranda, etc. will be treated as CONFIDENTIAL MATERIAL and shall not be viewed by anyone outside of counsel (i.e., you and Larry, and us), and the Mitchell, Maxwell & Jackson representative.

6. The Mitchell, Maxwell & Jackson representative will be permitted to take a reasonable, limited number of photographs of the premises, consistent with the purpose of appraising the property. Photographs will not be permitted, however, of areas or items which will invade my client's privacy interests. In addition, all photographs will be required to be produced to plaintiff's counsel, who reserves the right to object to any photograph that constitutes an invasion of my client's privacy. You, your clients, and Mitchell, Maxwell & Jackson agree that the photographs will be used solely for the purpose of appraising the apartment and for use in this litigation. All photographs (including originals, copies, negatives and/or digital media) will be treated as CONFIDENTIAL MATERIAL pursuant to the draft stipulated protective order. Accordingly, the photographs may not be used in any advertising or other public forum; their use must be consistent with, and solely related to, the pending litigation. At the conclusion of the litigation, all photographs (including originals and copies) and all negatives or digital media thereof will be given to plaintiff's counsel and no remaining originals, copies, negatives, or digital media of said photographs will remain with you, your clients, Mitchell, Maxwell & Jackson, or any other person or entity.

7. You, your clients, and Mitchell, Maxwell & Jackson agree that the appraisal of the apartment will be treated as CONFIDENTIAL MATERIAL pursuant to the draft stipulated protective order. Accordingly, neither the appraisal nor any

3/3/06

parts thereof, may be used in any advertising or other public forum; its use must be consistent with, and solely related to, the pending litigation. At the conclusion of the litigation, all documents reflecting the appraisal (including originals and copies) will be given to plaintiff's counsel and no remaining originals or copies will remain with you, your clients, Mitchell, Maxwell & Jackson, or any other person or entity.

8. No videotaping will be permitted as it is not contemplated by Federal Rule of Civil Procedure 34.

As I mentioned on the telephone, provided you agree to the above reasonable restrictions, we will agree to your proposed date and time of inspection as set forth in the notice. If you do not agree to the above reasonable restrictions, and we cannot reach an agreement with respect thereto, we will serve an objection to the notice and will not agree to allow any person to enter the premises until such time as an agreement on reasonable restrictions can be reached.

I look forward to hearing from you.

Michelle


*************************************
Michelle L. Dineen Jerrett, Esq.

C H O A T E

Choate, Hall & Stewart LLP
Two International Place
Boston, MA 02110
t 617-248-5261
f 617-248-4000
mdineenjerrett@choate.com
www.choate.com

3/3/06

# Exhibit 5

From: Hodes, Lisa M. [mailto:lhodes@sandw.com]
Sent: Friday, February 17, 2006 11:24 AM
To: Dineen Jerrett, Michelle L.
Cc: Varn, Larry
Subject: Rule 34 Request for Entry Upon Land


Michelle:

As a follow-up to your email, I am responding to your proposed limitations for our Rule 34
Request for Entry Upon Land.

As we discussed, Christopher Devine from Mitchell, Maxwell & Jackson will appraise the
apartment, and neither our clients nor their spouses will attend.  In addition, Larry and
I will not be present.  Mr. Devine has assured me that one hour should be plenty of time
for the appraisal.  As I have stated to you, this is a straight real property appraisal
and Mr. Devine's conduct will be consistent with that purpose.  However, Mr. Devine will
be permitted to open closets in order to determine square footage or whether the closet's
set-up contributes to the value of the apartment (i.e., if your client installed high-end
shelving, such as California Closets, that would increase the value of the apartment).
However, neither he nor we have any interest in your client's personal property.

Regarding paragraph 5, and consistent with our position throughout the negotiation of the
protective order, we will not agree to your request to restrict access by our clients and
their spouses to the appraisal materials. We will, of course, agree that the information
is only for this case and will not be disseminated beyond them.

Regarding paragraph 6, we will agree that the photographs will be used only for the
purposes of this litigation, but we will not agree to turn over the photographs and
negatives--our work product--to you at the conclusion of this litigation.  We will comply
with our obligations under Fed. R. Civ. P. 26(a)(2)(B), 26(b)(4)(A) and 26(e)(1) and the
applicable local rule if Mr. Devine is designated as a testifying expert.  Unless and
until that point, Fed. R. Civ. P. 26(b)(4)(B) governs.

This same argument supports our position regarding paragraph 7.  We will agree that the
appraisal will only be used for the purposes of this litigation, but we will not turn over
our work product to you.

Finally, we will agree to still photographs only and no videotaping.

Thanks,
Lisa

Lisa M. Hodes
Attorney At Law

Sullivan & Worcester LLP
One Post Office Square
Boston, MA 02109

T      617 338 2426
F      617 338 2880
lhodes@sandw.com
www.sandw.com

BOSTON   NEW YORK   WASHINGTON, DC


This message is intended to be confidential and may be legally privileged.  It is intended
solely for the addressee.  If you are not the intended recipient, please delete this

1

message from your system and notify us immediately. Any disclosure, copying, distribution or action taken or omitted to be taken by an unintended recipient in reliance on this message is prohibited and may be unlawful.

Communications from our firm may contain or incorporate federal tax advice. Under recently promulgated US Internal Revenue Service (IRS) standards, we are required to inform you that only formal, written tax opinions meeting IRS requirements may be relied upon by taxpayers for the purpose of avoiding tax-related penalties. Accordingly, this communication is not intended or written to be used, and it cannot be used, for the purpose of avoiding tax-related penalties under the Internal Revenue Code. Please contact a member of our law firm's Tax Department if you require a formal, written tax opinion that satisfies applicable IRS requirements, or if you have any other questions regarding federal tax advice.

# Exhibit 6

From: Varn, Larry [mailto:lvarn@sandw.com]
Sent: Friday, March 03, 2006 2:35 PM
To: Dineen Jerrett, Michelle L.
Cc: Hodes, Lisa M.; Leonard Bogorad (E-mail); Kiki Bogorad-Gross (E-mail); Cynthia Bogorad
(E-mail); James C. Gross (E-mail); Kenna, Larry
Subject: RE: Mullinix v. Bogorad-Gross, et al.


Michelle,

My comments are interlined.  For better or worse, this is all the time I can devote to
this case today.

Larry L. Varn
Sullivan & Worcester LLP
One Post Office Square
Boston, MA 02109
Direct Dial:  (617) 338-2965
FAX:  (617) 338-2880

Email:  lvarn@sandw.com
www.sandw.com

This message is intended to be confidential and may be legally privileged.


