UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| _____ ) | |
| KATHLEEN P. MULLINIX, ) | |
| ) | |
| Plaintiff, ) | |
| ) | Civil Action |
| v. ) | No. 04-12684-WGY |
| ) | |
| KIKI BOGORAD-GROSS and ) | |
| LEONARD P. BOGORAD, as They ) | |
| Are Executors of the Will of ) | |
| Lawrence Bogorad, ) | |
| ) | |
| Defendants. ) | |
| _____) | |

## MEMORANDUM OF LAW IN SUPPORT OF
## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Defendants Kiki Bogorad-Gross ("K. Bogorad-Gross") and Leonard Bogorad

("L. Bogorad"), as Executors of the Will of Lawrence Bogorad (collectively, "Defendants"), by

their attorneys, Sullivan & Worcester LLP, respectfully submit this memorandum of law in

support of their motion for summary judgment on all counts of the Complaint of the Plaintiff,

Kathleen P. Mullinix ("Mullinix" or "Plaintiff").

## INTRODUCTION

This case involves, in essence, a mistress attempting to elect against the will of her

paramour.  It is undisputed that the Plaintiff and the late Professor Lawrence Bogorad

("Bogorad" or "Laurie") were romantically involved.  It is also undisputed that Bogorad loved

the Plaintiff and considered her a part of his "family."  Bogorad was generous with his family,

giving his children and grandchildren large sums of money for various expenses, such as college

tuition, and also gave the Plaintiff money to cover certain expenses related to the renovation of

her new Manhattan cooperative apartment at 1050 Fifth Avenue ("the Apartment").

Plaintiff claims that Bogorad orally committed to pay (1) the cost of the renovation and the architect's fee ("Renovations Contract") for the Apartment; (2) past and future monthly maintenance charges for the Apartment in perpetuity ("Monthly Maintenance Fee Contract"); (3) one-half the capital gains tax consequence incurred as a result of the sale of Plaintiff's former Manhattan apartment located at 170 East 87th Street ("Capital Gains Tax Contract"); and (4) one-half the storage fees incurred during the renovation to the Apartment ("Storage Fee Contract"). Plaintiff also alleges that Bogorad, as well as L. Bogorad following Bogorad's death, orally promised she could live in Bogorad's home in Lexington, Massachusetts ("Lexington Home"), pending the completion of the renovation to the Apartment ("Lexington Home Contract" and, collectively, "Contracts"), and that the Defendants' breach of the alleged Lexington Home Contract required Plaintiff to pay for temporary housing.

Despite extensive discovery, there is not a shred of evidence that Bogorad intended the gifts that he made during his lifetime to constitute contracts enforceable against his estate. Moreover, as a matter of law, the Plaintiff cannot support actionable claims for breach of contract or estoppel because (a) all of the alleged Contracts fail for lack of consideration, (b) the alleged oral Monthly Maintenance Fee Contract also fails under the New York Statute of Frauds, and (c) Plaintiff cannot establish the critical elements of estoppel.

## **STATEMENT OF FACTS**

### I. **Bogorad and Plaintiff lived as husband and wife, according to Plaintiff, after their secret affair became public.**

According to the Plaintiff, she and Bogorad met in December, 1968, when Plaintiff was a postdoctoral fellow in Bogorad's graduate science lab at Harvard. Mullinix 8:2-14[1]. Plaintiff

---

[1] Reference to the transcripts of depositions in this action, the relevant portions of which are appended to the Affidavit of Lisa M. Hodes, filed herewith ("Hodes Aff."), are cited by the deponent's name followed by the page(s)

claims that she and Bogorad began a long-term illicit affair in 1975.  Mullinix 10:18-11:10; 11:11-12:8; 14:11-21, 21:4-18.  At that time, Plaintiff was married to Joseph Mullinix and Bogorad was married to Rosalyn Bogorad ("Rosalyn"), to whom he remained married until he died.  Mullinix 16:1-4; 50:23-51:16; L. Bogorad 13:12-14.  Bogorad never disclosed the affair to Rosalyn.  Mullinix 34:22-35:2.  Plaintiff disclosed the affair to her husband in 1997 and they divorced shortly thereafter.  Mullinix 35:3-8; 38:17-39:1.[2]

The Defendants, the daughter and son of Bogorad and Rosalyn, first learned that Bogorad had a new companion in 1997 after Bogorad had heart surgery.  K. Bogorad-Gross 59:5-10; 59:17-63:7; L. Bogorad 35:5-9.  Subsequently, Plaintiff began appearing regularly at Bogorad family functions.  K. Bogorad-Gross 92:20-93:17.[3]  According to Plaintiff, "our understanding was that we were man and wife except we weren't married."  Complaint, ¶ 9; Mullinix, 51:22-23.[4]  After Plaintiff's divorce in 1997, Bogorad "picked up the tab wherever we went."  Mullinix 58:17-21, 59:21-22.  In 1998 the Plaintiff alleges that she and Bogorad discussed that they would marry after Rosalyn died: "[I]t was part of our agreement to be committed to each other as

---

and line number(s).  Thus, by way of example, Page 8, Lines 2 through 14 of Plaintiff's deposition is cited as "Mullinix 8:2 - 14".  References to the affidavits submitted in support of Defendants' Motion for Summary Judgment are cited by the surname of the affiant, followed by "Aff." and the paragraph number of or exhibit.

[2] Rosalyn began showing symptoms of Alzheimer's disease in the early 1990's.  L. Bogorad 13:21-14:12.  By 1998 she required 24-hour care and was admitted to a nursing facility in Natick, Massachusetts; she currently resides at Fairlawn Nursing Home in Lexington, Massachusetts.  K. Bogorad-Gross 19:21-24, 20:20-24; L. Bogorad Aff., ¶ 1; K. Bogorad-Gross Aff., ¶ **5.**  Bogorad visited Rosalyn two or three times a week until his death.  K. Bogorad-Gross 23:12-13; L. Bogorad 22:8-10.