-----Original Message-----
From: Dineen Jerrett, Michelle L. [mailto:MDineenJerrett@choate.com]
Sent: Friday, March 03, 2006 2:19 PM
To: Varn, Larry
Cc: Hodes, Lisa M.; Leonard Bogorad (E-mail); Kiki Bogorad-Gross
(E-mail); Cynthia Bogorad (E-mail); James C. Gross (E-mail); Kenna,
Larry
Subject: RE: Mullinix v. Bogorad-Gross, et al.


Larry,
Thank you for the prompt email proposing dates for the depositions.

1.  As an initial matter, it is not practical to proceed with the
depositions of your clients and their spouses prior to having the
additional documents that remain outstanding.  Before we commit -- or
ask the deponents and you to commit -- to any dates, we would appreciate
knowing when we can expect the remaining documents that have been
withheld on "relevance" grounds.  It does not appear that the court
would share the Defendants' viewpoint as to a relevancy objection, so I
am hopeful that you will agree to produce any documents withheld on such
grounds as quickly as possible.  To the extent that any of those same
documents are also being withheld on the basis of a confidentiality
concern, I propose that we treat any such documents as "For Attorneys'
Eyes Only" (meaning, of course, attorneys who have filed an appearance
in this case), as we have been doing so far in this case, until such
time as a confidentiality agreement is in place.

We are reviewing the import of the Court's recent order.  As you know, our view of the
attorneys is that it extends to Jim Gross and Cynthia Bogorad, upon whom both the
executors and I rely and who are members in good standing of various bars.

2.  Your proposal of March 29 for the continuation of Kiki
Bogorad-Gross' deposition and the deposition of Jim Gross is acceptable,

1

provided the outstanding documents are produced by no later than March 22. I will have to confirm the amount of time already expended in Ms. Bogorad-Gross' deposition, but certainly will agree that her deposition will be limited to 7 hours of deposition testimony per the federal rules.

We will calendar 3/29 for those depositions.

3. I am no longer available on April 6 for the continuation of Leonard Bogorad's deposition and the deposition of Cynthia Bogorad, and apologize for any inconvenience. Could you please propose some additional possible dates? We can discuss location, and the amount of time remaining for Mr. Bogorad's deposition, when you are able to provide some proposed dates.

We moved several things to accommodate 4/6. We might be able to do 4/5 but we were told that 4/5 wasn't available for you. I have to think at some point that Choate can cover these depositions, if they want to proceed with them at all.

You are correct that I will be away for the next two weeks. I expect to have at least some access to email during that time period, but would appreciate trying to reach an agreement on these issues prior to leaving.

Thank you in advance.
Michelle

-----Original Message-----
From: Varn, Larry [mailto:lvarn@sandw.com]

Sent: Friday, March 03, 2006 12:57 PM
To: Dineen Jerrett, Michelle L.
Cc: Hodes, Lisa M.; Leonard Bogorad (E-mail); Kiki Bogorad-Gross (E-mail); Cynthia Bogorad (E-mail); James C. Gross (E-mail); Kenna, Larry
Subject: Mullinix v. Bogorad-Gross, et al.


Michelle,

I am writing regarding the scheduling of the remaining depositions of our clients and I have checked their availability and compared it with my understanding of the dates you are available after you return from vacation.

1. Kiki Bogorad-Gross can be available for the conclusion of her deposition on March 29th at your office. We can start pretty much whenever you want within reason. You have already deposed her for at least 5.5 hours so, per FRCP 30(d)(2), we will make her available for 1-1/2 additional hours.

2. Jim Gross can also be available for up to 7 hours on March 29th, also at your office.

3. Both Len and Cynthia Bogorad can be avilable at our Washington, D.C., office on April 6th. Again, we can start pretty much whenever you want within reason. Len has already been deposed for more than 7 hours; however, we will make him available for additional one (1) hour. Cynthia Bogorad can be available for a full 7 hours that day.

I understand that today is your last day in the office before departing for a 2-week vacation. Obviously I can't hold these dates, either for my clients or for myself, in limbo for two weeks so I would be grateful if you or someone else from your office would get back to me as soon as possible.

Larry L. Varn
Sullivan & Worcester LLP
One Post Office Square
Boston, MA 02109
Direct Dial:  (617) 338-2965
FAX:  (617) 338-2880


Email:  lvarn@sandw.com
www.sandw.com

This message is intended to be confidential and may be legally
privileged.


This message is intended to be confidential and may be legally
privileged.  It is intended solely for the addressee.  If you are not
the intended recipient, please delete this message from your system and
notify us immediately.  Any disclosure, copying, distribution or action
taken or omitted to be taken by an unintended recipient in reliance on
this message is prohibited and may be unlawful.

Communications from our firm may contain or incorporate federal tax
advice.  Under recently promulgated US Internal Revenue Service (IRS)
standards, we are required to inform you that only formal, written tax
opinions meeting IRS requirements may be relied upon by taxpayers for
the purpose of avoiding tax-related penalties.  Accordingly, this
communication is not intended or written to be used, and it cannot be
used, for the purpose of avoiding tax-related penalties under the
Internal Revenue Code.  Please contact a member of our law firm's Tax
Department if you require a formal, written tax opinion that satisfies
applicable IRS requirements, or if you have any other questions
regarding federal tax advice.
*********************************************************************
This Message is transmitted to you by the law firm of Choate, Hall & Stewart LLP.  The
substance of this message, along with any attachments, may be confidential and legally
privileged.  If you are not the designated recipient of this message, please destroy it
and notify the sender of the error by return e-mail or by calling 1-800-520-2427.


Under regulations of the Treasury Department, we are required to include the following
statement in this message: Any advice contained herein (or in any attachment hereto)
regarding federal tax matters was not intended or written by the sender to be used, and it
cannot be used by any taxpayer, for the purpose of avoiding penalties that may be imposed
on the taxpayer.

For more information about Choate, Hall & Stewart LLP, please visit us at choate.com

*********************************************************************

This message is intended to be confidential and may be legally privileged.  It is intended
solely for the addressee.  If you are not the intended recipient, please delete this
message from your system and notify us immediately.  Any disclosure, copying, distribution
or action taken or omitted to be taken by an unintended recipient in reliance on this
message is prohibited and may be unlawful.