[3] Although initially uncomfortable, the Defendants accepted the relationship because their father appeared happy and Rosalyn was no longer able to be a companion to him; thus, they maintained a friendly relationship with Plaintiff because they believed their father considered her to be part of the "family".  K. Bogorad-Gross 88:3-15, 91:6-92:2; L. Bogorad 36:17-37:2.

[4] From July, 1999, until his death in December, 2003, Bogorad spent the weekdays at his Lexington Home, which remained his residence, and visited Plaintiff in New York City most weekends.  Mullinix, 41:15-20, 42:8-10; L. Bogorad 72:13-73:11.

married people and that's the way we would live. . . . that we considered ourselves to be man and

wife, that I was committed to him forever and he to me.  Mullinix 60:11-13, 60:17-23.[5]

## II.    Bogorad paid for furniture, renovations and the monthly maintenance fees for the 87th Street Apartment as gifts to Plaintiff.

After Plaintiff divorced her husband in 1997, Plaintiff purchased an apartment on East

87th Street, located between Lexington Avenue and Third Avenue in Manhattan ("87th Street

Apartment").  Complaint ¶ 10; Mullinix 39:21-40:15.  Plaintiff paid the mortgage and utilities

for the 87th Street Apartment out of her own resources.  Mullinix 61:9-62:1.  She claims,

however, that Bogorad reimbursed her for the $870 monthly maintenance fee because he wanted

to do so.  Complaint, ¶¶ 11-12; Mullinix 55:13-18, 58:13-14; 55:6-8.  Mullinix 55:13-18.

Plaintiff did not do or promise to do anything in exchange:

> A.    Laurie said, "I want to pay the maintenance."
>
> Q.    So he offered to do it?
>
> A.    Uh-huh.
>
> Q.    And you agreed?
>
> A.    Yeah.
>
> Q.    And what, if anything, did you do or promise to do in exchange for that payment?
>
> A.    Nothing.

---

[5] Over the course of their relationship, Bogorad displayed his characteristic generosity by showering Plaintiff with gifts and vacations.  Mullinix 44:20-45:19, 59:21-22; L. Bogorad 78:8-18; 79:13-16; K. Bogorad-Gross 113:8-19. Bogorad displayed similar generosity with his children and grandchildren, often footing the bill for major expenses incurred on the family vacations.  L. Bogorad 133:5-13, 134:15-135:4.  Bogorad also provided each of his grandchildren $10,000 per year for college expenses.  L. Bogorad 50:21-51:9, 52:15-57:22; K. Bogorad-Gross 36:18-38:1.  No payments were made, however, after Bogorad died, although two of his grandchildren were in college.  L. Bogorad 55:6-12; K. Bogorad-Gross, 38:14-18.  His estate has not made these payments, nor are there any claims for these expenses.  L. Bogorad 57:10-22.

Mullinix 55:16-23 (emphasis added).  Plaintiff did not declare any of the $870 monthly

payments from Bogorad to her on her federal, New York State or New York City income tax

returns.  Mullinix 62:2-20.

### III.    The Plaintiff sold the 87th Street Apartment after she received an enticing offer for a handsome profit.

In early 2002, a neighbor approached Plaintiff about selling the 87th Street Apartment.

Complaint ¶ 13; Mullinix 66:19-67:14.  Plaintiff consulted her son Brendan Mullinix

("Brendan"), the Vice President of a real estate investment trust, who recommended that Plaintiff

sell that apartment and buy an apartment on Fifth Avenue because, according to Brendan, an

apartment on Fifth Avenue would appreciate faster than an apartment on 87th Street.  Mullinix

19:8-21; L. Bogorad 104:6-10, 142:4-143:20; K. Bogorad-Gross 168:16-20.  Plaintiff also

conferred with Bogorad and Judith Durham ("Durham"), her real estate agent, both of whom

recommended that she sell the 87th Street Apartment.  Mullinix 68:13-69:7, 70:13-71:8, 74:6-13,

75:9-12, 77:2-78:12.  In February 2003 she did so for $1.325 million.  Mullinix 74:2-5.

### IV.    Bogorad paid for the monthly maintenance fees and part of the renovations for the Apartment as gifts to the Plaintiff.

Plaintiff engaged Durham to find a new apartment.  Mullinix 79:1-2.  In November 2002,

Plaintiff toured the Apartment, located three long blocks and one short block from the 87th Street

Apartment.  Mullinix 91:16-19; Complaint ¶ 14.  The Apartment, which was listed at around

$2.4 million, needed extensive renovations.  Complaint, ¶ 14; Mullinix 93:4-8.  Plaintiff

discussed the Apartment with Bogorad after she toured it, lamenting that it was too expensive

and claiming that Bogorad told her he wanted to pay for the renovations.  Complaint, ¶ 14;

Mullinix 104:18-105:3, 109:20-110:1.  Later, in January 2003, Plaintiff toured the Apartment a

second time and reported to Bogorad.  Mullinix 103:6-104:13.  Plaintiff claims that Bogorad

repeated that he wanted to pay for the renovations "and, obviously, I'll pay for the maintenance as I have been." Complaint, ¶ 17; Mullinix 105:4-9.

In February 2003, Plaintiff and Bogorad toured the Apartment. Complaint ¶ 16; Mullinix 115:2-5. In a private conversation with Bogorad, Plaintiff again lamented that the Apartment was still too expensive and claims that Bogorad repeated that he wanted to pay for the renovations and the monthly maintenance fees. Mullinix 118:8-14, 118:16-119:9. Plaintiff also claims that Bogorad reiterated that he wanted to pay for half of the capital gains tax incurred in connection with the sale of the 87th Street Apartment and half of the storage costs Plaintiff would incur until the renovations were completed. Complaint, ¶ 18.