Communications from our firm may contain or incorporate federal tax advice.  Under
recently promulgated US Internal Revenue Service (IRS) standards, we are required to
inform you that only formal, written tax opinions meeting IRS requirements may be relied
upon by taxpayers for the purpose of avoiding tax-related penalties.  Accordingly, this
communication is not intended or written to be used, and it cannot be used, for the
purpose of avoiding tax-related penalties under the Internal Revenue Code.  Please contact
a member of our law firm's Tax Department if you require a formal, written tax opinion
that satisfies applicable IRS requirements, or if you have any other questions regarding
federal tax advice.

# Exhibit 7

Page 1

Volume: I
Pages: 207
Exhibits: 1-13


UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

CIVIL ACTION No. 04-12684-WGY



--------------------------------X
KATHLEEN P. MULLINIX,
            Plaintiff,
   Vs.
KIKI BOGORAD-GROSS and LEONARD P.
BOGORAD, as They are Executors
of the Will of Lawrence Bogorad,
            Defendants.
--------------------------------X

  DEPOSITION of:  KIKI BOGORAD-GROSS
  Date:  Friday, January 20, 2006
  Time:  10:00 a.m.
  Location:  Choate, Hall & Stewart, LLP
             Two International Place
             Boston, MA   02110


--- REPORTER: Evelyn M. Slicius, CSR, RPR ---

        K. L. GOOD & ASSOCIATES
     Registered Professional Reporters
             P.O. BOX 367
     Swampscott, Massachusetts 01907
   Tel. 781-598-6405  *  Fax. 781-598-0815

Page 170

1   Apartment?
2   A.  No.
3   Q.  Did you have any indication from your father
4       that he was not supportive of Kathy's purchase
5       of the Apartment?
6   A.  I didn't have any indication of it, no.
7   Q.  Did you have any indication from your father
8       that he was supportive of her purchasing the
9       Apartment?
10  A.  I would say I had a general sense that he was
11      supportive of buying one.
12  Q.  Did you have any conversation with your father
13      about whether he intended to stay at the
14      Apartment after the renovations were complete?
15  A.  No.
16  Q.  During the time after Ms. Mullinix sold her
17      apartment, to your knowledge, where did she
18      live?
19  A.  She lived in Lexington while the renovations
20      were being done.
21  Q.  To your knowledge, did she live any other place
22      after her East 87th Street apartment was sold up
23      to the time the Lexington house was sold?
24  A.  She spent a few nights at the Apartment on 5th

Page 171

1   Avenue.
2   Q.  How did you learn that?
3   A.  She told me.
4   Q.  Other than with the exception of a few nights,
5       do you know if Kathy Mullinix lived anywhere
6       else during that time period?
7   A.  Not on a -- I mean, she may have -- not on a
8       permanent basis though.
9   Q.  Did you have any information from your father
10      that he did not plan to spend time at the
11      Apartment after the renovations were complete?
12          MR. VARN:  I'm sorry can you say that
13      one more time.
14  Q.  Did?
15  Q.  Did you have any information from your father
16      that he did not intend to spend time at the
17      Apartment when the renovations were complete?
18  A.  No.
19  Q.  Other than discussions with your father and
20      Kathy Mullinix prior to your father's death, did
21      you talk to anybody about the Apartment or the
22      plans to renovate the Apartment?
23  A.  In what context?
24  Q.  In any context.

Page 172

1   A.  What was the time frame, I'm sorry, again?
2   Q.  Up until your father's death, did you have any
3       conversations with people other than your father
4       or Kathy Mullinix about the Apartment or the
5       plans to renovate the Apartment?
6   A.  I probably did.
7   Q.  With whom?
8   A.  Friends, you know, that there was -- just in
9       passing, that Kathy was buying an apartment in
10      New York.  I don't know if it was about the
11      renovations, I think it was more the purchase of
12      the Apartment.
13  Q.  Do you recall any specific statements that you
14      made?
15  A.  No.  I think just that she was buying an
16      apartment, she was moving in and buying an
17      apartment on 5th Avenue.
18
19          MS. DINEEN JERRETT:  Back on the
20      record.  And can we mark that, please.f
21          (Exhibit No. 9, Large packet of
22      American Express corporate statements, etc., was
23      marked for identification.)
24          MS. DINEEN JERRETT:  During the break

Page 173

1   Mr. Varn and I discussed what has now been
2   marked as Exhibit 9 to Ms. Bogorad-Gross'
3   deposition.  And correct me if I'm wrong, you
4   will stipulate that Exhibit 9, to the extent
5   that it bears documents with a Bates label
6   beginning with "Kiki" and a number, are
7   documents that you produced on behalf of your
8   client?
9       MR. VARN:  That's correct.
10  Q.  Ms. Bogorad-Gross, we talked a little while ago
11      about your conversation with Ms. Mullinix on the
12      airplane and you you testified, I believe, that
13      you spoke at some point after that with your
14      brother about that conversation, correct?
15  A.  Yes.
16  Q.  I don't believe I asked you and I apologize if
17      I did, but do you recall what you said to your
18      brother during that conversation?
19  A.  I just said that Kathy had mentioned or had told
20      me that she was concerned because my father had
21      promised that he would pay for the $400,000
22      renovation to the Apartment.
23  Q.  Do you recall saying anything else to your
24      brother about that topic during that

Page 174

1     conversation?
2  A.  I don't recall.
3  Q.  What did your brother say in response?
4  A.  I don't recall the exact words of what he said.
5  Q.  Do you recall generally what he said?
6  A.  Think he was surprised, that was the first that
7     he had heard of it.
8  Q.  He indicated to you words to the effect that he
9     was --
10  A.  Well, his expression was that he was surprised
11     to hear about that.
12  Q.  Do you recall anything else about that
13     conversation with your brother?
14  A.  No. Other than that there were other things
15     discussed during the conversation, such as
16     funeral arrangements and the like.
17  Q.  And what else do you recall being discussed
18     during that conversation?
19  A.  Funeral arrangements and things like that.
20  Q.  When was your father's funeral?
21  A.  I believe it was New Year's day, the day before
22     New Year's, I'm not sure, it was a Friday I
23     believe.
24  Q.  In any event, is it fair to say that your

Page 175

1     conversation with your brother about what
2     Ms. Mullinix told you on the airplane had
3     occurred after the airplane ride but before
4     your father's funeral?
5  A.  I would say so, yes.
6  Q.  Did you speak with anyone else about your
7     conversation with Kathy Mullinix other than
8     your husband and your brother?
9  A.  I spoke to our attorney.
10  Q.  Other than those individuals you identified, did
11     you speak with anyone else about that issue?
12  A.  No.
13  Q.  Did you speak with Kathy Mullinix again about
14     that issue?
15  A.  In what time frame?
16  Q.  At any point after the Mexico plane ride?
17  A.  I don't know that I did.
18  Q.  In case my questions weren't clear, other than
19     your brother, your husband and your lawyers, at
20     any point after Kathy Mullinix made that
21     statement to you on the plane ride to Mexico,
22     have you spoken with anybody about that
23     including Kathy Mullinix?
24  A.  Yes, I guess the answer would be yes.