Ultimately, Plaintiff offered $1,400,000[6] for the Apartment and interviewed with the seller's attorney. Mullinix 122:15-125:6, 127:11-15. During that interview, Plaintiff provided a list of her financial accounts, but she never mentioned Bogorad as her partner or as a source of any money to purchase or renovate the Apartment. Mullinix 140:17-141:3. The next day Plaintiff learned that the seller had accepted her offer. Mullinix 142:2-5. Plaintiff claims that she expressed panic to Bogorad about the finances and Bogorad told her not to worry. Mullinix 143:19-144:9. Thereafter, she learned that, just weeks after Plaintiff and Bogorad first discussed renovations, Bogorad had changed his estate plan to provide her with a 1/6 interest in his 1997 revocable trust.[7] Mullinix 150:15-151:20, 152:11-14, 190:9-16; see also L. Bogorad 65:21-69:20; K. Bogorad-Gross Aff., ¶ 6; L. Bogorad Aff., ¶ 5.

---

[6] The Apartment is now worth approximately $2,100,000. See Defendant's Motion for Reconsideration Exh. A; Hodes Aff. Exh. D.

[7] That trust is currently worth nearly $2 million. Berlin Aff., ¶ 5. By November 2002, Bogorad had already suffered from bladder cancer and had a quadruple bypass. Mullinix 206:5-18.

In early June 2003 Plaintiff interviewed with the Cooperative Board.  Mullinix 213:5-13.

They asked Plaintiff about her source of wealth.  Ring 25:2-9.  Plaintiff never mentioned

Bogorad as one of her financial resources for the purchase or occupancy of the Apartment.[8]  Ring

27:3-9.  Instead she responded that she had sold her interest in a technology company.  Ring

25:2-9.[9]  The Cooperative Board also asked Plaintiff if she expected overnight guests.  She

replied that "she did not have guests."[10]  Ring 25:2-9.  According to Plaintiff, she knowingly

omitted Bogorad's name from both her oral interview and written Cooperative Application.

Mullinix 177:10-23.

In February 2003, Plaintiff began researching costs for mandatory and discretionary

renovations to the Apartment.  Mullinix 167:1-13.[11]  Plaintiff then determined that her

discretionary renovations would cost approximately $450,000.  Mullinix 169:11-170:4.  To help

her, Bogorad referred her to Raynor Warner ("Warner"), a close friend and architect.  Complaint,

¶ 23; Mullinix 216:10-23; K. Bogorad-Gross 155:19-156:15.  Bogorad paid Warner's bill, which

---

[8]

|     |                                                                                                          |
| --- | -------------------------------------------------------------------------------------------------------- |
| Q.  | Did Ms. Mullinix ever at that interview or subsequently inform you, in words or substance, that she intended to rely upon wealth or finances from any other person in connection with her purchase and occupancy at 1050 Fifth Avenue? |
| A:  | No.                                                                                                       |

Ring 27:3-9.

[9] In fact, Plaintiff had served as the Chief Executive Officer of a technology company she founded.  Mullinix 28:14-29:7.  Subsequently, Plaintiff worked as an independent biotechnology consultant, which included writing a business plan for a science-based neutraceutical company, for which she received $450,000 in compensation.  Mullinix 29:14-18; 30:17-22.

[10]

|     |                                                                                                          |
| --- | -------------------------------------------------------------------------------------------------------- |
| Q.  | Did you, Ms. Ring, or any other board member ask Ms. Mullinix at her interview how often she had or intended to have overnight guests? |
| A:  | Yes.                                                                                                     |
| Q:  | And what did she respond?                                                                                 |
| A:  | My recollection is that she responded she did not have guests.                                           |

Ring 25:2-9.

[11] The Cooperative Board required Plaintiff to install new windows and the Apartment's heating system was broken.  Mullinix 167:14-168:6.

was addressed only to Plaintiff, directly and Plaintiff did not report it as income.  Complaint, ¶ 23; Mullinix 221:18-21; K. Bogorad-Gross 156:22-157:7.  Warner referred Plaintiff to Heather Aman, an interior designer in New York City, and Plaintiff signed a contract with Aman on July 25, 2003.  Complaint, ¶ 24; Mullinix 216:10-12, 218:12-21.  Bogorad was not a party to the contract between Aman and Plaintiff.  However, Bogorad reimbursed Plaintiff for Aman's bills but, again, she never declared these payments on any of her income tax returns.  Mullinix 201:17-203:18; 225:11-16.

## V.  The Plaintiff manipulatively portrays Bogorad's gifts to her as a contract.

On December 28, 2003, Bogorad passed away while on a Bogorad family vacation to Mexico.  Complaint, ¶ 30.  Plaintiff flew back to Boston with K. Bogorad-Gross and her family. K. Bogorad-Gross 134:16-17; L. Bogorad 97:4-21.  Plaintiff and K. Bogorad-Gross sat next to each on the second leg of the return flight.  K. Bogorad-Gross Aff. ¶ 12.  As both grieved Plaintiff realized Bogorad had not yet given her money for the majority of her renovation expenses:

> "Oh no! What am I going to do? Laurie was going to pay for the renovations."

K. Bogorad-Gross 136:22-137:24; K. Bogorad-Gross Aff., ¶ 12.  Still attempting to cope with the reality of her father's unexpected death, K. Bogorad-Gross replied only that they would "figure it out."  K. Bogorad-Gross 135:11-15, 137:4-24; L. Bogorad 100:8-14; K. Bogorad-Gross Aff., ¶ 12.