Page 176

1  Q.  Who have you spoken with on that subject?
2  A.  Friends, relatives.
3  Q.  Can you identify by name who you've spoken with?
4  A.  I spoke to Mascha Ziskind, M-a-s-c-h-a,. Z.
5  Q.  ZYSKIND. Ziskind. K Y N D?
6
7  Q.  Other than Mascha Ziskind have you spoken with
8     anybody else?
9  A.  I'm sure I have, I can't recall everybody's
10     name.
11  Q.  Can you recall anybody else's name?
12  A.  This is generally the discussion about the --
13     just to reiterate the question -- about the
14     discussion on the airplane?
15  Q.  I want to make sure we are both clear.
16     At any point after your conversation
17     with Kathy Mullinix on the plane about her
18     allegation that your father agreed to pay for
19     some amount of renovations to the Apartment,
20     have you spoken with any person at any time
21     about that conversation other than your husband,
22     your brother, and your lawyers?
23  A.  Yes.
24  Q.  You mentioned Ms. Ziskind. Who else have you

Page 177

1     spoken with about that?
2  A.  Numerous friends. Do you want all their names?
3  Q.  Yes, the names that you can remember.
4  A.  Alice Holstein, Sheila Treve, Laurie Gross.
5  Q.  Are there any other names that you can recall?
6  A.  Ira Gross. There probably are other people but
7     those would be the main people that I would say
8     I had conversations with.
9  Q.  And when you say there are "probably other
10     people," is there anybody by name that you
11     identify that you had spoken to regarding that
12     subject?
13  A.  I'm sure there are, yes.
14  Q.  Any names that you can provide?
15  A.  Ron Treve, Sarah Wolfe -- that's it.
16  Q.  Is it fair to assume that Laurie Gross and Ira
17     Gross are family members?
18  A.  Yes.
19  Q.  With respect to Alice Holstein Sheila and Ron
20     Treve, are those family members or --
21  A.  Friends.
22  Q.  And with respect to Mascha Ziskind, she is a
23     friend?
24  A.  Yes.

45 (Pages 174 to 177)

Page 178

1   Q.  And a slightly different question, so if you're
2       not clear please ask me to clarify.  And I'll
3       try to short circuit this as well.
4           I'm making an assumption that you have
5       spoken with your husband, your brother and your
6       lawyers about the issues in this case, is that a
7       correct assumption?
8   A.  Yes.
9   Q.  Other than those individuals, have you spoken
10      to any other person about the issues in this
11      lawsuit?
12  A.  In general terms, yes.
13  Q.  I'll to try to short-circuit this even further.
14          The individuals that you have
15      identified, those being Mascha Ziskind, Alice
16      Holstein, Laurie Gross, Ira Gross, Ron Treve and
17      Sarah Wolfe, have you spoken with those
18      individuals about the issues in the case
19      generally?
20  A.  Yes.
21  Q.  Of that group of people, is there anyone that
22      you have not spoken with generally about the
23      issues in this case?
24  A.  No.

Page 179

1   Q.  Is there anyone in addition to those people that
2       you have spoken to generally about the issues in
3       this case?
4   A.  No.
5   Q.  Have you spoken to Cynthia Bogorad?
6   A.  Yes.  I thought she was included in the family,
7       so I wasn't including her.
8   Q.  I just want to make sure I have the whole
9       universe of people.
10  A.  My brother, Leonard Bogorad, my children, David
11      and Ben.
12  Q.  Anyone else?
13  A.  I don't believe so.
14  Q.  Did you speak with Cynthia Bogorad about your
15      conversation with Ms. Mullinix on the airplane?
16  A.  She may have been present in a conversation.
17  Q.  You can't recall one way or the other?
18  A.  No.
19  Q.  Have you spoken with your son Daniel about the
20      conversatioin with Kathy Mullinix on the
21      airplane?
22  A.  He may have been present when we discussed it.
23  Q.  But you don't recall specifically?
24  A.  Right.

Page 180

1   Q.  Is your answer any different with respect to
2       Ben?
3   A.  No.
4   Q.  Have you spoken with Marcie Schneider?
5   A.  No.
6   Q.  Have you spoken with Raynor Warner?
7   A.  I don't believe so.
8   Q.  Have you spoken with Ranne Warner?
9   A.  I don't believe so.
10  Q.  Have you spoken with any of your father's former
11      neighbors?
12  A.  I don't believe so.
13  Q.  With the exception -- is Mascha Ziskind a former
14      neighbor of your father's?
15  A.  No.
16  Q.  So is there any other person that you can think
17      of that you have spoken to generally about the
18      issues in this case?
19  A.  I don't believe so, no.
20          MS. DINEEN JERRETT:  I'm trying to
21      short-circuit this as best as I can, Larry.  If
22      you have an objection to the way I'm asking the
23      questions, I'll do it the other way?
24          MR. VARN:  You'll hear if I did.

Page 181

1   Q.  With respect to any of these individuals that
2       you've identified, have you discussed the
3       estate's position with respect to Kathy
4       Mullinix's claims that have been set forth in
5       the complaint?  It's just a yes or no.
6           MR. VARN:  I just want to point out
7       one thing so you don't inadvertently walk into
8       something.
9           Ira Gross is a lawyer and my partner.
10      And I know as a fact that the family has also
11      consulted with him in that professional
12      capacity, and not just in this capacity as a
13      member of the family.  So if you excise Ira out
14      of this, I think we are probably okay.
15          MS. DINEEN JERRETT:
16  Q.  I don't want to excise him out of it.  If there
17      were any conversations that were not in the
18      professional context.  But with that caveat, if
19      it was in the context of a professional
20      consultation or professional advice, then I
21      will excise him from these questions generally.
22          Do you understand what I'm saying?
23  A.  No.
24          MR. VARN:  The last question you can

46 (Pages 178 to 181)