After her discussion with K. Bogorad-Gross, the Plaintiff twice approached L. Bogorad. On January 2, 2004, Plaintiff met with L. Bogorad and James Gross, Esq., the husband of K. Bogorad-Gross, who were sorting through Bogorad's files at the Lexington Home, and claimed that she and Bogorad "had an agreement that [Bogorad] was going to pay for the

renovations on the apartment up to $400,000, and he also paid the maintenance on the apartment

both at 87th Street and at Fifth Avenue." Mullinix, 233:20-235:14; L. Bogorad Aff. ¶ 9; Gross.

Aff ¶¶ 13-16. Despite being a sophisticated businesswoman, Plaintiff did not have any of

Bogorad's alleged promises in writing. Mullinix 233:20-235:14; L. Bogorad 84:13-24. Plaintiff

admits that L. Bogorad never told her that the Estate would pay for the renovations or the

monthly maintenance fees. Mullinix 233:20-235:14.

Plaintiff and L. Bogorad spoke again by telephone a few weeks later. L. Bogorad 86:14-

17. Plaintiff began the conversation by offering to help L. Bogorad's wife, Cynthia Bogorad,

obtain an appointment with a renowned physician in New York. L. Bogorad 122:22-123:13.

Plaintiff then asked L. Bogorad how the estate wanted to handle the bills for the renovations,

who replied that it would violate the Defendants' fiduciary duties as executors of Bogorad's

estate to pay any bills in connection with Plaintiff's Apartment.[12] L. Bogorad 86:14-96:7; 234:3-

14; Mullinix 241:14-19; 242:1-5.

Prior to their conversations with Plaintiff, the Defendants had no knowledge of any of the

Plaintiff's alleged discussions with Bogorad concerning any of the alleged Contracts.

L. Bogorad Aff., ¶ 8, 13; K. Bogorad-Gross Aff., ¶ 13, 14. Although it was not unusual for

Bogorad to be "close to the vest" about personal aspects of his relationship with Plaintiff,

L. Bogorad 44:1-13; K. Bogorad-Gross 25:19-26:2, Bogorad usually discussed important

financial matters with K. Bogorad-Gross. K. Bogorad-Gross 26:3-19; 51:22-52:8.[13] In fact, on

several occasions K. Bogorad-Gross had discussed the renovations to the Apartment with her

---

[12] Subsequent to Plaintiff's conversation with K. Bogorad-Gross on the flight home from Mexico, the Defendants sought legal advice from the estate's lawyer. L. Bogorad 96:8-24. The estate's lawyer stated that any payments to the Plaintiff would violate the Defendants' fiduciary duties. L. Bogorad 95:20-24.

[13] For example, Bogorad informed K. Bogorad-Gross of changes to his estate plan, certain insurance policies and large purchases, such as a new car and computer. K. Bogorad-Gross Aff., ¶ 8.

father, but he never mentioned the alleged Renovations Contract to her or to his son, L. Bogorad, even though Bogorad and L. Bogorad discussed Plaintiff's purchase of the Apartment over brunch in 2003. K. Bogorad-Gross 116:8-117:3, 145:13-24, 147:13-19, 149:14-20, 151:19-152:3; L. Bogorad 101:13-17, 103:14-104:6, 107:22-108:4, 135:5-13, 137:3-19. A thorough search of Bogorad's papers and personal effects has not unearthed a scrap of paper, or bit or byte of electronic data, memorializing any of the alleged "Contracts". L. Bogorad Aff., ¶ 9; Gross Aff. ¶¶ 13, 14, 17 and 19.

**VI.    The Plaintiff received notice that the Estate would not pay for the renovations, but proceeded with the renovations anyway.**

In a letter dated February 11, 2004, the estate's lawyer notified Plaintiff that the estate would not pay any of her claims because payment would violate the Defendants' fiduciary duties. Mullinix Depo. Ex. 15 (Hodes Aff., Exh. ¶ F); <u>see also</u> L. Bogorad 233:9-15. Despite that express notice, on March 17, 2004, Plaintiff entered into a $350,000 contract with McGraime Woodworking to perform her discretionary renovations to the Apartment. Complaint ¶ 32; Mullinix Depo. Exh. 6 (Hodes Aff., Exh. G).

**VII.   After Bogorad died the Defendants gratuitously allowed the Plaintiff to reside in the Lexington Home until it was sold.**

Plaintiff alleges that Bogorad told her she could live at the Lexington Home until the renovations to the Apartment were completed. Complaint, ¶¶ 21, 53. The Defendants had no knowledge of this alleged discussion and there is no evidence that it ever occurred. L. Bogorad 72:19-23, 74:9-19. After Bogorad died, the Defendants never promised Plaintiff that she could live in the Lexington Home until the renovations were completed or that the estate would pay for

alternate housing.  L. Bogorad 220:22-221:7.[14]  In fact, in the telephone conversation with

L. Bogorad on January 25, 2004, Plaintiff recommended that the Lexington Home be sold that

spring.  L. Bogorad 146:22-148:24.  In her emails to K. Bogorad-Gross, Plaintiff communicated

her intent to cooperate with the Defendants in connection with the sale.  Mullinix Depo. Exhs.

16-21 (Hodes Aff. Exhs. H-M); L. Bogorad 230:13-232:10.