K.L. Good & Associates, 781-598-6405

Page 182

1    answer yes or no. I don't have any problem with
2    that.
3        MS. DINEEN JERRETT: Since we are on
4    this topic, we'll try to deal with this now.
5        It's my understanding from
6    representation that your counsel just made that
7    Ira Gross is an attorney at Sullivan and
8    Worcester with whom you and possibly other
9    members of your family have engaged in
10   professional consultations with regarding this
11   case; is that true? Just yes or no.
12   A.  Yes.
13   Q.  With respect just to Mr. Gross, meaning Ira
14   Gross, have you also had conversations with
15   him related to the issues in this case that
16   were not in the context of the professional
17   consultation?
18   A.  Yes.
19   Q.  What I'm trying to do to short-circuit this,
20   excluding conversations that you had with
21   Mr. Gross in a professional context, I don't
22   want you to answer my questions with respect to
23   just that subset of conversations. But with
24   respect to conversations that you had with Ira

Page 183

1    Gross, not in a professional consultation
2    context, as well as all of these other
3    individuals that we have identified over the
4    last few minutes.
5        My question to you is -- and this is
6    just a yes or no question right now -- have you
7    spoken with any of those individuals about the
8    estate's position with respect to claims made by
9    Kathy Mullinix as set forth in the complaint?
10   A.  Yes.
11   Q.  Of the individuals that have been listed, is
12   there anyone that you have not spoken do about
13   the estate's position with respect to the
14   allegations and Kathy Mullinix's complaint?
15   A.  No.
16   Q.  In the context of those communications, again
17   with the exception of communications with Ira
18   Gross in a professional consultation capacity,
19   have you told any of these individuals the
20   basis for the estate's position with respect
21   to Kathy Mullinix's allegations in the
22   complaint?
23   A.  Yes.
24   Q.  Who?

Page 184

1    A.  The names that I've given you.
2    Q.  What have you told them?
3    A.  That the estate documents that were set forth
4    by my father did not include -- they did not
5    include this, it is an alleged promise to
6    provide these, the funds, for the renovations
7    that were not a part of his will or his estate.
8    Q.  Anything else?
9    A.  No.
10   Q.  Have you indicated that, as a result of the
11   statement you just made, that you have received
12   legal advice as to how to respond to the
13   complaint?
14   A.  I don't know that I've mentioned it to them.
15   Q.  Have you mentioned to any of the individuals,
16   with the exception of the one we previously made, what
17   your lawyers have told you with respect to
18   respect to the allegations as set forth in the
19   complaint?
20   A.  I suspect I have.
21   Q.  What have you said?
22   A.  That our lawyers have advised us because it is
23   not part of the estate that we are not
24   authorized as in our fiduciary responsibility

Page 185

1    to make those payments.
2    Q.  Can you recall anything else about what you had
3    said on the subject of what your lawyers have
4    told you to any of these other people?
5    A.  No.
6    Q.  That is the extent to what you can recall?
7    A.  Yes, mm-hmm.
8    Q.  With respect to Ms. Mullinix's claims regarding
9    your father's alleged promise to pay for the
10   renovation costs up to $400,000, why is the
11   estate not paying those claims?
12       MR. VARN: Objection.
13   A.  My understanding is that they are not part of
14   the estate, part of the stipulation as the
15   estate is spelled out, it is not part of the
16   estate.
17   Q.  What does that mean?
18   A.  That my understanding from my lawyers, from my
19   attorney, is that, as trustees of the estate, we
20   are responsible for living up to the -- what is
21   in the estate.
22   Q.  By "what is in the estate," and correct me if
23   I'm wrong, I'm not trying to testify on your
24   behalf, do you mean the estate planning

47 (Pages 182 to 185)

# Exhibit 8

Page 1

Volume: I

Pages: 254

Exhibits: 1-15

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

CIVIL ACTION No. 04-12684-WGY

--------------------------------X
KATHLEEN P. MULLINIX,
                Plaintiff,
    Vs.
KIKI BOGORAD-GROSS and LEONARD P.
BOGORAD, as They are Executors
of the Will of Lawrence Bogorad,
                Defendants.
--------------------------------X

  DEPOSITION of: LEONARD P. BOGORAD
  Date: Thursday, January 19, 2006
  Time: 10:00 a.m.
  Location: Choate, Hall & Stewart, LLP
            Two International Place
            Boston, MA  02110


--- REPORTER: Evelyn M. Slicius, CSR, RPR ---

K. L. GOOD & ASSOCIATES
Registered Professional Reporters
P.O. BOX 367
Swampscott, Massachusetts 01907
Tel. 781-598-6405  *  Fax. 781-598-0815

Page 206

1    she didn't.
2    Q. Did you detail to Ms. Warner in your questions
3       any of the financial arrangements' details?
4    A. No.
5    Q. As best you can recall, what were the questions
6       you asked her?
7    A. I think it was, "Were you aware of any of the
8       financial arrangements associated with this?"
9       And I think she said, "No." And I think I had
10      a follow-up, in particular, "Did you have any
11      knowledge of any commitment to make any
12      payments after he died?" And she said, "No, I
13      didn't have any knowledge of the financial
14      arrangements."
15   Q. What else, if anything, do you recall about
16      that conversation?
17   A. I think I have covered everything that I can
18      recall. There may have been other things, but
19      that's all I can recall.
20   Q. Do you recall her saying anything else to you?
21   A. The general theme was sadness that it had come
22      to this, because she was obviously friends with
23      both of my parents and with Kathy, and she was
24      sad, as we all are, that this came to pass.

Page 207

1    Q. Other than Mrs. Warner, who else have you spoken
2       to about the lawsuit or the issues related to
3       the lawsuit?
4    A. No one with any relevance to it. I've talked
5       about it with, you know, my uncle and aunt and
6       cousins and people like that, just keeping them
7       up to date on what's going on.
8    Q. And in talking to your uncles and aunts and
9       cousins, what information have you provided?
10   A. A general summary of what Kathy's claims were
11      and what our opinion was of them.
12   Q. And when you communicated that opinion, what was
13      that opinion?
14   A. That, in my view, these are issues that should
15      be dealt with; and my father presumably intended
16      them to be dealt with through a will. And we
17      were puzzled as to why she would try to assert
18      these as something as gifts that she was
19      entitled to after he died when he was no longer
20      alive to consummate the gifts.
21   Q. Did you tell anyone about the basis for your
22      understanding as to the estate's denial of
23      Ms. Mullinix's claims?
24   A. I think I just summarized what I told them; if