The Lexington Home was sold in May 2004.  Mullinix 244:8-10; K. Bogorad-Gross Aff.,

¶ 19.  Plaintiff never voiced any objection or discontent to the Defendants about moving out of

the Lexington Home.  Mullinix Depo. Exhs. 16-21 (Hodes Aff. Exhs. H-M); L. Bogorad Aff.,

¶ 13; K. Bogorad-Gross Aff., ¶ 20; L. Bogorad 147:21-148:3.  Similarly, Plaintiff never

requested that the Estate pay for temporary housing pending the completion of the renovations to

her Apartment.  Mullinix Depo. Exhs. 16-21 (Hodes Aff. Exhs. H-M); L. Bogorad Aff. ¶ 15;

K. Bogorad-Gross Aff. ¶ 22; L. Bogorad 221:8-24.

## <u>ARGUMENT</u>

## I.    <u>The Legal Standard and Governing Law.</u>

The Defendants bear the initial burden of showing that there are no material facts

genuinely in dispute and that they are entitled to judgment as a matter of law.  <u>See</u> Fed. R. Civ.

P. 56(c).  Once the Defendants have done so, the Plaintiff must establish at least a genuine

factual dispute on an element essential to her case in chief.  <u>See</u> <u>Fed. Refinance Co. v. Klock</u>,

352 F.3d 16, 30 (1st Cir. 2003).  Moreover, those factual disputes "must herald the existence of

'definite, competent evidence;'" "[o]ptimistic conjecture, unbridled speculation, or hopeful

surmise will not suffice."  <u>Vega v. Kodak Caribbean, Ltd.</u>, 3 F.3d 476, 479 (1st Cir. 1993); <u>see</u>

---

[14] Plaintiff continued to live rent-free at the Lexington Home after Bogorad died.  <u>See</u> Mullinix Depo. Exhs. 16-21;
(Hodes Aff., Exhs. H-M).  While she lived at the Lexington Home, Plaintiff never paid rent, utilities, the phone bill
or any of the general upkeep of the house.  Mullinix 244:8-245:4.

also <u>Mesnick v. Gen. Elec. Co.</u>, 950 F.2d 816, 822 (1st Cir. 1991); <u>Medina-Muñoz v. R.J. Reynolds Tobacco Co.</u>, 896 F.2d 5, 8 (1st Cir. 1990). There are no genuine factual disputes bearing on the fact that Bogorad made generous, gratuitous gifts to Plaintiff. However, as a matter of law, Bogorad's gifts to the Plaintiff do not constitute enforceable oral contracts.

## II.    <u>New York Law Governs The Alleged Contracts.</u>

A federal court sitting in diversity applies the choice of law rules of the forum state. <u>Klaxon Co. v. Stentor Elec. Mfg. Co.</u>, 313 U.S. 487, 496 (1941). Massachusetts courts emphasize the factors of the Restatement (Second) of Conflict of Laws (1971), §§ 6(2)[15] and 188(2)[16] in applying a "functional choice of law approach that responds to the interests of the parties, the States involved, and the interstate system as a whole." <u>Shinberg v. Bruk</u>, 875 F.2d 973, 975 (1st Cir. 1989) (<u>quoting</u> <u>Bushkin Assocs. v. Raytheon Co.</u>, 393 Mass. 622 (1985)).[17]

The Massachusetts "functional choice of law approach" favors the application of New York law to Plaintiff's various claims. Plaintiff is a New York resident. The centerpiece of this action, the Apartment, is real property located in New York City. Plaintiff claims that Bogorad

---

[15] The relevant factors under § 6(2) include: "(a) the needs of the interstate and international systems, (b) the relevant policies of the forum, (c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue, (d) the protection of justified expectations, (e) the basic policies underlying the particular field of law, (f) certainty, predictability and uniformity of result, and (g) ease in the determination and application of the law to be applied." Restatement (Second) of Conflict of Laws § 6(2) (1971).

[16] In applying § 6(2), the following contacts should be considered: "(a) the place of contracting, (b) the place of negotiation of the contract, (c) the place of performance, (d) the location of the subject matter of the contract, and (e) the domicile, residence . . . of the parties." Restatement (Second) of Conflict of Laws § 188(2) (1971) (outlining the "most significant relationship" test).

[17] In <u>Bushkin</u>, the Supreme Judicial Court applied the Massachusetts Statute of Frauds, rather than the New York Statute of Frauds, to an oral agreement to pay a broker's or finder's fee. <u>Bushkin</u>, 393 Mass. at 627. In its reasoning, the court relied on the parties' expectation that the oral agreement would be enforced. <u>Id.</u> at 635. Furthermore, the court stated that, in cases where the relevant contacts in each state are balanced, the law that validates the transaction should apply. <u>Id.</u> at 636. Although this Court is required to follow the choice of law test established in <u>Bushkin</u>, that decision does not require the application of the Massachusetts Statute of Frauds in this case. Here, there is absolutely no evidence that Bogorad ever expected his gifts to the Plaintiff to constitute enforceable oral contracts. Moreover, the predicate of <u>Bushkin</u>, the equality of contacts, does not exist in this case. Thus, the <u>Bushkin</u> court's choice of the more liberal law is not required here.

planned to move to the Apartment after the renovations were completed, and Bogorad allegedly

spent three or four days with the Plaintiff in New York every week. All of the material, albeit

uncorroborated, conversations between Plaintiff and Bogorad relating to the alleged Contracts

took place in New York and, except for the alleged tenancy in the Lexington Home, were to be

performed in New York, and New York claims a substantial interest in protecting residents and

nonresidents conducting business in New York. See generally William J. Conlon & Sons v.

Wanamaker, 583 F. Supp. 212, 214 (E.D.N.Y. 1984); O'Keeffe v. Bry, 456 F. Supp. 822, 827-

828 (S.D.N.Y. 1978). The sole connection to Massachusetts is that it was Bogorad's domicile.

Therefore, the nature and quality of the contacts with New York, coupled with New York's

substantial interest in having its law applied, especially to issues relating to real estate located in

that state, New York's interests in this matter far outweigh Massachusetts' negligible interests in

applying its laws.