Page 208

1    you consider that to be the basis, so be it.
2    Q. Is there anything else that you can recall
3       telling them?
4    A. I may have mentioned that, you know, she also
5       benefited greatly from having made this purchase
6       since the real estate condominium and co-op
7       market has been so hot in New York; it was a
8       very fortuitous purchase on her part, and she
9       undoubtedly has made a lot of money on it.
10   Q. And what is the basis for your opinion on that
11      matter?
12   A. I'm a real estate expert and I'm aware, in
13      general, of condominium and co-op price trends
14      in major cities. I've also, you know, out of
15      curiosity, looked at the internet and looked at
16      several sources on co-op prices and seen, not to
17      my surprise, that they have gone up at an
18      unprecedentedly fast-paced during the period
19      that she's owned the co-op.
20   Q. Have you specifically looked at co-op prices on
21      5th Avenue?
22   A. Not price trends specifically, no.
23   Q. What have you looked at?
24   A. There are several companies -- I don't recall

Page 209

1    the names offhand -- but there are several
2    companies easily accessible on the internet that
3    track average prices of co-ops and condominiums
4    in Manhattan, and I think they may have some
5    sub-area data, the pattern has been pretty
6    consistently -- you know, it's had increases of
7    25, 30 percent a year. It's had unbelievably
8    fast increases in prices, as has been the case
9    in a number of other coastal cities.
10   Q. Have you done any other research or looking with
11      respect to Ms. Mullinix's investment?
12   A. No.
13   Q. Is it fair to say that, based upon what you have
14      looked at, that Brendan Mullinix's prediction
15      was a good one?
16   A. I'm not at all -- I don't have any evidence that
17      5th Avenue prices have gone up more than the
18      87th Street prices; and I would be surprised to
19      find that or, if that is the case, it would be a
20      random occurrence.
21          I do think that her decision to put a
22      lot more chips in the market, if you want to
23      call it that, to invest more money; when you
24      combine the cost of the new apartment and the

53 (Pages 206 to 209)

Page 210

1   renovations, she obviously had more money in the
2   real estate market, in co-ops and condominiums,
3   than she did in the old apartment. And so in
4   that respect, I think that she has benefited
5   greatly as it happened from making this
6   decision.
7   Q.  And what is the impact of her financial gain?
8   What is the impact of -- what is the importance
9   of that in relation to you communicating that
10  fact to your uncles, aunts and other
11  individuals?
12  A.  In my opinion -- and, again, I'm not a lawyer --
13  but in my opinion, if there's -- you know, I
14  think my understanding of her claim is that
15  she relied to her detriment on some asserted
16  promises.
17      And even if those promises were true,
18  and even if they were intended to live beyond
19  his death, that she certainly did not rely
20  detrimentally on this, she, in fact, benefited
21  greatly from having made those decisions,
22  whether they were based on that reliance or
23  not.
24  Q.  So is it your testimony that because

Page 211

1   Mrs. Mullinix made a good financial decision,
2   that she is otherwise not entitled to the
3   benefit of an agreement or promise or commitment
4   made by your father to her?
5       MR. VARN:  Objection.
6   A.  It is getting into the things I've discussed
7   with a lawyer, so I probably need to stay away
8   from talking about that.
9   Q.  I'm not asking anything that they told you. I'm
10  asking you --
11  A.  I can't answer without reflecting things that
12  they've told me, because it relates to things
13  that they've told me.
14  Q.  Have you made any statements to other
15  individuals, respecting the financial gain
16  that you perceive that Ms. Mullinix has in the
17  Apartment?
18  A.  I believe I may have mentioned it to a cousin
19  or two, I'm not sure.
20  Q.  And what have you mentioned to them?
21  A.  Well, what I just told you that, as it happened,
22  she has made a lot of money on this Apartment;
23  this was hardly a detrimental move on her part.
24  Q.  And have you made any statements to these

Page 212

1   individuals or others as to the impact of that
2   decision on whether she should receive the
3   benefit of an agreement, promise, or other
4   arrangements that she made with your father?
5   A.  I don't believe I have. Their reaction has been
6   instantaneous; they can't believe that she is
7   bringing the suit or that she would have any
8   rights beyond what is in the will to get any
9   money out from this. That would have been their
10  reaction after I gave them a quick rundown on
11  what was happening.
12  Q.  Why, in general, were you giving these people
13  rundowns of the lawsuit?
14  A.  It's a major thing happening in our lives and
15  they were curious about what was going on.
16      They were aware this was happening
17  and they knew Kathy and thought highly of her
18  and they were pretty shocked that she was
19  battling over this stuff.
20  Q.  Can you provide me a list of names of the
21  individuals that you spoke with?
22  A.  I'm not sure I remember every one who was in the
23  room at the time, but my Uncle Earl Sagen, my
24  Aunt Barbara Sagen, my cousin Steve Sagen, his

Page 213

1   wife Phyllis Pearle Roth, I think my uncle
2   Harold Rosenthal. Those are the ones that I
3   remember.
4   Q.  And was this one conversation or more than one
5   conversation?
6   A.  The main one I recall was in San Diego, a number
7   of people were together for a birthday party. I
8   think I may have gotten into the conversation
9   with a few of the cousins.
10  Q.  And when did that conversation take place?
11  A.  I don't recall. I've have to look it up. Some
12  time last year, I believe.
13  Q.  And you reference that there may have been other
14  conversationss with cousins?
15  A.  You know, I was with some of my cousins and my
16  uncle last week and they asked, "How were things
17  going with the case?" And I mentioned, "That I
18  was going to be" -- you know, what the status
19  was and that I was "going to be deposed this
20  week."
21  Q.  What else did you say last week with respect
22  to --
23  A.  They aleard knew everything else, so we really
24  didn't get beyond any substance other than they

Page 214

1 expressed condolences that this was still
2 dragging on.
3 Q. Other than the people you've just identified and
4 Mrs. Warner, have you spoken with anybody else
5 about this case?
6 A. I don't recall. I may have mentioned -- I
7 probably mentioned it in passing just to a
8 couple of friends of mine that this was going
9 on. And they were generally surprised to hear
10 this one. I would say that everyone I've
11 mentioned this to thought that the will was
12 what determined these things.
13 Q. So when you made these statements to the various
14 individuals, as best you can recall, what is it
15 that you've said?
16     MR. VARN: Objection. Asked and
17 answered.
18 A. I've already answered that. I've spent about
19 20 minutes answering that.
20 Q. Well, did you go through the claims with
21 specificity?
22 A. No.
23 Q. So tell me with respect to the lawsuit and the
24 claims everything that you can recall describing