## III.    The Plaintiff Cannot Meet Her Burden of Proof.

Plaintiff must prove her claims against the Estate by clear and convincing evidence. See

In re Gorden's Estate, 8 N.Y.2d 71, 76 (1960) (upholding lower court's rejection of witness

testimony as evidence of an implied agreement between companions).[18]  At the close of

discovery, Plaintiff's claims remain undocumented, unsupported and uncorroborated. The

evidence produced in discovery, including the parties' depositions and Bogorad's financial

records, even taken in the light most favorable to Plaintiff, fall far short of "clear and

---

[18] In re Gordon's Estate involved a companion who filed a claim against her paramour's  estate for oral promises to, inter alia, (1) compensate her for services rendered at her paramour's inn, and (2) marry her. See id. at 73.  The Court of Appeals of New York rejected witness testimony—the only evidence that the decedent said the claimant worked for him as an employee—as insufficient under the "clear and convincing" standard and found that there was no basis for a claim against the decedent's estate. See id. ("[i]f during the lifetime of Mr. Gorden claimant was not accorded the rights and privileges which she would have had as his wife, she cannot get them by filing a claim against his estate after he is dead.").

convincing" proof of any of the alleged Contracts.  At best, the Plaintiff has only proffered evidence that she and Bogorad lived as though they were married and gave each other gifts pursuant to that loving and intimate relationship.

**IV.**     **The Court Should Grant Summary Judgment on the Complaint in its Entirety.**

  **A.**     **Bogorad's Payments to the Plaintiff Were Gifts and Any Gift Undelivered At the Time of Bogorad's Death Fails As A Matter of Law.**

  As a matter of law, Bogorad's payments to Plaintiff for the monthly maintenance fees and part of the renovations constitute gifts to her from an enamored Bogorad.  See Lawless v. Mortimore, 348 N.Y.S.2d 394, 396 (App. Div. 1973); In re Moore's Estate, 46 N.Y.S.2d 882, 883 (Surr. Ct. 1944).[19]  However, a gift that has not been delivered is incomplete and, thus, fails to create any legal obligation on the part of the donor.  Id.  Lawless is analogous.  In that case, the gift failed where the testimony only established, akin to Mullinix's testimony in this case, that the decedent "was going to give", "spoke of giving", "she wanted to give" and claimant "was to have" funds in two bank accounts and the contents of a safe deposit box.  Lawless, 348 N.Y.S.2d at 396.  Because the evidence established donative intent, but not delivery, the New York court concluded that the decedent's statements did not give rise to any legal obligations binding upon his estate.  Id.[20]

---

[19] To create a valid *inter vivos* gift, there must be (1) donative intent to effectuate an irrevocable present transfer of ownership, (2) delivery of the gift that divests the donor of title, (3) and acceptance by the donee.  In re Moore's Estate, 46 N.Y.S.2d at 883.  A cash gift given during the decedent's lifetime is valid *inter vivos* gift because it was a completed act.  Id. at 884 (cash gift of $100 shortly before decedent's death was valid inter vivos gift).  Likewise, Bogorad's completed payments to the Plaintiff with respect to the monthly maintenance fees and part of the renovations were valid *inter vivos* gifts because Bogorad intended to give Plaintiff funds for certain monthly maintenance fees and renovations costs, he delivered the funds to Plaintiff, and Plaintiff accepted the funds.

[20] Similarly, in In re Moore's Estate the decedent's gift of his automobile failed where he executed and delivered the automobile's registration card, but did not transfer the automobile or its keys.  46 N.Y.S.2d at 883.  Because the decedent retained possession of the car, the intended gift failed to create any obligation on the part of his estate.  Id. at 884.  Massachusetts law is in accord.  See Monaghan v. Monaghan, 320 Mass. 367, 369-370 (1948) (finding decedent's gift of a bank book failed where there was no delivery).

In this case, at most, the evidence establishes that Bogorad intended to give Plaintiff various funds.  However, Bogorad retained possession of those funds at the time of his death.  As in In re Moore's Estate, and Lawless, Bogorad's mere words of his intention to gift Plaintiff funds are insufficient to establish delivery.  Thus, any unconsummated gift to the Plaintiff at the time of Bogorad's death fails.

**B.    The Alleged Contracts Fail As A Matter of Law.**

It is axiomatic that a binding contract requires an offer, acceptance, consideration, mutual assent and an intent to be bound.  See generally Rozsa v. May Davis Group, Inc., 152 F. Supp. 2d 526, 533 (S.D.N.Y. 2001).  The absence of any one of these elements bars the enforcement of the agreement.  See Trimmer v. Van Bomel, 434 N.Y.S.2d 82, 89 (Sup. Ct. 1980), aff'd, 441 N.Y.S.2d 762 (App. Div. 1981).  As a matter of law, the alleged Contracts fail for lack of consideration and impermissibly vague terms.  The New York Statute of Frauds also voids the Monthly Maintenance Fees Contract.

1.    *The Alleged Contracts Fail for Lack of Consideration.*

The Complaint makes effort to plead consideration and it is undisputed – in fact, Plaintiff has so testified under oath – that Bogorad received no consideration for his alleged promises to the Plaintiff.  See page 4, supra.  Consideration must be regarded as such by both parties.  See Rose v. Elias, 576 N.Y.S.2d 258 (App. Div. 1991); see also Cohn v. Levy, 725 N.Y.S.2d 376 (App. Div. 2001); Young v. Carruth, 455 N.Y.S.2d 776, 779 (App. Div. 1982).  Moreover, when the parties are related, "it is presumed that the services were rendered in consideration of love and affection, without expectation of payment."  In re Estate of Barr, 173 Misc. 2d 685 (N.Y. Surr. Ct. 1997).