Page 215

1 about those claims?
2     MR. VARN: Objection. Asked and
3 answered.
4 A. I think I've told you everything. If you want
5 me to go through everything for another
6 half-hour, I will. I don't understand the
7 relevance.
8     MR. VARN: If you have something more
9 to add to what you've already said in response
10 to answering the question, add it; if you don't,
11 you don't.
12 A. I don't have anything else to add.
13 Q. Have you told individuals that Ms. Mullinix
14 claims that your father promised to pay for up
15 to $400,000 of renovation costs?
16 A. I don't remember whether I used a dollar amount
17 or not. I told them that she claims that he had
18 promised to pay for her renovation costs.
19 Q. Have you told them that she claims that your
20 father promised to pay for one-half of the
21 capital gains tax consequences for the sale of
22 her East 87th Street Apartment?
23 A. I don't believe I mentioned that, no.
24 Q. Did you mention that she claims that your father

Page 216

1 promised to pay for one-half of the storage
2 costs for their belongings?
3 A. I don't believe so.
4 Q. Did you mention that she claims that your father
5 promised to pay the monthly maintenance costs
6 for the Apartment?
7 A. I may have, I'm not sure.
8 Q. And did you mention anything with respect to her
9 claims regarding the Lexington house?
10 A. I don't recall. I don't think so but I may
11 have.
12 Q. Have you discussed with any of these individuals
13 the estate's response to those claims?
14 A. Just what I've told you already, my assessment
15 of things.
16 Q. Have you ever spoken with Marsha Ziskind?
17 A. Yes, I did, when she was at Kiki's house, when
18 she was over for dinner, I guess.
19 Q. And who is she?
20 A. She is a very long-time friend of my parents. I
21 think she knows Kathy as well. But I think they
22 have known her since before I was born.
23 Q. When was this dinner at your sister's house?
24 A. A few months ago, I guess. My sister probably

Page 217

1 remembers more than I do.
2 Q. What do you recall saying to Ms. Ziskind during
3 that dinner?
4 A. I think we gave her a general summary of the
5 facts, that Kathy was claiming the rights to be
6 paid for renovation and costs. And I can't
7 remember whether we mentioned any other things
8 or not. And that was it.
9 Q. And what did Ms. Ziskind say in response?
10 A. As I recall, she expressed sort of dismay that
11 these claims would have been made, and that she
12 didn't seem to understand the logic of why she
13 would be entitled to it after my father died.
14 He was certainly very generous when he was
15 alive.
16     And it's the same reaction we've had
17 from these other relatives, and so on; they
18 don't understand the basis for this.
19 Q. And when she indicated that she didn't
20 understand the basis for it, what did you say?
21 A. I don't recall any response; I think I nodded or
22 whatever.
23 Q. Do you recall anybody responding?
24 A. Not specifically, no.

Page 218

1　Q.　Did you or anyone else during that dinner ask
2　　　Mrs. Ziskind if she had any information
3　　　regarding the issues in the case?
4　A.　I may have asked her. I know she didn't have
5　　　any information regarding any promise to pay
6　　　but -- I mean, she didn't state anything of that
7　　　sort, whether we asked or not, I suspect someone
8　　　did, but I don't remember for sure.
9　Q.　And who else was there at the dinner?
10　A.　Kiki and Jim and my wife Cindy, I believe was
11　　　there.
12　Q.　And prior to that dinner, do you recall speaking
13　　　at any point to Mrs. Ziskind about the case or
14　　　the issues in the case?
15　A.　No, I do not.
16　Q.　Do you recall anybody else speaking to her about
17　　　the issues in the case or the lawsuit?
18　A.　I don't know.
19　Q.　To your knowledge, has anyone else spoken to
20　　　her?
21　A.　Not to my knowledge; but, you know, Kiki and Jim
22　　　live close to her and they may have talked to
23　　　her.
24　Q.　Other than the individuals that you've

Page 219

1　　　identified that are family members of yours,
2　　　Ms. Warner and Ms. Siskind, have you talked to
3　　　anybody else many about this lawsuit or the
4　　　issues involved in this lawsuit?
5　A.　Other than who we've mentioned, I don't recall
6　　　anybody, no.
7　Q.　With respect to Ms. Mullinix's claims regarding
8　　　the costs for the Lexington house -- sorry, I
9　　　misspoke -- strike that.
10　　　　　With respect to Ms. Mullinix's claims
11　　　regarding the costs she incurred to rent an
12　　　Apartment after the Lexington house was sold, do
13　　　you recall that she has made those claims
14　　　against the estate?
15　A.　Yes.
16　Q.　If you will, look at Exhibit 10, which I believe
17　　　you still have before you, in paragraphs 52, 53,
18　　　54, 55 and 56, and the corresponding paragraphs
19　　　in the Answer.
20　A.　Yes.
21　Q.　Do you recall those allegations?
22　A.　Yes.
23　Q.　Based upon the Answers provided by the estate
24　　　with respect to paragraphs 54 through 56, the

Page 220

1　　　estate denies those claims, correct?
2　A.　Correct.
3　Q.　And with respect to paragraph 53, the estate
4　　　denies the allegations, "Except deny having any
5　　　knowledge or information sufficient to form a
6　　　belief as to the truth of the allegations in
7　　　the first sentence thereof"; is that correct?
8　A.　I think it says "Except deny having knowledge or
9　　　information sufficient" -- that's correct.
10　Q.　And with respect to the first sentence in
11　　　paragraph 53 of the Complaint, "Mr. Bogorad
12　　　promised Ms. Mullinix that she would live in
13　　　the Lexington home until such time as the
14　　　renovations to the Apartment were complete." Is
15　　　that a fair reading of that sentence?
16　A.　It's a fair reading of the sentence, yes.
17　Q.　Do you understand the basis for the estate
18　　　denying the allegations contained in paragraphs
19　　　53 through 56?
20　A.　At least part of the reasons. I think I
21　　　understand all of the reasons, some of which are
22　　　related potentially to legal issues. But the
23　　　basic issue here is that there was never such a
24　　　commitment to allow her to live there until it

Page 221

1　　　was complete. There was certainly never such a
2　　　commitment. I think she asserted it someplace
3　　　that we had even told her that she could -- it
4　　　was during this phone call on January 25th that
5　　　I had told her that she could rent an Apartment,
6　　　if necessary, and I certainly said nothing of
7　　　the kind.
8　Q.　During that conversation or at any point, do you
9　　　recall Ms. Mullinix asking you about alternative
10　　　living arrangements once the Lexington house was
11　　　sold?
12　A.　No, she never asked me about that.
13　Q.　Do you recall Ms. Mullinix ever suggesting that
14　　　the estate should consider alternative living
15　　　arrangements for her after the Lexington house
16　　　was sold?
17　A.　She never suggested this to me and I never
18　　　heard that she had suggested that to anybody
19　　　else.
20　Q.　With respect to the claims in the Complaint
21　　　regarding your statements about the Lexington
22　　　home, your contention is that those statements
23　　　are untruthful; is that correct?
24　A.　They are incorrect, yes.