Construing the facts in a light most favorable to Plaintiff, the most she claims is she provided Bogorad -- her "husband" -- with love, affection and personal companionship and that,

as a result of Plaintiff's move, Bogorad received the satisfaction of knowing that his "wife" moved three blocks from her allegedly rough neighborhood on 87th Street and Lexington to a safer neighborhood on Fifth Avenue. Under New York law, such personal services and sentiments do not constitute consideration. See Trimmer, 434 N.Y.S.2d at 85 (services rendered in a quasi-marital relationship are exchanged without expectation of pay); Rose, 576 N.Y.S.2d at 258 (rejecting love and affection as consideration for written promise to purchase house for paramour). If there was any consideration, which there was not, it was tainted by the illicit sexual relationship and thus violates settled New York public policy.[21]

Trimmer is instructive. The Trimmer court granted summary judgment against the plaintiff, the defendant's former companion, for, *inter alia*, breach of an express oral contract to maintain the plaintiff on a standard of "sumptuous living." 434 N.Y.S.2d at 83-89. Noting that the plaintiff was seeking "companiomony", the Trimmer court found that the alleged services, such as devoting time and attention to the defendant, acting as a companion, accompanying the defendant to restaurants and on vacations and accepting gifts and jewelry, are ordinarily exchanged without expectation of payment. Id. at 83, 85.[22]

---

[21] It is well-established under New York law that illicit sexual relations cannot be part of the consideration for a contract. See Van Brunt v. Rauschenberg, 799 F. Supp. 1467, 1471 (S.D.N.Y. 1992). Where a contract is formed as a result of a cohabitating relationship and one party remained married during substantially all of the relationship, the "inescapable conclusion [is] that illicit sexual relations formed the primary consideration." See Pfeiff v. Kelly, 623 N.Y.S.2d 965, 967 (App. Div. 1995). As discussed above, Plaintiff's own sworn testimony is that she and Bogorad agreed to marry after Rosalyn died. However, Bogorad remained married to Rosalyn throughout his entire sexual and intimate relationship with Plaintiff. Thus, there is a presumption that the Contracts violate public policy because illicit sexual relations were part of any consideration.

[22] The Trimmer court cautioned:

As a matter of human experience personal services will frequently be rendered by two people . . . because they value each other's company, or because they find it a convenient or rewarding thing to do. For courts to attempt through hindsight to sort out the intentions of the parties and affix jural significance to conduct carried out within an essentially private and generally noncontractual relationship runs too great a risk of error. . . . There is, therefore, substantially greater risk of emotion-laden afterthought, not to mention fraud, in attempting to ascertain by implication what

Plaintiff is also seeking "companiomony."  Based on her belief that she and Bogorad were "husband and wife" and that Bogorad considered her as part of his family, Plaintiff rendered to Bogorad services similar to those of the plaintiff in <u>Trimmer</u>: the Plaintiff devoted substantial time and attention to Bogorad, acted as his companion, accompanied him to restaurants, family functions and on the Bogorad family vacations, and she accepted gifts and jewelry from him.  Plaintiff gratuitously rendered these services out of love and affection for Bogorad, which gives rise to a presumption that Plaintiff did not expect payment in return.

Moreover, the fact that Plaintiff did not declare <u>any</u> of the payments from Bogorad on any of her income tax returns further confirms that Plaintiff did not consider the payments from Bogorad as consideration for the alleged Contracts.  Consideration for a contract is taxable as ordinary income.  <u>Compare</u> <u>Mansfield Journal Co. v. Comm'r.</u>, 274 F.2d 284, 286 (6th Cir. 1960) (consideration received for assignment of rights under supply contract is taxable as ordinary income); <u>with</u> 26 U.S.C. § 102(a) (1954) (gifts do not constitute gross income).  Thus, the payments from Bogorad to Plaintiff were gifts and not consideration.

> 2. *The Contracts' Material Terms are Impermissibly Vague.*

Basic contract law requires that the exchange of promises be clear and definite to enable a court to give it exact meaning.  <u>See</u> <u>Trimmer</u>, 434 N.Y.S.2d at 86 (<u>quoting</u> 1 Williston Contracts § 37 (3d ed)).  It is not for the court to flesh out the terms of the Contracts where the

---

services, if any, were rendered gratuitously and what compensation, if any the parties intended to be paid.

<u>Id.</u> at 85 (<u>quoting</u> <u>Morone v. Morone</u>, 407 N.E.2d 438, 488 (N.Y. 1980)).

Plaintiff and Bogorad neglected to do so themselves.  See Soderholm v. Kosty, 676 N.Y.S.2d 850, 852 (Justice Ct. 1998).[23]

The Contracts are vague and ambiguous.  Bogorad and Plaintiff never reached an equivocal "meeting of the minds" on material terms, such as (1) who would pay the renovations costs, maintenance fees, and half of the capital gains taxes and storage costs if Bogorad or the Plaintiff died; (2) whether Bogorad's alleged commitments were to survive his death; (3) if Bogorad would continue to pay the renovations costs, maintenance fees, and half of the capital gains taxes and storage costs if they ceased to be a couple;[24] or (4) the time period to which Bogorad was committing to pay the monthly maintenance fee.  Depo. Tr. Mullinix, 183:8-185:6. Without a specification of these material terms, the Contracts are vague and unenforceable.

     3.    *The New York Statute of Frauds Voids the Monthly Maintenance Fees Contract.*

The New York Statute of Frauds requires a writing for promises or agreements that are, by their terms, not able to be completed within one year from its making or if its "performance . . . is not to be completed before the end of a lifetime."  N.Y. General Obligations Law § 5-701(a)(1) (McKinney 2002).[25]  The Monthly Maintenance Fees Contract falls squarely within the New York Statute of Frauds because it could not be completed within one year or by the end of Bogorad's or the Plaintiff's lifetime.