56 (Pages 218 to 221)

# Exhibit 9

From: Hodes, Lisa M. [mailto:lhodes@sandw.com]
Sent: Wednesday, February 08, 2006 5:31 PM
To: Dineen Jerrett, Michelle L.
Cc: Varn, Larry
Subject: Mullinix v. Bogorad-Gross, et al.


Michelle:

Larry's trial just concluded today and we spoke about a number of issues regarding this case.


First, absent a certification from you or an affidavit from Kathy that all documents responsive to our defendants' document requests have been produced, we will not be making any witnesses available for depositions. We simply cannot allow a piecemeal document production that is designed for the hurt and harassment of our clients.

Second, we will not sign off on any protective order that does not allow our clients to talk with their spouses on this case. Both Jim Gross and Cindy Bogorad are lawyers that are subject to the rigorous ethical requirements of the Bar. In addition, both assist us in providing legal advice on this case.

I look forward to seeking a resolution on these matters.

Thanks,
Lisa

Lisa M. Hodes
Attorney At Law

Sullivan & Worcester LLP
One Post Office Square
Boston, MA 02109

T     617 338 2426
F     617 338 2880
lhodes@sandw.com
www.sandw.com

BOSTON    NEW YORK    WASHINGTON, DC


This message is intended to be confidential and may be legally privileged.  It is intended solely for the addressee.  If you are not the intended recipient, please delete this message from your system and notify us immediately.  Any disclosure, copying, distribution or action taken or omitted to be taken by an unintended recipient in reliance on this message is prohibited and may be unlawful.

Communications from our firm may contain or incorporate federal tax advice.  Under recently promulgated US Internal Revenue Service (IRS) standards, we are required to inform you that only formal, written tax opinions meeting IRS requirements may be relied upon by taxpayers for the purpose of avoiding tax-related penalties.  Accordingly, this communication is not intended or written to be used, and it cannot be used, for the purpose of avoiding tax-related penalties under the Internal Revenue Code.  Please contact a member of our law firm's Tax Department if you require a formal, written tax opinion that satisfies applicable IRS requirements, or if you have any other questions regarding federal tax advice.

# Exhibit 10

From: Dineen Jerrett, Michelle L.
Sent: Thursday, February 09, 2006 2:13 PM
To: 'Hodes, Lisa M.'
Cc: Varn, Larry; Kenna, Larry
Subject: RE: Mullinix v. Bogorad-Gross, et al.


Lisa-
If you want to file a motion for a protective order regarding the depositions of Cynthia
Bogorad and Jim Gross and/or the continued depositions of your clients, that's your
prerogative.  Our document productions have in no way been "designed for the hurt and
harassment" of your clients.  I cannot and will not provide you any certification, or have
my client provide an affidavit, regarding the document production.  As I explained in my
February 3 cover letter accompanying our supplemental document production, documents in
the form of photographs have not been included in the production (although I have made the
offer to have them available for inspection, as is permitted under the Federal Rules of
Civil Procedure, to which I have received no response).  I also explained that there are a
small number of boxes presently outside of my client's possession, custody or control that
may -- although it is highly unlikely -- contain responsive, non-privileged documents.
Finally, before you continue to make accusations regarding my client's document
productions, I would suggest that you look to your own clients' productions and the
notable absence of certain responsive, non-privileged documents such as photographs,
documents pertaining to Lawrence Bogorad's estate, and all documents relating to Ms.
Mullinix, just to name a few.  As you know, I have requested an explanation as to why such
documents have not been provided by your clients, and have yet to receive any substantive
response.

I expect next week's depositions to proceed unless you file a motion for a protective
order.  And, absent a motion for a protective order, I expect this issue to be dropped.

With respect to the Stipulated Protective Order, I fail to see how restrictions regarding
Ms. Bogorad's or Mr. Gross' access to CONFIDENTIAL MATERIALS "does not allow [your]
clients to talk with their spouses on this case."  It does no such thing.  Your clients'
spouses do not need to review confidential materials, discuss them with your clients, or
provide legal advice with respect thereto.  Nothing in your purported explanation suggests
otherwise.  If there is a specific, articulable need for your clients' spouses to review
such material in the future, I suggest we could address the issue then.

Michelle

-----Original Message-----
From: Hodes, Lisa M. [mailto:lhodes@sandw.com]
Sent: Wednesday, February 08, 2006 5:31 PM
To: Dineen Jerrett, Michelle L.
Cc: Varn, Larry
Subject: Mullinix v. Bogorad-Gross, et al.


Michelle:

Larry's trial just concluded today and we spoke about a number of issues regarding this
case.


First, absent a certification from you or an affidavit from Kathy that all documents
responsive to our defendants' document requests have been produced, we will not be making
any witnesses available for depositions. We simply cannot allow a piecemeal document
production that is designed for the hurt and harassment of our clients.

Second, we will not sign off on any protective order that does not allow our clients to
talk with their spouses on this case. Both Jim Gross and Cindy Bogorad are lawyers that

are subject to the rigorous ethical requirements of the Bar. In addition, both assist us in providing legal advice on this case.

I look forward to seeking a resolution on these matters.

Thanks,
Lisa

Lisa M. Hodes
Attorney At Law

Sullivan & Worcester LLP
One Post Office Square
Boston, MA 02109

T      617 338 2426
F      617 338 2880
lhodes@sandw.com
www.sandw.com

BOSTON    NEW YORK    WASHINGTON, DC


This message is intended to be confidential and may be legally privileged.  It is intended solely for the addressee.  If you are not the intended recipient, please delete this message from your system and notify us immediately.  Any disclosure, copying, distribution or action taken or omitted to be taken by an unintended recipient in reliance on this message is prohibited and may be unlawful.

Communications from our firm may contain or incorporate federal tax advice.  Under recently promulgated US Internal Revenue Service (IRS) standards, we are required to inform you that only formal, written tax opinions meeting IRS requirements may be relied upon by taxpayers for the purpose of avoiding tax-related penalties.  Accordingly, this communication is not intended or written to be used, and it cannot be used, for the purpose of avoiding tax-related penalties under the Internal Revenue Code.  Please contact a member of our law firm's Tax Department if you require a formal, written tax opinion that satisfies applicable IRS requirements, or if you have any other questions regarding federal tax advice.