---

[23] In Trimmer, the court refused to enforce an alleged oral contract between paramours on the grounds that material terms, such as the length of the term, the amount of the compensation, the terms of the payment and the nature of the duties, were not specified.  See Trimmer, 434 N.Y.S.2d at 87.  Similarly, in Soderholm, the court ruled unenforceable a vague and ambiguous oral contract for restitution because there was no clear meeting of the minds between the paramours.  See Soderholm, 676 N.Y.S.2d at 852-3 ("[w]ithout more, these. . . expenditures, surrounded not by clear or third-party 'IOU's', but by cohabitation, love, bliss, 'somedays' and borrowed cars, do not a contractual debt make."  (emphasis added)).

[24] The Plaintiff threatened to break up with Bogorad for another man in 1998.  K. Bogorad-Gross 64:7-65:7.

[25] Section (a)(1) is not limited to the lifetime of the promisor.  See Meltzer v. Koenigsberg, 302 N.Y. 523, 525 (1951) (finding legislature could have, but did not, expressly limit section (a)(1) to the promisor's lifetime).

In a case with almost identical facts, this Court granted summary judgment where the New York Statute of Frauds voided an oral contract for monthly payments for the rest of the plaintiff's lifetime because there was no possibility the contract would terminate before the end of a lifetime.  Rubenstein v. Kleven, 163 F. Supp. 237, 238 (D. Mass.), aff'd, 261 F.2d 921 (1st Cir. 1958), .  The same reasoning applies squarely to this case.  As alleged by Plaintiff, Bogorad would pay the Plaintiff's monthly maintenance fee "in perpetuity."  Therefore, the alleged oral contract for monthly maintenance fees is void under the New York Statute of Frauds because it could not be completed in one year or before the end of Bogorad's or Plaintiff's lifetime. [26]

**C.    The Plaintiff Cannot Establish Promissory Estoppel as a Matter of Law.**

To meet the elements of promissory estoppel, the Plaintiff must prove: (1) a clear and unambiguous promise; (2) reasonable and foreseeable reliance by the party to whom the promise is made; and (3) an injury sustained by the party asserting the estoppel by reason of her reliance. See Van Brunt v. Rauschenberg, 799 F. Supp. 1467, 1473 (S.D.N.Y. 1992).  New York law also requires the Plaintiff's injury to be "unconscionable".  Lowinger v. Lowinger, 733 N.Y.S.2d 33, 39 (App. Div. 2001) (no unconscionable injury where unhappy marriage pre-existed and did not result from plaintiff's reliance on oral promise for financial support if she converted to Judaism); D&N Boening, Inc. v. Kirsch Beverages, Inc., 471 N.Y.S.2d 299 (App. Div.), aff'd, 63 N.Y.2d 449 (1984) (no unconscionable result where plaintiff derived substantial income from oral agreement).

First, as discussed above, Bogorad did not make clear and unambiguous promises to Plaintiff.  Second, Plaintiff's sale of the 87th Street Apartment and purchase of the Apartment

---

[26] Rubenstein involved a plaintiff who alleged that the defendant promised to pay the plaintiff $1,000 a month for the rest of her life in consideration for the plaintiff's agreement to devote all or substantially all of her attention to the defendant.  Id.

cannot be unequivocally linked to Bogorad's alleged promises.  Other persons, such as the Plaintiff's son and broker, recommended that Plaintiff sell the 87th Street Apartment and buy an apartment on Fifth Avenue.  Moreover, Plaintiff's claim of reliance on Bogorad in purchasing the Apartment suggests that the Plaintiff somehow stood on unequal footing with Bogorad, a suggestion irrefutably belied by entrepreneurial background and business acumen.

Finally, Plaintiff cannot claim reliance or unconscionable injury.  She was told, in writing, that the Estate would not pay for renovations five weeks <u>before</u> she entered into a contract to have them done.  Moreover, the Apartment is now worth $2,100,000, a gain to her of $700,000 over just three years.  <u>See</u> Hodes Aff., Exh. D.  The Plaintiff's profit will more than cover all of the alleged expenditures at issue in this case.[27]  Plaintiff's argument that she suffered <u>any</u> injury as a result of her purchase of the Apartment strains credulity too far.

## V.    CONCLUSION

For the foregoing reasons, this Court should grant Defendants' motion for summary judgment on the Complaint in its entirety.

[The remainder of this page intentionally left blank.]

---

[27] Moreover, Plaintiff failed to mitigate her damages.  Plaintiff had not yet signed a contract for the renovations at the time Plaintiff received notice that the estate would not pay her claims.  She nevertheless charged forward with the original renovations plans and then demanded that the Estate reimburse her.

## REQUEST FOR ORAL ARGUMENT

Defendants hereby request oral argument on the foregoing motion.

                                    KIKI BOGORAD-GROSS and
                                    LEONARD P. BOGORAD, as
                                    they are the Executors of the Will
                                    of Lawrence Bogorad,
                                    By their attorneys,


May 25, 2006                        /s/  Lisa M. Hodes
                                    Larry L. Varn (BBO # 508130)
                                    Lisa M. Hodes (BBO # 660444)
                                    SULLIVAN & WORCESTER LLP
                                    One Post Office Square
                                    Boston, Massachusetts 02109
                                    (617) 338-2800
                                    lvarn@sandw.com
                                    lhodes@sandw.com


## FEDERAL RULE 26(c) AND LOCAL RULES 7.1(A)(2) AND 37.1 CERTIFICATE

Counsel for Defendants has made a good-faith effort to resolve this dispute without court action. Counsel for Defendants and counsel for Plaintiff have exchanged emails and have held multiple phone conferences, but have been unable to reach agreement.

                        /s/  Lisa M. Hodes


### Certificate of Service

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non registered participants on May 25, 2006.

                        /s/  Lisa M. Hodes