UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| KATHLEEN P. MULLINIX, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Civil Action |
| v. | ) | No. 04-12684-WGY |
| | ) | |
| KIKI BOGORAD-GROSS and | ) | |
| LEONARD P. BOGORAD, as They | ) | |
| Are Executors of the Will of | ) | |
| Lawrence Bogorad, | ) | |
| | ) | |
| Defendants. | ) | |

## AFFIDAVIT OF LISA M. HODES

Lisa M. Hodes, being duly sworn, deposes and states as follows:

1.     I am an associate of the firm Sullivan & Worcester LLP, counsel to Defendants Kiki Bogorad-Gross and Leonard Bogorad, as Executors of the Will of Lawrence Bogorad.  I make this affidavit on personal knowledge in Defendants' Motion for Summary Judgment.

2.     Annexed to this affidavit as Exhibit A is a true and accurate copy of portions of the deposition transcript of Kathleen P. Mullinix, taken on March 1, 2006.

3.     Annexed to this affidavit as Exhibit B is a true and accurate copy of portions of the deposition transcript of Leonard Bogorad, taken on January 19, 2006.

4.     Annexed to this affidavit as Exhibit C is a true and accurate copy of portions of the deposition transcript of Kiki Bogorad-Gross, taken on January 20, 2006.

5.     Annexed to this affidavit as Exhibit D is a true and accurate copy of the expert appraisal report from Christopher Devine of Mitchell, Maxwell & Jackson, Inc.

6.      Annexed to this affidavit as Exhibit E is a true and accurate copy of portions of the deposition transcript of Renee Ring, the President of the Board of 1050 Fifth Avenue Cooperative Association, taken on December 13, 2005.

7.      Annexed to this affidavit as Exhibit F is a true and accurate copy of the letter from Matthew A. Berlin, Esq. to Larry C. Kenna, Esq., dated February 11, 2004.

8.      Annexed to this affidavit as Exhibit G is a true and accurate copy of the contract between Kathleen P. Mullinix and McGraime Woodworking, Inc., dated March 17, 2004, that was produced in discovery in this case.

9.      Annexed to this affidavit as Exhibit H is a true and accurate copy of the email from Kathleen P. Mullinix to Kiki Bogorad-Gross, dated March 11, 2004, that was produced in discovery in this case.

10.      Annexed to this affidavit as Exhibit I is a true and accurate copy of the email from Kiki Bogorad-Gross to Kathleen P. Mullinix, dated May 12, 2004, that was produced in discovery in this case.

11.      Annexed to this affidavit as Exhibit J is a true and accurate copy of the email from Kathleen P. Mullinix to Kiki Bogorad-Gross, dated May 15, 2004, that was produced in discovery in this case.

12.      Annexed to this affidavit as Exhibit K is a true and accurate copy of the email from Kathleen P. Mullinix to Kiki Bogorad-Gross, dated May 27, 2004, that was produced in discovery in this case.

13.      Annexed to this affidavit as Exhibit L is a true and accurate copy of the email from Kathleen P. Mullinix to Kiki Bogorad-Gross, dated May 28, 2004, that was produced in discovery in this case.

14.     Annexed to this affidavit as Exhibit M is a true and accurate copy of the email from Kathleen P. Mullinix to Kiki Bogorad-Gross, dated June 11, 2004, that was produced in discovery in this case.

15.     Annexed to this affidavit as Exhibit N is a true and accurate copy of the email from Kathleen P. Mullinix to Kiki Bogorad-Gross, dated May 16, 2004, that was produced in discovery in this case.

Signed under the pains and penalties of perjury this 25th day of May, 2006.

/s/  Lisa M. Hodes
Lisa M. Hodes

Certificate of Service

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non registered participants on May 25, 2006.

/s/  Lisa M. Hodes

# EXHIBIT A
# (1 OF 2)

Page 1

Vol. 1

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

C.A. NO. 04-12684-WGY

KATHLEEN P. MULLINIX,
                    Plaintiff,
          vs.
KIKI BOGORAD-GROSS and LEONARD P.
BOGORAD, as They Are Executors of the
Will of Lawrence Bogorad,
                    Defendants.

DEPOSITION OF KATHLEEN P. MULLINIX,

taken pursuant to Notice under the applicable

provisions of the Federal Rules of Civil

Procedure on behalf of the Defendants, before

Simonne J. Elwood, R.P.R. and a Notary Public

in and for the Commonwealth of Massachusetts,

at the office of Sullivan & Worcester LLP, One

Post Office Square, Boston, Massachusetts,
commencing on Wednesday, March 1, 2006 at
8:41 a.m.

NEAL A. SALLOWAY - COURT REPORTERS
FIVE CARDIGAN ROAD

WEST PEABODY, MA 01960
781-581-3993 - 978-535-0313 - FAX 978-536-3142

00008

1   A     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.

2   Q     When did you first meet Professor Lawrence

3         Bogorad?

4   A     December 1968.

5   Q     And how was it that occasioned your first

6         meeting with Professor Bogorad?

7   A     I was looking to arrange a postdoctoral

8         fellowship.  I was finishing my Ph.D., and I

9         was going to do a postdoc starting the next

10        September, September of 1969.

11  Q     Did you pursue that postdoctoral fellowship?

12  A     Yes, I did.

13  Q     At what institution of higher learning?

14  A     Harvard University.

15  Q     And how long were you involved in that

16        fellowship?

17  A     Just shy of three years.

18  Q     Until late 1972, is that correct?

19  A     June.  I left in June 1972.

20  Q     Would you describe, in general terms, please,

21        what was involved in that academic pursuit?

22  A     I was a -- I did a research project, and so I

23        was in the lab all the time, and we published

00010

1  A    I was there for nine -- Wait.  Yeah, nine

2       years.  I left in 1981.

3  Q    Was that a full-time position?

4  A    Uh-huh.  Yes.  After I was Research Chemist,

5       was I Assistant Director of the NIH for two

6       years.

7  Q    After you left Harvard in June of 1972, did

8       you pursue any other academic pursuits?

9  A    No.

10 Q    Okay.  You joined the work force, correct?

11 A    Yeah.

12 Q    After you left Harvard in June of 1972, when

13      was the next time you met Professor Bogorad?

14 A    I don't remember if I -- I think I saw him --

15      Let me think just a moment.  I saw him at the

16      NIH probably -- Yeah.  Right.  Probably in

17      1973.  He was at a meeting.  And then I --

18      and then -- then I saw him in 1975 in

19      November.

20 Q    When?  I'm sorry.

21 A    In November of 1975.

22 Q    And what occasioned the meeting in November

23      of 1975?

00011

1 A    We both attended the American Society for

2      Cell Biology meeting.

3 Q    Where was that?

4 A    In Puerto Rico.

5 Q    Do you recall where in Puerto Rico?

6 A    San Juan.

7 Q    Was that a chance encounter, or was there --

8 A    A chance.

9 Q    -- a plan?

10 A    Chance.

11 Q    What transpired between the two of you at the

12      Puerto Rico meeting?

13 A    We -- I met -- I met him in the big hall that

14      was having poster sessions and so forth, and

15      I hadn't seen him for awhile, and he invited

16      me to join his group for dinner which I did,

17      and he said he would see me the next day and

18      that I should meet him at the posters if we

19      didn't see each other during the day.

20          I met him at the posters in the late

21      afternoon, and he asked me to come to dinner,

22      and there was a, like a dance, a party, you

23      know, a meeting, an organized party at a big

00012

1    fort in San Juan, and so he asked -- So I met

2    him for dinner, and he asked me to meet him

3    at the bus. I met him at the bus, and then

4    we went to this dance, and we spent the

5    evening together.

6 Q    How long were the two of you together that

7    evening?

8 A    We spent the entire evening together.

9 Q    Are you familiar with your complaint in this

10    case?

11 A    I think so.

12        MR. VARN: Do you have a copy? Off

13    the record.

14        (Whereupon an off-the-record

15    discussion took place.)

16        MR. VARN: Back on the record.

17        Would you please mark that as Mullinix

18    Exhibit 1?

19        (Whereupon the Stenographer marked as

20    Exhibit No. 1 - Complaint and Demand for Jury

21    Trial.)

22 Q    I just want to show you, Ms. Mullinix, the

23    document that I've asked the court reporter

00014

1 A    Okay. Sorry.

2 Q    The first sentence of that recites, and I

3    quote, "In or about 1975, Ms. Mullinix and

4    Mr. Bogorad began a relationship." Do you

5    see that?

6 A    Uh-huh.

7 Q    And does that make reference to events that

8    transpired in San Juan that you just

9    testified about?

10 A    That's correct.

11 Q    Was there anymore to the relationship other

12    than dinner and dancing?

13 A    Yes.

14 Q    What more?

15 A    We had an intimate relationship. We spent

16    the night together.

17 Q    And the next day, was there a continuation of

18    the relationship, or did people go their

19    separate way?

20 A    No. We were together from then on as much as

21    we could be.

22 Q    Well, I'm just referring to Puerto Rico. How

23    long did --

00016

1  Q    In or as of November 1975, were you married?

2  A    Yes.

3  Q    To whom?

4  A    Joseph Mullinix.

5  Q    When did the two of you get married?

6  A    June 18th, 1966.

7  Q    Was that your first marriage?

8  A    Yes.

9  Q    Did you -- At some point, did you and Mr.

10      Mullinix get divorced?

11 A    Yes.

12 Q    When did you get divorced?

13 A    I think the divorce was finalized maybe in

14      2000 or maybe 1999.  I don't remember exactly

15      the date.

16 Q    At some point, did you and Mr. Mullinix cease

17      living together?

18 A    Yes.

19 Q    And when did that transpire?

20 A    On March 31st, 1997.

21 Q    Were you living in New York City at the time?

22 A    In '97?

23 Q    Yes.

**Mullinix, Kathleen  03-01-06**                     **Page 16**

00019

1  Q   And is he presently employed?

2  A   Yes.

3  Q   What does he do for a living?

4  A   He's a securities trader.

5  Q   For what firm?

6  A   He's essentially self-employed.

7  Q   And his twin is named?

8  A   Brendan Philip Mullinix.  B-R-E-N-D-A-N.

9  Q   And where does he reside?

10  A   142 Wooster Street.

11  Q   The two brothers live together?

12  A   Correct.

13  Q   Is he gainfully employed?

14  A   Yes.

15  Q   What does he do?

16  A   He is a Vice President of a real estate

17     investment trust firm.

18  Q   Which one?

19  A   Lexington Corporate Properties.

20  Q   Is his office in New York City?

21  A   Correct.

22  Q   After the Puerto Rico meeting in November of

23     1975, when did you next have occasion to

00021

1    transpired during that telephone

2    conversation?

3  A   No.

4  Q   And when was the next communication, either

5    in any form, with Professor Bogorad after

6    that telephone call?

7  A   We talked essentially every day.

8  Q   Was there -- For how long?

9      MS. JERRETT:  Objection.  You can

10    answer.

11  A   We probably talked four, five times a day.

12    He called me all the time, and I called him

13    when I could, and our calls would probably

14    range anything from five minutes to an hour

15    depending on what we were doing.

16  Q   And how long did that, what I'll call, daily

17    telephone-conversation relationship last?

18  A   Forever.

19  Q   I take it by forever, you meant until his

20    passing on December 28, 2003?

21  A   That's correct.

22  Q   Did Professor Bogorad, in fact, come to

23    Washington, D.C., on or about December 10,

**Mullinix, Kathleen  03-01-06**        **Page 21**

00028

1  Q    How long did you live in Ridgewood, New

2       Jersey?

3  A    Until April of 1994.

4  Q    What happened then?

5  A    We sold our house and moved.  We bought an

6       apartment in the city in New York.

7  Q    I'm sorry.  That was 1994?

8  A    '94.

9  Q    1994.  Was that the apartment located at 975

10      Park Avenue?

11 A    Yes.

12 Q    What's the cross street there?

13 A    84.  83.  Excuse me.  83.

14 Q    How long did you remain employed by Columbia

15      University?

16 A    Until October l0th, 1987.

17 Q    What happened then?

18 A    I left to start a business.

19 Q    And the name of that business?

20 A    The first -- The initial name was

21      Neurogenetic Corporation,

22      N-E-U-R-O-G-E-N-E-T-I-C, Corporation, and we

23      changed the name of the company in 1993, I

00029

1    think, to Synaptic, S-Y-N-A-P-T-I-C,

2    Pharmaceutical Corporation.

3  Q   That was located in New Jersey, correct?

4  A   Correct.

5  Q   You were the Chief Executive Officer, is that

6    correct?

7  A   Correct.

8  Q   And how long did you remain with that

9    enterprise first known as Neurogenetic and

10    then subsequently known as Synaptic?

11  A   Until September 16th, 2002.

12  Q   What happened then?

13  A   I left.

14  Q   Did you pursue further gainful employment or

15    self-employment after that?

16  A   For awhile, I didn't; and since that time, I

17    have worked from time to time, not much, as

18    an independent biotechnology consultant.

19  Q   When did you start doing independent

20    consulting work?

21  A   I had -- I did -- I did that assignment in

22    maybe April of 2003.  Yeah.  April of 2003,

23    and I did another one in the summer of early

00030

1    fall, I think.  Wait.  Yeah.  I finished it

2    in September of 2003.

3 Q    So you had an assignment that started in

4    April of 2003 and lasted until September of

5    2003?

6 A    No.  It probably lasted from maybe like for

7    six weeks.

8 Q    Okay.  I guess I'm a little confused.  Was

9    there one assignment or two?

10 A    Two.

11 Q    And the first was in April for a handful of

12    weeks, correct?

13 A    Yeah.  Right.

14 Q    And the second was in September?

15 A    Yeah, the same.

16 Q    Have you done any since?

17 A    Yes.  In -- Let's see.  In the spring of

18    2004, I worked with a group to see if we

19    could start a business around health,

20    nutraceutical, science-based nutraceutical.

21    I wrote a business plan, and the idea was to

22    see if we could fund it, and we could not.

23    The person who was sort of the nucleating

**Mullinix, Kathleen  03-01-06**            **Page 30**

00034

1      MS. JERRETT: Objection. You can

2    answer.

3  A    In general terms, it was the same arrangement.

4    Laurie would try to -- We would try to see

5    each other once a month. He would typically

6    come to New York. Sometimes he would have a

7    meeting in Washington, and I'd go down to

8    Washington. Sometimes we met each other at

9    scientific meetings.

10 Q    So your best memory is, during that 13-year

11    period, the two of you would get together

12    approximately once a month?

13 A    Right.

14 Q    And did it continue to be an intimate

15    relationship?

16 A    Yes.

17 Q    Did you, during that period of time, any time

18    during those 13 years, disclose to your

19    husband that you were having an affair with

20    Professor Bogorad?

21 A    No.

22 Q    Do you know whether he made any disclosure to

23    his wife that he was having an affair with

**Mullinix, Kathleen  03-01-06**                    **Page 34**

00035

1     you?

2  A    Not to my knowledge.

3  Q    At some point, did your husband learn of the

4        affair?

5  A    Yes.

6  Q    And do you recall the circumstances under

7        which he learned of it?

8  A    I told him in 1997.

9  Q    What caused you, at that point in time, to

10       decide to make that disclosure?

11  A    The pressures of -- The pressures of living a

12       double life became too great for me, and the

13       precipitating event was an illness that

14       Laurie had in about 1995, '94 or '95. I

15       think it was '95.

16  Q    What sort of illness?

17  A    He had a -- He had a bacterial infection of

18       something called H-Pylori which gave him a --

19       he had an ulcer that bled terribly. He had a

20       big hemorrhage.

21  Q    Was he hospitalized?

22  A    Yep.

23  Q    Where?

00038

1  A    76.

2  Q    Is it fair to say that you contemplated that

3       he would, in all likelihood, predecease you?

4          MS. JERRETT:  Objection.  Time frame.

5  Q    As of the mid to late-'90s?

6  A    We always did.  Statistics says that that's

7       what would happen.  I always used to say,

8       "But I could be hit by a truck tomorrow."  We

9       would have that discussion.

10  Q    But it's fair to say, is it not, that just as

11       an actuarial matter, in your ordinary course

12       of things, you expected to live longer than

13       he would, correct?

14          MS. JERRETT:  Objection.  You can

15       answer if you know the answer.

16  A    Actuarially speaking, yes.

17  Q    I believe you testified earlier that you and

18       your husband separated at the end of March

19       1997, is that right?

20  A    Yeah.

21  Q    Was that separation, roughly, contemporaneous

22       in time with your disclosure to him that you

23       were having an affair with Professor Bogorad?

00039

1  A    Maybe a couple of months after that.

2  Q    And at that point, you and your husband were

3       living on Park Avenue in New York in an

4       apartment, correct?

5  A    Yes.  We -- We were; but in 1994, I think --

6       Wait.  Yeah.  19 -- Early 1993, my husband

7       took a job at Yale, and so he rented an

8       apartment in New Haven and was there during

9       the week.

10 Q    Okay.  And at Park Avenue on weekends,

11      typically?

12 A    Yes.

13 Q    And when you separated at the end of March

14      1997, which one of you moved out?

15 A    My husband.

16 Q    And you continued to reside at 975 Park

17      Avenue, correct?

18 A    Yeah.

19 Q    For approximately how long did that continue

20      to be your residence?

21 A    Until July 1st or 2nd, 1999.

22 Q    And was that when you purchased the

23      condominium apartment on East 87th Street?

00040

1  A    That's correct.

2  Q    And was that apartment located at 170 East

3       87th?

4  A    That's correct.

5  Q    And what was the cross avenue there?

6  A    This was between Lex and Third.

7  Q    Did you either retain or receive ownership of

8       the Park Avenue apartment in connection with

9       your divorce?

10  A    No.  We sold the apartment together and

11       divided the proceeds.

12  Q    And was the sale of the Park Avenue apartment,

13       roughly, contemporaneous with your purchase

14       of the 87th Street condo?

15  A    Yeah.

16  Q    And I'm trying to get my timeline right.

17       Were you with -- Strike that.

18           What were you doing, if anything, for

19       gainful employment in 1999?

20  A    I was employed by Synaptic.

21  Q    Still at Synaptic.  So I'm clear, you were

22       living in New York City, but your office was

23       in Paramus, New Jersey, correct?

**Mullinix, Kathleen  03-01-06**                    **Page 40**

00041

1 A    Yes.

2 Q    So, you were doing, in essence, of reverse

3    commuting each day, is that right?

4 A    Yep.

5 Q    Okay.  Am I correct that you continued to

6    reside on East 87th Street until

7    approximately the fall of 2002?

8 A    No.  I had lived there until -- until April

9    7, 2003.

10 Q    And at that point, you sold that condominium,

11    correct?

12 A    Yeah.  Actually, I sold it, and the

13    transaction was at the end of March, and I

14    stayed in the apartment for another week.

15 Q    Between July of 1999 when you bought that

16    apartment and April of 2003 when you sold it,

17    would you please describe the frequency of

18    your personal contact with Professor Bogorad?

19 A    Laurie came to New York just about every

20    weekend.  I, occasionally, came here.

21    Mostly, he came to New York.  My parents were

22    very old and in the process of, you know, --

23    they both died; one in 2002, and my mother in

00042

1    2003. So I came to New York; I mean; to

2    Massachusetts to -- When I would come to do

3    things for them, I would stay in Lexington.

4    And what did you ask me? I'm sorry.

5 Q    I was asking you how frequently the two of

6    you saw each other between July of '99 and

7    April of 2003?

8 A    We were together, except, typically, maybe

9    like three days in the middle of the week.

10    Laurie would come up to Cambridge.

11 Q    At some point, did you learn that Professor

12    Bogorad's wife had been institutionalized?

13 A    Yes.

14 Q    When did you learn that?

15 A    When she was institutionalized.

16 Q    When was that?

17 A    It was, I think, in January of 1998. I'm not

18    totally sure if it was January, but it was --

19    I don't think it was -- I don't think it was

20    before the new year, but it could have been;

21    end of '97 early '98.

22 Q    And you're aware, are you not, that she

23    remains institutionalized to this day,

**Mullinix, Kathleen  03-01-06**                    **Page 42**

00044

1    but he was very interested in a theoretical

2    project he was doing.  So he went to work,

3    and he was writing, and he did all kinds of

4    stuff.  His students would come to visit.  So

5    he went to the office during the week.

6  Q    And that was the office at Harvard

7    University, correct?

8  A    Uh-huh.

9  Q    And during that period of time, he resided,

10    at least during the week, at the house in

11    Lexington?

12  A    Yes.

13  Q    Do you know or did he disclose to you the

14    frequency of his visits to his wife during

15    that period of time?

16  A    Yes.

17        MS. JERRETT:  Objection.  What time

18    period?

19  Q    July 1999 until 2003.

20  A    I forgot.  I should add something to what --

21    Did you ask me before how often we were --

22    how we interacted between '99 and 2003; was

23    that the question?

00045

1  Q    I believe I did.

2  A    Yes.  So, in addition to his being in New

3      York, we went on vacations together.  We went

4      on a lot of vacations as a matter of fact.

5      So that would be weeks, a week here, a week

6      there, ten days here.

7  Q    Am I correct that apart from vacations

8      involving travel that between July of 1999

9      and April of 2003 when you owned the 87th

10      Street apartment that the typical pattern was

11      that he would come to New York most weekends;

12      occasionally, you would come to the Boston

13      area; and during the week, he was in

14      Massachusetts and going to his office at

15      Harvard, correct?

16  A    With the exception of on two occasions, we

17      took two different weeks' vacations in New

18      York, and we went sightseeing in New York

19      together.  I just lost my thought.  We went

20      to California.  No.  That was travel.  What

21      else?  I forget what you asked me.  I think

22      that's right.

23  Q    Did Professor Bogorad or anyone else tell you

**Mullinix, Kathleen  03-01-06**                    **Page 45**

00050

1     Mrs. Bogorad died, and I don't know.  I

2     certainly wouldn't suggest that he divorce

3     his wife.  So I don't think we talked about

4     that.

5  Q    My question is a little different.  Did the

6        "divorce" word involving Professor Bogorad

7        and his wife come up at all in discussions

8        between the two of you after you disclosed

9        the fair to your husband?

10  A    I don't remember.  I don't remember.

11  Q    I believe you testified a moment ago that

12       there was discussion between the two of you

13       to the effect that the two of you would marry

14       after Mrs. Bogorad passed away, is that

15       correct?

16  A    Yeah.

17  Q    And when did discussions of that subject

18       matter along those lines begin?

19  A    I think -- I think -- I think probably right

20       after my husband and I separated.

21  Q    In early 1997, correct?

22  A    Yeah.

23  Q    Is it fair to say, Ms. Mullinix, that you

**Mullinix, Kathleen  03-01-06**                    **Page 50**

00051

1    understood that so long as Mrs. Bogorad were

2    alive that Professor Bogorad would not

3    divorce her?

4        MS. JERRETT:  Objection.

5 A   I certainly wasn't talking about it.

6 Q   Was that in your mind his understanding that

7    as long as Mrs. Bogorad was alive that he

8    would not pursue divorce proceedings?

9        MS. JERRETT:  Objection.  You can

10    answer if you understand.

11 A   Yeah.  I guess it was my understanding.  I

12    didn't think he would, I mean, or he should.

13    His wife was -- needed huge amounts of care.

14    I don't see how you divorce someone who is

15    essentially dead but needs a huge amount of

16    care.  Maybe people do that.  I don't know.

17 Q   Was it also your understanding that unless

18    and until Mrs. Bogorad died, you and

19    Professor Bogorad could not or would not get

20    married?

21        MS. JERRETT:  Objection.

22 A   Our understanding was that we were man and

23    wife except we weren't married.

**Mullinix, Kathleen  03-01-06**        **Page 51**

00055

1  Q    And approximately what was the monthly amount

2        during that period for maintenance during the

3        period that you owned the 87th Street

4        condominium?

5  A    It was $870.

6  Q    Did Professor Bogorad pay you, or did he pay

7        the condominium association directly?

8  A    He paid me.

9  Q    And was there a discussion between you,

10       between you and Professor Bogorad, concerning

11       that monthly payment?  I'll ask it a

12       different way.

13            How did that start that pattern of him

14       paying you the monthly maintenance fee of

15       approximately $870 a month?

16  A    Laurie said, "I want to pay the maintenance."

17  Q    So he offered to do it?

18  A    Uh-huh.

19  Q    And you agreed?

20  A    Yeah.

21  Q    And what, if anything, did you do or promise

22       to do in exchange for that payment?

23  A    Nothing.

00058

1  Q    And how did he do that with you; was it cash;

2       did he write checks?

3  A    Checks.  He wrote checks every month.

4  Q    Did he make -- During that period of time

5       and, again, I'm just referring to the time

6       period when you owned the 87th Street

7       condominium, did he make any other payments

8       to you other than the checks for the monthly

9       maintenance fee for the condominium that you

10      recall?

11 A    Well, we bought furniture together, and I

12      bought -- I would buy, you know, buy things,

13      and he would reimburse me.  We did some

14      painting.  We had the floors refinished.  So

15      I would typically pay for things, and he

16      would reimburse me.

17          He paid for -- I don't know what you

18      mean payment exactly; but when we were

19      together, you know, he paid for everything,

20      going to dinner or the theater or whatever if

21      that's included in your question.

22 Q    Prior to your acquiring the ownership of the

23      87th Street condominium, did Professor

**Mullinix, Kathleen  03-01-06**                    **Page 58**

00059

1    Bogorad make any other payments directly to

2    you; and so I'm excluding things like picking

3    up the dinner tab and stuff like that?

4 A   I don't think so.  You mean just like things

5    for my house?

6 Q   I'm asking anything; if you recall any

7    instance, prior to you buying the 87th Street

8    condominium, in which Professor Bogorad made

9    any payments directly to you by cash, by

10    check, by wire, by anything; do you recall?

11 A   He paid for some theater subscription tickets.

12    I think I would buy -- I don't think so.

13 Q   Am I generally correct that when the two of

14    you were together, prior to your buying the

15    87th Street condominium, that he would

16    generally pick up the tab for things like,

17    you know, dinner, entertainment, things of

18    that sort?

19 A   During what period of time?

20 Q   Prior to 87th Street.

21 A   Up until -- From 1997 on, he picked up the

22    tab whenever we did anything together.

23 Q   And prior to 1997 when you were together, who

**Mullinix, Kathleen  03-01-06**         **Page 59**

00060

1    picked up the cost or the tabs?

2  A   We typically shared the costs.

3  Q   Was there a discussion at all between the two

4    of you, in or about, you know, 1997, as to

5    the change from cost sharing to him picking

6    up the tab?

7  A   It was in -- Actually, in the middle of 1998.

8    Yeah. Early 1998, middle of 1998.

9  Q   And what discussion did you have with him on

10    that subject?

11  A   It was part of our agreement that we were

12    committed to each other as married people,

13    and that's the way we would live.

14  Q   As best you can recall, what did he say to

15    you and you say to him in connection with

16    that discussion?

17  A   The discussion was that we were going to go

18    forward together as a couple and live

19    together as a commuting couple, but we were a

20    couple together, that our relationship would

21    be public, that we considered ourselves to be

22    man and wife, that I was committed to him

23    forever and he to me.

**Mullinix, Kathleen  03-01-06**        **Page 60**

00061

1  Q    And more specifically on the subject of, as

2       we discussed, making payments or picking up

3       tabs, what did he say to you and you say to

4       him on that subject?

5  A    I don't think it was explicit.  He just

6       said -- He would just say, "Don't be

7       ridiculous.  This is mine."  That's what he

8       did.

9  Q    In respect of the 87th Street condominium,

10      there were expenses of living other than the

11      maintenance fee, correct?

12 A    Yeah.

13 Q    Was there a mortgage?

14 A    Yes.

15 Q    Who paid that?

16 A    I did.

17 Q    And did you pay it out of your own resources?

18 A    Yes.

19 Q    And there were utility bills, correct?

20 A    Yes.

21 Q    Who paid that?

22 A    I did.

23 Q    Out of your own resources?

00062

1  A    Yes.

2  Q    The $870 maintenance fee payments which he

3        made to you in respect of 87th Street, did

4        you declare any of those as income on your

5        federal income tax returns?

6  A    No.

7  Q    Did you declare it as income on your New York

8        State income tax returns?

9  A    No.

10 Q    Did you, during that period of time, also

11       file New York City income tax returns?

12 A    Yeah.

13 Q    And did you declare any of those payments as

14       income on your New York City income tax

15       returns?

16 A    No.

17 Q    Did you ever consider declaring any of those

18       payments as income on any of your income tax

19       returns?

20 A    It never occurred to me.

21 Q    Is it fair to say, Ms. Mullinix, that those

22       $870 monthly payments which he made to you in

23       respect of the 87th Street condominium

**Mullinix, Kathleen  03-01-06**                    **Page 62**

00066

1    property of you and his estate?

2  A    No, no.

3  Q    What changed?

4  A    We bought them together, and I guess I would

5        say there's no way he would have thought that

6        this furniture would be going to somebody

7        else if he died.  I don't.

8  Q    After he passed away, did you make any

9        disclosure to the executors of his estate

10       that you were holding items that the two of

11       you had purchased jointly?

12  A    Kiki Bogorad-Gross and her family came to

13       visit our apartment in New York, so she --

14       and we have happily disclosed the things we

15       had bought together.  So she knows what was

16       bought together as well as I do even the

17       chairs that we have discussed in our document

18       or whatever, the desk chairs.

19  Q    At some point in time, you were approached by

20       someone who was interested in purchasing the

21       87th Street condominium, correct?

22  A    Yes.

23  Q    Who was that?

**Mullinix, Kathleen  03-01-06**                    **Page 66**

00067

1  A   Jeffrey Ascherman.

2  Q   Was he a neighbor?

3  A   Yeah.  He lived in the building.

4      A-S-C-H-E-R-M-A-N.  I don't know if it's one

5      N or two.  Jeffrey.

6  Q   When did Mr. Ascherman first approach you?

7  A   In -- I think it was the late summer of 2002

8      or spring.  It was some time, significant

9      time before I ever called him up.  I don't

10     remember.

11 Q   How did he first approach you?

12 A   He knocked on the door on Saturday morning

13     and asked if I would consider selling my

14     apartment to him.

15 Q   What did you say?

16 A   "No."  I said, "I live here.  This is my

17     home."

18 Q   As of that point in time or prior to then,

19     had you given any thought or contemplated

20     selling the 87th Street condominium?

21 A   No.

22 Q   Would you describe what happened next in

23     terms of your contemplation of a possible

00068
1    sale of that condominium unit?

2  A    So, I said, "No.  I live here.  I love the

3    apartment."  And he had the apartment next

4    door to mine; I guess; was on or might come

5    on the market was his idea, and he could buy

6    that next-door apartment and join it with

7    mine, and he would have a lot of space.  He

8    had several kids.  And that was -- Well, he

9    wasn't totally outlandish that he knocked on

10    the door, and so Laurie was there, and we

11    kind of said, "That was funny."  And that was

12    a Saturday.

13          Sometime after, he said, "You know,

14    that might not be a bad idea."  And it was

15    the first time he said, "I'm not thrilled

16    with the neighborhood.  I don't like 86 and

17    Lex.  It's too rough."  And I said, "This is

18    great space.  C'mon."  And then sometime

19    thereafter, we were having dinner with my

20    twin sons which we did a lot, and Laurie

21    said, "Have you told Brendan and David about

22    Dr. Ascherman?"  And I said, "No."  So he

23    said, "Well, tell them."  And I told them,

00069

1    and I was -- I thought it was a joke, and one

2    of my sons said, "Well, did you ask him what

3    he had in mind?" I said, "No. You know, I

4    don't want to move anywhere." And Laurie and

5    Brendan started with, "You know, you should

6    talk to him. You should ask him what he has

7    in mind. Clearly, he wants this place."

8         He had a religious affiliation down

9    the street and did not drive on the weekends,

10   so he wanted to be close. So I said, "No."

11   And Laurie asked me several times. He said,

12   "You know, I think it would be a good idea

13   for you to move." And I didn't. I wasn't

14   interested; but, you know, he asked me a

15   bunch of times, and it was after a weekend

16   that he had mentioned it again, and I saw the

17   guy's wife in the lobby.

18 Q   I hate to interrupt you. The guy's wife is

19   Dr. Ascherman's wife?

20 A   Yes. Sorry. And so I said, "Oh, are you

21   still looking to move?" And she said, "Well,

22   you know, we really like your apartment. Are

23   you sure you wouldn't think about selling

00070

1    it?"  And I said, "Well, I don't know.  Maybe

2    we should talk about it."

3        And so I think they called me back.  I

4    think the husband called me back the next day

5    or something, and I don't remember.  I think

6    maybe he and his wife came to look at the

7    apartment, or the wife came alone because she

8    hadn't come that day that he came to the

9    door.  I just don't remember.  And so he

10    asked me what I would consider selling it

11    for.

12 Q    Did you answer?

13 A    No.  I had no idea.  So I called my son

14    and --

15 Q    Which one?

16 A    Brendan.

17 Q    He's the one in the real estate business?

18 A    That's right.  And I said, "This is nuts.

19    Should I suggest a price to him?"  And he

20    looked around at the apartments that had sold

21    in the neighborhood or something, and he

22    said -- he thought like $1.2 million would be

23    a very good price.  I had paid $800,000 for

00071

1    the apartment in -- it was July of '99.  So I

2    talked to Laurie, and he said, "Look, if you

3    can get $1.2 million for that apartment, you

4    should sell it.  I would like you to move

5    closer to Fifth Avenue.  I don't like

6    Lexington and 87th.  It's rough."  So I told

7    the Aschermans that I would sell them my

8    apartment for $1.5 million.

9  Q    I'm sorry.  1.5?

10  A    Yes.

11  Q    How much time transpired between that first

12    Saturday morning knock on the door by Dr.

13    Ascherman until you told them that you would

14    sell for $1.5 million?

15  A    See, I don't remember exactly when Dr.

16    Ascherman came to the door.  I think it was

17    in the spring, but it was sometime in

18    November because we had -- we had a couple of

19    discussions about the price before

20    Thanksgiving because I remember they went

21    away for Thanksgiving and so something like

22    that.

23  Q    So a period of several months elapsed between

00074

1  A    Yeah.

2  Q    And, ultimately, did you agree on a price?

3  A    Yes.

4  Q    And what did you agree on?

5  A    1.325.

6  Q    During the course of that process of

7        discussions with the Aschermans, did you go

8        back to your son, Brendan, and seek his

9        advice?

10  A    He thought 1.1 or 1.2 was a reasonable thing

11        to do, you know, that that would be a good

12        price for the apartment.  Yeah.  I talked to

13        him.  I talk to Laurie.

14  Q    Your son, Brendan, is in the real estate

15        business in New York, correct?

16  A    Well, he works for a real estate investment

17        trust in New York, but he doesn't do

18        business -- I mean, his business is not in

19        New York.

20  Q    Am I correct that when you first spoke with

21        your son, Brendan, about the possible sale of

22        the 87th Street condo, he did some

23        investigation or research, is that right?

**Mullinix, Kathleen  03-01-06**                    **Page 74**

00075

1  A    Yes, which I could have done on line, but I

2        didn't.  He did.

3  Q    And he advised you that -- I think you said

4        something in the neighborhood of 1.2 million

5        would be a fair price?

6            MS. JERRETT:  Objection.

7  A    He said --

8  Q    Is that right?

9  A    He said, "If you can sell the apartment for

10       1.1 or 1.2, that would be -- that would be

11       not a bad thing to do.  You should think

12       about it."

13 Q    And at the end of the discussions, you

14       received $1,325,000, correct?

15 A    Right.

16 Q    I believe you testified that Professor

17       Bogorad made statements to the effect that he

18       didn't like 86th and Lexington?

19 A    Right.

20 Q    What did he say was wrong with it?

21 A    It's a -- He thought the crowd was rough.

22       There are -- There are a lot of homeless

23       people who actually hang out on the corner of

00077

1 the newspaper; did you get a broker?

2 A I called a real estate broker.

3 Q And who did you call.

4 A Judith Durham.

5 Q And what agency is she with?

6 A Stribling.

7 Q Is she still with Stribling to your

8 knowledge?

9 A Yeah.

10 Q And had you known her previously?

11 A She handled the sale of Park Avenue and my

12 purchase of 87th Street.

13 Q Okay.  So she had been your broker with

14 respect to two previous transactions,

15 correct?

16 A Right.

17 Q Did you have a positive feeling towards Ms.

18 Durham?

19  MS. JERRETT:  Objection.

20 A Yeah.

21 Q And when you -- What did you tell her when

22 you first contacted her?

23 A I told her that -- I told her what had

00078

1    transpired with the Aschermans and that I was

2    reluctant to seek her advice because if I

3    sold the apartment to Mr. Ascherman, I

4    would -- it wouldn't be through a broker, so

5    I didn't want to call up and pick her brain,

6    but did she think this was crazy and,

7    obviously, I would have to find another

8    apartment and what does she think.

9  Q    What did she say?

10 A    She said, "I think it would be a good thing

11    to do." She said, "There's been a big

12    appreciation of your apartment." When I

13    bought the apartment in 1999, it was just

14    being converted to condos. It had been -- It

15    had been built as a condo. The condo scheme

16    hadn't worked, so they had essentially rented

17    the apartments, and the market was better, I

18    guess. So her thought when I bought it was

19    that it was a very advantageous price, and

20    she said, "I think it's a good idea," and I

21    said, "Well, I don't know if I could find

22    another apartment. You know, I could make a

23    lot of money here, but I have to find

**Mullinix, Kathleen  03-01-06**                    **Page 78**

00079

1    someplace else to live." So she said, "Well,

2    let's go out and look." So we did.

3  Q    And over what period of time did you look at

4    other possible apartments?

5  A    Just a couple of weeks.

6  Q    And was this in approximately November of

7    2002?

8  A    Uh-huh.

9  Q    Does uh-huh mean yes?

10  A    Yes. I'm sorry.

11  Q    Do you recall approximately how many other

12    apartments you looked at?

13  A    Maybe ten.

14  Q    Were they all in Manhattan?

15  A    Yes.

16  Q    And can you describe just in general terms

17    what the boundaries of the areas in Manhattan

18    that you were looking in?

19  A    We looked between -- We look at apartments

20    between 72nd and maybe 90th between Park and

21    Fifth. I think we looked at one apartment on

22    72nd between Park and Lex.

23  Q    So your geography was approximately 18 blocks

**Mullinix, Kathleen  03-01-06**                    **Page 79**

00091

```
1     I had told him that I liked this apartment
2     that was on the 11th or whatever it was
3     floor.  And so I think -- I think what I did
4     was call the -- I think I called the -- God,
5     I don't remember; whatever broker was
6     representing the seller.  It was in the -- on
7     the internet thing and asked if I could come
8     see it.
9  Q    And I take it the response was in the
10     affirmative because you went to see it on the
11     Wednesday before Thanksgiving 2002, correct?
12 A    Right.
13 Q    First of all, how did you get there; did you
14     just walk down the street?
15 A    I walked.
16 Q    The distance from your 87th Street apartment
17     to 86th and Fifth is about three long and one
18     short block, correct?
19 A    Yeah.
20 Q    And did you meet with anyone there, that is
21     to say, a broker?
22 A    Yes, the broker.
23 Q    And do you recall who that was?
```

00093

1 A    Ten minutes, tops.

2 Q    A walk-through?

3 A    Yeah.

4 Q    Did you make any observations?

5 A    That it was a wreck and very expensive.

6 Q    Do you recall what the listing price was?

7 A    Wait.  I think the listing price, at that

8      point, was maybe like 2.5 or something, 2.4.

9 Q    Million?

10 A    Correct.

11 Q    Do you recall what the listing price had been

12      on the 11th floor apartment that you had

13      liked?

14 A    Yeah.  That was around maybe 1.1.

15 Q    So this was twice as much and then some,

16      correct?

17 A    Yeah.

18 Q    Was it -- What differentiated the two

19      apartments; was it bigger; was it --

20 A    It was bigger.

21       MS. JERRETT:  Objection.

22 Q    Okay.  So you looked at it, and you said it

23      was too expensive, or you thought it was too

**Mullinix, Kathleen  03-01-06**                    **Page 93**

00103

1    the Aschermans, had you been back at all to

2    look at Apartment 15B, or had you just been

3    there on the one occasion on the day before

4    Thanksgiving 2002?

5  A   No.  I went back sometime --

6  Q   When did you go back?

7  A   I don't remember, but it was right after --

8    after I called Judith Durham, and she said

9    that they had lowered the price, and I don't

10    think she hadn't seen it because we didn't

11    even go together.  So the two of us went over

12    there.

13  Q   Do you recall when that visit happened?

14  A   Maybe the second week of January or so or the

15    third.  It was shortly after I came back.

16  Q   And you and Ms. Durham went over there,

17    correct?

18  A   Yes.

19  Q   Anybody else with you?

20  A   No.

21  Q   How long were you there?

22  A   15 minutes.

23  Q   I'm going to indulge in the shrewd surmise

00104

1    that the apartment hadn't improved any in the

2    passage of time?

3  A    No.

4  Q    Do you have any other memories from that

5    visit as to your observations other than the

6    ones that you remembered from the prior

7    visit?

8  A    No.

9  Q    Still a wreck?

10  A    Yeah.

11  Q    But you had learned that the price had been

12    reduced from the original asking price?

13  A    Yes.

14  Q    Correct?

15  A    Yes.

16  Q    And what happened next with respect to

17    Apartment 15B?

18  A    I talked to Laurie about it.  Laurie had seen

19    the floor plan over Thanksgiving because I

20    had the thing, and we had the floor plans and

21    a couple of other things around the house;

22    and when I had told him about the place in

23    November, I said, you know, "It's too

00105

1    expensive; and besides that, it's a wreck."

2    And he said, "Well, I could pay for the

3    renovations." And I said, "You haven't even

4    seen it." And then when -- in January, I

5    told him I had gone back, and the price was

6    down, but it still needed all these huge

7    renovations, and he said, "Well, I could pay

8    for the renovations and, obviously, I'll pay

9    for maintenance as I have been."

10 Q    Do you recall, at that point in time, what

11    the monthly maintenance fee was on Apartment

12    15B?

13 A    Yeah. It was 18 something. I think, 1,880

14    or 19 something. It was 18. I ought to

15    know. I pay the damn thing now. I don't

16    know. 18 something, whatever it is.

17 Q    So the record is flushed out on this, what do

18    you get in exchange for the monthly

19    maintenance fee that you pay to the co-op?

20 A    I don't know. You get to live there. It

21    supports the -- I don't know. The upkeep of

22    the building. I guess they pay some taxes.

23    I don't know.

00109

1  Q    That took place in person as opposed to over

2       the telephone, correct?

3  A    Yes.

4  Q    Was anybody else present, or was it just the

5       two of you if you remember?

6  A    Well, that would have taken place probably

7       Thanksgiving weekend, and I suspect I would

8       have probably -- I don't know when I showed

9       it to him.

10 Q    Maybe I misunderstood.  I thought you said

11      that sometime in mid-January of 2003 after

12      you returned from Asia, you went back with

13      Ms. Durham and subsequently had a discussion

14      with Professor Bogorad.  Did I get the

15      sequence out of whack?

16 A    I told him about it in November when I first

17      saw it.

18 Q    Well, let's focus --

19 A    And I had the plan.  I picked it up.

20 Q    I apologize.  I misunderstood.  Let's rewind

21      back to Thanksgiving weekend of 2002.  You

22      had a discussion with Professor Bogorad about

23      Apartment 15B?

00110

```
 1  A    Yeah.  Yes.

 2  Q    And do you recall where that discussion took

 3       place, that is to say, where you were at the

 4       time?

 5  A    I probably told him over the phone and sort

 6       of -- I'm sure we talked about it again over

 7       Thanksgiving weekend with the other places

 8       that I had seen.

 9  Q    The floor plan for 15B, did you have it in

10       your hands before you went over on the

11       Wednesday before Thanksgiving?

12  A    No.

13  Q    Did you get it on that date?

14  A    Uh-huh.

15  Q    Okay.  Uh-huh means yes?

16  A    Yes.

17  Q    And then -- And then, as I recall your

18       testimony, Professor Bogorad came to New York

19       on the day after Thanksgiving, correct?

20  A    Uh-huh.

21  Q    Was that -- Either that day or over that

22       weekend, was that the first time that you and

23       he discussed Apartment 15B?
```

# EXHIBIT A
# (2 OF 2)

00115

1      15B?

2  A    Judith Durham called me on Wednesday or

3      Thursday.  I think we -- I think we did

4      the -- We went to see -- Laurie and I went to

5      see the place together on the 7th.  So she

6      called me on Wednesday or Thursday and said

7      that there was interest in the apartment,

8      that someone had made or was going to make an

9      offer, and she said -- she thought I should

10      think seriously about it, and that was the

11      next discussion I had about it.

12  Q    All right.  I think you testified that you

13      and Professor Bogorad, at some point, went

14      over to see the apartment together, is that

15      correct?

16  A    Uh-huh.

17  Q    You're nodding.  Is that yes?

18  A    Yes.

19  Q    She can't take down nods.

20  A    Yes.  I'm sorry.

21  Q    Can you tell me when that visit took place?

22  A    Yes.  That visit took place on Friday,

23      February 7th.

00118

1  A    Yes.

2  Q    What?

3  A    He said, "It's a great space; but more

4        important, it's a great location, and I want

5        you to be here."

6  Q    Well, what happened next in respect of your

7        hour and-a-half visit on February 7, 2003?

8  A    We walked around into the other rooms, and

9        Laurie repeated that I should buy the

10       apartment, and then I think we had gone back

11       into the living room, and I said, "It's going

12       to be too expensive."  And he said, "Let's go

13       in the other room and talk."  We went into

14       the bedroom.

15 Q    Which one?

16 A    The south-facing bedroom.  We sat on the --

17       the radiator cover or something, and he said,

18       "This is absolutely doable."  And I said,

19       "Look, --."  At that point, I was talking

20       to -- we were like 1.275, or maybe we were --

21       maybe we had the price down right.  So the

22       building required a 50 percent downpayment,

23       50 percent cash, and I said, "Look, if I take

00119

1    all the money from all the cash that I'll get

2    out of the sale of 87th Street, that's all

3    the money."  And he said, "Well, yeah.

4    That's all right.  I'll pay for the

5    renovations.  You put the cash in on the 50

6    percent down, and you get the mortgage.  I'll

7    do the renovation, and I'll pay the

8    maintenance.  It's doable."  And he said,

9    "That's what I want you to do."

10 Q    Am I correct, the apartment from your point

11    of view, was still a wreck?

12 A    Oh, yeah.

13 Q    Did you have -- Well, I think you testified

14    to several issues; leaking heat, bathroom

15    fixtures, flooring, lighting, ceiling issues,

16    etcetera.  Did you have any understanding, in

17    your mind, as to what it was going to take in

18    terms of money to get the place in a

19    condition that you would find acceptable?

20 A    At that point, Judith Durham said, "I think

21    you're looking at $300,000.  Plus, you have

22    to replace the windows by contract; and you,

23    obviously, have to replace the heating

**Mullinix, Kathleen  03-01-06**                    **Page 119**

00122

1    discussion, I think you said, sitting on the

2    radiator cover?

3 A    So we went back into the living room, and

4    Judith Durham was there, and I said, "Well, I

5    think we're going to make an offer."  And she

6    said, "Okay."  And I don't know if someone

7    else had made an offer.  Somehow or another,

8    someone was either about to make an offer or

9    had.  So I offered to pay $1.3 million.  So

10    Judy called the broker and was told that

11    someone --

12 Q    She called the selling broker?

13 A    Right.

14 Q    The seller's letters broker?

15 A    Yes.  Correct.  And was told that someone

16    else had offered $1.3 million, and I think it

17    had been accepted, actually, and Judy said,

18    "You know, you can always bid more."  And I

19    said, "Forget it.  That's it."  And Laurie

20    said, "No, no, no.  You should increase the

21    bid."  And I said -- and I said, "No.  You

22    know, we said 1.3.  That's it."  And he said

23    to Judy, "How much -- What do you think we

**Mullinix, Kathleen  03-01-06**                    **Page 122**

00123

1    should counter with if we're going to?"  And

2    she said, "Why don't you try 1.4?"  And I

3    said, "No.  This is crazy.  I don't -- We

4    can't get into a bidding war over an

5    apartment."  And Laurie said, "Don't be

6    crazy.  Another $100,000 or $200,000 is

7    trivial and the amount of money that is in

8    this deal."  So I said, "Okay."  So she

9    called up and offered 1.4, and I think the

10    seller's broker said that they should go back

11    to the other people.

12        The other people offered 1.4, and I

13    don't know how this actually got aborted

14    because the -- What happened?  I think the

15    seller's broker said something like, "Well,

16    if you want to make an offer of 1.4, go

17    ahead."  So Laurie said, "Do it."  And he

18    said, "How can we do that?"  And so Judy

19    tried to call the lawyer who represented me

20    on the 87th Street transaction, and she was

21    told that he was sick or something, and she

22    suggested a different lawyer that we used,

23    and Laurie said, "We're going.  Let's go."

00124

1     And he wasn't available until later in the

2     afternoon on Friday, and so I think we met

3     him at 4:00 o'clock or something; and when we

4     got there, I think he said that -- I don't

5     know how this works.  Somehow or another, he

6     called the attorney who was representing the

7     seller who said that we could make an offer,

8     and they had another offer, another -- I

9     don't know if they had a signed contract or

10    something.  Anyway, the other people had

11    submitted a contract and that he wanted, on

12    behalf of his client, to interview both

13    people who wanted to buy this apartment, and

14    he wanted to do that on Monday morning.

15 Q    That would be February 10th?

16 A    Right.

17 Q    Correct?

18 A    Yeah.

19 Q    So everything you've just testified to, if I

20    understand correctly, took place on Friday

21    the 7th of 2003, right?

22 A    Right.

23 Q    And you mentioned an initial offer of 1.3

00125

1    million and a subsequent offer of 1.4

2    million, is that correct?

3 A    (Nods head)

4        MS. JERRETT:  You have to say yes or

5    no.

6 A    Yes.

7 Q    Were either/or both of those offers

8    communicated, you know, in writing in any

9    way, or was this purely verbal by telephone?

10 A    Telephone.

11 Q    And were you utilized -- If I understood

12    correctly, and you can correct me if I

13    misunderstood, that Ms. Durham was the

14    intermediary who was conveying that

15    information to the seller's broker, is that

16    correct?

17 A    Yes.

18 Q    Did you ever, personally, during the course

19    of that day speak to the seller's broker?

20 A    No.

21 Q    And, to your knowledge, did Professor

22    Bogorad, during the course of that day, ever

23    speak to the seller's broker?

00127

1    offer." Frankly, I don't remember. I don't

2    remember.

3  Q   Am I correct that it was contemplated in your

4    mind on that day that if you purchased this

5    apartment, you would be the purchaser?

6  A   Yes.

7  Q   Was there ever any discussion on that day or

8    afterwards about purchasing the apartment

9    jointly in your name and Professor Bogorad's?

10  A   Never.

11  Q   You mentioned you went at 4:00 o'clock that

12    afternoon to meet with some lawyer, correct?

13  A   Uh-huh.

14  Q   Do you remember his name?

15  A   Alan Kroll.

16  Q   And how did -- And Mr. Kroll was not the

17    lawyer who you had used for the prior

18    transaction?

19  A   Correct.

20  Q   How did you happen to get hooked up with Mr.

21    Kroll?

22  A   He had -- Judith Durham had done business

23    with him. She said he was good.

**Mullinix, Kathleen  03-01-06**          **Page 127**

00140

1    wanted to figure out which of the two

2    prospective buyers was more likely to pass

3    the Board.

4 Q   And you're referring in that instance to the

5    Board of the co-op, correct?

6 A   Yeah.

7 Q   Was there any discussion -- Well, first of

8    all, did Mr. Brog say to you, in words or

9    substance, anything at all about the other

10    prospective buyers?

11 A   No, nothing.

12 Q   Nothing at all?

13 A   No.

14 Q   Do you know if the other prospective buyers

15    were individual, a couple?

16 A   I have no idea.

17 Q   Was there any discussion between you and Mr.

18    Brog concerning your finances or the

19    financing of the purchase of the apartment?

20 A   No.

21 Q   Did any money ever come up as a topic?

22 A   No, but I had -- What had I done?  I had --

23    Oh, God.  I think I had -- I had made a list

00141

1    of accounts I had that I brought, I think.  I

2    think I -- But we didn't talk about finance.

3    We just chatted.

4 Q    Did you give him that list?

5 A    Yeah.

6 Q    And you said accounts.  Are you talking like

7    banks, securities, things of that nature?

8 A    Right.

9 Q    Did you have any discussion with Mr. Brog

10    concerning, you know, the 1050 Fifth Avenue

11    co-op or its Board or anything along those

12    lines?

13 A    No.  He told me that he had been Mr.

14    Maricca's lawyer for 20 years; that was the

15    seller; 20 or more or something like that;

16    context kind of thing.  M-A-R-I-C-C-A.  That

17    was the seller.

18 Q    Have you told us everything you can recall

19    about your meeting with Mr. Brog?

20 A    Yeah.

21 Q    What happened next after that meeting in

22    respect of Apartment 15B?

23 A    In the afternoon, I think it must -- I don't

00142

1    know if it was Alan Kroll or Judith Durham.

2    Somebody called and said, "Mr. Brog

3    recommended to the Mariccas that they accept

4    your offer, and they're going to sign the

5    contract this afternoon."

6  Q   And at some point, did you learn that the

7    sellers had, in fact, signed the proposed

8    contract?

9  A   Yes.

10  Q   And when did you learn that?

11  A   I don't remember.  Probably -- Maybe that

12    day.  I don't remember.

13  Q   Was it a short period of time, that is to

14    say, a day or so?

15  A   I think.

16  Q   Or was it an extended period?

17  A   No.

18  Q   When you met with Mr. Brog, did Professor

19    Bogorad's name come up at all in your

20    conversation?

21  A   I don't think so.

22  Q   So you think it was the afternoon of the

23    10th, right, when you learned or you were

**Mullinix, Kathleen  03-01-06**        **Page 142**

00143

1    informed that --

2  A    I think so.

3  Q    -- the sellers were going to accept your

4    offer and sign the contract, right?

5  A    Right.  Yep.

6  Q    Did you notify Professor Bogorad?

7  A    Oh, yeah.

8  Q    How did you do that?

9  A    I called him up.

10  Q    And what did you say?

11  A    I said, "Mr. Brog apparently has told Mr.

12    Maricca that he should sell the apartment to

13    me."  And he said, "I knew that would

14    happen."  He said, "I told you that all

15    weekend."  He thought it was hilarious.

16  Q    His prediction having been borne out, was

17    there any further discussion between the two

18    of you that day about 15-B?

19  A    I either then or that night -- I don't know

20    when, I said I was kind of in a panic about

21    the finances, and he said, "You know, you're

22    being ridiculous.  Everything is going to

23    work.  It's not a problem."

**Mullinix, Kathleen  03-01-06**                    **Page 143**

00144

1  Q    Did he say anymore detail or just that

2       general statement of --

3  A    He said, "You're going to have the cash.  You

4       get the mortgage, and I'm going to pay for

5       the renovations and the maintenance."  And,

6       in fact, the mortgage was -- Was it less?

7       The mortgage was not significantly more.  It

8       might have been less than what I was paying

9       at 87th Street.

10 Q    It's fair to say then that from a financial

11      perspective, the mortgage was not the issue

12      that caused you any concern?

13 A    No.

14 Q    It was the other costs, correct?

15 A    It was the renovation.

16 Q    And at that point, did you finetune any

17      further what the renovations were likely to

18      cost, or were you still in the same mindset

19      as you were the previous Friday, that is to

20      say, 300,000 plus something?

21 A    Right.

22 Q    Still the same?

23 A    Yeah.

**Mullinix, Kathleen  03-01-06**                    **Page 144**

00150

1   A    I don't know.  In the '90s somewhere.  He

2        started talking to somebody in Chicago.

3   Q    Was that a regular topic of conversation?

4   A    No.  No.  Sometimes he would say he was

5        talking to the guy in Chicago wanted him to

6        get organized, and it's such a pain.  I would

7        say, "Oh, yeah."  I wasn't -- I don't --

8        Occasionally, he would have had a phone call

9        from the guy in Chicago whoever that was.

10  Q    Did you have any further conversations with

11       him about his estate plan insofar as it was

12       intended to or might provide some benefit to

13       you?

14  A    No.

15  Q    Did you, at some point in time, learn that he

16       had, in fact, made a provision for you,

17       financially, under his estate plan?

18  A    Yep.

19  Q    When did you learn that?

20  A    It was -- It was whenever he had called Len

21       and Kiki, whatever that day was, in December

22       of 2002 just before we went on vacation.

23  Q    And you said -- I'm sorry.  He called Len and

00151

1    Kiki?

2  A    Yes.  That's what he told me.

3  Q    As best you can recall, what did he tell you

4    in the December 2002 time frame about what he

5    had done in respect of his estate plan for

6    your benefit?

7  A    He said, "I finally got organized and got the

8    documents from the lawyer to do what I told

9    you I wanted to do."  And he said, "I sent

10    Kiki and Len something that they have to

11    sign," I think, and he said, "I called them

12    up and told them."  And I said, "Oh, what did

13    they say?"  And he said, "That's fine."

14  Q    Did you, at some point either then or

15    subsequently, ever see the actual

16    documentation that made provision for you

17    under Professor Bogorad's estate plan?

18  A    Yeah.  I think he -- I think he showed me the

19    document.  I think it's just a piece or two

20    of paper.

21  Q    Do you recall when he showed it to you?

22  A    No.

23  Q    Was it at or about that time frame, that is

00152

1    to say, December of 2002 or some other time

2    frame?

3 A    I don't remember.  What I remember is just

4    him saying that he had called Len and Kiki

5    and my asking, "What did they say?"

6 Q    Was there any discussion between the two of

7    you, in about December of 2002, as to the

8    estimated or projected financial value of

9    that provision he made for you?

10 A    No.  I had no idea.

11 Q    Your understanding was, though, that it was

12    more or less about one-sixth of whatever his

13    estate was, correct?

14 A    Right.

15 Q    And at some point, he showed you a copy,

16    correct?

17 A    Yeah.

18 Q    Do you recall the circumstances under which

19    he showed you a copy?

20 A    No, I don't.

21 Q    Do you recall where you were?

22 A    It was no big ceremony, whatever it was; and

23    somehow -- somehow I seem to -- I think it

00167

1  Q    At some point, did you finetune any further

2       what it was going to cost to get 15-B in

3       shape?

4  A    Uh-huh.

5  Q    And over what period of time did you get a

6       handle on that?

7  A    Between March, we made our first shopping --

8       looking -- our first research trip on this

9       was in February; and so in the spring, at

10      various times, I called various contractors,

11      people had recommended, friends of mine, to

12      come and have a look at the apartment and

13      give some estimate about what it would cost.

14  Q    Am I correct that there were basically --

15      and, again, I'm just trying to shortcircuit

16      some things that I don't think are

17      controversial, but I may be wrong, but there

18      were basically two aspects of renovations;

19      the first was the windows and the heating

20      system --

21  A    Yes.

22  Q    -- which was basically you were committed to

23      do as part of the purchase; and then the

**Mullinix, Kathleen  03-01-06**                    **Page 167**

00168

1    second piece was whatever else you wanted to

2    do, is that fair?

3  A   The windows had to be replaced.  That was by

4    contract.  And the heating was essentially

5    non-functional, and so we were going to do

6    that, and there was -- there was no choice in

7    either the windows.  There were two approved

8    window vendors and no discretion about the

9    heating things because of the size of the

10    things for the wall.  So we decided that we

11    would do that on our own and not pay extra

12    money to a contractor when we figured, you

13    know, we could pick up the phone and order

14    the things as well as anybody.

15  Q   And do you recall what the ultimate price was

16    for the window replacements, approximately?

17  A   Wait.  God.  18, maybe.

18  Q   Thousand?

19  A   Yes.

20  Q   And --

21  A   I'm not exactly sure of that.

22  Q   And that was mandatory by contract as part of

23    the purchase, correct?

**Mullinix, Kathleen  03-01-06**           **Page 168**

00169

1  A    Yes.

2  Q    And then the heating, that was not mandatory

3       by contract, but it needed to be done so you

4       didn't freeze, is that right?

5  A    Yes.

6  Q    Approximately how much was the heating?

7  A    That, I think, was maybe around -- I think it

8       was 14.

9  Q    $14,000?

10 A    Yes.

11 Q    Okay.  And then the third aspect of the

12      renovations, would it be fair to say, what we

13      would call discretionary?

14 A    Yeah.  You would call it discretionary.

15 Q    It was not required in order to live there,

16      but it was something that you wanted to do in

17      order to live there in the way you wanted to

18      live there, is that fair?

19 A    Yes.

20 Q    And how much did that third aspect end up

21      costing?

22 A    Oh, I don't know.  I think -- We have

23      those -- I think we have -- I think -- I

00177

1  A    Yes.

2  Q    And do you see in the second line, it says,

3       "Names and Relationship of proposed occupants

4       of the Apartment and ages of children, if

5       any, and schools attending."; do you see

6       that?

7  A    Yes.

8  Q    And your name is typed in after that?

9  A    That's correct.

10  Q    There's no reference to Professor Bogorad

11      there, correct?

12  A    That's correct.

13  Q    Why not?

14  A    Because we -- We were advised that since we

15      weren't married, putting Laurie's name on was

16      not -- was not a smart thing to do because

17      people on the Board, somebody might say,

18      "Well, these people aren't married."  So I

19      didn't, and the apartment was -- he was not

20      to have any ownership interest in the

21      apartment.  His financials were not offered

22      as securing my ability to pay in any way, so

23      we didn't do it.

**Mullinix, Kathleen  03-01-06**                    **Page 177**

00183

1    discuss the subject of the monthly

2    maintenance fees for Apartment 15B?

3  A    I don't remember the number.  More than maybe

4    ten.  It was in the context of my saying,

5    "This is very expensive," when he would be

6    explaining to me that it was doable and,

7    "Here's how it's going to work."

8  Q    Was there ever any discussion between you and

9    Professor Bogorad on the subject of

10    maintenance fees for Apartment 15B or what

11    would happen in the event of his death?

12  A    No.

13  Q    Was there any discussion between the two of

14    you as to what period of time he would

15    undertake to pay the monthly maintenance

16    fees?

17  A    It was never limited.  We never talked about

18    any limitation.

19  Q    Was it indefinite?

20  A    Yeah.

21  Q    Was there ever any discussion between the two

22    of you as to the payment of monthly

23    maintenance fees if for some reason you two

00184

1    were no longer a couple?

2 A   No.

3 Q    Did you give any thought or contemplation to

4    what would happen in terms of payment of

5    maintenance fees if, for any reason, the two

6    of you were no longer a couple?

7 A   No.

8 Q    Did you give any contemplation or thought as

9    to what would happen in respect of the

10    maintenance fees if he were to die?

11 A   No.

12 Q    Was there any discussion between the two of

13    you as to what would happen if, for some

14    reason, you were to die?

15 A   No.

16 Q    Was there any contemplation or expectation on

17    your part as to what would happen to the

18    maintenance fees if you were to die?

19 A   No.

20 Q    Was there any discussion between the two of

21    you as to what would happen in terms of

22    occupancy of the apartment if, for some

23    reason, you were to die?

**Mullinix, Kathleen  03-01-06**                    **Page 184**

00185

1  A    No.

2  Q    Was there any contemplation or expectation on

3      your part as to what would happen in terms of

4      occupancy of the apartment if, for some

5      reason, you were to die?

6  A    No.

7  Q    Was there ever any document, by that, I mean

8      writing, typed, printed, electronic, any

9      document at all that memorialized Professor

10     Bogorad's undertaking to pay the maintenance

11     fees for Apartment 15B?

12  A    The checks that he wrote to me in the amounts

13     of the maintenance.

14  Q    Is there any other documentation, other than

15     the checks he actually wrote during his life,

16     that memorialized any commitment or

17     undertaking on his part to continue to pay or

18     reimburse you for the monthly maintenance

19     fees for Apartment 15B?

20  A    No.

21  Q    Did you provide anything or make any promises

22     to Professor Bogorad in exchange for his

23     commitment to pay the maintenance fees on

00190

1  Q    So you had a little bigger mortgage on 15-B

2       than you had on 87th Street, correct?

3  A    Yes.

4  Q    What's your monthly payment on your mortgage?

5  A    It's about $3,700.

6  Q    So a little less than what you were paying

7       for the old 87th Street mortgage, correct?

8  A    Right.

9  Q    Now, we talked -- We've talked in different

10      context about the various categories of

11      renovations to Apartment 15B and your

12      estimate of the cost of those.  When did the

13      subject of payment for the renovations first

14      come up between you and Professor Bogorad?

15  A   In November of 2002 when I first told him I

16      had seen this place and it was a wreck.

17  Q   Is my memory correct, at that point, you

18      really didn't have a figure in mind as to

19      what it was going to cost, correct?

20  A   No.

21  Q   And you started to get figures in February,

22      correct, when the two of you visited 15-B

23      together, correct?

**Mullinix, Kathleen  03-01-06**                    **Page 190**

00201

1    bottom left where it says, "Agreed and

2    accepted by," is that your signature?

3 A    Yes.

4 Q    And would you take a look at Exhibit 10 which

5    appears to be -- these are documents you

6    produced, so I am, obviously, relying on what

7    they purport to be.  They appear to be a

8    series of invoices from Heather Aman to you

9    dated November 3, 2003 in the amount of

10    $6,000; November 24, 2003 in the amount of

11    $7,500; January 30, 2004 in the amount of

12    $7,500; May 17, 2004 in the amount of

13    $8,012.44; and August 2, 2004 in the amount

14    of $6,241.32.  Do you see those?

15    (Indicating)

16 A    Uh-huh.

17 Q    Are those, in fact, the invoices which you

18    did receive from Heather Aman?

19 A    Yeah.

20 Q    Do you know whether all of them were paid?

21 A    Yes.

22 Q    Let's -- I'd like to look at the first one,

23    the one dated November 3, 2003 for $6,000

**Mullinix, Kathleen  03-01-06**                    **Page 201**

00202

1    which appears to be the invoice for 20

2    percent of the contract price. Do you see

3    that?

4 A    Uh-huh.

5 Q    Did you pay that bill in or about November of

6    2003?

7 A    Yeah. I don't remember when, but I would

8    have paid it.

9 Q    Do you know whether you were reimbursed by

10    Professor Bogorad for all or any part of that

11    bill?

12 A    I think I was. I'm pretty sure I was. I

13    must say that when Laurie died, I don't

14    really know where we were in the accounting,

15    and you know that better than I do because I

16    don't have the last checks that he wrote. I

17    mean, I don't remember if he reimbursed me

18    for the maintenance for December. I just

19    don't remember because he had the surgery on

20    his leg at the end of November.

21        So the last couple of -- the last

22    couple of months, maybe, I think he -- he

23    would have paid it if he paid it, and I don't

00203

1    remember; and as I say, you have more

2    documentation than I do.

3  Q    As you sit here today, you just don't recall

4    one way or the other, correct?

5  A    Yeah.

6  Q    Similarly, with the second invoice there, the

7    one dated November 24, 2003 which would

8    obviously been close to Thanksgiving of that

9    year for $7,500, do you know whether you paid

10    that?

11  A    I paid it, yes, of course.

12  Q    Do you know whether you paid it before you

13    left for Mexico or the end of December or

14    after you returned?

15  A    I would think I did.

16  Q    Do you know whether you were reimbursed for

17    all or any part of that payment?

18  A    I don't remember.

19  Q    You mentioned that Professor Bogorad had

20    surgery on his leg in the latter part of

21    2003?

22  A    Yes.

23  Q    And that was at Mass. General Hospital,

00206

1    had a bladder infection in November, and then

2    he had this thigh thing, and the thigh was --

3    the artery was successfully fixed.  The

4    bladder infection was something that he had

5    had many times before.  He had had bladder

6    cancer in early '90s, and it was being

7    treated with Cipro; and, you know, that was

8    hanging on.  It was a pain, and he was very

9    annoyed about it.  Yes.  A toothache, a

10    bladder infection and a leg.

11 Q   Do you know whether, as of that time,

12    Professor Bogorad had any, you know, chronic

13    conditions such as, for example,

14    cardiovascular disease or others?

15 A   No.  In fact, when he had -- he a quadruple

16    bypass in November of 1997, and the surgeon

17    gave him a 25-year guarantee on his

18    cardiovascular chart.

19 Q   There has been some discussion and some

20    questioning from your counsel and my clients

21    at their depositions which I know you

22    attended concerning the change in plans for

23    the family vacation for the year-end holidays

00213

1 A    Right.

2 Q    And the decision was made not to answer that

3       question fully, correct?

4 A    Right.

5 Q    At some point, did you go for an interview

6       with the Co-Op Board or some subset of it?

7 A    Yes, I did.

8 Q    And do you recall when that took place?

9 A    Yes.  That took place about -- just about a

10      week before we closed.  So it would be June

11      something, early June of 2003.

12 Q   About how long did that last?

13 A   Half an hour.

14 Q   Do you recall where it took place?

15 A   Yes.  It took place on 86th Street in some

16      institutional building next to the building

17      in which I lived, and it was called the

18      something or other club.

19 Q   Did you go alone or with anybody?

20 A   I went alone.

21 Q   How many of the co-op folks were there?

22 A   I don't remember.  I don't know.  Eight,

23      maybe.

00216

1    nights a week?

2  A    Yeah.

3  Q    And why is it that you believe she knew that,

4    that is to say, did you tell her; were you

5    part of some conversation or how?

6  A    She knew that Laurie and I were a couple in

7    1999 when I bought the apartment on 87th

8    Street because Laurie came to see it with her

9    and with me.

10  Q    We talked a little bit about Ms. Aman.  How

11    did you get in contact with Ms. Aman?

12  A    Through Raynor Warner.

13  Q    Mr. Warner is an architect here in

14    Massachusetts, correct?

15  A    Correct.

16  Q    Who was also, I think, a social friend of

17    Professor Bogorad, is that correct?

18  A    Yes.  Yeah.

19  Q    They were friends, and they also had done

20    business together over the years, is that

21    correct?

22  A    Yes.

23  Q    At least that was your understanding.  Let me

00218

1  Q    And did you go see her, or did she come see

2      you?

3  A    Yeah.  She came to see me.

4  Q    All right.  And, ultimately, you decided to

5      hire her, correct?

6  A    Right.

7  Q    And the business relationship with Ms. Aman

8      is strictly between you and her, correct?

9          MS. JERRETT:  Objection.

10 A    She and Laurie talked a lot when Laurie was

11     alive.

12 Q    Can you take a look back.  I think it's

13     Exhibit No. 9, I think.  It should be right

14     there.  Just so we're clear, that's the

15     contract between you and Ms. Aman dated as of

16     July 25th, 2003, correct?

17 A    Yep.

18 Q    And that contract is strictly between you and

19     she; there's nobody else referred to in it,

20     correct?

21 A    That's correct.

22 Q    And all of the payments to Ms. Aman were made

23     by you, correct?

00221

1    reimbursement, I would tell him what it was

2    to the penny.

3  Q    And he paid to the penny, correct?

4  A    Yeah.

5  Q    Turning to the next page, Page 9, and the

6    bottom Check No. 6580, it looks like it's

7    dated the 18th of August 2003 from Professor

8    Bogorad to you in the amount of $4,242.  Do

9    you see that?

10  A    Yes.

11  Q    Do you know what that's for?

12  A    No.  I don't know.

13  Q    Any explanation for a payment from him to you

14    in that amount in that August 2003 time

15    frame?

16  A    I don't know.  I don't know.  Does it jive

17    with any -- I don't know what it is.

18  Q    You mentioned Mr. Warner earlier.  Professor

19    Bogorad paid Mr. Warner directly as opposed

20    to reimbursing him, correct?

21  A    Right.

22  Q    And that's the top check on Page 9 --

23  A    Right.

00225

1    2003?

2  A    Not specifically.

3  Q    And do you have any understanding of what --

4       Do you see there's a notation there?  It says

5       4625 plus 1818?

6  A    Right.

7  Q    Does that help at all?

8  A    Nope.  Again, it's some sort of mix of

9       windows, heater, Heather Aman in there.  I

10      just don't know.

11  Q    Just so I don't have to ask the same

12      questions repetitively, did you, at any time,

13      declare any of the moneys you received from

14      Professor Bogorad as income on your income

15      tax returns?

16  A    No.

17  Q    Did you have a standard practice, in the 2003

18      time frame when you received a check from

19      Professor Bogorad, as to what you did with

20      it, that is to say, you know, where you

21      endorsed it and processed it?

22  A    Yeah.  I would process checks through Chase.

23  Q    Chase Bank?

**Mullinix, Kathleen  03-01-06**                    **Page 225**

00233

1    Kenna, Esq., from Matthew A. Berlin.)

2  Q    Exhibit 15 appears to be a letter from Mr.

3       Berlin, counsel to the estate, to Mr. Kenna,

4       your lawyer, one of your lawyers, dated

5       February 11, 2004.  Did you receive a copy of

6       that?  (Indicating)

7  A    Yes.

8  Q    And did you receive a copy of it, you know,

9       shortly after the date it bears, that is to

10      say, sometime in about the middle of February

11      2004?

12 A    Probably.  Yeah.

13 Q    In between the time you spoke with Kiki at

14      the airport and February 11, 2004, did you

15      also have a discussion with Kiki's brother,

16      Len, regarding these matters?

17 A    Yes, I did.

18 Q    And approximately when did that discussion

19      take place?

20 A    There were two discussions.

21 Q    All right.  When was the first one?

22 A    January 2nd.

23 Q    And how did that discussion take place, that

00234
1    is to say, in person, by telephone?

2 A    In person.

3 Q    And where were you and Len at that time?

4 A    In Lexington in Laurie's office in his home

5    study.

6 Q    Was anyone else present, or was it just you

7    and Len?

8 A    James Gross.

9 Q    And what, to the best of your memory,

10    transpired during that discussion, that is to

11    say, what did you say to them, and what did

12    either Mr. Gross or Len Bogorad say to you?

13 A    They had come over to have me help them find

14    and sort through Laurie's financial

15    documents, and so I knew that there was --

16    his stuff was in the files, and I was pulling

17    all the stuff out of the files, and they were

18    trying to figure out where his accounts were,

19    trying to figure out what the total was of

20    how much money he had, and I said -- the two

21    of them were sitting in the room, and I said,

22    "Laurie and I had an agreement that he was

23    going to pay for the renovations on the

00235

1    apartment up to $400,000, and he also paid

2    the maintenance on the apartment both at 87th

3    Street and at Fifth Avenue." And Len said,

4    "Do you have that in writing?" And I said,

5    "No." And I don't remember what else was

6    said, but I said that Laurie's credit cards

7    were -- I had put them in the drawer in the

8    bedroom in the bureau, and I said, "I think

9    you should take those." And Len and I went

10    in the bedroom, and Len said, "How much was

11    the maintenance? How much is the

12    maintenance?" And I said, "It's about 1,850.

13    I don't know exactly what it is." And he

14    said, "Oh."

15 Q   He said?

16 A   "Oh."

17 Q   Have you told us everything you can recall

18    about that discussion with Len and with Jim

19    Gross?

20 A   Yeah.

21 Q   I think you said you had a second discussion

22    with Len?

23 A   Yes.

00241

1  Q.  Mr. Bogorad, do you know if you communicated

2      what you proposed in that portion of the e-mail

3      to Ms. Mullinix?

4  A.  I don't recall having done that, no.

5  Q.  Was this e-mail sent from your work?

6  A.  Yes.

7  Q.  Did you engage in trying to ascertain whether

8      there was any follow-up communications from you

9      to Ms. Mullinix around this time period relating

10     to what you proposed to tell her?

11 A.  There wasn't anything else in your system to

12     Ms. Mullinix.

13 Q.  And what was the process you used to identify

14     e-mails in your system at work?

15 A.  I searched the archived folders and the regular

16     folders in the box, sent and so on, for anything

17     that involved the parties to this.  And then I

18     -- I can't remember what the date was that I

19     found the folders and that I asked our IT guy

20     whether there was anything that I wouldn't be

21     finding through those searches, and he said,

22     "no, that's all that we have."

23 Q.  Do you know what that date was?

24 A.  I don't know, no.

00242

1  Q.  Is it your understanding -- is it your -- do you

2      believe that you had a conversation with

3      Ms. Mullinix sometime on or after March 11th of

4      2004, related to the substance of this e-mail

5  A.  I don't recall any, now.

6  Q.  Do you recall sending an e-mail on or after

7      March 11, 2004, relating to this substance?

8  A.  I don't, no.

9  Q.  Do you think you didn't get back to Ms. Mullinix

10     at all about her questions?

11 A.  Kiki was the one who was generally talking to

12     her the most, so I sort of assumed that she was

13     dealing with that.  (Witness is reading from

14     document.)  They were talking about forwarding

15     mail, reading Kathy's e-mail, she was sharing

16     thoughts, it seemed consistent with what we were

17     talking about.  You know, as I said in my e-mail

18     that it looked like that should match up pretty

19     well.

20         She expressed, "Hopefully this won't

21     interfere with things."  There wasn't really a

22     question when it comes down to it.  You know,

23     normally I do respond to e-mails and, as I said,

24     I was, you know, proposing to Kiki that maybe

**Bogorad, L. 01-19-06**                    **Page 242**

00244

1  A    Yes, it did.

2  Q    And that was, from a financial point of view,

3       that was the largest of the

4       renovation-related contracts, correct?

5  A    Yes, it was.

6  Q    How long did you consider -- Withdraw that

7       one.

8           How long did you continue to reside in

9       the Lexington house?

10 A    Until June 10th, 2004.

11 Q    From the year end time frame of 2003,

12      beginning of 2004 until June 10, 2004 did you

13      pay any rent or occupancy charges for living

14      in Lexington?

15 A    No.

16 Q    Obviously, the house had certain utility

17      bills, etcetera, during that period of time.

18      Who paid them?

19 A    The estate.

20 Q    Was there a working telephone in the house?

21 A    Yes.

22 Q    Who paid the phone bill?

23 A    The estate.

00245

1  Q    Did you make any payments in respect of the

2       occupancy or upkeep of the Lexington house

3       during the time that you lived there?

4  A    No, I don't think so.

5           MR. VARN:  Mark this as the next

6       exhibit, Exhibit 16.

7           (Whereupon the Stenographer marked as

8       Exhibit No. 16 - E-Mail - 3/11/04 to

9       kikibg@hotmail.com from Kathleen Mullinix.)

10  Q    Ms. Mullinix, would you take a look, please,

11      at Exhibit 16 and ignore for the moment the

12      fact that Ms. Solfanelli's name is on the top

13      which we've established here means that this,

14      at some point, was forwarded to her, and she

15      printed it out from her computer.

16      (Indicating)

17  A    Right.

18  Q    Is the rest of that an e-mail which you sent

19      to Professor Bogorad's daughter and son, Kiki

20      and Len, on or about March 11, 2004?

21  A    Yes.

22          MR. VARN:  What's the next exhibit,

23      17?  Mark this as Exhibit No. 17.

**Mullinix, Kathleen  03-01-06**                    **Page 245**

# EXHIBIT B
# (1 OF 2)

00001

```
 1                    Volume: I
                      Pages: 254
 2                    Exhibits: 1-15

 3
        UNITED STATES DISTRICT COURT
 4
        DISTRICT OF MASSACHUSETTS
 5
        CIVIL ACTION No. 04-12684-WGY
 6

 7

 8
     ---------------------------------X
 9  KATHLEEN P. MULLINIX,
             Plaintiff,
10     Vs.

11  KIKI BOGORAD-GROSS and LEONARD P.
     BOGORAD, as They are Executors
12  of the Will of Lawrence Bogorad,
             Defendants.
13  ---------------------------------X

14

15     DEPOSITION of:  LEONARD P. BOGORAD
        Date: Thursday, January 19, 2006
16     Time: 10:00 a.m.
        Location: Choate, Hall & Stewart, LLP
17            Two International Place
              Boston, MA  02110
18

19

20  --- REPORTER: Evelyn M. Slicius, CSR, RPR ---

21

22        K. L. GOOD & ASSOCIATES
          Registered Professional Reporters
23            P.O. BOX 367
          Swampscott, Massachusetts 01907
24     Tel. 781-598-6405  *  Fax. 781-598-0815
```

**Bogorad, L. 01-19-06**                    **Page 1**

00013

1  Q.  And she is still alive; is that correct?

2  A.  She is.

3  Q.  And your sister that you referenced, is that

4      Kiki Bogorad-Gross?

5  A.  Yes.

6  Q.  And is that the woman who is sitting two people

7      down from you today?

8  A.  Yes, it is.

9  Q.  Other than Kiki Bogorad-Gross, do you have any

10     other siblings?

11 A.  No.

12 Q.  How long were your parents married?

13 A.  I think they got married in 1943, if I remember

14     correctly.

15 Q.  And did they continuously live together until

16     your father's death?

17 A.  My mother came down with Alzheimer's, obviously

18     it's a gradual sort of thing, and she ended up

19     in an assisted-living facility first of all, and

20     then moved into a nursing home.

21 Q.  Do you remember when your mother was diagnosed

22     with Alzheimer's?

23 A.  I don't know specifically, no.

24 Q.  Do you have a general idea?

00014

1  A.   As you know, it is not exactly a clear science.

2     There were certainly signs that her memory

3     wasn't as good at various times.  I think we got

4     the sense that she was coming down with it

5     probably before there was any formal diagnosis.

6     I can't even say that I know of any formal

7     diagnosis.

8         But, let's see, I would think in the

9     -- probably in the early 1990's she was probably

10    showing some signs of it, and I don't really

11    remember when we first had her moved to the

12    assisted living.

13        Before that she was involved in some

14    daycare for a year or two, I believe, but I

15    really don't remember the exact dates.

16  Q.   Just so I'm clear on the chronology, is it your

17    testimony that your mother had been showing

18    signs of what you presume was later diagnosed as

19    Alzheimer's, she had a period of a year or two,

20    roughly, where she was involved in some sort of

21    daycare program, and then moved to an assisted

22    living facility, and from there moved into a

23    nursing facility?

24  A.   That's correct.  I guess the only clarification

**Bogorad, L. 01-19-06**                    **Page 14**

00022

1        Certainly, when we were getting closer

2    to the times when we were taking the Christmas

3    trips we would be focusing on the logistics and

4    ideas of some things for those trips.

5    Occasionally health things would come up, but as

6    I said, he tended to be circumspect about that.

7    And certainly how my mother was doing.

8  Q.  Do you remember if your father regularly visited

9    your mother?

10 A.  My understanding is it was very frequent, yes.

11 Q.  Did he provide details to you during your

12    conversations with him about your mother's

13    progress or prognosis?

14 A.  Yes.  Although, I would say, as it became more

15    and more constant and not very positive, we

16    tended to not talk about it nearly as much as we

17    would have earlier.

18        But I guess the answer would have

19    been, "She's the same" and "She doesn't

20    recognize me any more," that kind of thing;

21    obviously, not a fun topic.

22 Q.  Your father was saying that your mother did not

23    recognize him any longer?

24 A.  That is what he would have had to say.  The

**Bogorad, L. 01-19-06**                    **Page 22**

00035

1    She is a woman that my father was very fond of.

2    She lives in New York; she is a biologist, a

3    former chief executive of a biotech firm.  I

4    don't know what else you are expecting.

5  Q.  Do you recall when you first heard about

6    Kathleen Mullinix?

7  A.  I'm not absolutely sure, but I believe it was

8    shortly after my father had bypass surgery,

9    which would be in the late '90s, I guess.

10  Q.  Is this the bypass surgery you referenced

11    earlier that was somewhere around 1997?

12  A.  Yes.  I believe the bypass surgery was at the

13    end of 1997.  And I believe I first learned of

14    Kathy's existence and their friendship in the

15    early part of '98, if I have those dates

16    correct.

17  Q.   And at the time that you first learned about

18    Ms. Mullinix's existence, what was your

19    understanding as to who she was?

20        MR. VARN:  Objection as to form.  You

21    can go ahead and answer.

22  Q.  Do you understand my question?

23  A.  I think so.  Unfortunately, I don't remember

24    the details of how I learned or exactly what I

00036

1    learned when or how.

2         But my general sense was that she

3    was someone with whom my father was having a

4    romantic relationship with, presumably with my

5    mother in not a very good mental state; but

6    there was the assumption at the time that he

7    had moved on to another active relationship

8    because my mother had Alzheimer's and was

9    really not all that much of a spouse anymore

10    in that respect, I guess.

11  Q.  At some point did that understanding change?

12  A.  In terms of the issue of whether it was a

13    relationship that existed for a long time

14    before that or not, I really didn't learn

15    anything about that until after he died from

16    Ms. Mullinix.

17         So it really was a continuation

18    from -- certainly it was a very serious

19    relationship that the two of them were having,

20    and I think all the family welcomed Kathy into

21    the fold and were very friendly toward her.

22         And we were happy that my father had

23    someone that he loved and would be a companion

24    because my mother wasn't certainly able to --

**Bogorad, L. 01-19-06**                    **Page 36**

00037

1    sadly -- she was not able to serve that role

2    anymore.

3  Q.  Who first told you about Kathleen Mullinix?

4  A.  I don't remember.

5  Q.  Do you recall if it was your father who first

6    mentioned her?

7  A.  I don't know.

8  Q.  Can you provide me any more details about the

9    nature of you first learning about Kathleen

10    Mullinix?

11  A.  No, I really don't recall any more specifics,

12    I'm afraid.

13  Q.  Did you hear about Ms. Mullinix before you met

14    her?

15  A.  I'm pretty sure I did.

16  Q.  Do you have any estimate as to the time between

17    you hearing about Ms. Mullinix and the time that

18    you met her?

19  A.  I don't.  I don't even remember exactly when I

20    first met her.  It may have been -- no, I don't

21    remember.  It was, I believe, in the context

22    of the time when he had a mental breakdown,

23    basically, a few months after his surgery.

24        And I went to New York, along with my

**Bogorad, L. 01-19-06**                **Page 37**

00044

1 A.  Not in terms of anything like, "I have this

2     girlfriend" or anything like that.  My best

3     recollection is that I already knew that there

4     was this relationship by the time I talked to

5     him, is my best recollection, and so it was just

6     a given.

7          And as I said, we were very happy that

8     he had a nice relationship at that point.  But

9     we didn't talk about romantic or emotional

10     things much at all at any time in our lives, and

11     so I don't believe we did at that point either.

12 Q.  Did you ask your father questions about her?

13 A.  No.

14 Q.  You had a sense that he was in, I believe you

15     said, "a nice relationship."  Where did you get

16     that understanding from?

17 A.  I don't know.  Obviously, my sister saw them or

18     my father a lot more from living in the same

19     city, and I probably heard reports from her.

20     And we had just a general sense when we did see

21     them together that they seemed to be enjoying

22     each other.

23 Q.  Did your father appear happy when he was with

24     Kathy Mullinix?

**Bogorad, L. 01-19-06**                    **Page 44**

00050

1    substance with the exception of the revised

2    date.

3  A.  Okay.  I notice my name is spelled wrong, but

4    otherwise that is fine.

5  Q.  Mr. Bogorad, just so I'm clear on the record, is

6    it your understanding that you are here pursuant

7    to a notice of deposition today?

8  A.  I don't know the legal terminology.  I assume

9    that there was some kind of notice; I don't

10    remember whether I actually saw it or I was told

11    by the attorney that I should be here.

12        MS. DINEEN JERRETT:   Will you mark

13    this as the next exhibit.

14        (Exhibit No. 3, Handwritten Letter

15    from the Department of Molecular and Cellular

16    Biology was marked for identification.)

17        MS. DINEEN JERRETT:  Back on the

18    record.

19  A.  I have one other thing I can recall which might

20    be considered financial.

21        My father called me, as I recall, it

22    would have been before my daughter started in

23    college, so it was probably in 2001, I guess, to

24    indicate that he wanted to give us a gift of

**Bogorad, L. 01-19-06**                    **Page 50**

00051

1    paying for $10,000 in tuition for each year that

2    each of our children and each year that Kiki's

3    children was in college, for which we did

4    appreciate it.

5        He did end up making those gifts to

6    us.  He did not end up getting around to it the

7    year that he died, so that there was no payment

8    for that year.  But until he died, he did pay

9    that, which was very nice of him.

10   Q.  Thank you for that clarification.  I do have a

11   couple of questions about that issue.

12       You stated that this is something that

13   you have now recalled since the time we took a

14   break; is that correct?

15   A.  I recalled it as relevant to your question, yes.

16   I certainly remembered it before, but I wasn't

17   connecting that with the question about

18   financial --

19   Q.  Is that something that you -- and I'll use the

20   term "recalled" unless you have a different term

21   that you would prefer?  Is recall --

22   A.  Well, just to clarify, it is probably connected,

23   connected to your question, yes.  I thought

24   about it as an appropriate answer to your

**Bogorad, L. 01-19-06**                    **Page 51**

00052
1      question.

2  Q.   In thinking about it as an answer to my prior

3      question, did you come to that conclusion on

4      your own or did you talk to somebody during the

5      break about that?

6  A.   No, no, just by myself.

7  Q.   You indicated that this was sometime in 2001 as

8      best you can recall?

9  A.   I believe that's right.  My daughter graduated

10      in May of 2005, so she would have started in the

11      fall of 2001, so it was sometime, I believe,

12      sometime before she started college and probably

13      in that year prior, you know, the year that she

14      started, but I'm not absolutely sure.

15  Q.   What do you recall your father saying during

16      that conversation?

17  A.   Just that he wanted to give us a gift and help

18      pay -- he knew college was expensive these days

19      and wanted to help us bear that burden or

20      whatever.  And he wanted to make a gift of

21      $10,000, as I said, for each of our kids for

22      each year they were in college.

23          And, you know, obviously, we said that

24      is not necessary, you know, but he was not the

**Bogorad, L. 01-19-06**                          **Page 52**

00053

1    kind of guy.  He was very generous and if he

2    wanted to give you a present, he was going to

3    give you a present.  And we were obviously happy

4    to have it, and my daughter was very excited as

5    well.

6  Q.  Other than indicating that this was a wish that

7    he had, did he indicate that there was another

8    reason for wanting to provide $10,000 every year

9    to his grandchildren for their education?

10  A.  Not that I recall, no.

11  Q.  Do you recall if there was any discussion about

12    tax consequences or tax issues related to that?

13  A.  No, I'm pretty sure there wasn't.

14  Q.  You are pretty sure there was not a conversation

15    about that?

16  A.  Yes.

17  Q.  Other than that conversation sometime prior

18    to -- you said it was Sarah entering college?

19  A.  Correct.

20  Q.  Do you recall any other instance, either prior

21    to that or subsequent to that, where you had a

22    conversation with your father about him making a

23    gift of money towards his grandchildren's

24    college education?

00054

1  A.  I can't remember, you know, in subsequent years

2    whether there was a conversation or whether he

3    just sent a check along; we may have talked

4    about it.  I'm sure we thanked him for it when

5    we received it.

6  Q.  Did your father send a check directly to you or

7    was it to the college?  Where was the check

8    sent?

9  A.  I'm trying to remember.  It got sort of

10    confusing as to whether in some cases we had

11    already paid the tuition.  I think they sent it

12    to us; I think there may have been one time that

13    he wrote the check out to the college and we

14    sent it along with our additional monies.

15  Q.  Where did Sarah go to college?

16  A.  Oberlin, O-b-e-r-l-i-n, Ohio.

17  Q.  So if I understand your testimony, you think

18    that there may have been at least one occasion

19    where your father made a check payable directly

20    to Sarah's college, but other than you that, you

21    think he may have reimbursed you?

22  A.  I don't think so but that is really my

23    recollection.

24  Q.  For the checks that came to reimburse you, do

**Bogorad, L. 01-19-06**           **Page 54**

00055

1    you know if they were made payable to you or

2    payable to your daughter?

3  A.   I don't recall.

4  Q.   For what years do you recall your father making

5    those gifts or payments?

6  A.   Let's see -- well, he would have made it

7    definitely for the school year of '01 to '02,

8    and definitely the school year of '02 to '03.

9    And he definitely did not do it -- even though

10   I'm sure he planned to -- for the year that he

11   died of '03 to '04, he did not make a payment.

12   So there would have been two payments.

13  Q.   Do you recall if your father sent the payments

14   by semester or whether he sent one payment for

15   $10,000 prior to the school year?

16  A.   I'm pretty sure it was one payment for the -- I

17   don't think it was necessarily prior, but it was

18   one per school year.

19  Q.   And is it your testimony that you recall

20   receiving payments for the 2001/2002 school year

21   and the 2002/2003 school year for Sarah but not

22   for the two subsequent years?

23  A.   He was deceased for the fourth year.  And I

24   definitely did not receive it for the year that

**Bogorad, L. 01-19-06**                    **Page 55**

00056

1    he died that she was in school.

2  Q.  Did you -- for the year that Sarah was in

3    school and your father died, for the '03/'04

4    school year, did you have a conversation with

5    your father about the fact that you had paid

6    the college tuition and asked him what his

7    intentions were with respect to his prior

8    statements of wanting to make a gift?

9  A.  No.  It was a gift.  I was sure he was going

10    to pay it sooner or later and that was not

11    something I would have raised with him.

12  Q.  To your knowledge, did your father make any

13    payments towards his other grandchildren's

14    college education?

15  A.  My understanding was that he had the same

16    arrangement with Kiki's children, or probably

17    just one child who was in college during that

18    period.  I have no idea whether the payments

19    were actually made.

20  Q.  Your son -- David, is it?

21  A.  Yes.

22  Q.  When did he enter college, if at all?

23  A.  He is in his second year, so he would have

24    entered in the fall of '04.

**Bogorad, L. 01-19-06**                **Page 56**

00057

1  Q.  And that was after your father had passed away?

2  A.  That is correct.

3  Q.  It is probably an obvious answer, but did your

4      father make any contributions towards David's

5      college education while he was alive?

6  A.  No; he said he was going to.

7  Q.  Had the estate made any contributions to either

8      Sarah's or David's college educations?

9  A.  No.

10 Q.  To your knowledge, do you have any knowledge

11     whether the estate has made any contributions

12     towards Kiki's children's education?

13 A.  No.  I'd be surprised if I had, but I have no

14     knowledge of that.

15 Q.  And you are a co-executor along with your sister

16     of your father's estate, correct?

17 A.  Yes.

18 Q.  Would it be fair to say that as a co-executor

19     you would have knowledge if the estate were

20     making payments to your children's or your

21     sister's children's college education?

22 A.  Yes.

23 Q.  And other than that connection that you made

24     during the break, is there any other information

**Bogorad, L. 01-19-06**                    **Page 57**

00065

1    open about things like that than he was with

2    a son of his.  And, again, reminiscent of the

3    letters that we had seen to my mother which,

4    again, were of similar tone.

5  Q.   Did you have an understanding while your father

6    was alive that he was in love with Kathy

7    Mullinix?

8  A.   That would have been my assumption.  The

9    question is how you define that, I guess, but I

10    would say so, yes.

11  Q.   The letters that you found after your father's

12    death between your father and your mother, do

13    you have any recollection as to the dates of

14    those letters?

15  A.   I believe these were all before they were

16    married, when they were living with each other.

17    I suppose they didn't have much occasion to

18    write letters to each other, but this would have

19    been before they were married in the early

20    1940's, I guess.

21  Q.   We discussed a bit earlier that you became aware

22    in, I believe you said, December of 2002 that

23    your father wished to provide for Ms. Mullinix

24    in his estate plan; is that correct?

**Bogorad, L. 01-19-06**                                    **Page 65**

00066

1  A.  Correct.

2  Q.  And I believe you testified that it was an

3      e-mail that you received from your father?

4  A.  Correct.

5      MS. DINEEN JERRETT:  And this will be

6      marked as Exhibit No. 4.

7      (Exhibit No. 4, E-mail of 12-19-02

8      from Lawrence Bogorad to Kiki Bogorad-Gross was

9      marked for identification.)

10 Q.  Mr. Bogorad, if you could take a few minutes and

11     look at that and make sure you are familiar with

12     it.

13 A.  Okay.

14 Q.  Mr. Bogorad, let me ask you this first, do you

15     recognize what's been marked now as Exhibit 4?

16 A.  Yes, I do.

17 Q.  What is it?

18 A.  This is the e-mail we were referring to of

19     December 19, 2002, to me and to Kiki, regarding

20     the addition of Kathy to the estate.

21 Q.  And is this the e-mail that you previously

22     testified to receiving regarding your father's

23     intent to include Ms. Mullinix in his estate

24     plan?

**Bogorad, L. 01-19-06**                    **Page 66**

00067

1  A.  Yes.

2  Q.  Do you recall if there was any other e-mail

3     related to that issue?

4  A.  I don't recall any others, no.

5  Q.  And after looking at this e-mail, is there

6     anything in addition to what you have previously

7     testified to about your father's wishes to

8     include Ms. Mullinix in his estate plan that

9     comes to mind?

10  A.  I don't know if it relates to the question you

11     just made, but in terms of an earlier question,

12     it does refer to this Charitable Unit Remainder

13     Trust.

14         Again, it is not clear from this

15     whether he was mentioning this in passing or

16     whether I knew about it already.  But I would

17     say this probably leads me to think that he had

18     us sign documents about that earlier than this

19     date.

20         Otherwise, obviously, it has a lot of

21     details about different shares and the Q-TIP

22     Trust and dealings of that sort, but honestly I

23     don't claim to really understand the different

24     parts of this.

**Bogorad, L. 01-19-06**                    **Page 67**

00068

1  Q.  Is this, as best you can recall, the first time

2     that you became aware that Mr. Bogorad wanted to

3     include Ms. Mullinix in his estate plan?

4  A.  I believe it's the first time, yes.

5  Q.  Prior to December 19, 2002, the date of the

6     e-mail, do you recall having any conversation

7     with your sister Kiki about your father's wishes

8     to include Ms. Mullinix in his estate plan?

9  A.  I don't recall any, no; it is possible though.

10  Q.  Mr. Bogorad, if I could just refer you -- I'll

11     just point to the provision, it appears to be

12     above the name "Matthew A. Berlin," there was an

13     indentation above that starting, "Inasmuch as

14     you are both trustees," do you see that

15     sentence?

16  A.  Mm-hmm.

17  Q.  Do you recall your father requesting you to sign

18     a copy of a revocable trust to authorize his

19     change to include Ms. Mullinix in his estate

20     plan?

21  A.  Well, this is the request for that here.  I

22     recall receiving this e-mail that requested

23     that, yes.

24  Q.  And do you recall providing your signature in

**Bogorad, L. 01-19-06**                    **Page 68**

00069

1    response to that request?

2  A.   I'm pretty sure I did; I can't say I remember

3       exactly when I did it.  There's a note here, he

4       said, "it will be fine to do it after we got

5       back," meaning the trip to Southeast Asia.  I

6       don't recall whether I did it before or after

7       that.

8  Q.   Do you recall having any -- other than this

9       e-mail communication, do you recall having any

10      specific communication with your father about

11      his desire to include Ms. Mullinix in his estate

12      plan?

13  A.  I don't recall.  I'm sure I responded probably

14      by e-mail that "that sounded fine," but it is

15      possible that I said that verbally, orally.  I'm

16      sure I would have responded one way or the

17      other, but I don't recall; and I didn't have any

18      records in my e-mails of a response, but my

19      e-mails aren't saved that far back in the

20      system.

21  Q.   Did you engage in a search of your e-mails to

22      see if there was a response by you to this

23      e-mail?

24  A.   Yes.  I looked through the e-mails when the

**Bogorad, L. 01-19-06**                               **Page 69**

00072

1    generally those questions and answers?

2  A.  Yes.

3  Q.  And I believe you testified that the family

4    welcomed Kathy into the fold.  Do you recall

5    saying something along those lines?

6  A.  Yes.

7  Q.  Prior to your father's death, did you consider

8    Kathy Mullinix part of your family?

9  A.  I have a pretty strict definition of family.

10    I guess it would be more sort of a legal,

11    sociological, whatever you want to call it,

12    definition, so I suppose not technically.

13  Q.  What was your understanding prior to your

14    father's death as to whether he and Kathy

15    Mullinix were living together?

16  A.  I guess I don't define it as living together

17    because he was living in Boston and she was

18    living in -- well, I guess before death -- I

19    guess once they started -- once she started

20    doing rehabilitation of the co-op that she

21    bought, I guess my understanding was that Kathy

22    was probably spending a lot of time in Lexington

23    at my father's house.

24        But before that happened, it seemed

**Bogorad, L. 01-19-06**                    **Page 72**

00073

1       from what I was hearing, just in passing, and

2       more than anything that he was spending most

3       weekdays in Lexington, both because he was going

4       to work and because he lived there and he wanted

5       to be close to my mother, and that he was

6       frequently going to New York for weekends when

7       he wasn't traveling otherwise.

8               So, I guess, by my definition, that

9       would not be living together, although obviously

10      spending a fair amount of time together in

11      different locals.

12  Q.  What would your definition of living together

13      be?

14  A.  It would be having one household together, you

15      know, that would be your legal abode, the place

16      where you'd spend the vast majority of your

17      time, it would be in the same place as each

18      other, presumably changing your voter

19      registration and your insurance and all those

20      things that would go toward living in the same

21      place with each other.  I don't know if that's a

22      legal definition but that would by my personal

23      definition I suppose.

24  Q.  At any point prior to your father's death, did

00074

1    you have an understanding that he and

2    Ms. Mullinix were living together, as you

3    define the term?

4 A.  No.  Again, except if you consider the fact that

5    she probably was spending most of her time in

6    Boston while her apartment was being renovated,

7    after she sold her first co-op or whatever it

8    was and bought another one.

9        I think I probably knew that her new

10   apartment wasn't easily habitable in its form

11   and so she needed someplace to live and I

12   probably knew that she was spending most of the

13   time in Lexington.

14       My assumption was that she was

15   planning on moving back to this apartment that

16   she was working on.  And so it was more of a

17   temporary living in Lexington, rather than she

18   had moved formally to Lexington and that they

19   therefor had been living together in Lexington.

20   And so I guess I would still consider her to be

21   a resident of New York and my father of

22   Lexington.

23 Q.  You indicated that you had an assumption that

24   Kathy Mullinix was planning to move back to New

**Bogorad, L. 01-19-06**                    **Page 74**

00078

1    hand where a wedding band would normally be

2    seen?

3  A.  I think I probably did.  I must say, and my wife

4    would tell you, I don't notice jewelry as much

5    as I probably should.

6  Q.  Do you have any information about whether your

7    father purchased jewelry for Ms. Mullinix?

8  A.  I saw him going through the documents the last

9    few days, a receipt for a jewelry store in

10    Bangkok, which would have been in that trip to

11    Southeast Asia.  I think it was about $3,000 and

12    I would assume -- and he wouldn't be the type of

13    guy that would buy himself jewelry, so I guess

14    it was for Ms. Mullinix.  But I don't have any

15    more evidence than that.  I would certainly not

16    be surprised if he brought her jewelry, but I

17    don't have evidence of that one way or the

18    other.

19  Q.  The trip to Southeast Asia, you have mentioned

20    that a couple of times, when do you recall that

21    that trip was?

22  A.  That would have been just after this e-mail, so

23    that would have been at Christmastime of late

24    December 2002, or perhaps running into the first

00079

 1    few days of '03.

 2  Q.   And who went on that trip?

 3  A.   That would have been my father, my sister Kiki

 4       Bogorad-Gross, my brother-in-law, their two

 5       children, my wife, myself, my two children, and

 6       Kathy Mullinix.

 7  Q.   And during that trip, to your knowledge, did

 8       your father purchase jewelry for any person

 9       other than Ms. Mullinix?

10  A.   I'm pretty sure he did not.

11  Q.   Are you aware of other gifts that your father

12       purchased for Ms. Mullinix?

13  A.   Not really.  It certainly wouldn't surprise me.

14       It would surprise me if he didn't, since he is

15       a very generous guy and I know he loved her, but

16       I don't know of any specifics.

17  Q.   Do you recall whether there was a red Saab

18       convertible that your father purchased at some

19       point?

20  A.   Yes.

21  Q.   Do you know when that was purchased?

22  A.   I don't.  It was in Ms. Mullinix's statement in

23       the documentation, so I read the date a few days

24       ago, but I don't remember what day it was.

# EXHIBIT B
# (2 OF 2)

00084

1  Q.  Anybody that accompanied your father?

2  A.  No.

3  Q.  At some point after your father's death, you and

4      Ms. Mullinix had some conversations about her

5      claims; is that right?

6  A.  Claims?  I don't know about the definition of

7      "claims."  We had some conversations about

8      things that turned into claims.

9  Q.  And do you recall the general nature of what

10     those things were?

11  A.  Yes.

12  Q.  What were they?

13  A.  To the best of my recollection, it was around

14     the time of the funeral in early January after

15     he died, so that would have been in 2004.  And I

16     was in my father's house going through some of

17     his papers with my brother-in-law, Jim Gross,

18     and Kathy was there.

19          And my best recollection is that she

20     mentioned the fact that she had been

21     rehabilitating or was going to be rehabilitating

22     this co-op that she had bought and that my

23     father had, she said, planned to pay for the

24     renovation costs.  That is my best recollection.

**Bogorad, L. 01-19-06**                    **Page 84**

00086

1    respond at all?

2 A.   It's my best recollection.

3 Q.   Do you recall if your brother-in-law, Jim Gross,

4    said anything in response to Ms. Mullinix's

5    statements?

6 A.   That would be the same recollection about him,

7    that he did not respond either.  But, again,

8    that is my best recollection, I don't have a

9    perfect recollection of that.

10 Q.   After this early January 2004 conversation, do

11    you recall any other conversations with

12    Ms. Mullinix about the things that have since

13    turned into claims?

14 A.   Yes.  She called my house, I believe it was

15    January 25th of that year, and said that she

16    wanted to talk about her co-op and about her

17    staying in the house in Lexington.

18 Q.   Do you recall what she said specifically about

19    those things?

20 A.   I mean, I took notes, I think quite complete

21    notes about what she said and they are in the

22    record.  I can either refer to those and give

23    you verbatim, or tell you my best recollection

24    without those notes.

**Bogorad, L. 01-19-06**                    **Page 86**

00087

1   Q.  Do you have those notes with you today?

2   A.  I think I do have a copy of you want.  It's in

3        the documents that you have already.  Do you

4        want me to pull it out?

5            MS. DINEEN JERRETT:  Let's go off the

6   record.

7            (Discussion of the record.)

8            MS. DINEEN JERRETT:  Okay.  Let's mark

9   this as the next exhibit.

10           (Exhibit No. 5, Handwritten notes of

11       1/25/04, 5 pgs., was marked for identification.)

12  Q.  Mr. Bogorad, I've just handed you a document.

13       Feel free to look through it if you need to in

14       order to refresh your recollection.

15  A.  I remember it.

16  Q.  Do you recognize this document?

17  A.  Yes.

18  Q.  What is it?

19  A.  It's the document that I was referring to as

20       notes I took while I was on the phone with Kathy

21       Mullinix on, as it says on the top, January 25,

22       2004, during the call that she made to me.

23  Q.  Is it your testimony that any of the handwriting

24       on these five pages is your handwriting?

**Bogorad, L. 01-19-06**                    **Page 87**

00088

1   A.  Yes.

2   Q.  And this appears to be on either a note pad or

3        letterhead of your wife; is that correct?

4   A.  That's correct.  It was a note pad that happened

5        to be next to the phone.

6   Q.  I'd like you, Mr. Bogorad, to go through the

7        handwriting, and read slowly so that the court

8        reporter can get it down, what is handwritten

9        there, please.

10  A.  Yes, I'll try.  There are a few places where I

11        can't quite honestly make out.

12  Q.  That makes two of us.

13  A.  The good news is I take very detailed notes when

14        I'm talking to people; the bad news is I don't

15        always, in order to refer to those, remember

16        what I said or be able to read what I said, but

17        I'll do my best.

18          It says: "House and Kathy's living

19        arrangements."  And my recollection is she said

20        that those were the two topics she wanted to

21        talk about.  And, obviously, she would have said

22        "my living arrangements" but --

23          MR. VARN:  Wait, wait.  She just asked

24        you to read the notes.

**Bogorad, L. 01-19-06**                          **Page 88**

00089

1   A.   Sorry. "1. The house and selling it. What

2        plans are when standard renovation, plan to stay

3        down here" -- I'm sorry -- "when started

4        renovation, plan to stay down here." Which I

5        took to mean Lexington because she was calling

6        from Lexington. "I'd want to be here until the

7        renovations are done. If could be sold in

8        spring, would be great. If house sold in

9        spring, could delay closing, later delivery,

10       work around that, delivery" -- and then I can't

11       read the next word. Then it says, "house for

12       another year," and "Kathy in New York."

13  Q.   Page 2.

14  A.   The next page says, "talking four months,"

15       circled, it says, "end of May, need to plan

16       to" -- and then I must have run out of time to

17       finish that sentence.

18            And then, "No. 2," which I take to

19       mean that she was moving on to the next topic

20       dealing with the renovation of the apartment,

21       which is what it says next. "Renovation of New

22       York apartment. Mentioned to me and to Kiki

23       that my father and Kathy had agreement with

24       respect to real estate in New York. Dad was

**Bogorad, L. 01-19-06**                    **Page 89**

00090

1    going to pay $400,000 out to bid on the 17th,"

2    which I believe I took to mean January 17th.

3    "We had entered into real estate transaction

4    knowing that not livable and need to do gut

5    renovation.  How want to handle bills as come

6    in," which I think the full sentence was, "How

7    do you want to handle the bills as they come

8    in."

9         The next page, "Talk to Jim several

10   days after conversation with lawyer.  Jim

11   said would take some time to have named as

12   executors," it says "couldn't if paying bills."

13   I'll try to interpret what these meant later if

14   you want, but that's what it says there.

15        And then "talking about going through

16   documents and so forth" and "he didn't seem to

17   be addressing issue of renovations.  Wondering

18   if I should sell it."  I think what she said

19   was, "I was wondering if I should sell it."

20   Then "decided that is ridiculous."

21        The next page.  I'm not sure what this

22   means.  "Think about cascade in living

23   situation."  I don't know what she meant by

24   that.  "Probably makes sense to go forward.

**Bogorad, L. 01-19-06**                    **Page 90**

00091

1    Send to" -- and that's all I had down there.

2         I have a line.  "Talk to a couple of

3    people, Re: How should be proceed," but I guess

4    it should be, "how I should proceed" is probably

5    what I meant.  "Maybe should have someone talk

6    to our lawyer."  Then "Niece, Thomas Whitney" --

7    I can't read the word before that.  "Thomas

8    Whitney at Choate, Hall & Stewart."  I believe

9    that was a referral from her niece to this

10    lawyer or something like that.

11         The last page must have been an

12    earlier one because it says, "Ilagua Falls,"

13    which was where he must have been going on the

14    trip to Argentina that never happened, so I

15    assume somehow that had been on this pad

16    earlier.

17  Q.   And just so I'm clear, Mr. Bogorad, you

18    indicated that when Kathy telephoned you at

19    home on January 25, 2004, you took these notes

20    concurrent with that telephone call; is that

21    right?

22  A.   That's correct.

23  Q.   Other than this conversation here, do you have

24    notes of other conversations that you took

**Bogorad, L. 01-19-06**                    **Page 91**

00092
1    between you and Kathy Mullinix?

2 A.  No.

3 Q.  And why did you take notes on this occasion?

4 A.  Partially, I suppose, because I had a pad next

5    to me and I tend to do a lot of interviews in

6    my job and so I'm used to taking down as many

7    words as I can.  And it struck me that this was

8    a call that was perhaps setting up something

9    for litigation or some claim or whatever and it

10    would probably be helpful to have it down in

11    writing.

12 Q.  Any other reason why you decided to take notes

13    on this occasion?

14 A.  No.

15 Q.  Did you record the conversation in any other

16    fashion besides your notes here?

17 A.  No.

18 Q.  And is it fair to say that you used these five

19    pages of notes in preparing answers to requests

20    for interrogatories?

21 A.  Yes.

22 Q.  If you would turn to the third page, six lines

23    down --

24 A.  Yes.

**Bogorad, L. 01-19-06**                    **Page 92**

00093

1  Q.  -- can you tell me again what just that line

2      says.

3  A.  "Couldn't if paying bills."

4  Q.  And what is it that that is in reference to?

5  A.  I don't know for sure.  It was in the context of

6      what Jim told her, so my best recollection would

7      be that -- it says, "Jim said, 'would take some

8      time to have named executors.'"  I assume it was

9      some kind of reference on her part that bills

10     could not be paid by the estate because they

11     weren't executors maybe or something like that.

12 Q.  "Jim" is referring to "Jim Gross"; is that

13     correct?

14 A.  Correct.

15 Q.  Was anyone other than you on the telephone call

16     with Ms. Mullinix from your end?

17 A.  No.

18 Q.  Do you have any knowledge whether anyone was on

19     the telephone conversation between you and

20     Ms. Mullinix on her end?

21 A.  No.

22 Q.  The statement that you read that is beginning

23     six lines down on page 3 of your handwriting

24     notes of that conversation, do you recall at any

00094

1     point Jim Gross making a statement or telling

2     you that he made a statement to Ms. Mullinix

3     about the need to get executors appointed?

4  A.  No, I don't recall.

5  Q.  After the 6th line, the 7th, 8th, 9th, 10th

6     line, could you tell me again what those say?

7  A.  "Issue of renovations" or "we didn't seem to be

8     addressing issue of renovations."

9  Q.  And what do you understand that statement to be?

10  A.  She seemed to be frustrated that she wanted Jim

11     to somehow commit to paying or -- she was

12     phrasing it as in, "Where do I send these

13     bills?"  As if it was a given that the estate

14     would pay for this, which it certainly wasn't.

15          And she was phrasing it at least as

16     if she was exasperated that even though she was

17     asking about the issue of renovations, he was

18     talking about other things like being appointed

19     executor and things of that sort.

20  Q.  Did you have a sense that Kathy was frustrated

21     during this conversation?

22  A.  I had a sense that she was trying to set it up

23     as if she knew that this was going to end up in

24     the recommendation of a lawyer.  That she

**Bogorad, L. 01-19-06**                    **Page 94**

00095

1     probably was hoping that she could somehow get

2     me to say that she could send the bills to a

3     certain place, probably knowing that we had no

4     expectation that we should be getting bills

5     because there was no fee.  I don't know whether

6     she knew that, but the tone of her voice led me

7     to believe that she was probably not surprised

8     to hear that we were not giving her a place to

9     send the bills.

10  Q.  Prior to January 25, 2004, did you have a

11        conversation with Kathy Mullinix indicating

12        that the estate did not view her statements

13        of what your father promised her to be the

14        responsibility of the estate?

15  A.  I don't recall any such conversation, no.

16  Q.  Do you recall having a conversation with her

17        on January 25th and expressing that sentiment?

18  A.  Yes.  My best recollection -- and I wrote down

19        what she said pretty much verbatim but I didn't

20        write down anything that I said.  But my best

21        recollection is that in response to her request

22        to send the bills, that I mentioned that the

23        attorney for the estate had advised us as future

24        executors that it would be a violation of our

**Bogorad, L. 01-19-06**                    **Page 95**

00096

1     fiduciary responsibilities to pay this, that it

2     was not an appropriate claim on the estate.

3            You know, I don't recall the exact

4     words I used, but certainly that would have been

5     the gist of my comments because I had just

6     received the letter from that lawyer about a

7     week or two ago.

8  Q.   And when had you consulted with a lawyer about

9       whether the estate was under an obligation to

10      pay for what Ms. Mullinix claimed?

11  A.   It was one of the many questions that we had as

12      soon as we got back from Mexico, I guess, and

13      the funeral occurred.  This was a lawyer that

14      was Matthew Berlin, who my father had retained

15      to prepare the wills and so on.

16            And we had various questions.  I guess

17      the first I had known about payment for -- the

18      issue of possible payment for the renovation was

19      a report from Kiki that Kathy had mentioned this

20      on the plane back from Mexico.  So, obviously,

21      we wanted to know whether this was something

22      that struck us as odd since he wasn't

23      alive anymore, but we certainly wanted to ask

24      the attorney for a legal opinion.

**Bogorad, L. 01-19-06**                    **Page 96**

00097

1  Q.  When did you have the conversation with Kiki

2      about the statements made during the plane ride

3      home?

4  A.  I don't remember.  It probably would have

5      been -- she came back right away after my father

6      died to start arranging things for the funeral.

7      And my wife and the children and I stayed down

8      in Mexico to make sure that the body was

9      transported back with us and so on.

10         So we were there a few more days

11     dealing with the state department.  I would

12     guess it was a phone call after we got back to

13     Washington but I don't recall.

14 Q.  Is it your testimony that your sister and

15     Ms. Mullinix both left Mexico at the same time?

16 A.  They were on the same plane, I believe, at least

17     the first flight, I don't know whether -- I

18     guess one was going to New York and the other

19     was going to Boston, so I assume they probably

20     changed planes and one went to New York and one

21     went to Boston, but I'm not sure about that.

22 Q.  And you recall having a conversation with your

23     sister at some point after that about her

24     conversation with Kathy Mullinix on the plane?

00100

1  Q.  So is it your recollection that your sister told

2      you at some point that during this conversation

3      with Kathy Mullinix on the plane ride back from

4      Mexico, that in response to Kathy's statements

5      about your father's intentions to pay for up to

6      $400,000 of renovations and that your sister

7      responded "don't worry"?

8  A.  I think it was something to that effect, but it

9      was certainly not in the -- I didn't interpret

10     it and I don't think the words would have been

11     interpreted reasonably to mean, "Don't worry,

12     we're going to pay for it."  But rather, "Don't

13     worry about it now, we'll deal with that stuff

14     later" kind of thing.

15 Q.  Well, I guess that's what I'm trying to figure

16     out.  Do you recall what your sister told you

17     that she said to Kathy Mullinix?

18 A.  No.  I've told you everything that I know.

19 Q.  And you don't have any understanding as to how

20     Kathy Mullinix interpreted those statements?

21 A.  No.

22 Q.  And your interpretation of those statements is

23     based upon what?

24 A.  Just the context of whenever I heard about what

00101

1    my sister said and that I would assume, if I

2    were in the situation, I would say something

3    similar, just to try to, you know, ease a

4    grieving person.

5         But, obviously, since we don't have

6    any legal basis for knowing what could be paid

7    or anything, it certainly wasn't any -- you

8    know, I would have assumed that she would do

9    the same thing as I would and not make any kind

10   of legal commitment -- not that we could have

11   anyway about what would or would not have been

12   payable or anything legalistic like that.

13  Q.  Did you have any information during your

14   father's lifetime about any intent on his part

15   to pay for renovations to an apartment that

16   Kathy Mullinix purchased?

17  A.  No, not that I can recall.

18  Q.  We've talked a little bit about an apartment.

19   I'd like to make sure we are both on the same

20   page.

21        What is your understanding of the

22   apartment that we're -- strike that.

23        What apartment are you referring to

24   when you say Kathy made these statements?

**Bogorad, L. 01-19-06**                    **Page 101**

00103

1    5th Avenue?

2  A.  I had a conversation with her about that topic.

3    I'm not sure that she told me at that point that

4    she had already signed a contract.  Although, I

5    believe, from reading the records since then, it

6    seems that she had probably the week before

7    that.

8  Q.  For ease, if it is okay with you, I'm going to

9    refer to the "Apartment" --

10  A.  Unless you tell me otherwise, that means the 5th

11    Avenue apartment.

12  Q.  Is that fair?

13  A.  Yes, that is fine.

14  Q.  When did you first have a conversation with

15    Ms. Mullinix about the Apartment?

16  A.  It was in February, mid-February of 2003.  Kathy

17    and my father were up for a brunch that my

18    sister-in-law was having for her child who was

19    having a Bar Mitzvah, I guess it was, and we

20    discussed it at that point, at that sort of

21    brunch.

22  Q.  What do you recall about that discussion with

23    Ms. Mullinix?

24  A.  That she had said that her -- that she was

00104

1    selling -- and, again, I'm not sure that then

2    some of these may have happened already or that

3    they were about to happen -- but that she was

4    selling or was going to be selling her apartment

5    on 87th Street and buying an apartment on 5th

6    Avenue.  Because her son, who was, you know, a

7    knowledgeable real estate person, an executive

8    at a real estate investment trust, had advised

9    her that the values would increase faster on 5th

10    Avenue than they would on 87th Street.

11  Q.  Was anyone else present for this conversation

12    between you and Ms. Mullinix?

13  A.  I don't believe so, no.

14  Q.  And what else do you recall Ms. Mullinix saying

15    about that Apartment at that time?

16  A.  That's all I recall from that conversation.

17  Q.  Did you say anything in response to her

18    statements during that conversation?

19  A.  Not that I recall.  I probably, you know,

20    said -- I don't know what I said, but I'm sure

21    it was nothing negative.  I probably was nodding

22    or whatever.

23  Q.  Did Ms. Mullinix make any statements to you

24    during that conversation about Mr. Bogorad's --

**Bogorad, L. 01-19-06**                          **Page 104**

00107
1      Apartment prior to February 16th of 2003?

2  A.   You asked me whether I talked to Kathy about it.

3      I don't recall whether I heard about it from

4      Kiki or possibly from my father.

5  Q.   Do you remember at any point hearing from your

6      sister about the Apartment?

7  A.   I'm sure we talked about it; I wouldn't say it

8      was "heard about." My best recollection is it

9      was after I knew about it from this

10     conversation, but I may have talked to her

11     before that. But after that, I'm sure we talked

12     about it on occasion.

13  Q.   Do you recall whether you spoke with your father

14     at any point about the Apartment?

15  A.   I really don't remember ever talking to him

16     about it. I'm sort of surprised to say that,

17     because I would think it might have come up, and

18     it may have, but I don't recall any time that it

19     did.

20  Q.   And why are you surprised that it wouldn't have

21     come up?

22  A.   Well, from reading all these documents, it's

23     obvious that he was involved in making decisions

24     about it, what to put into the apartment and

00108

1    that kind of thing.  So it seems like something

2    that he might well have mentioned at one point

3    or another, but I just don't remember him ever

4    specifically talking about it.

5  Q.  So it's fair to stay that based upon your review

6    of documents in this case, that you have a sense

7    that your father was involved in making

8    decisions related to the Apartment?

9  A.  It's my sense of it, but I'm probably no better

10    than anyone else reading the documents.

11  Q.  Is there anything else about the conversation

12    with Kathy Mullinix on February 16, 2003, that

13    you can recall that's related to the Apartment

14    or otherwise?

15  A.  I recall telling my wife about it just

16    afterwards, because I was struck, as a real

17    estate expert myself, that this seemed like an

18    awfully self-confident kind of prediction, that

19    one could somehow predict that an apartment on

20    5th Avenue would appreciate faster than an

21    apartment on 87th Street.

22         Obviously, all things being equal, an

23    apartment over on 87th Street would cost less

24    than one on 5th Avenue.  But, in my judgment,

**Bogorad, L. 01-19-06**                    **Page 108**

00122

1  A.  To her claim that there was an agreement?

2  Q.  Yes.

3  A.  No, I don't.  I answered that before.

4  Q.  Do you recall asking her if she had anything in

5     writing to that effect?

6  A.  No, I did not ask her.

7  Q.  Have you ever asked her that question?

8  A.  I have not personally, no.

9  Q.  During the early January 2004 conversation, did

10    Jim Gross ask Ms. Mullinix if she had anything

11    in writing?

12  A.  I don't know.  I don't believe so, no.

13  Q.  To your knowledge, has anyone asked her that

14    question since the time of your father's

15    passing?

16  A.  I believe the estate lawyers asked her.

17  Q.  And you believe that based upon what?

18  A.  Reading the documents.

19  Q.  From the pleadings and the other correspondence

20    in this case?

21  A.  Yes.

22  Q.  During the January 25, 2004 conversation, the

23    telephone conversation with Ms. Mullinix, other

24    than what is reflected in your notes that have

**Bogorad, L. 01-19-06**                    **Page 122**

00123

1    been marked as Exhibit 5, do you recall any

2    other conversation with Ms. Mullinix during that

3    same telephone call regarding issues not related

4    to the Apartment?

5  A.   Her statement, her admission or whatever,

6    indicated that the call began with conversations

7    about my wife's cancer.  And I -- both of us did

8    not recall that it was the same conversation.

9    But certainly Cathy was very helpful in terms of

10    obtaining access to a doctor in New York to

11    advise on my wife's case, and it is certainly

12    possible that that was the beginning of our

13    conversation.

14          And as Kathy said in her submission

15    that she then asked just to talk to me.  But

16    that was not either something we specifically

17    remembered or actually that we remembered even

18    after reading that, but it's certainly quite

19    possible.

20  Q.   Just so I'm clear, you do recall at some point

21    having a conversation with Kathy Mullinix and

22    your wife regarding Ms. Mullinix assisting your

23    wife in obtaining an appointment related to your

24    wife's cancer?

**Bogorad, L. 01-19-06**                    **Page 123**

00133

1  Q.  For the trips that you and your father,

2      Ms. Mullinix, and your family and your sister's

3      family took together, was there a typical course

4      of who paid for those trips?

5  A.  I guess what we evolved into -- and I can't say

6      for sure whether that was the case for the first

7      trip or two, it may not have been -- but what we

8      evolved into was that Kiki and I and our spouses

9      paid for all of the restaurant-types of things

10     for the whole of group, including my father and

11     Kathy; and that my father paid for all of the

12     hotel and ground transportation and tours and

13     that kind of thing.

14         And I believe, in general, we paid for

15     our own air transportation, although, it is

16     possible that that wasn't always the case, or

17     it may even have been different with respect to

18     KiKi, or maybe there were some frequent flyer

19     miles that were used for some people.  But I

20     believe we generally paid for our own air

21     transportation, at least with my personal

22     family I did.

23  Q.  Was there any sort of after-the-fact equalling

24     up among the family members to make sure that

00134

1    everybody contributed a roughly equal amount?

2  A.  Kiki, Jim, Cindy and I tried to keep sort of

3    track of how much we were spending and we tried

4    to equalize.  I can't swear that we remembered

5    to do it every time, but that was the goal.  But

6    we were keeping a rough track on receipts on

7    that score.  There was no effort to decide

8    whether that was less or more than the hotels or

9    the tours or anything else that my father was

10    paying for.

11  Q.  Was there any inclusion of your father and/or

12    Ms. Mullinix in those conversations or attempts

13    to equalize?

14  A.  No, no.

15  Q.  Is it fair to say that, from your perception,

16    your father was generous in the sense of

17    providing some financial aspect for vacations

18    and gifts and things like that?

19  A.  He was very generous.  Certainly the

20    vacations -- I mean, personally, the thing I

21    appreciated the most was that he was organizing

22    them and spending a huge amount of time doing

23    it.  But he also certainly paid for a big chunk

24    of it in the aspects that I just mentioned,

00135

1    which was very generous.

2 Q.  Is there anything about your father that you

3    would characterize as not generous?

4 A.  No.

5 Q.  When you first became aware that there were

6    planned renovations to the Apartment, did you

7    have any understanding as to the financial

8    arrangements made with respect to those

9    renovations?

10 A.  To the extent I knew what was happening before

11    he died, absolutely no.  Afterwards, it was all

12    based on the documents that are in the case and

13    that we've already talked about.

14 Q.  When you first became aware from your sister,

15    Kiki, about Ms. Mullinix's statements that your

16    father agreed to pay for a certain amount of

17    renovations to the Apartment, you're confident

18    that that occurred after your father died; is

19    that correct?

20 A.  Absolutely.  That was the discussion they had

21    on the plane coming back from after he died.

22 Q.  In late January of 2004, when you had the

23    telephone conversation with Ms. Mullinix that

24    is reflected in your notes as Exhibit 5, do you

**Bogorad, L. 01-19-06**                    **Page 135**

00137

1    the Apartment was being renovated?

2  A.  I do recall that it said that, yes.

3  Q.  Did you know that your father and Ms. Mullinix

4    were storing belongings together?

5  A.  No, I didn't.

6  Q.  Other than in the context of these discussions

7    prior to a lawsuit being filed and subsequent to

8    a lawsuit being filed, were you aware of the

9    fact that there was a storage cost agreement

10     between Ms. Mullinix and Mr. Bogorad?

11        MR. VARN:  Objection.

12  A.  Could you rephrase the time on that.

13  Q.  Sure.  Let me break it down for you actually.

14        Prior to your father's death, were

15    you aware of an agreement between him and

16    Ms. Mullinix related to payment of storage

17    costs?

18        MR. VARN:  Objection.

19  A.  No.

20  Q.  After your father's death, do you recall when

21    you first learned of that specific allegation

22    from Ms. Mullinix?

23  A.  The first time I recall is the letter that I

24    believe was sent to the estate's attorney in

**Bogorad, L. 01-19-06**                          **Page 137**

00142

1  Q.  With respect to your statement just now that --

2  A.  I'm sorry, I probably do have one other thing,

3      yes.

4           The other thing I was struck by is on

5      page 4 where the description here of my father

6      being "instrumental in deciding to purchase the

7      Apartment on 5th Avenue" was directly different

8      from what she had told me contemporaneously in

9      February of 2003; which is, as we discussed

10     before, she had said that her son Brendan was

11     the one who wanted her to buy it because it

12     would be a better investment.  So that was in

13     conflict with what I heard personally myself

14     from Kathy at the time.

15  Q.  With respect to that last statement that you

16     just made, did Ms. Mullinix tell you at any

17     point that Mr. Bogorad was not instrumental in

18     the decision to purchase the Apartment?

19  A.  No, she didn't discuss it like that.

20  Q.  So your assumption that it was -- strike that.

21           In February of 2003 when Ms. Mullinix

22     made mention of her son Brendan Mullinix's

23     opinion, you assumed that that was the only

24     factor in Ms. Mullinix's decision to buy the

**Bogorad, L. 01-19-06**                    **Page 142**

00143

1     Apartment?

2          MR. VARN:  Objection.

3  A.   The way she described it to me was that that was

4     why she had purchased it.  So I thought it was

5     odd that that reason wasn't mentioned here and

6     another reason was mentioned here.

7  Q.   The fact that this mentions that Mr. Bogorad was

8     instrumental in that decision, however, I just

9     want to understand, was that inconsistent with

10     any statements Ms. Mullinix told you about

11     Mr. Bogorad's involvement in the Apartment?

12          MR. VARN:  Objection.

13  A.   My understanding of what she told me was that

14     the reason she bought it was because of her son,

15     and that that was the reason.  If my father was

16     instrumental in it, I would have expected her to

17     say that that was another reason or the only

18     reason.  And, as it says here, that seems to be

19     the key reason that she is giving in August of

20     2004, and, in my view, it was inconsistent.

21  Q.   In the conversation -- the only conversation

22     that you had prior to your father's death with

23     Ms. Mullinix about decisions relating to

24     purchasing the Apartment was in February of '03

**Bogorad, L. 01-19-06**                    **Page 143**

00146

1  Q.  You also indicated that you were surprised in

2     this August of 2004 letter about Ms. Mullinix's

3     claim that you assured her that she could remain

4     in the Lexington house until her Apartment was

5     renovated; is that a fair characterization of

6     what you said?

7  A.  Yes.

8  Q.  Do you recall having a specific conversation

9     with Ms. Mullinix about her residing in the

10     Lexington home?

11  A.  Yes, in the conversation of January 25th.

12  Q.  And, again, that is the notes that are reflected

13     in Exhibit 5; is that correct?

14  A.  Correct.

15  Q.  And Exhibit 5, just so I'm clear, reflects only

16     statements that she made to you; is that

17     correct?

18  A.  That's correct.

19  Q.  It doesn't reflect statements that you made to

20     her?

21  A.  That's correct.

22  Q.  But it's your testimony that at no point did you

23     assure Ms. Mullinix that she could remain in the

24     Lexington house until her Apartment was

00147
1     renovated?

2  A.  Not in terms of completion of renovation.  She

3     had indicated in that cause that she thought

4     about four months would be about the right time,

5     and that seemed to be consistent with what was

6     likely timing.  And she had indicated at some

7     point to me, and I can't remember exactly when,

8     that she assumed it would make the most sense to

9     sell the house during the spring season.

10          So everything was consistent with that

11    throughout that whole period where she was being

12    helpful in terms of getting her way out of the

13    way of the house and asking when the house was

14    going to be closing, and finding out it was the

15    end of June, which was five months after we had

16    had this conversation.

17          And at one point she mentioned to Kiki

18    in an e-mail that she had rented an Apartment in

19    New York, which was a couple of months, I guess,

20    before the closing.

21          And everything was very friendly,

22    which there was no indication that there was any

23    issue with the closing or when it would happen

24    or anything else.  So that is why I was taken

**Bogorad, L. 01-19-06**                    **Page 147**

00148

1    aback to find out that she thought the estate

2    should be paying for something, paying for her

3    Apartment at that time.

4  Q.  Did you, at any point after your father's death,

5    independent of needing to sell the house, did

6    you contemplate asking Ms. Mullinix to move out

7    of the house?

8  A.  I don't believe so.  You know, it seemed to us

9    that there was no reason why we couldn't sell it

10    with her things in it; as long as she was doing

11    what she had already volunteered to do, which

12    was to keep it neat and, you know, there was no

13    reason why we couldn't have the house shown by a

14    broker and so on.

15  Q.  And did you find her actions during the time

16    after your father's death and before the house

17    was sold to be consistent with what she promised

18    she would do?

19  A.  Yes.

20  Q.  Did she create any problems or issues with

21    selling the house?

22  A.  No,  I don't believe so.  Kiki was more

23    intimately involved with it, but I was not aware

24    of anything.

00220

1    estate denies those claims, correct?

2 A.  Correct.

3 Q.  And with respect to paragraph 53, the estate

4    denies the allegations, "Except deny having any

5    knowledge or information sufficient to form a

6    belief as to the truth of the allegations in

7    the first sentence thereof"; is that correct?

8 A.  I think it says "Except deny having knowledge or

9    information sufficient" -- that's correct.

10 Q.  And with respect to the first sentence in

11    paragraph 53 of the Complaint, "Mr. Bogorad

12    promised Ms. Mullinix that she would live in

13    the Lexington home until such time as the

14    renovations to the Apartment were complete." Is

15    that a fair reading of that sentence?

16 A.  It's a fair reading of the sentence, yes.

17 Q.  Do you understand the basis for the estate

18    denying the allegations contained in paragraphs

19    53 through 56?

20 A.  At least part of the reasons.  I think I

21    understand all of the reasons, some of which are

22    related potentially to legal issues.  But the

23    basic issue here is that there was never such a

24    commitment to allow her to live there until it

**Bogorad, L. 01-19-06**                    **Page 220**

00221

1     was complete.  There was certainly never such a

2     commitment.  I think she asserted it someplace

3     that we had even told her that she could -- it

4     was during this phone call on January 25th that

5     I had told her that she could rent an Apartment,

6     if necessary, and I certainly said nothing of

7     the kind.

8  Q.   During that conversation or at any point, do you

9     recall Ms. Mullinix asking you about alternative

10     living arrangements once the Lexington house was

11     sold?

12  A.   No, she never asked me about that.

13  Q.   Do you recall Ms. Mullinix ever suggesting that

14     the estate should consider alternative living

15     arrangements for her after the Lexington house

16     was sold?

17  A.   She never suggested this to me and I never

18     heard that she had suggested that to anybody

19     else.

20  Q.   With respect to the claims in the Complaint

21     regarding your statements about the Lexington

22     home, your contention is that those statements

23     are untruthful; is that correct?

24  A.   They are incorrect, yes.

**Bogorad, L. 01-19-06**                    **Page 221**

00230

1  Q.  Do you deny making a statement like that to

2      Ms. Mullinix?

3  A.  I do not remember making it.  I am pretty sure I

4      never made it.  Proofing the negative is

5      difficult, but I really don't believe I ever

6      made that statement.

7  Q.  Do you recall any other instance where you

8      didn't have a verbal conversation with

9      Ms. Mullinix about her continuing to reside in

10     the Lexington home, but had any other

11     communication via e-mail or other writing with

12     Ms. Mullinix?

13 A.  Yes.  There was at least 20 e-mail exchanges,

14     which I think is in the record, which was

15     reassuring.  You know, she had made the argument

16     when she called on January 25th that, you know,

17     she wanted to sort of talk about the timing and

18     indicate that she wanted to stay for four months

19     or so, but it was a little ambiguous as to long

20     construction would take.

21         And, obviously, we were hoping that

22     there wouldn't be battles over this.

23         On the other hand, she and the brokers

24     and everyone else said that, "of course, you'd

**Bogorad, L. 01-19-06**                    **Page 230**

00231

1   want to sell the house in the spring." And I

2   was certainly hoping that we wouldn't have an

3   issue where we'd have to have her leave before

4   the settlement.

5        And it sounded like things would all

6   work out well, because we couldn't even put it

7   on the market for some period of time because we

8   weren't the executors yet, and that took time

9   from the time of settlement. So it seemed like

10  everything was fitting together well.

11       She e-mailed at one point, I think to

12  Kiki and me, wondering about the about the

13  status of the timing and exactly, you know, what

14  did we know about when she had to leave. And it

15  seemed like all that was fitting together well.

16  As I said earlier, she was very cooperative

17  about things and there didn't seem to be any

18  real contention about this. I think her e-mail

19  was a little bit vague.

20       And I think I sent an e-mail to Kiki

21  at that point sort of indicating that it seemed

22  like this was good news that we weren't going to

23  have battle over this, a littl ambiguous but it

24  seems like it was all fitting together.

**Bogorad, L. 01-19-06**                    **Page 231**

00232

1            And then when she continued to be very

2        cooperative about it and e-mailed Kiki that had

3        she moved to an apartment, I think at the end of

4        April, even though that was two months before

5        settlement, it seemed like everything was very

6        smooth in that regard, which we were happy with.

7        And that is why I was so shocked when she came

8        in and asked for a claim for paying for this

9        apartment which we had no -- we never talked

10       about it before.

11  Q.  Other than this e-mail communication that you

12       just referred to, can you recall any additional

13       communications either verbally or in writing

14       with Ms. Mullinix about her claims, either

15       regarding continuing to remain at the Lexington

16       home or cost of alternative housing after the

17       Lexington home was sold?

18  A.  No, there were no -- other communications in

19       that regard, that was always -- there was never

20       any conversation about cost for any alternative

21       and there was never any contention about when

22       the closing was that I was aware.

23  Q.  At any point, did you have an understanding,

24       prior to the sale of the Lexington home, that

**Bogorad, L. 01-19-06**                    **Page 232**

00233

1  the renovations to Ms. Mullinix's Apartment

2  would not be complete by that point?

3  A.  I don't think I ever really knew the timing of

4  it, no.

5  Q.  Do you recall any information -- or do you

6  recall the status of the renovations to her

7  apartment between January of 2004 and June of

8  2004?

9  A.  At some point we learned that she had signed the

10  contract for renovations I believe in March

11  after she had been -- because I know the

12  estate's lawyer had given her notice that the

13  estate didn't think that they would be paying

14  for this, and that she should not be proceeding

15  on the basis of any assumption in that regard.

16  So that dated that.

17       And later we've seen documents that

18  showed that that was sometime in March, I don't

19  know that we knew that at the time.  I was

20  really not aware of the schedule for renovation.

21  Q.  Did you ever inquire of Ms. Mullinix or any one

22  else as to the timing of the renovations?

23  A.  I don't believe so, no.

24  Q.  Did you ever have any conversation with

**Bogorad, L. 01-19-06**                    **Page 233**

00234

1      Ms. Mullinix about whether she should sign a

2      contract for the renovations to the apartment?

3  A.   In this call on January 25th, my recollection is

4      that I told her, you know, the estate -- the

5      lawyer for the estate had advised that this was

6      not something that we as future executors could

7      pay, it would be a fiduciary violation.  And,

8      obviously, it was left up to her whether she

9      chose to proceed with it.  But I'm pretty sure

10     that I told her at that point, and certainly she

11     received notice shortly after that from the

12     attorney directly, that we, as future executors

13     or whatever, we did not think it was something

14     that we could pay her.

15 Q.   And what was the basis for that conclusion that

16     it was not something that the estate could pay

17     her?

18 A.   It was communication with lawyers and I don't

19     think I'm supposed to talk about that.

20         MR. VARN:  You're not.

21         MS. DINEEN JERRETT:  I would request

22     that the witness answer the question because he

23     just communicated that he -- or he just

24     testified that he communicated with Ms. Mullinix

**Bogorad, L. 01-19-06**                    **Page 234**

# EXHIBIT C

Kiki

1

Volume: I
Pages: 207
Exhibits: 1-13

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

CIVIL ACTION No. 04-12684-WGY

---------------------------------X
KATHLEEN P. MULLINIX,
                    Plaintiff,
     Vs.

KIKI BOGORAD-GROSS and LEONARD P.
BOGORAD, as They are Executors
of the Will of Lawrence Bogorad,
                    Defendants.
---------------------------------X

DEPOSITION of:  KIKI BOGORAD-GROSS
Date:  Friday, January 20, 2006
Time:  10:00 a.m.
Location:  Choate, Hall & Stewart, LLP
                Two International Place
                Boston, MA  02110

--- REPORTER: Evelyn M. Slicius, CSR, RPR ---

K. L. GOOD & ASSOCIATES
Registered Professional Reporters
P.O. BOX 367
Swampscott, Massachusetts 01907
Tel. 781-598-6405  *  Fax. 781-598-0815

□K.L. Good & Associates

2

1         APPEARANCES:

2

3              CHOATE, HALL & STEWART, LLP
           (By Michelle L. Dineen Jerrett, Esq.)
                    Page 1

00019

1    my mind.

2 Q.  Based upon, again, the same rough time frame,

3    the last five years of his life, if your father

4    were traveling to somewhere other than New York,

5    would he generally let you know that?

6 A.  Generally, not always, but generally.

7 Q.  And would he try to provide you a contact phone

8    number to reach him?

9 A.  If he were going on a long trip, he generally

10    would.

11 Q.  Did your father have a mobile phone?

12 A.  No.

13 Q.  Do you know if he routinely checked messages

14    left at his home or his office?

15 A.  I think so.

16 Q.  Yesterday when we deposed your brother, we asked

17    certain questions about your mother.  And I

18    recognize that that is probably a difficult

19    topic to speak about, but I did want to talk to

20    you a little bit about her also.

21         Where is your mother physically living

22    now?

23 A.  She is at the Fairlawn Nursing Home in

24    Lexington.

00020

1  Q.  And how long has she been there?

2  A.  She's been there about five years, I believe,

3      but I'm not exactly sure.

4  Q.  And do you know what level of care is provided

5      at that facility?

6  A.  Nursing care.

7  Q.  Do you know whether it is considered skilled

8      nursing care?

9  A.  Yes.

10  Q.  And what is the condition, if you know, that

11      has caused your mother to be in the Fairlawn

12      Nursing facility?

13  A.  Alzheimer's.

14  Q.  Has she received a formal diagnosis?

15  A.  I believe so.  Again, it's a hard disease to

16      diagnose, but as far as I know it's pretty

17      definite.

18  Q.  And do you know, roughly, when the diagnosis was

19      made?

20  A.  I would say around 1998 she was -- her symptoms

21      worsened and she was -- she began living in an

22      assisted-living facility in Natick,

23      Massachusetts, and she was there for a few

24      years, I would guess.

**Bogorad-Gross Kiki 01-20-06**                    **Page 20**

00023

1 Q.  I understood from your brother yesterday that

2     it's been difficult, from a family member's

3     perspective, because your mother oftentimes

4     doesn't remember people?

5 A.  Yes.

6 Q.  How often do you see your mother?

7 A.  Once a week.

8 Q.  Does she recognize you?

9 A.  I don't think so.

10 Q.  Did you have a sense of how often your father

11     visited your mother before he died?

12 A.  I think he went two or three times a week if he

13     was in town.

14 Q.  Did you and your father ever discuss your

15     mother's medical condition during the last five

16     years?

17 A.  If there were changes in her condition or if

18     there were any issues about the nursing home or

19     anything like that, if there was just sort of a

20     concern about her, you know, it was hard to

21     visit her, that sort of thing.

22 Q.  And did your father express those sentiments to

23     you?

24 A.  Mm-hmm.

00025

1  Q.  And you are here testifying at a deposition

2      pursuant to those deposition notices, correct?

3  A.  Yes.

4  Q.  I'd like to talk to you a little bit in more

5      detail about your relationship with your father

6      just so I can understand how you characterize

7      it.

8          Did you talk with your father during

9      the last five years of his life about personal

10     matters?

11 A.  Yes, but not extensively.

12 Q.  And would that go for both sides of the

13     conversation?

14 A.  Yes.

15 Q.  So would it be fair to say that you shared

16     certain personal information with your father

17     and vice versa but not in extensive detail?

18 A.  Yes.

19 Q.  Your brother testified yesterday that he

20     generally did not have discussions with your

21     father about feelings.  Do you recall that

22     testimony?

23 A.  Yes.

24 Q.  Would you describe your conversations with

00026

1    your father in a similar fashion?

2  A.  I think so, yes.

3  Q.  During the last five years of his life, did your

4      father discuss financial matters with you?

5  A.  Certain ones, I don't think all of them, but

6      certain financial matters.

7  Q.  What do you recall him discussing with you?

8  A.  When he amended his will, he notified us about

9      that; certain insurance policies or things like

10     that; the arrangement that he had gifts

11     regarding paying for our children's college

12     tuition.

13 Q.  Any other examples of financial matters that you

14     can recall him discussing with you during the

15     last five years?

16 A.  Not really; other than, you know, maybe selling

17     his house, that is not really financial, but the

18     possibility of doing that.  But that's all that

19     I can remember.

20 Q.  The first thing you mentioned was when your

21     father amended his will he discussed that with

22     you, correct?

23 A.  Yes.

24 Q.  Do you know roughly when that occurred?

00036

1    father send you a check and have you make a

2    payment?

3  A.   I believe it was once a year.

4  Q.   So is it fair to say that it was roughly five

5    times during the last five years?

6  A.   Yes.

7  Q.   And who handled that in your household, you or

8    your husband?

9  A.   My husband.

10  Q.   Without disclosing any content, did you ever

11    discuss the issue with your husband?

12  A.   Nothing more than "we need to make this

13    payment."

14  Q.   And, to your knowledge, did you or your husband

15    make the payments as your father had instructed

16    him to?

17  A.   Yes.

18  Q.   You also mentioned that -- related to financial

19    matters during the last five years of your

20    father's life -- you and he discussed payments

21    for your children's college education; is that

22    correct?

23  A.   Yes.

24  Q.   Do you know on how many occasions you had that

00037

1     discussion with your father?

2 A.  I don't.  My son was in school for four years,

3      so it may have been -- and he didn't actually

4      make all the payments, so it probably was two

5      years.  And, again, my husband was the one who

6      typically made those arrangements, so there

7      probably was maybe three or four conversations

8      about it.

9 Q.   When was the first conversation?

10 A.  I assume it was before Daniel went to school

11     when my father said, "I would like to contribute

12     $10,000 a year to his college education."

13 Q.   And that conversation occurred over the phone or

14     in person?

15 A.  I don't remember.

16 Q.   Was it between you and your father or were there

17     others --

18 A.  It is possible my husband was there, I don't

19     remember.

20 Q.   As best you can recall, what did your father

21     tell you as to his reasons for wanting to do

22     this?

23 A.  I don't recall the actual conversation.  I think

24     he just said that he wanted to make a gift of

00038

1    helping us with his tuition.

2  Q.  Did he indicate that there was any sort of tax

3    reason for him wishing to make this gift?

4  A.  I believe that he did, that he made the payments

5    directly to the University, so that there were

6    some tax advantages.

7  Q.  So for how many years did this payment actually

8    occur?

9  A.  Freshman year, sophomore year -- I don't

10    honestly know, but Daniel's junior year and not

11    senior year.

12  Q.  What year did Daniel enter college?

13  A.  2001.

14  Q.  So, if I understand you correctly, for 2001,

15    2002, possibly 2003, but not 2004, your father

16    made a payment directly to the University of

17    $10,000 per year?

18  A.  Correct.

19  Q.  Did he send you the check and you sent it to

20    the University or did he send it directly to the

21    University?

22  A.  I don't remember.  As I said, my husband was the

23    one who paid the bill for the school, so he may

24    have -- I don't remember.  I think that he sent

00051
1    to be close-to-the-vest about a lot of things.

2    Do you recall that?

3  A.  Yes.

4  Q.  Would you agree with that statement?

5  A.  I would say so about some things, yes.

6  Q.  What things would he be close-to-the-vest about?

7  A.  I think emotional things he kept to himself or

8    he didn't share.

9  Q.  Anything else?

10  A.  I would say that is the main thing.  I think he

11    shared things with us that he felt were relevant

12    to us.

13  Q.  Would you say that your father was

14    close-to-the-vest about financial matters?

15  A.  I think so.  I think the same thing, that if it

16    were relevant to us, he would have shared them

17    with us.

18  Q.  Can you recall any instance in the last five

19    years of his life where he shared a financial

20    matter with you that did not relate to you?

21  A.  Not really, no.

22  Q.  Did your father in general discuss purchases,

23    whether large or small with you?

24  A.  I would assume large purchases, but he didn't

**Bogorad-Gross Kiki 01-20-06**                    **Page 51**

00052

1    make that many that I know of.

2  Q.  At some point during the last few years of his

3    life your father purchased a Saab vehicle; is

4    that correct?

5  A.  Yes.

6  Q.  Is that something he discussed with you?

7  A.  I think he told us he was going to buy one.  We

8    actually went with him to pick it up.

9  Q.  What do you recall him saying about it?

10  A.  I think he said that he decided that he wanted

11    to get a new car and that this was probably

12    going to be the last car he would buy and he

13    wanted it to be a fun car.  He often had bought

14    himself a Mercedes when he was able to.

15         And so I think it was a splurge or,

16    you know, something that he allowed himself --

17    he didn't allow himself very many extras -- but

18    I think this was something that when he wanted

19    to, he did.

20  Q.  And when you say "we" went with him, who are you

21    referring to?

22  A.  My mother, my son and myself.  I believe he

23    drove him to the dealership and then he drove

24    the car back home.

**Bogorad-Gross Kiki 01-20-06**                    **Page 52**

00059

1    conversation with her?

2         MR. VARN:  Objection.  Asked and

3    answered.

4 A.  No.

5 Q.  When is the next most recent time that you

6    recall hearing about Kathy Mullinix?

7 A.  Probably after my father's heart surgery.

8 Q.  When was that?

9 A.  I believe it was the end -- the latter part of

10    1997, I believe.

11 Q.  And was this the procedure where your brother

12    testified yesterday he was at Mass. General

13    Hospital?

14 A.  Yes.

15 Q.  And what do you recall hearing about Kathy

16    Mullinix at that point?

17 A.  I honestly do not remember the exact content of

18    that; it's just that I believe my father

19    mentioned that, as my brother said yesterday,

20    there was somebody who was checking on his

21    progress at the hospital; somehow we were told

22    that there was somebody else, you know, you

23    have to check, you have to be a family member

24    or somebody to check on people's status at the

**Bogorad-Gross Kiki 01-20-06**                    **Page 59**

00060

1    hospital, and somehow we found out that there

2    was another person checking on him.  So there

3    was a little bit of wondering who this other

4    person was.

5         And then at some point after my father

6    recovered, there was some mention of -- and I

7    honestly don't remember the context of it --

8    mention of Kathy's existence, you know, that she

9    was involved in his life.

10   Q.   When your father was hospitalized at

11       Massachusetts General Hospital, how did you

12       hear that there was somebody else checking on

13       his progress?

14   A.   I honestly don't remember.  I just know that

15       at some point when calling in the hospital

16       somebody said, "Oh, somebody else has called

17       already," that's all that I remember.

18   Q.   Did that strike you as unusual at the time?

19   A.   Yes.

20   Q.   Why was that?

21   A.   My mother was not able to call, there was nobody

22       else that I could think of who would be checking

23       on him.

24   Q.   As far as you can recall, did somebody tell you

**Bogorad-Gross Kiki 01-20-06**                    **Page 60**

00061

1    that it was another woman that was checking in

2    on him?

3  A.  I don't remember.

4  Q.  Did you question other family members as to

5    whether they had been checking in on your

6    father?

7  A.  I don't know that I did.  I just don't think --

8    I don't know.

9  Q.  What was it about the information that you

10    received at that time that struck you as

11    unusual?

12  A.  Just as I said, that there was no other person

13    -- I must have known that it wasn't my brother

14    and so it was unusual that there was another

15    person -- as I said, there was no one else who

16    would have been checking.

17  Q.  Did you talk to your father about it while he

18    was at Mass. General?

19  A.  I don't remember.

20  Q.  Did you speak with your brother about it?

21  A.  It's possible.

22  Q.  When you heard that there was somebody else

23    checking in on your father, did you have a

24    conversation with anybody about the issue?

**Bogorad-Gross Kiki 01-20-06**          **Page 61**

00062

1  A.  Other than family members, I don't think so.

2  Q.  Which family members did you discuss it with?

3  A.  Probably my husband and possibly my brother, but

4      I can't remember.

5  Q.  But you don't recall speaking with your father

6      during his hospitalization about it?

7  A.  I don't remember.  I don't remember if I did or

8      not.

9  Q.  You said you were curious about it?

10  A.  Yes.

11  Q.  What did you do to satisfy that curiosity?

12  A.  I'm not sure.  I mean, he was in intensive care.

13      I'm not sure I asked him at that point, "who is

14      calling," it just didn't seem appropriate at

15      that point.

16  Q.  Did you ask any of the hospital staff or the

17      nursing staff?

18  A.  I don't remember if I did or not.

19  Q.  Did you try to identify the name of the person

20      who was calling in?

21  A.  I don't remember.  I'm not sure they would have

22      told me anyway.

23  Q.  Did you ask anybody to detail to you when the

24      person was calling in or how often?

00063

1  A.  I don't think so, I don't remember.

2  Q.  So is there anything specific that you can

3      recall in trying to do to satisfy your

4      curiosity?

5  A.  Not specifically, no.

6  Q.  What about generally?

7  A.  No.

8  Q.  After your father was discharged from

9      Massachusetts General Hospital, you said that

10     you can't quite recall the context but you

11     remember hearing about Kathy Mullinix?

12  A.  Again, I don't remember how it was disclosed but

13     I believe, as best I remember, that he must have

14     mentioned that she was involved with his life.

15     But I honestly do not remember the context of it

16     or when or how far or what he said.

17  Q.  You do recall a conversation with your father

18     about it, though?

19  A.  Well, we found out somehow so I'm assuming he

20     was the one that told us about it, but I don't

21     remember the context of the conversation.

22  Q.  Do you recall what your father told you about

23     Kathy Mullinix?

24         MR. VARN:  Objection.

**Bogorad-Gross Kiki 01-20-06**                    **Page 63**

00064

1  A.  No.

2  Q.  Did he at any point tell you that he had a

3     romantic involvement with Ms. Mullinix?

4  A.  At some point he did.  I don't remember if it

5     was at that point, but at some point he did.

6  Q.  What do you recall about that conversation?

7  A.  Well, I guess the most specific conversation

8     was when he -- after his surgery and I believe

9     it was sometime in February or March of 1998, I

10    guess, he had some emotional issues, mental

11    issues.  And I was -- I was trying to get a hold

12    of him and he was not -- it was one o'clock or

13    two o'clock in the morning and I couldn't reach

14    him, his phone was busy.  So I drove out to

15    Lexington to see if he was all right and he was

16    very distraught and told me that he was very

17    upset because -- I mean, I suspect there was

18    knowledge of Kathy before that, but I think he

19    detailed the relationship more at this point.

20        He said that, you know, he was

21    involved with her and that she was thinking of

22    braking off the relationship and that he was

23    very distraught about it and that he loved her

24    and that he didn't want to lose her.

**Bogorad-Gross Kiki 01-20-06**                **Page 64**

00065

1            So I think at that point, I became,

2      you know, I was -- that was the most information

3      I had gotten up to that point about their

4      relationship.  There was another man involved

5      and she was trying to decide, where or what

6      allegiance, you know, where to end up, and he

7      was very distraught about it.

8  Q.  As best as you can recall, that exchange with

9      your father took place in February or March of

10     1998?

11 A.  I don't want to quote the date.  It was after

12     his surgery, after he had come out of being in a

13     rehab facility, so he had moved back home.  His

14     surgery I believe was around November, so it was

15     sometime --

16 Q.  Of 2003 -- I'm sorry of 1997?

17 A.  I believe so.  So it was at some point after

18     that.

19 Q.  So he was at Mass. General for the surgery, and

20     he was then transferred to a rehab facility --

21 A.  Right, and then he was home.

22 Q.  And then you estimated -- I believe your

23     testimony was that during February or March of

24     1998, he was having some emotional or mental

00088
1       MR. VARN:  You said "brother."

2       MS. DINEEN JERRETT:  Yes.

3  A.  I think he -- my brother and I were happy that

4   my father was happy because Kathy was a part of

5   his life.  So if that is interpreted as a

6   positive feeling, then the answer is yes.

7  Q.  Did your father tell you he was happy because

8   Kathy was part of his life?

9  A.  I don't know that he ever said that in so many

10   words.  He seemed happy.

11  Q.  How did he seem happy?

12  A.  You know, he was in a good mood, when they were

13   together he seemed to be happy, he enjoyed her

14   company, so I interpreted that he was happy that

15   she was part of his life.

16  Q.  Other than the conversation you had with your

17   father at his house in the middle of the night,

18   did your father ever tell you at other times

19   that he loved Kathy Mullinix?

20  A.  Not that I remember.

21  Q.  Is that something that you discussed typically

22   with your father?

23  A.  No.

24  Q.  Did you have any doubts during the time that you

**Bogorad-Gross Kiki 01-20-06**       **Page 88**

00091

1   feelings were not fond of her because of that,

2   because of the effects on my father.

3 Q.  Other than that instance up until the time of

4   his death, can you recall ever having negative

5   feelings for Kathy Mullinix?

6 A.  Well, I think there were probably feelings of

7   a little bit of -- initially, I think -- that

8   the relationship existed, but I think that I

9   overcame that by realizing that my father was

10   happy and that that was the most important

11   thing.  If I was uncomfortable with the

12   relationship, I overcame that because of the

13   end result.  I'm not sure those are negative

14   feelings.  I'm just saying --

15 Q.  And so you were uncomfortable when you learned

16   about the existence of their relationship?

17 A.  Yes.

18 Q.  Why were you uncomfortable?

19 A.  Well, my mother was still alive.

20 Q.  Is that the only reason?

21 A.  Yes, I think so.

22 Q.  Up until the time of your father's death, how

23   did you and Kathy Mullinix get along?

24 A.  I think we got along reasonably well.  You know,

**Bogorad-Gross Kiki 01-20-06**          **Page 91**

00092

1     we saw each other and I think it was a cordial

2     relationship.

3  Q.  Did you consider her part of your family?

4  A.  Not really.  My father, I think, considered her

5     part of the family.  I don't think I -- I

6     considered her to be with my father.  So I

7     wouldn't say -- if someone asked me if she was a

8     part of the family -- no.

9  Q.  Did you ever describe Kathy Mullinix to anybody?

10  A.  Yes.

11  Q.  How did you describe her?

12  A.  Well, I described her relationship with my

13     father, that she was my father's girlfriend.

14  Q.  Is that the term you used, your "father's

15     girlfriend"?

16  A.  Probably, yes.

17  Q.  Did you use any other term to describe her

18     relationship with your father?

19  A.  No.

20  Q.  Did you invite Ms. Mullinix to family dinners?

21  A.  Yes.

22  Q.  Did you invite Ms. Mullinix to family

23     celebrations?

24  A.  Yes.

**Bogorad-Gross Kiki 01-20-06**                    **Page 92**

00093

1  Q.  Did she attend family dinners and family

2      celebrations?

3  A.  Yes.

4  Q.  What types of celebrations did you invite her

5      to?

6  A.  She came to Passover, she came to Thanksgiving,

7      I'm not sure about Bar Mitzvah.

8  Q.  Why did you invite her?

9  A.  She was with my father, and I knew it would be

10     important for her to be there with him.

11 Q.  Did Ms. Mullinix attend any other family

12     functions?

13 A.  I'm sure there were birthday parties --

14 Q.  Were there funerals, things like that, that she

15     attended?

16 A.  She attended my aunt's funeral in Iowa.  I don't

17     remember any others.

18 Q.  Based upon what you observed during the time

19     frame that you knew about the existence of their

20     relationship, did your father consider Kathy

21     part of the family?

22         MR. VARN:  Objection.

23 A.  I don't know.  I can't read his mind.  I don't

24     know.

**Bogorad-Gross Kiki 01-20-06**                    **Page 93**

00113

1        MR. VARN:  Objection.  You can answer

2    it.

3  A.  I don't remember if he did.  I don't remember.

4  Q.  You testified earlier this morning that you

5     were aware that your father gave gifts to

6     Ms. Mullinix; is that right?

7  A.  Mm-hmm.

8  Q.  What gifts did he give her that you can recall?

9  A.  Well, these are in part assumptions that they

10    were --

11       MR. VARN:  Don't make assumptions.

12    Testify to what you know and remember.

13  A.   Okay.  I believe that he purchased some sort of

14     jewelry on the trip to Southeast Asia in 2003.

15     I did see the credit card receipt for that.  I

16     was with him in that location and he did not

17     purchase anything for himself, so I believe he

18     did purchase her some jewelry for her at that

19     point.

20  Q.  Any other items that you can recall?

21  A.  I think -- no, nothing specific that I know

22     specifically that he paid for.

23  Q.  Were you aware that your father purchased a ring

24     for Ms. Mullinix that she wore on her left hand

**Bogorad-Gross Kiki 01-20-06**                    **Page 113**

00116
1  A.  It was an an engagement ring to my

2      sister-in-law.

3  Q.  Do you recall seeing anything else during that

4      time frame?

5  A.  No.

6  Q.  Did your father discuss with you any purchases

7      that he made generally?

8  A.  Not generally, unless it was a large purchase

9      and it affected me; he probably would mention

10     it but not the specifics.

11 Q.  Give me an example of.

12 A.  His car.

13 Q.  The Saab?

14 A.  Mm-hmm.

15 Q.  Anything else that you can think of?

16 A.  If he bought a new camera or something or a new

17     computer, he might have mentioned it in passing.

18 Q.  Do you recall if he did mention those things in

19     passing?

20 A.  I know that he bought a computer when he set

21     up an office at home after his surgery so that

22     he could work from home; he did mention that

23     one.

24 Q.  Did he mention the computer purchase before he

**Bogorad-Gross Kiki 01-20-06**                    **Page 116**

00117
1     purchased it?

2  A.   I don't remember.  It's possible in passing we

3       talked about what he was getting, I don't know.

4  Q.   When you spoke with your father during the last

5       few years of his life, what types of things did

6       you talk about?

7  A.   We talked about my children, you know, sort of

8       daily things.  But I would say mostly about our

9       children or the holidays, when we were going to

10      see each other, any trips.

11 Q.   How long would you speak with your father during

12      these occasions?

13 A.   If it was on the phone, briefly; if it was in

14      person, the length of a dinner.

15 Q.   And how do you define a brief conversation over

16      the phone?

17 A.   Five minutes, 10 minutes.

18 Q.   And Ms. Mullinix also provided assistance to

19      members of your father's family, aside from your

20      family; is that correct?

21 A.   Yes.

22 Q.   Did she provide assistance to you at any point

23      during the time that you knew about her

24      relationship with your father?

**Bogorad-Gross Kiki 01-20-06**                    **Page 117**

00134

1  A.  Well, she was obviously upset, as we are all

2     were.  I think -- I don't remember specifics,

3     but I think she was acting appropriately to the

4     situation.  I know that doesn't mean much to you

5     but she was concerned, she was upset, she was

6     all those things that go along with that kind of

7     a situation.

8  Q.  After your father passed away, was your -- and

9     specific to you -- was your trip cut short?  Did

10     you leave Mexico early?

11  A.  Yes.

12  Q.  When did you leave Mexico?

13  A.  We left the next morning.  He died early in the

14     morning, so it was the end of that day, I don't

15     remember what time.

16  Q.  Who left at the same time, if anyone?

17  A.  My immediate family and Kathy.

18  Q.  Why did you and your family leave?

19  A.  Kathy wanted to get back to Lexington.  And,

20     ultimately, we had to go back, so we decided to

21     go then.

22  Q.  When you say, "Kathy had to be back in

23     Lexington," did she have a discussion with you

24     about it?

**Bogorad-Gross Kiki 01-20-06**                    **Page 134**

00135

1   A.   Yes.

2   Q.   What did she say?

3   A.   She said she wanted to be back in Lexington.

4   Q.   Did she say why?

5   A.   She wanted to be with his things.

6   Q.   Was there anything about Ms. Mullinix's behavior

7        after your father died in that immediate time

8        frame that you didn't think was appropriate to

9        the situation?

10  A.   No, not really.

11  Q.   Is it fair to say that you were grieving?

12  A.   Yes.

13  Q.   Is it fair to say is that Kathy seemed to be

14       grieving also?

15  A.   Yes.

16  Q.   Why did you and your immediate family decide to

17       leave with Kathy to go home?

18  A.   Well, we live in Boston and my brother lives in

19       Washington.  So it was decided that we would

20       accompany Kathy back to Lexington because that

21       is where we were living, and my brother would

22       come back afterwards, after he took care of what

23       needed to be taken care of there, and then go

24       back to Washington.

00136

1 Q. When you came back to Boston, who was involved

2 in making the funeral arrangements for your

3 father?

4 A. Myself, my husband and Kathy.

5 Q. Was Kathy welcomed as part of that process?

6 A. Yes.

7 Q. Did Kathy do or say anything during the funeral

8 arrangement process that you did not feel was

9 appropriate to the situation?

10 A. I don't believe so.

11 Q. When you were at the airport in Mexico on your

12 way to travel home, did you and Kathy speak?

13 A. I mean, we were all speaking. We were waiting

14 in the airport, so I'm sure we spoke. We didn't

15 have any -- we were just reflecting on the

16 situation, I guess.

17 Q. Did Kathy Mullinix make any statements to you

18 in the airport regarding her agreement with your

19 father related to the issues that have become

20 part of this complaint?

21 A. Not that I remember.

22 Q. Do you remember having a conversation with Kathy

23 Mullinix at some point about those issues?

24 A. Yes.

00137

1 Q.  And when was that?

2 A.  On the airplane.

3 Q.  What do you recall about that conversation?

4 A.  As I remember it, she said, "Your father

5      promised to pay for $400,000 of renovations for

6      the apartment."

7 Q.  And what did you say?

8 A.  I said something to the effect of "Don't worry

9      about it, we will figure it out" in an attempt

10     to -- she was distraught, we were all

11     distraught, this was not the time to be --

12 Q.  Do you remember your exact words?

13 A.  I don't remember them exactly.  To the best of

14     my ability, that is what I said.

15 Q.  Did you tell Kathy during that conversation that

16     you certainly would want to do what your father

17     wanted or words to that effect?

18 A.  No.

19 Q.  At any point did you tell Ms. Mullinix that you

20     certainly would want to do what your father

21     wanted or words to that effect?

22 A.  I don't remember saying that.

23 Q.  You don't remember saying that?

24 A.  No.

00145

1     issue that is at issue in this case.  And,

2     unfortunately, he is not around to testify

3     about it.

4  A.  Can you restate the question.

5  Q.  Do you need me to clarify it or do you not

6     understand the question?

7  A.  I've forgotten what the question was.

8  Q.  I'll have the court reporter read back the

9     question, and if you still need clarification,

10     please ask me.

11          (Whereupon, the last question and

12     answer were read back by the stenographer.)

13  A.  I think I'm surprised because we discussed the

14     renovations, not at length, but we discussed the

15     renovations.  And, you know, it might have come

16     up that that was -- if there was an agreement,

17     that that was the agreement.

18  Q.  When did you discuss the renovations with your

19     father?

20  A.  I mean, as I said, they were not lengthy

21     discussions, but there were discussions about

22     the renovations.  I saw the plans, there were

23     some discussions about kitchen cabinets, that

24     was, as I said, it was not.

**Bogorad-Gross Kiki 01-20-06**                **Page 145**

00147

1    and Kathy?

2  A.  It was not on a regular basis every month or so.

3      You know, it depended on the time of year, it

4      depended on a lot of different things.

5  Q.  Based upon your recollection of first hearing

6      about the apartment, just so I'm clear, you

7      believe it was before there was a contract

8      signed for the apartment?

9  A.  Yes.

10  Q.  When did you next hear about the apartment?

11  A.  I don't remember.  I mean, there were mentions

12      of it -- I don't really remember.

13  Q.  During the last year of your father's life, how

14      often did you speak with him about the

15      apartment?

16  A.  I mean, not every time that we had a

17      conversation did it come up, and it was not a

18      constant subject of conversation, but it did

19      come up.

20  Q.  Did your father talk to you about the financial

21      arrangements for purchasing the apartment?

22  A.  No.

23  Q.  Did Ms. Mullinix talk to you about the financial

24      arrangements for purchasing the apartment?

00149

1    purchased the apartment before you heard about

2    any discussions about renovations?

3  A.  I honestly don't remember.

4  Q.  When you first heard about discussions with the

5    renovations, what did you hear?

6  A.  That she was renovating.  She had to renovate

7    the windows and the air-conditioning, that was

8    required by the co-op association and the rest

9    of it was optional.  But, you know, it needed

10    to be done to upgrade the apartment.

11  Q.  Who were those discussions with?

12  A.  Kathy, and my father might have been there

13    sometimes but not all the time.

14  Q.  During the last year of his life, do you recall

15    speaking with your father about the renovations

16    and the plans to renovate the apartment?

17  A.  Yes.  I don't know if it was always with him, if

18    it was him separately, or both of them together,

19    but there were conversations where he was

20    present about the renovations.

21  Q.  Did the subject of financial arrangements for

22    paying for the renovations come up prior to your

23    father's death?

24  A.  No.

00151

1    checkbooks, bank statements, anything along

2    those lines?

3 A.   No.

4 Q.   After your father's death, in the context of --

5    strike that.

6           After your father's death, did you

7    obtain access to his bank records, his bank

8    statements, cancelled checks, check registers,

9    things of that nature.

10 A.   Yes.

11 Q.   During the discussions about the renovations,

12    is it fair to characterize the discussions as

13    regular discussions about the renovations?

14 A.   "Regular" meaning on a regular pattern or in a

15    regular meeting?  "Regular" meaning what?

16 Q.   I'll clarify.  Is it fair to say that it was a

17    frequent topic of discussion prior to your

18    father's death?

19 A.   It came up.  I mean, I would say that whenever

20    we saw each other, we discussed it; it wasn't

21    lengthy discussions, but the subject came up, I

22    would say.

23 Q.   And when the subject came up, what was

24    discussed?

**Bogorad-Gross Kiki 01-20-06**                    **Page 151**

00152

1  A.  It was mostly about the status of it, how things

2        were going, what progress was made, what was

3        going to be done, things of that nature.

4  Q.  Did your father consult with you in the context

5        of those renovations in any sort of professional

6        capacity?

7  A.  The only thing was when he came to the building

8        that I work at to look at kitchen cabinets and

9        to show me the plans, maybe once; that was not

10       frequent.

11  Q.  When did your father come into the showroom

12       where you work at?

13  A.  I don't remember the exact time, but it was

14       sometime -- I don't remember the exact date.

15  Q.  Do you remember the season?

16  A.  No, I don't.

17  Q.  And can you estimate how long prior to his

18       death he came to your showroom to look at the

19       cabinets?

20  A.  I would guess it was a few months before that.

21  Q.  Did he come alone?

22  A.  No.

23  Q.  Who did he come with?  With Kathy?

24  A.  Yes.

**Bogorad-Gross Kiki 01-20-06**                    **Page 152**

00155

1 death to the showroom where you work, did they,

2 together, or did either of them separately, you

3 know, make a visit to your showroom at any

4 point?

5 A. No.

6 Q. After you showed your father and Ms. Mullinix

7 the design center options for kitchens, what

8 happened?

9 A. They left.

10 Q. Did they discuss with you ordering any kitchen

11 cabinets?

12 A. There was the mention that they were expensive

13 and that there was the possibility through Ray

14 Warner that they could get the kitchen cabinets.

15 There was a unit that they were building and

16 that they might be able to kitchen cabinets that

17 they might be able to get a better price on

18 something because of the showroom purchase.

19 Q. And you knew who the Warners were?

20 A. Yes.

21 Q. What is your understanding of their relationship

22 with your father and Ms. Mullinix

23 A. Ray and Ranne Warner, she is a developer, Ray

24 Warner is an architect.  They work, they're

**Bogorad-Gross Kiki 01-20-06**     **Page 155**

00156
1    friends and have worked on certain investment

2    properties with my father.

3 Q.  Prior to your father's death, were you aware

4    of any involvement between the Warners and

5    Ms. Mullinix?

6 A.  I knew that Kathy had met with Ray Warner to

7    work on the architectural plans for the

8    apartment.

9 Q.  And how did you know that?

10 A.  I was told they were meeting with him.

11 Q.  Who told you?

12 A.  Kathy or my father, I don't recollect who.

13 Q.  Was it your understanding that they were meeting

14    with Ray Warner together?

15 A.  I don't know the specifics, it's possible.

16 Q.  At some point -- strike that.

17        Prior to your father's death, did you

18    have any information as to who paid Ray Warner

19    for her services?

20 A.  No.

21 Q.  After your father's death?

22 A.  Death did you obtain any information about what

23    mid Ray Warner for her services.

24 A.  Yes.

00157

1  Q.  Who?

2  A.  My father.  There was a they can Tom Ray worner

3      and I don't know that is for those services but

4      there is a document with that check for

5      something.

6  Q.  Have you reviewed that check?

7  A.  Yes.

8          MS. DINEEN JERRETT: Can you mark that

9      as Exhibit No. 6.

10         (Exhibit No. 6, Photocopy of Check No.

11     6572 to Raynor Warner for $1787 together with

12     correspondence of 7-11-03 was marked for

13     identification.)

14 Q.  Now, I've given you what's been marked as

15     Exhibit No. 6 to the deposition and I'll ask

16     that you review it and if you recognize that

17     document.

18 A.  Yes.

19 Q.  What is it?

20 A.  It's a copy of a check and an invoice for Raynor

21     Warner for preliminary meetings regarding 1050

22     5th Avenue.

23 Q.  The invoice from Ray Warner is addressed to

24     whom?

00168

1    actually had a discussion with me about it at

2    the time.

3 Q.  Hearing the testimony yesterday on that subject,

4    was that subject familiar to you?

5 A.  Yes.

6 Q.  Do you recall -- have you and your brother

7    spoken about the subject of that issue at any

8    point prior to yesterday?

9 A.  Yes.

10 Q.  When?

11 A.  I don't remember an exact date, just in

12    reference to the case.

13 Q.  And what did our brother tell you about it?

14 A.  He told me what he testified to yesterday.

15 Q.  Can you --

16 A.  He told me that he had a discussion with Kathy

17    about the reason to purchase the Apartment and

18    that it was suggested, you know, that her son

19    thought it would be a good investment to

20    purchase it there.

21 Q.  Do you recall anything else about your

22    conversation with your brother on that topic?

23 A.  No.

24 Q.  At any point prior to your father's death, did

# EXHIBIT D

# FannieMae

MITCHELL, MAXWELL & JACKSON, INC.

**Individual Cooperative Interest Appraisal Report**

MULLINIX v. BOGORAD

File No. P601535

| | | | |
|---|---|---|---|
| Property Address 1050 FIFTH AVENUE | City NEW YORK | State NY | Zip Code 10028 |
| Legal Description BLOCK: 1498 LOT:01 | County NEW YORK | | Unit No. 2D |
| Project Name/Phase No. 1050 5TH AVE INC. | Map Reference 2, D-15 | | Census Tract 0150.01 |

Borrower N/A

Current Owner MULLINIX v. BOGORAD-GROSS

Current Occupant (Indicate One): [X] Owner    [ ] Tenant (Market Rent)    [ ] Tenant (Regulated Rent)    [ ] Vacant

Data Source INSPECTION/CONTRACT

| | |
|---|---|
| Sales Price $ N/A    Date of Sale N/A | Description and $ amount of loan charges/concessions to be paid by seller UNKNOWN |
| Lender/Client SULLIVAN & WORCESTER LLP | Address ONE POST OFFICE SQUARE, ZONE 10, BOSTON, MA 02109 |
| Appraiser CHRISTOPHER DEVINE | Address 546 5TH AVENUE, 9TH FLR, NEW YORK NY 10036 |

## NEIGHBORHOOD

| Location | [X] Urban | [ ] Suburban | [ ] Rural | Predominant cooperative occupancy | Cooperative housing | | Predominant condominium occupancy | Condominium housing | |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | PRICE $(000) | AGE (yrs) | | PRICE $(000) | AGE (yrs) |
| Built up | [X] Over 75% | [ ] 25-75% | [ ] Under 25% | [X] Owner | 150 Low 15 | | [X] Owner | 150 Low NEW | |
| Growth rate | [ ] Rapid | [X] Stable | [ ] Slow | [ ] Tenant | 10000+ High 100+ | | [ ] Tenant | 10000+ High 100+ | |
| Property values | [ ] Increasing | [X] Stable | [ ] Declining | [X] Vacant (0-5%) | 2 MILL. Predomin. | | [ ] Vacant (0-5%) | 2.5 MILL. Predomin. | |
| Demand/supply | [ ] Shortage | [X] In balance | [ ] Over supply | [ ] Vacant (over 5%) | | | [ ] Vacant (over 5%) | | |
| Marketing time | [X] Under 3 mos. | [ ] 3-6 mos. | [ ] Over 6 mos. | | | | | | |

Present land use: One Family 2 , 2-4 Family 3 , Apartments 10 , Condominium 5 , Cooperative 70 , Commercial 10 , Industrial 0 , Other 0 .

Land use change: [X] Not likely    [ ] Likely    [ ] In process to 100% BUILT UP

Note: Race and the racial composition of the neighborhood are not appraisal factors.

Neighborhood boundaries and characteristics: THE SUBJECT IS LOCATED IN THE UPPER EAST SIDE NEIGHBORHOOD OF MANHATTAN. THIS AREA IS BOUNDED BY 96TH STREET TO THE NORTH, 59TH STREET TO THE SOUTH, CENTRAL PARK TO THE WEST AND THE EAST RIVER TO THE EAST.

Factors that affect the marketability of the properties in the neighborhood (proximity to employment and amenities, employment stability, appeal to market, etc.):
THE AREA IS PROXIMATE TO EMPLOYMENT CENTERS, HOUSES OF WORSHIP, LOCAL SHOPPING AND AMENITIES. PROPERTIES ARE GENERALLY WELL MAINTAINED. NEIGHBORHOOD TRENDS ARE WELL ESTABLISHED. MARKETABILITY IS RATED GOOD.

Market conditions in the subject neighborhood (including support for the above conclusions related to the trend of property values, demand/supply, and marketing time - - such as data on competitive properties for sale in the project and neighborhood, description of the prevalence of sales and financing concessions, etc.):
MARKET CONDITIONS IMPROVED FROM 1994 TO 12/2004 AT A RATE OF 5-20% PER ANNUM. CURRENT DATA INDICATES PRICE STABILITY. SUPPLY AND DEMAND ARE GENERALLY IN BALANCE. MARKETING TIME FOR APPROPRIATELY PRICED PROPERTIES IS 3 MONTHS. MOST SALES ARE EITHER CONVENTIONALLY FINANCED OR ALL CASH. INTEREST BUYDOWNS AND SALES CONCESSIONS ARE NOT COMMON.

## SITE

| | | | |
|---|---|---|---|
| Specific zoning classification and description R-10 RESIDENTIAL PERMITTED | | Topography | LEVEL ON GRADE |
| Zoning compliance [X] Legal [ ] Legal nonconforming (Grandfathered use) [ ] Illegal [ ] No zoning | | Size | TYPICAL |
| Highest & best use as improved [X] Present use [ ] Other use (explain) | | Density | TYPICAL |

| Utilities | Public | Other | Off-site Improvements | Type | Public | Private | | |
|---|---|---|---|---|---|---|---|---|
| Electricity | [X] | | Street | MACADAM | [X] | | View | AVERAGE |
| Gas | [X] | | Curb/gutter | CONCRETE | [X] | | Drainage | APPEARS ADEQUATE |
| Water | [X] | | Sidewalk | CONCRETE | [X] | | Apparent easements | NONE NOTED |
| Sanitary sewer | [X] | | Street lights | OVERHEAD | [X] | | FEMA Special Flood Hazard Area [ ] Yes [X] No | |
| Storm sewer | [X] | | Alley | NONE | | | FEMA Zone C     Map Date 07/94 | |
| | | | | | | | FEMA Map No. 360497-0032B | |

Comments (apparent adverse easements, encroachments, special assessments, slide areas, illegal or legal nonconforming zoning use, etc.): NO ADVERSE EASEMENTS, ENCROACHMENTS, OR CONDITIONS OBSERVED. SMSA: 5600

## PROJECT IMPROVEMENTS

| GENERAL DESCRIPTION | | | | EXTERIOR DESCRIPTION | |
|---|---|---|---|---|---|
| No. of Units | 90 | Existing/Proposed | EXISTING | Total No. Parking NONE | |
| No. of Buildings | 1 | Age (Yrs.) | 1950 | Ratio (spaces/units) N/A | Exterior Walls BRICK |
| No. of Stories | 20 | Condition | GOOD | Type of Parking N/A | Roof Surface TAR |
| No. of Elevator(s) | 4 | If Conversion, Orig. use | RENTAL | | Window Type DBL-HUNG |
| | | Date of Conversion | 04/25/58 | Guest Parking (Y/N) NONE | |

Project Type: [X] Primary Residence    [ ] Second Home or Recreational    [ ] Other (Describe)

Does the cooperative project include or own any commercial units? [X] Yes [ ] No    If Yes, describe units 1 GARAGE.

Condition of the project, depreciation, repairs needed, remodeling/modernization, quality of construction, unit mix, appeal to market, etc.: PROJECT APPEARS TO BE PROPERLY MAINTAINED. NO DEFERRED MAINTENANCE NOTED.

Describe the project amenities, security features, recreational facilities, etc.: TYPICAL COMMON ELEMENTS, DOORMAN.

Are the units and project amenities completed? [X] Yes [ ] No    If No, describe status of completion: N/A

## SUBJECT UNIT

Finished area above grade contains:    5.5 Rooms;    2 Bedroom(s);    2 Bath(s);    1,698+/- Square Feet of Gross Living Area Per Unit

Finished area below grade contains:    0 Rooms;    0 Bedroom(s);    0 Bath(s);    0 Square Feet of Gross Living Area Per Unit

| GENERAL DESCRIPTION | | HEATING | | KITCHEN EQUIP. | | AMENITIES | | CAR STORAGE | | INSULATION | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Floor No. | 15 | Type | STEAM | Refrigerator | [X] | Fireplace(s) # | | None | [X] | Roof | [U] |
| No. of Levels | 1 | Fuel | OIL | Range/Oven | [X] | Patio | | Garage | | Ceiling | [N] |
| INTERIOR | Materials/Condition | Condition | AVG | Disposal | | Balcony | | No. of Cars | | Walls | [N] |
| Flooring | HARDWOOD/VGD | COOLING | | Dishwasher | [X] | Deck | | Open | | Floor | [N] |
| Walls | GYPSUM/VGD | Central | UNITS | Fan/Hood | | Porch | | No. of Cars | | None | [U] |
| Bath Floor | MARBLE/VGD | Other | N/A | Microwave | [X] | Terrace | | Parking Space No. N/A | | Unknown | [W] |
| Bath Wainscot | MARBLE/VGD | Condition | AVG | Washer/Dryer | | | | Assigned/Owned N/A | | | [N] |

Condition of the unit, depreciation, repairs needed, quality of construction, remodeling/modernization, additional features (special energy efficient items, etc.): THE SUBJECT IS PHYSICALLY AND FUNCTIONALLY ADEQUATE 'AS IS,'. NO MAJOR REPAIRS OR MODERNIZATION ARE NECESSARY. THE SUBJECT IS IN VERY GOOD CONDITION OVERALL WITH RENOVATED KITCHEN AND BATHS.

## COMMENTS

Adverse environmental conditions (such as, but not limited to, hazardous wastes, toxic substances, etc.) present on the site, in the project improvements, in the unit, or in the immediate vicinity of the subject property: NONE NOTED.

Fannie Mae Form 1075 July 86

CONFIDENTIAL
DEVINE00001

MITCHELL, MAXWELL & JACKSON, INC.

# Individual Cooperative Interest Appraisal Report

MULLINIX v. BOGORAD

File No. P601535

| | | |
|---|---|---|
| The number of shares attributable to the unit | 610 | Monthly Maintenance Fee (or Monthly Assessment) $ | 1,859.73 |
| Monthly Maintenance Fee (or Monthly Assessment Unit Charge) $ | 1,859.73 per mo. x 12 = $ | 22,317 per yr. |
| Annual Maintenance Fee (or assessment charge) divided by the square feet of gross living area for the subject unit = $ | | 13.14 |

Note the *pro rata* share of the project blanket financing that is attributable to the unit: N/A

Note the *pro rata* share of each lien that is attributable to the unit: N/A

Compared to other competitive projects of similar quality and design, the subject unit charge appears: ☐ High ☒ Typical ☐ Low

Comment on compatibility to other projects in the market area:  TYPICAL FOR THE MARKET.

**PROJECT ANALYSIS**

Utilities included in unit charge: ☐ None ☒ Heat ☐ Air Conditioning ☐ Electricity ☐ Gas ☒ Water ☒ Sewer

Comment on compatibility to other projects in the market area:  TYPICAL FOR MARKET

Note any fees, other than regular monthly maintenance fees (or monthly assessments, such as special assessments, etc.), for use of facilities and comment on compatibility to other projects in the market area:  NONE NOTED.

Is the project subject to ground rent? ☐ Yes ☒ No  If yes, $ _____ N/A per year and describe terms: _____

INSIGNIA RESIDENTIAL GROUP    (212) 350-2821

Cooperative Project Management: ☒ Management Agent (Identify)  # SEE ABOVE    ☐ Sponsor/Developer    ☐ Cooperative Board

Quality of management and its enforcement of Rules and Regulations based on general appearance of project appears: ☒ Adequate ☐ Inadequate

Information known to the appraiser about the project that would affect marketability (if none, so state):  NONE KNOWN

**DATA SOURCE**

THE APPRAISER'S DATA SOURCE(S) FOR THE FOLLOWING COOPERATIVE PROJECT INFORMATION IS THE: ☒ MANAGEMENT AGENT, ☐ COOPERATIVE BOARD, ☐ SPONSOR/DEVELOPER, AND/OR ☒ OTHER (DESCRIBE)  COOPERATIVE DATA CORP

IDENTIFY THE DATA SOURCE(S) BELOW BY NAME, TITLE, COMPANY, ADDRESS AND TELEPHONE NUMBER:

INSIGNIA RESIDENTIAL GROUP    (212) 350-2821

COOPERATIVE DATA CORP    (212) 843-0777

**COOPERATIVE PROJECT INFORMATION**

Number of shares issued and outstanding for the Cooperative Corporation:  62,695

Is the Sponsor or Builder/Developer in Control of the Cooperative Corporation? ☐ Yes ☒ No

Is the Sponsor or Builder/Developer offering any types of sales or financing concessions (such as, a maintenance fee rebate or credit, etc.) with the transfer of units in the project? ☐ Yes ☒ No  If Yes, describe: N/A

Are any of the project facilities leased to or by the Cooperative Corporation? ☐ Yes ☒ No  If yes, describe which facilities and note any fees for their use: N/A.

Is the subject project the recipient of any tax abatements or exemptions? ☐ Yes ☒ No  If Yes, note their remaining term, provisions for escalation of real estate taxes, and dollar amount:  NONE NOTED

Are any of the units in the project subject to a stock transfer fee (such as, waiver of option fees, flip taxes, etc.)? ☐ Yes ☒ No  If Yes, describe: N/A

How many owners of units in the project are two or more months delinquent in the payment of their financial obligations to the Cooperative Corporation?  UNKNOWN

Does any single entity (including the same individual, investor group, partnership, or corporation, as well as the developer or sponsor) own more than 10% of the stock or shares in the Cooperative Corporation and the related occupancy rights? ☐ Yes ☒ No  If Yes, describe:  N/A

## PROJECT BLANKET FINANCING

| Lien Priority | FIRST | SECOND | OTHER ( N/A ) |
|---|---|---|---|
| Lien Type (Mortgage, Line of Credit, Wraparound, Etc.) | NO MORTGAGE | N/A | |
| Mortgage Balance | $ | $ | $ |
| Balloon Mortgage (Y/N) | | | |
| Remaining Term | | | |
| Monthly Payment | $ | $ | $ |
| Interest Rate | % | % | % |
| Fixed/Variable Rate | | | |
| Lienholder | | | |

## PROJECT OCCUPANCY STATUS

| Unit Ownership and Occupancy | # of Units | % of Project |
|---|---|---|
| Owner Occupied | 90 | 100.00 |
| Sponsor/Developer-Vacant | 0 | 0.00 |
| Sponsor/Developer-Tenant Occupied (Market Rent) | 0 | 0.00 |
| Sponsor/Developer-Tenant Occupied (Regulated Rent) | 0 | 0.00 |
| Investor-Vacant | 0 | 0.00 |
| Investor-Tenant Occupied (Market Rent) | 0 | 0.00 |
| Investor-Tenant Occupied (Regulated Rent) | 0 | 0.00 |
| Total | 90 | 100.00 |

CONFIDENTIAL
DEVINE00002

MITCHELL, MAXWELL & JACKSON, INC.

## Individual Cooperative Interest Appraisal Report

MULLINIX v. BOGORAD

File No. P601535

THE SALES PRICE REPORTED FOR THE SUBJECT PROPERTY AND THE COMPARABLE SALES IN THE SALES COMPARISON ANALYSIS ADJUSTMENT GRID SHOWN BELOW DO NOT INCLUDE THE PRO RATA SHARE OF THE BLANKET MORTGAGE(S) ON THE REAL ESTATE.

| ITEM | SUBJECT | COMPARABLE NO. 1 | | COMPARABLE NO. 2 | | COMPARABLE NO. 3 | |
|---|---|---|---|---|---|---|---|
| Address and Unit # | 1050 FIFTH AVENUE 15B | 1050 FIFTH AVENUE 5C | | 1050 FIFTH AVENUE 9/10A | | 45 EAST END AVENUE 14G/H | |
| Project Name | 1050 5TH AVE INC. | 1050 5TH AVE INC. | | 1050 5TH AVE INC. | | EAST END OWNERS | |
| Proximity to Subject | | SAME BUILDING | | SAME BUILDING | | .6 MILE | |
| Sales Price | $ N/A | $ 1,845,000 | | $ 1,695,000 | | $ 1,740,000 | |
| Price/Gross Liv. Area | $ 0.00 ☑ | $ 1,396.67 ☑ | | $ 1,471.35 ☑ | | $ 1,111.82 ☑ | |
| Data and/or Verification Sources | INSPECTION | LISTING AGT/BROKER | | LISTING AGT/BROKER | | INSPECTION/LISTING AGT | |
| VALUE ADJUSTMENTS | DESCRIPTION | DESCRIPTION | + (-) $ Adjustment | DESCRIPTION | + (-) $ Adjustment | DESCRIPTION | + (-) $ Adjustment |
| Sales or Financing Concessions | | NONE KNOWN | | NONE KNOWN | | NONE KNOWN | |
| Date of Sale/Time | | 12/05 Clsd | NO ADJ | 11/05 Clsd | NO ADJ | 11/05 CLSD | NO ADJ |
| Location | VERY GOOD | SIMILAR | | SIMILAR | | INF(10%) | 174,000 |
| View | GOOD | S INF (5%) | 92,250 | SIMILAR | | SIMILAR | |
| Floor Location | 15 FL | 5 FL | +90,000 | 9/10 FL | +40,000 | 14 FL | +10,000 |
| Monthly Assessment | 1,859.73 | 1,391.00 | NO ADJ | 1,319.00 | NO ADJ | 2,145.76 | +21,500 |
| Project Amenities (Rec. Facilities, etc.) | TYPICAL | TYPICAL | | TYPICAL | | TYPICAL | |
| Project Security Features | DOORMAN | DOORMAN | | DOORMAN | | DOORMAN | |
| Design and Appeal | POSTWAR/AVG | POSTWAR/AVG | | POSTWAR/AVG | | POSTWAR/AVG | |
| Age | 1960 | 1960 | | 1960 | | 1951 | NO ADJ |
| Condition | VERY GOOD | SIMILAR | | INF(10%) | 169,500 | SIMILAR | |
| Remodeling (Kitchen, Baths, etc.) | RBNO KITCHEN/ BATHS | SIM KITCHEN/ BATHS | | INF KITCHEN/ BATHS | +75,000 | SIM KITCHEN/ BATHS | |
| Above Grade Room Count and Gross Living Area | Total 5.5  Bdrms 2.0  Baths 2.0  1698+/- Sq.Ft. | Total 4.0  Bdrms 2.0  Baths 2.0  1321+/- Sq.Ft. | NO ADJ 226,200 | Total 5.0  Bdrms 2.0  Baths 2.5  1152+/- Sq.Ft. | -25,000 327,600 | Total 6.0  Bdrms 2.0  Baths 3.0  1565+/- Sq.Ft. | -50,000 79,800 |
| Below Grade | NONE | NONE | | NONE | | NONE | |
| Functional Utility | SIMPLEX/GOOD | SIMPLEX/GOOD | | DUPLEX/GOOD | NO ADJ | SIMPLEX/GOOD | |
| Heating/Cooling | STEAM/UNITS | SIMILAR | | SIMILAR | | SIMILAR | |
| Energy Efficient Items | PER CODE | PER CODE | | PER CODE | | PER CODE | |
| Car Storage | NONE | NONE | | NONE | | NONE | |
| Balcony, Patio, Fireplace(s), etc. | NONE NONE | NONE NONE | | NONE NONE | | NONE NONE | |
| Net Adj. (total) | | ☒ + ☐ - $ | 408,450 | ☒ + ☐ - $ | 587,100 | ☒ + ☐ - $ | 235,300 |
| Adjusted Sales Price of Comparable | | $ | 2,253,450 | $ | 2,282,100 | $ | 1,975,300 |

Comments on Sales Comparison (including the subject property's compatibility to other cooperative units in the neighborhood, etc.): SEE ADDENDUM AND ADDITIONAL COMPARABLE(S).

| ITEM | SUBJECT | COMPARABLE NO. 1 | COMPARABLE NO. 2 | COMPARABLE NO. 3 |
|---|---|---|---|---|
| Date, Price and Data Source for prior sales within year of appraisal | NONE NOTED IN THREE YEARS MGT AGENT | NONE NOTED IN THREE YEARS MGT AGENT | NONE NOTED IN THREE YEARS MGT AGENT | NONE NOTED IN THREE YEARS MGT AGENT |

Analysis of any current agreement of sale, option, or listing of the subject property and analysis of any prior sales of subject and comparables within one year of the date of appraisal: No listing, agreement, or option was revealed on the subject property during the investigation.

INDICATED VALUE BY SALES COMPARISON APPROACH .................................................................. $ 2,100,000
INDICATED VALUE BY INCOME APPROACH (Attach, if applicable) ............................................... $ N/A
INDICATED VALUE BY COST APPROACH (Attach, if applicable) .................................................. $ N/A
This appraisal is made ☒ "as is" ☐ subject to the repairs, alterations, inspections, or conditions listed below ☐ subject to completion per plans and specifications.
Conditions of Appraisal: THIS APPRAISAL IS MADE 'AS IS' AND IS INTENDED FOR MATRIMONIAL PURPOSES ONLY.

Final Reconciliation: SEE ATTACHED ADDENDUM.

The purpose of this appraisal is to estimate the market value of the cooperative interest that is the subject of this report (which is the equity interest in the cooperative shares exclusive of the project's blanket financing), based on the above conditions and the certification, contingent and limiting conditions, and market value definition that are stated in the attached Freddie Mac Form 439/Fannie Mae Form 1004B (Revised _____ 06/93 _____ ).
I (WE) ESTIMATE THE MARKET VALUE, AS DEFINED, OF THE COOPERATIVE INTEREST (THE COOPERATIVE SHARES OR OTHER EVIDENCE OF AN OWNERSHIP INTEREST IN THE COOPERATIVE CORPORATION AND THE ACCOMPANYING OCCUPANCY RIGHTS) THAT IS THE SUBJECT OF THIS REPORT, AS OF ___ 03/31/2006 ___ (WHICH IS THE DATE OF INSPECTION AND THE EFFECTIVE DATE OF THIS REPORT) TO BE $ ___ 2,100,000 ___ I (WE) CERTIFY THAT THE PRO RATA SHARE OF THE BLANKET MORTGAGE(S) ON THE REAL ESTATE HAS NOT BEEN ADDED TO THE MARKET VALUE ESTIMATE OF THE COOPERATIVE INTEREST.

APPRAISER:
Signature _____
Name CHRISTOPHER DEVINE
Date Report Signed 04/06/2006
State Certification # 45-39270
Or State License #                    State NY

SUPERVISORY APPRAISER (ONLY IF REQUIRED):
Signature _____
Name STEVEN KNOBEL
Date Report Signed 04/06/2006
State Certification # 45-38006
Or State License #                    State NY

☐ Did ☒ Did Not
Inspect Property

PAGE 3 OF 3
Produced using ACI software, 800.234.8727 www.aciweb.com

MITCHELL, MAXWELL & JACKSON INC.

Fannie Mae Form 1075   July 96

CONFIDENTIAL
DEVINE00003

MITCHELL, MAXWELL & JACKSON, INC.

# Individual Cooperative Interest Appraisal Report

MULLINIX v. BOGORAD

File No. P601535

THE SALES PRICE REPORTED FOR THE SUBJECT PROPERTY AND THE COMPARABLE SALES IN THE SALES COMPARISON ANALYSIS ADJUSTMENT GRID SHOWN BELOW DO NOT INCLUDE THE PRO RATA SHARE OF THE BLANKET MORTGAGE(S) ON THE REAL ESTATE.

| ITEM | SUBJECT | COMPARABLE NO. 4 | | COMPARABLE NO. 5 | | COMPARABLE NO. 6 | |
|---|---|---|---|---|---|---|---|
| Address and Unit # | 1050 FIFTH AVENUE 15B | 870 FIFTH AVENUE 6F | | 1050 FIFTH AVENUE 8C | | NOT USED | |
| Project Name | 1050 5TH AVE INC. | 870 FIFTH AVE CORP | | 1050 5TH AVE INC. | | | |
| Proximity to Subject | | .8 MILE | | SAME BUILDING | | | |
| Sales Price | $ N/A | $ 2,100,000 | | $ 1,699,000 | | $ | |
| Price/Gross Liv. Area | $ 0.00 ☑ | $ 1,574.21 ☑ | | $ 1,286.15 ☑ | | $ ☑ | |
| Data and/or Verification Sources | INSPECTION | LISTING AGT/BROKER | | LISTING BROKER | | | |
| VALUE ADJUSTMENTS | DESCRIPTION | DESCRIPTION | + (-) $ Adjustment | DESCRIPTION | + (-) $ Adjustment | DESCRIPTION | + (-) $ Adjustment |
| Sales or Financing Concessions | | NONE KNOWN | | NONE KNOWN | | | |
| Date of Sale/Time | | 07/05 Clsd 2% | 42,000 | 02/06 Listing 5% | -84,950 | | |
| Location | VERY GOOD | SUP(10%) | -210,000 | SIMILAR | | | |
| View | GOOD | S INF (5%) | 105,000 | S INF (5%) | 84,950 | | |
| Floor Location | 15 FL | 6 FL | | 8 FL | | | |
| Monthly Assessment | 1,859.73 | 2,029.00 | +80,000 | 1,441.00 | +60,000 | | |
| Project Amenities (Rec. Facilities, etc.) | TYPICAL | TYPICAL | +28,400 | NO ADJ | | | |
| Project Security Features | | | | TYPICAL | | | |
| Design and Appeal | DOORMAN | DOORMAN | | DOORMAN | | | |
| Age | POSTWAR/AVG 1960 | POSTWAR/AVG 1949 | NO ADJ | POSTWAR/AVG 1960 | | | |
| Condition | VERY GOOD | SIMILAR | | S INF(5%) | 84,950 | | |
| Remodeling (Kitchen, Baths, etc.) | RENO KITCHEN/ BATHS | SIM KITCHEN/ BATHS | | INF KITCHEN/ BATHS | +75,000 | | |
| Room Count and Gross Living Area | Total 5.5 Bdrms 2.0 Baths 2.0 / 1698+/- Sq.Ft. | Total 5.0 Bdrms 2.0 Baths 2.0 / 1334+/- Sq.Ft. | NO ADJ 218,400 | Total 4 Bdrms 2 Baths 2.0 / 1321+/- Sq.Ft. | NO ADJ 226,200 | Total Bdrms Baths / Sq.Ft. | |
| Below Grade | NONE | NONE | | NONE | | | 0 |
| Functional Utility | SIMPLEX/GOOD | SIMPLEX/GOOD | | SIMPLEX/GOOD | | | |
| Heating/Cooling | STEAM/UNITS | SIMILAR | | SIMILAR | | | |
| Energy Efficient Items | PER CODE | PER CODE | | PER CODE | | | |
| Car Storage | NONE | NONE | | NONE | | | |
| Balcony, Patio, Fireplace(s), etc. | NONE | NONE | | NONE | | | |
| Net Adj. (total) | | ☑ + ☐ - $ 263,800 | | ☑ + ☐ - $ 446,150 | | ☑ + ☐ - $ | 0 |
| Adjusted Sales Price of Comparable | | $ 2,363,800 | | $ 2,145,150 | | $ | 0 |

Comments on Sales Comparison (including the subject property's compatibility to other cooperative units in the neighborhood, etc.): THE ABOVE WERE PROVIDED AS ADDITIONAL SUPPORT FOR THE FINAL VALUE ESTIMATE DERIVED EARLIER IN THIS REPORT.

| ITEM | SUBJECT | COMPARABLE NO. 4 | COMPARABLE NO. 5 | COMPARABLE NO. 6 |
|---|---|---|---|---|
| Date, Price and Data Source for prior sales within year of appraisal | NONE NOTED IN THREE YEARS MGT AGENT | NONE NOTED IN THREE YEARS MGT AGENT | NONE NOTED IN THREE YEARS MGT AGENT | |

Analysis of any current agreement of sale, option, or listing of the subject property and analysis of any prior sales of subject and comparables within one year of the date of appraisal:

Produced using ACI software, 800.234.8727 www.aciweb.com

Fannie Mae Form 1075  July 96

CONFIDENTIAL
DEVINE00004

MITCHELL, MAXWELL & JACKSON, INC.

MULLINIX v. BOGORAD

## Request For Cooperative Project Information

File No. P601535

To:
Address:
Individual Loan Information is as follows:
Borrower(s) Name:  N/A
Cooperative Project Name:  1050 5TH AVE INC.
Property Address and Unit #:  1050 FIFTH AVENUE

This form was developed to facilitate the collection of cooperative project information for appraisers and lenders by standardizing the reporting format because the availability of financing often depends on the management agent's, the cooperative board's, or the project sponsor's/developer's willingness to provide requested information (for underwriting consideration) in a timely manner.  Either the management agent, the cooperative board, or the project sponsor/developer can complete this form.

Please complete this form by answering all questions or by indicating "Unknown" or "N/A" (Not Applicable).  Do not limit your responses to the spaces provided; attach an addendum, if necessary.  If you have any questions or need any assistance, please contact the requestor indicated below.  This form includes the Cooperative Project information that most lenders, investors, and mortgage insurers require for evaluating project eligibility.  We appreciate your cooperation in providing the requested information.

Requestor (Signature):
Name:
Title:
Company Name:
Address:
Telephone Number:

How many units in the project have been sold within the last year? _____    Attach list of comparable sales for the subject unit indicating, at least, the following:  Address, Number of Shares, Contract Date, Closing or Settlement Date, Seller, Lender, Size, Condition, and Monthly Maintenance Fees.

Does the cooperative project include or own any commercial units?  [X] Yes  [ ] No   If Yes, describe units  1 GARAGE.

Number of shares issued and outstanding for the Cooperative Corporation:  62,695

Is the Sponsor or Builder/Developer in Control of the Cooperative Corporation?  [ ] Yes  [X] No

Is the Sponsor or Builder/Developer offering any types of sales or financing concessions (such as, a maintenance fee rebate or credit, etc.) with the transfer of units in the project?  [ ] Yes  [X] No   If Yes, describe:  N/A

Are any of the project facilities leased to or by the Cooperative Corporation?  [ ] Yes  [X] No   If yes, describe which facilities and note any fees for their use:
N/A.

Is the subject project the recipient of any tax abatements or exemptions?  [ ] Yes  [X] No   If Yes, note their remaining term, provisions for escalation of real estate taxes, and dollar amount:  NONE NOTED

Are any of the units in the project subject to a stock transfer fee (such as, waiver of option fees, flip taxes, etc.)?  [ ] Yes  [X] No   If Yes, describe:
N/A

How many owners of units in the project are two or more months delinquent in the payment of their financial obligations to the Cooperative Corporation?  UNKNOWN

Does any single entity (including the same individual, investor group, partnership, or corporation, as well as the developer or sponsor) own more than 10% of the stock or shares in the Cooperative Corporation and the related occupancy rights?  [ ] Yes  [X] No   If Yes, describe:  N/A

### PROJECT BLANKET FINANCING

| | FIRST | SECOND | OTHER (N/A_____) |
|---|---|---|---|
| Lien Priority | | | |
| Lien Type (Mortgage, Line of Credit, Wraparound, Etc.) | NO MORTGAGE | N/A | |
| Mortgage Balance | $ | $ | $ |
| Balloon Mortgage (Y/N) | | | |
| Remaining Term | | | |
| Monthly Payment | $ | $ | $ |
| Interest Rate | % | % | % |
| Fixed/Variable Rate | | | |
| Lienholder | | | |

### PROJECT OCCUPANCY STATUS

| Unit Ownership and Occupancy | # of Units | % of Project |
|---|---|---|
| Owner Occupied | 90 | 100.00 |
| Sponsor/Developer-Vacant | 0 | 0.00 |
| Sponsor/Developer-Tenant Occupied (Market Rent) | 0 | 0.00 |
| Sponsor/Developer-Tenant Occupied (Regulated Rent) | 0 | 0.00 |
| Investor-Vacant | 0 | 0.00 |
| Investor-Tenant Occupied (Market Rent) | 0 | 0.00 |
| Investor-Tenant Occupied (Regulated Rent) | 0 | 0.00 |
| Total | 90 | 100.00 |

I, THE UNDERSIGNED, AS AN AUTHORIZED REPRESENTATIVE OF THE (INDICATE ONE):  [ ] MANAGEMENT AGENT,  [ ] COOPERATIVE BOARD,  [ ] SPONSOR/DEVELOPER, OR  [ ] OTHER (DESCRIBE) _____, CERTIFY THAT TO THE BEST OF MY KNOWLEDGE AND BELIEF THE ABOVE INFORMATION AND STATEMENTS ON THIS FORM (AND THE ATTACHMENTS, IF APPLICABLE) ARE TRUE AND CORRECT.

Signature of Authorized Representative
Name of Authorized Representative
Name of Organization
Address
Telephone Number
Date

MITCHELL, MAXWELL & JACKSON INC.

CONFIDENTIAL
DEVINE00005

## ADDENDUM

| Borrower: N/A | | File No.: P601535 | |
| Property Address: 1050 FIFTH AVENUE | | Case No.: MULLINIX v. BOGORAD-GROSS | |
| City: NEW YORK | | State: NY | Zip: 10028 |
| Lender: SULLIVAN & WORCESTER LLP | | | |

**HISTORICAL BACKGROUND:**

THE MID 1980'S SAW A MASSIVE INCREASE IN HOUSING SUPPLY DRIVEN BY A STRONG ECONOMY AND GENEROUS TAX INCENTIVES. THE END OF THE DECADE BROUGHT CHANGES IN THE TAX LAWS AFFECTING REAL ESTATE INVESTMENTS, THE STOCK MARKET CRASH IN 1987, THE GULF WAR AND A WEAKENING OF THE ECONOMY. THE COMBINATION OF THESE FACTORS CAUSED MARKET WIDE RECESSION AND A PERIOD OF DECLINING VALUES. FROM 1988 TP 1992 THE REAL ESTATE MARKET WENT THROUGH A RE-ADJUSTMENT. NEW CONSTRUCTION NEARLY DISAPPEARED AND VALUES DECLINED 10 -20% PER ANNUM WHILE THE MARKET STRUGGLED TO FIND EQUILIBRIUM.

DECLINING INTEREST RATES, A LACK OF NEW INVENTORY AND THE GENERAL RECOVERY OF THE LOCAL AND NATIONAL ECONOMIES STABILIZED THE MARKET BETWEEN 1993 AND 1994. GENERAL MARKET CONDITIONS STEADILY IMPROVED UNTIL MID 1998 WITH VARIOUS SUB-SECTORS OF THE HOUSING MARKET RECOVERING IN WAVES. THE EPICENTER OF THE RECOVERY WAS THE ARCHITECTURALLY APPEALING, OWNER OCCUPIED, FAMILY SIZED APARTMENTS IN PRIME LOCATIONS. A MITCHELL, MAXWELL & JACKSON, INC. STUDY OF OVER 1000 RE-SALES BETWEEN 1990 AND MID 1998 INDICATES THAT THE RATE OF APPRECIATION DURING THIS PERIOD WAS BETWEEN 5% AND 25% PER ANNUM. BY THE END OF THIS PERIOD RECOVERY REACHED NEARLY ALL PROPERTY TYPES AND LOCATIONS IN THE BOROUGH OF MANHATTAN SOUTH OF 96-125 STREETS. DURING THIS ERA MARKETING TIME DECLINED TO BETWEEN 1 AND 3 MONTHS AND SHORTAGES OF INVENTORY WERE NOTED. SALES ACTIVITY WAS AT OR ABOVE ITS HIGHEST LEVEL SINCE THE MID 1980'S AND THE AVERAGE PRICE OF A NEW YORK APARTMENT BROKE THROUGH THE 1980'S HIGH AVERAGE. THE RELATIVELY FEW NEW CONSTRUCTION OWNER OCCUPIED RESIDENTIAL PROJECTS INITIATED FROM 1993 TO MID 1998 WERE VERY SUCCESSFUL AND MANY SOLD OUT WELL AHEAD OF EXPECTATIONS.

FROM 1994 TO MID 1998 PROPERTY VALUES INCREASED CITYWIDE DRIVEN BY IMPROVING ECONOMIC CONDITIONS. INCREASES IN RESIDENTIAL REAL ESTATE VALUES WERE 10 - 20% PER YEAR DURING THIS PERIOD OF GROWTH. GLOBAL CREDIT SHORTAGES DEVELOPED IN THE THIRD QUARTER OF 1998 AND THE MARKET LEVELED OFF. THE FEDERAL RESERVE BANK MADE INTEREST RATE REDUCTIONS IN THE FALL OF 1998 WHICH RESTARTED THE CAPITAL FLOW. THE CAPITAL AND REAL ESTATE MARKETS REACTED ACCORDINGLY IN THE FOURTH QUARTER OF 1998 AND PRICE APPRECIATION RESUMED AND SPREAD TO ALL AREAS OF MANHATTAN AND THE SURROUNDING SUB-MARKETS. BASED ON PAIRED SALES UTILIZED TO DEVELOP THE MMJ RE-SALE INDICES, MARKET APPRECIATION WAS 6 - 20% PER ANNUM (DEPENDING ON THE SUB-MARKET) DURING THIS TIME.

1999 STARTED OFF QUIET IN ANTICIPATION OF POSSIBLE FALLOUT FROM THE INTERNATIONAL CREDIT CRISIS. THE CONCERN PROVED UNFOUNDED AS CONSUMER CONFIDENCE RETURNED AND THE RESIDENTIAL MARKET RESUMED A STEADY CLIMB FINISHING OUT THE YEAR UP 25%.

THE FIRST 6 MONTHS OF 2000 ACCELERATED THE RISE IN PRICES WITH A RECORD SETTING GAIN OF 20% POSTED BY MID-YEAR. TIME ON THE MARKET WAS DRAMATICALLY REDUCED AND A HIGH PERCENTAGE OF PROPERTIES SOLD AT FULL ASKING PRICE WITH BIDDING WARS BECOMING COMMONPLACE PUSHING SALE PRICES EVEN HIGHER. AVAILABLE INVENTORY OF PROPERTIES ON THE MARKET EVAPORATED AND DECLINING INTEREST RATES FUELED SALES IN EVERY PRICE SEGMENT FOR THE REMAINDER OF THE YEAR.

WHILE THE IMMEDIATE IMPACT FOLLOWING 9-11-01 RESULTED IN A DRAMATIC DROP IN SALES VOLUME AND A MODERATE DECLINE IN PRICING, THE MARKET RECOVERED BY THE 2ND QUARTER OF 2002, SURPASSING PRE 9-11 LEVELS BY MID YEAR. OCCUPIED HOUSING STOCK IN THE AREA REMAINED RELATIVELY INTACT WITH ENVIRONMENTAL ISSUES AND PROXIMITY TO THE WTC SITE NOW FACTORS EFFECTING VALUE.

BUYER CONFIDENCE RETURNED BY MID 2002, SUPPORTED BY CONTINUALLY DROPPING INTEREST RATES THAT KEPT THE ENTIRE RESIDENTIAL MARKET MOVING. SALES VOLUME INCREASED BY 9% OVER 2001 WHILE PRICES GRADUALLY BEGAN RECOVER TO PRE 9-11 LEVELS

**CURRENT MARKET EVENTS:**

SALES VOLUME FOR THE FIRST HALF OF 2003 INCREASED, FUELED BY HISTORICALLY LOW INTEREST RATES THAT BOTTOMED OUT IN JULY. AVERAGE SALE PRICES ROSE DURING THE SAME PERIOD AND BIDDING WARS BECAME MORE FREQUENT ALTHOUGH AVAILABLE INVENTORY LEVELS REMAINED RELATIVELY UNCHANGED. INTEREST RATES BEGAN TO CREEP UP DURING THE SECOND HALF OF 2003 WHICH SLOWED PURCHASE VOLUME AS PRICES LEVELED OFF AND FEWER PROPERTIES CAME ONTO THE MARKET. BY SEPTEMBER, INTEREST RATES BEGAN TO DECLINE, REMAINING BELOW 6% FOR THE REMAINDER OF THE YEAR. BY MID NOVEMBER, SALES VOLUME BEGAN TO INCREASE, TIME ON THE MARKET DROPPED FROM 3-6 MONTHS TO 1-3 MONTHS AND BIDDING WARS BECAME MORE COMMON WITH ALMOST 50% FEWER PROPERTIES ON THE MARKET COMPARED TO YEAR END 2002. THESE FACTORS INDICATE A GENERALLY STABLE MARKET FOR THE FORESEEABLE FUTURE, LARGELY DETERMINED BY THE RELATIVELY MARGINAL CHANGES IN INTEREST RATES SEEN FROM SEPTEMBER 2003 THROUGH JANUARY 2004.

CONFIDENTIAL
DEVINE00006

## ADDENDUM

| | |
|---|---|
| Borrower: N/A | File No.: P601535 |
| Property Address: 1050 FIFTH AVENUE | Case No.: MULLINIX v. BOGORAD-GROSS |
| City: NEW YORK | State: NY | Zip: 10028 |
| Lender: SULLIVAN & WORCESTER LLP | |

**SUBJECT DESCRIPTION:**

THE SUBJECT IS A 5.5 ROOM, 2 BEDROOM APARTMENT LOCATED AT 1050 FIFTH AVENUE. THIS PROJECT IS A FULL SERVICE POSTWAR COOPERATIVE BUILDING SITUATED AT THE NORTHEAST CORNER OF EAST 86TH STREET AND FIFTH AVENUE IN MANHATTAN'S UPPER EAST SIDE NEIGHBORHOOD. AT THE TIME OF THE INSPECTION THE UNIT WAS FOUND TO BE IN VERY GOOD CONDITION WITH RENOVATED KITCHEN AND BATHS.

**COMMENTS ON SALES COMPARISON APPROACH:**

COMPARABLES #1 AND #2 ARE THE TWO MOST RECENT, SIMILAR SALES IN THE SUBJECT PROJECT. THESE SOMEWHAT SMALLER TWO BEDROOM UNITS WERE REPORTED TO BE IN SIMILAR/INFERIOR CONDITION RESPECTIVELY. THE FIRST SALE, LOCATED ON THE FIFTH FLOOR OF THE PROJECT IS REPORTED TO HAVE SLIGHTLY INFERIOR LIGHT/VIEWS. BOTH UNITS WERE ADJUSTED FOR THEIR INFERIOR FLOOR LEVEL(S).

COMPARABLE #3 IS A RECENT SALE FROM A NEARBY COMPETING PROPERTY. THIS PROJECT IS LOCATED ON EAST END AVENUE, FAR FROM CENTRAL PARK AND THE LEXINGTON AVENUE TRANSPORTATION CORRIDOR. THIS LOCATION IS RATED INFERIOR TO FIFTH AVENUE. THE UNIT WAS INSPECTED BY AN MMJ APPRAISER WHO FOUND IT TO BE IN SIMILAR CONDITION OVERALL WITH SIMILAR VIEWS. DUE TO THE FINANCIAL STRUCTURE OF THIS COOPERATIVE, THIS UNIT HAS AN INFERIOR MONTHLY MAINTENANCE CHARGE. ACCORDINGLY, AN ADJUSTMENT WAS PROCESSED BY MULTIPLYING THE WEIGHTED DIFFERENCE OF THE MONTHLY CHARGES BY A FACTOR OF $50.

COMPARABLE #4 WAS SELECTED FROM A COMPETING PROJECT LOCATED ON LOWER FIFTH AVENUE CLOSER TO MIDTOWN WITH ITS SIGNATURE SHOPPING, RESTAURANTS AND CENTRAL BUSINESS DISTRICT. THE LOCATION IS RATED SUPERIOR. THIS SMALLER TWO BEDROOM UNIT WAS REPORTED TO BE IN SIMILAR CONDITION OVERALL WITH SLIGHTLY INFERIOR LIGHT/VIEWS FROM THE SIXTH FLOOR OF ITS PROJECT. DUE TO THE FINANCIAL STRUCTURE OF THIS COOPERATIVE, THIS UNIT HAS AN INFERIOR MONTHLY MAINTENANCE CHARGE. ACCORDINGLY, AN ADJUSTMENT WAS PROCESSED BY MULTIPLYING THE WEIGHTED DIFFERENCE OF THE MONTHLY CHARGES BY A FACTOR OF $50.

THE FIFTH COMPARABLE IS A CURRENT LISTING FROM THE SUBJECT PROJECT OF UNIT #8C FOR $1,699,000. THIS UNIT WITH SLIGHTLY INFERIOR VIEWS WAS REPORTED TO BE IN SLIGHTLY INFERIOR CONDITION AND WAS ADJUSTED BY 5% FOR NEGOTIABILITY.

COMP #4 WAS ADJUSTED FOR TIME AT THE RATE OF 2% (POSITIVE) FROM ITS CLOSING DATE TO THE FOURTH QUARTER 2005 WHEN THE MARKET WAS FOUND TO HAVE LEVELED OFF. SEE WWW.MMJA.COM FOR FURTHER SUPPORT.

**FINAL RECONCILIATION:**

ALL 3 CLASSIC APPROACHES TO VALUE WERE CONSIDERED IN THIS ANALYSIS. THE SALES COMPARISON APPROACH IS DEEMED MOST APPLICABLE FOR THE SUBJECT PROPERTY. THE FINAL VALUE ESTIMATE IS $2,100,000. ESTIMATED MARKETING/EXPOSURE TIME IS 1-3 MONTHS.

**SUPPLEMENTAL CERTIFICATION:**

THIS IS A SUMMARY APPRAISAL REPORT WHICH IS INTENDED TO COMPLY WITH THE REPORTING REQUIREMENTS SET FORTH UNDER STANDARDS RULE 2-2(b) OF THE UNIFORM STANDARDS OF PROFESSIONAL PRACTICE FOR A SUMMARY APPRAISAL REPORT. AS SUCH, IT PRESENTS ONLY SUMMARY DISCUSSIONS OF THE DATA, REASONING, AND ANALYSES THAT WERE USED IN THE APPRAISAL PROCESS TO DEVELOP THE APPRAISER'S OPINION OF VALUE. SUPPORTING DOCUMENTATION CONCERNING THE DATA, REASONING AND ANALYSIS IS RETAINED IN THE APPRAISER'S FILE. THE DEPTH OF DISCUSSION CONTAINED IN THIS REPORT IS SPECIFIC TO THE NEEDS OF THE CLIENT AND FOR THEIR SPECIFIED USE. THE APPRAISER IS NOT RESPONSIBLE FOR UNAUTHORIZED USE OF THIS REPORT.

DUE TO THE PROXIMITY OF ADJACENT PROPERTIES A REAR PHOTOGRAPH WAS NOT AVAILABLE.

MOST BUILDINGS DO NOT CONTAIN A 13TH FLOOR. WHERE APPLICABLE, THE FLOOR ADJUSTMENT REFLECTS THIS SITUATION.

THIS APPRAISAL WAS COMPLETED IN CONFORMANCE WITH TITLE XI OF THE FEDERAL FINANCIAL INSTITUTION REFORM, RECOVERY AND ENFORCEMENT ACT OF 1989 (FIRREA) AND THE UNIFORM STANDARDS OF PROFESSIONAL PRACTICE (USPAP).

THE OBJECTIVE OF THIS APPRAISAL IS TO ESTIMATE THE FAIR MARKET VALUE OF THE SUBJECT PROPERTY AS OF THE DATE SPECIFIED IN THE REPORT. THE PURPOSE OF THIS REPORT IS TO PRESENT THE DATA AND REASONING THAT THE APPRAISER HAS USED TO FORM THE OPINION OF VALUE. THE SCOPE OF THE APPRAISAL INCLUDES A THOROUGH SEARCH OF ALL AVAILABLE AND APPLICABLE PUBLIC AND PRIVATE DATA SOURCES, A PHYSICAL INSPECTION OF THE SUBJECT PROPERTY AND SURROUNDING AREA AND ALL OTHER REQUIREMENTS UNDER THE UNIFORM STANDARDS OF PROFESSIONAL APPRAISAL PRACTICE (USPAP).

DUE TO THE FINANCIAL NATURE OF COOPERATIVES IT IS HIGHLY RECOMMENDED THAT THE CORPORATION BE REVIEWED BY APPROPRIATE LEGAL COUNSEL.

MANHATTAN DOES NOT HAVE A TRADITIONAL MULTIPLE LISTING SYSTEM AND SALES/CONTRACTS ARE NOT READILY AVAILABLE. THE VAST MAJORITY OF THE HOUSING STOCK IS COOPERATIVELY OWNED. THESE COOPERATIVE BUILDING CORPORATIONS ARE PRIVATELY HELD ENTITIES AND AS SUCH, SALES OF STOCK IN THESE CORPORATIONS ARE NOT A MATTER OF PUBLIC RECORD. SINCE SALES INFORMATION IS NOT AVAILABLE THROUGH MLS OR PUBLIC RECORD, THE APPRAISER IS NOT ABLE TO REVIEW ALL COOPERATIVE APARTMENT TRANSACTIONS. TYPICAL DATA SOURCES UTILIZED

CONFIDENTIAL
DEVINE00007

**ADDENDUM**

| | |
|---|---|
| Borrower: N/A | |
| Property Address: 1050 FIFTH AVENUE | File No.: P601635 |
| City: NEW YORK | Case No.: MULLINIX v. BOGORAD-GROSS |
| | State: NY    Zip: 10028 |
| Lender: SULLIVAN & WORCESTER LLP | |

INCLUDE MANAGING AGENTS, LENDERS, SPONSORS, COOPERATIVE BOARDS, PROJECT ATTORNEYS OR ACCOUNTANTS, THE NEW YORK TIMES RESIDENTIAL RE-SALES, REAL ESTATE BROKERS (WHEN CONFIRMED WITH ANOTHER DISINTERESTED SOURCE), OUTSIDE APPRAISERS, SELLERS, BUYERS, AND OUR INSPECTIONS. LISTING INFORMATION IS OBTAINED FROM AREA BROKERS. VIRTUALLY ALL OF THE DATA IS OBTAINED ON A CONFIDENTIAL BASIS.

**COST APPROACH:**

THE COST APPROACH IS NOT CONSIDERED APPLICABLE FOR INDIVIDUAL UNITS WHICH ARE PART OF A MULTI-UNIT APARTMENT BUILDING. THEREFORE, THIS APPROACH HAS NOT BEEN UTILIZED IN THIS ANALYSIS.

**INCOME APPROACH:**

INDIVIDUAL COOP/CONDO UNITS ARE NOT TYPICALLY PURCHASED FOR THEIR INCOME POTENTIAL. RECORDS REGARDING INCOME/EXPENSES ON UNITS THAT HAVE BEEN PURCHASED FOR THIS REASON ARE NOT PUBLICLY MAINTAINED OR READILY AVAILABLE. THEREFORE, THE INCOME APPROACH WAS NOT CONSIDERED APPLICABLE OR PROCESSED IN THIS VALUATION.

CONFIDENTIAL
DEVINE00008

**FLOORPLAN**

| | |
|---|---|
| Borrower: N/A | File No.: P601535 |
| Property Address: 1050 FIFTH AVENUE | Case No.: MULLINIX v. BOGORAD-GROSS |
| City: NEW YORK | State: NY |
| Lender: SULLIVAN & WORCESTER LLP | Zip: 10028 |



CONFIDENTIAL
DEVINE00009

**LOCATION MAP**

| Borrower: N/A | | File No.: P601535 |
| Property Address: 1050 FIFTH AVENUE | | Case No.: MULLINIX v. BOGORAD-GROSS |
| City: NEW YORK | State: NY | Zip: 10028 |
| Lender: SULLIVAN & WORCESTER LLP | | |



CONFIDENTIAL
DEVINE00010

SUBJECT PROPERTY **PHOTO ADDENDUM**

| Borrower: N/A | | |
|---|---|---|
| Property Address: 1050 FIFTH AVENUE | File No.: P601535 | |
| City: NEW YORK | Case No.: MULLINIX v. BOGORAD-GROSS | |
| Lender: SULLIVAN & WORCESTER LLP | State: NY | Zip: 10028 |



**FRONT VIEW OF
SUBJECT PROPERTY**

Appraised Date: March 31, 2006
Appraised Value: $ 2,100,000



**REAR VIEW OF
SUBJECT PROPERTY**



**STREET SCENE**



CONFIDENTIAL
DEVINE00011

| Borrower: N/A | | File No.: P601535 |
|---|---|---|
| Property Address: 1050 FIFTH AVENUE | | Case No.: MULLINIX v. BOGORAD-GROSS |
| City: NEW YORK | State: NY | Zip: 10028 |
| Lender: SULLIVAN & WORCESTER LLP | | |



KITCHEN



BATHROOM



LIVING ROOM



CONFIDENTIAL
DEVINE00012

COMPARABLE PROPERTY PHOTO ADDENDUM

| | |
|---|---|
| Borrower: N/A | File No.: P601535 |
| Property Address: 1050 FIFTH AVENUE | Case No.: MULLINIX v. BOGORAD-GROSS |
| City: NEW YORK | State: NY    Zip: 10028 |
| Lender: SULLIVAN & WORCESTER LLP | |



**COMPARABLE SALE #1**

1050 FIFTH AVENUE
5C
Sale Date: 12/05 Clsd
Sale Price: $ 1,845,000



**COMPARABLE SALE #2**

1050 FIFTH AVENUE
9/10A
Sale Date: 11/05 Clsd
Sale Price: $ 1,695,000



**COMPARABLE SALE #3**

45 EAST END AVENUE, #NEW YORK, NY 10028
14G/H
Sale Date: 11/05 CLSD
Sale Price: $ 1,740,000



CONFIDENTIAL
DEVINE00013

**COMPARABLE PROPERTY PHOTO ADDENDUM**

| | |
|---|---|
| Borrower: N/A | File No.: P601535 |
| Property Address: 1050 FIFTH AVENUE | Case No.: MULLINIX v. BOGORAD-GROSS |
| City: NEW YORK | State: NY    Zip: 10028 |
| Lender: SULLIVAN & WORCESTER LLP | |



**COMPARABLE SALE #4**

870 FIFTH AVENUE
6F
Sale Date: 07/05 Clsd 2%
Sale Price: $ 2,100,000



**COMPARABLE SALE #5**

1050 FIFTH AVENUE
8C
Sale Date: 02/06 Listing 5%
Sale Price: $ 1,699,000



**COMPARABLE SALE #6**

NOT USED

Sale Date:
Sale Price: $



CONFIDENTIAL
DEVINE00014

MULLINIX v. BOGORAE
File No.  P601535

**DEFINITION OF MARKET VALUE:**   The most probable price which a property should bring in a competitive and open market under all conditions requisite to a fair sale, the buyer and seller, each acting prudently, knowledgeably and assuming the price is not affected by undue stimulus.  Implicit in this definition is the consummation of a sale as of a specified date and the passing of title from seller to buyer under conditions whereby: (1) buyer and seller are typically motivated; (2) both parties are well informed or well advised, and each acting in what he considers his own best interest; (3) a reasonable time is allowed for exposure in the open market; (4) payment is made in terms of cash in U.S. dollars or in terms of financial arrangements comparable thereto; and (5) the price represents the normal consideration for the property sold unaffected by special or creative financing or sales concessions* granted by anyone associated with the sale.

*Adjustments to the comparables must be made for special or creative financing or sales concessions.  No adjustments are necessary for those costs which are normally paid by sellers as a result of tradition or law in a market area; these costs are readily identifiable since the seller pays these costs in virtually all sales transactions.  Special or creative financing adjustments can be made to the comparable property by comparisons to financing terms offered by a third party institutional lender that is not already involved in the property or transaction.  Any adjustment should not be calculated on a mechanical dollar for dollar cost of the financing or concession but the dollar amount of any adjustment should approximate the market's reaction to the financing or concessions based on the Appraiser's judgment.

## STATEMENT OF LIMITING CONDITIONS AND APPRAISER'S CERTIFICATION

**CONTINGENT AND LIMITING CONDITIONS:**   The appraiser's certification that appears in the appraisal report is subject to the following conditions:

1.  The appraiser will not be responsible for matters of a legal nature that affect either the property being appraised or the title to it.  The appraiser assumes that the title is good and marketable and, therefore, will not render any opinions about the title.  The property is appraised on the basis of it being under responsible ownership.

2.  The appraiser has provided a sketch in the appraisal report to show approximate dimensions of the improvements and the sketch is included only to assist the reader of the report in visualizing the property and understanding the appraiser's determination of its size.

3.  The appraiser has examined the available flood maps that are provided by the Federal Emergency Management Agency (or other data sources) and has noted in the appraisal report whether the subject site is located in an identified Special Flood Hazard Area.  Because the appraiser is not a surveyor, he or she makes no guarantees, express or implied, regarding this determination.

4.  The appraiser will not give testimony or appear in court because he or she made an appraisal of the property in question, unless specific arrangements to do so have been made beforehand.

5.  The appraiser has estimated the value of the land in the cost approach at its highest and best use and the improvements at their contributory value.  These separate valuations of the land and improvements must not be used in conjunction with any other appraisal and are invalid if they are so used.

6.  The appraiser has noted in the appraisal report any adverse conditions (such as, needed repairs, depreciation, the presence of hazardous wastes, toxic substances, etc. ) observed during the inspection of the subject property or that he or she became aware of during the normal research involved in performing the appraisal.  Unless otherwise stated in the appraisal report, the appraiser has no knowledge of any hidden or unapparent conditions of the property or adverse environmental conditions (including the presence of hazardous wastes, toxic substances, etc. ) that would make the property more or less valuable, and has assumed that there are no such conditions and makes no guarantees or warranties, express or implied, regarding the condition of the property.  The appraiser will not be responsible for any such conditions that do exist or for any engineering or testing that might be required to discover whether such conditions exist.  Because the appraiser is not an expert in the field of environmental hazards, the appraisal report must not be considered as an environmental assessment of the property.

7.  The appraiser obtained the information, estimates, and opinions that were expressed in the appraisal report from sources that he or she considers to be reliable and believes them to be true and correct.  The appraiser does not assume responsibility for the accuracy of such items that were furnished by other parties.

8.  The appraiser will not disclose the contents of the appraisal report except as provided for in the Uniform Standards of Professional Appraisal Practice.

9.  The appraiser has based his or her appraisal report and valuation conclusion for an appraisal that is subject to satisfactory completion, repairs, or alterations on the assumption that completion of the improvements will be performed in a workmanlike manner.

10.  The appraiser must provide his or her prior written consent before the lender/client specified in the appraisal report can distribute the appraisal report (including conclusions about the property value, the appraiser's identity and professional designations, and references to any professional appraisal organizations or the firm with which the appraiser is associated ) to anyone other than the borrower; the mortgagee or its successors and assigns; the mortgage insurer; consultants; professional appraisal organizations; any state or federally approved financial institution; or any department, agency, or instrumentality of the United States or any state or the District of Columbia; except that the lender/client may distribute the property description section of the report only to data collection or reporting service(s) without having to obtain the appraiser's prior written consent.  The appraiser's written consent and approval must also be obtained before the appraisal can be conveyed by anyone to the public through advertising, public relations, news, sales, or other media.

**CONFIDENTIAL**
**DEVINE00015**

MULLINIX v. BOGORAE
File No. P601535

**APPRAISERS CERTIFICATION:**   The Appraiser certifies and agrees that:

1. I have researched the subject market area and have selected a minimum of three recent sales of properties most similar and proximate to the subject property for consideration in the sales comparison analysis and have made a dollar adjustment when appropriate to reflect the market reaction to those items of significant variation.  If a significant item in a comparable property is superior to , or more favorable than, the subject property, I have made a negative adjustment to reduce the adjusted sales price of the comparable and, if a significant item in a comparable property is inferior to, or less favorable than the subject property, I have made a positive adjustment to increase the adjusted sales price of the comparable.

2. I have taken into consideration the factors that have an impact on value in my development of the estimate of market value in the appraisal report.  I have not knowingly withheld any significant information from the appraisal report and I believe, to the best of my knowledge, that all statements and information in the appraisal report are true and correct.

3. I stated in the appraisal report only my own personal, unbiased, and professional analysis, opinions, and conclusions, which are subject only to the contingent and limiting conditions specified in this form.

4. I have no present or prospective interest in the property that is the subject to this report, and I have no present or prospective personal interest or bias with respect to the participants in the transaction.  I did not base, either partially or completely, my analysis and/or the estimate of market value in the appraisal report  on the race, color, religion, sex, handicap, familial status, or national origin of either the prospective owners or occupants of the subject property or of the present owners or occupants of the properties in the vicinity of the subject property.

5. I have no present or contemplated future interest in the subject property, and neither my current or future employment nor my compensation for performing this appraisal is contingent on the appraised value of the property.

6. I was not required to report a predetermined value or direction in value that favors the cause of the client or any related party, the amount of the value estimate, the attainment of a specific result, or the occurrence of a subsequent event in order to receive my compensation and/or employment for performing the appraisal.  I did not base the appraisal report on a requested minimum valuation, a specific valuation, or the need to approve a specific mortgage loan.

7. I performed this appraisal in conformity with the Uniform Standards of Professional Appraisal Practice that were adopted and promulgated by the Appraisal Standards Board of The Appraisal Foundation and that were in place as of the effective date of this appraisal, with the exception of the departure provision of those Standards, which does not apply.  I acknowledge that an estimate of a reasonable time for exposure in the open market is a condition in the definition of market value and the estimate I developed is consistent with the marketing time noted in the neighborhood section of this report, unless I have otherwise stated in the reconciliation section.

8. I have personally inspected the interior and exterior areas of the subject property and the exterior of all properties listed as comparables in the appraisal report.  I further certify that I have noted any apparent or known adverse conditions in the subject improvements, on the subject site, or on any site within the immediate vicinity of the subject property of which I am aware and have made adjustments for these adverse conditions in my analysis of the property value to the extent that I had market evidence to support them.  I have also commented about the effect of the adverse conditions on the marketability of the subject property.

9. I personally prepared all conclusions and opinions about the real estate that were set forth in the appraisal report.  If I relied on significant professional assistance from any individual or individuals in the performance of the appraisal or the preparation of the appraisal report, I have named such individual(s) and disclosed the specific tasks performed by them in the reconciliation section of this appraisal report.  I certify that any individual so named is qualified to perform the tasks.  I have not authorized anyone to make a change to any item in the report; therefore, if an unauthorized change is made to the appraisal report, I will take no responsibility for it.

**SUPERVISORY APPRAISER'S CERTIFICATION:**   If a supervisory appraiser signed the appraisal report, he or she certifies and agrees that: I directly supervise the appraiser who prepared the appraisal report, have reviewed the appraisal report, agree with the statements and conclusions of the appraiser, agree to be bound by the appraiser's certifications numbered 4 through 7 above, and am taking full responsibility for the appraisal and the appraisal report.

**ADDRESS OF PROPERTY APPRAISED:**   1050 FIFTH AVENUE, NEW YORK, NY  10028

| APPRAISER: | SUPERVISORY APPRAISER (only if required) |
|---|---|
| Signature: | Signature: |
| Name: CHRISTOPHER DEVINE | Name: STEVEN KNOBEL |
| Date Signed: 04/06/2006 | Date Signed: 04/06/2006 |
| State Certification #: 45-39270 | State Certification #: 45-18006 |
| or State License #: | or State License #: |
| State: NY | State: NY |
| Expiration Date of Certification or License: 06/23/2006 | Expiration Date of Certification or License: 07/06/2007 |

☐ Did   ☒ Did Not Inspect Property

Freddie Mac Form 439 6-93                    Page 2 of 2                    Fannie Mae Form 1004B 6-93

CONFIDENTIAL

# EXHIBIT E

1

# ORIGINAL

1
2          UNITED STATES DISTRICT COURT

3            DISTRICT OF MASSACHUSETTS

4   --------------------------------
    KATHLEEN P. MULLINIX,
5                  Plaintiff,              Civil Action
                                           No. 04-12684-WGY
       vs.
6   KIKI BOGORAD-GROSS and
    LEONARD P. BOGORAD, as They
7   Are Executors of the Will of
    Lawrence Bogorad,
8                  Defendants.
    --------------------------------
9

10

11          1290 Avenue of the Americas

12            New York, New York

13

14            December 13, 2005

15               10:00 a.m.

16

17     DEPOSITION of RENEE RING, before S. Arielle

18  Santos, Certified Shorthand Reporter and

19  Notary Public.

20

21

22

23     ELLEN GRAUER COURT REPORTING CO. LLC
          126 East 56th Street, Fifth Floor
24             New York, New York
                 212-750-6434
25               Ref: 79386

25

RING/VARN

Q      Did you, Ms. Ring, or any other
board member ask Ms. Mullinix at her interview
how often she had or intended to have overnight
guests?

A      Yes.

Q      And what did she respond?

A      My recollection is that she
responded she did not have guests.

Q      Did you, Ms. Ring, or other
members of the board ask Ms. Mullinix at her
interview why she wanted to buy an apartment in
the 1050 Fifth Avenue building?

A      Yes.

Q      And what did she respond?

A      My recollection is that she
responded she had an offer she could not refuse
on her condo at the Gotham and that's why she was
selling it.  One of her neighbors she told us
wanted to buy her apartment.

Q      And did she say anything in words
or substance as to why, apart from the reasons
for selling her condominium, that she chose 1050
Fifth Avenue as a prospective residence?

A      I have a vague recollection.

27

1                        RING/VARN
2    company.
3         Q      Did Ms. Mullinix ever at that
4    interview or subsequently inform you, in words or
5    substance, that she intended to rely upon wealth
6    or finances from any other person in connection
7    with her purchase and occupancy at 1050 Fifth
8    Avenue?
9         A      No.
10        Q      Did you or any other board member
11   ask Ms. Mullinix what she was planning to do with
12   the apartment at 1050 if she purchased it?
13        A      I don't know that I understand
14   your question.
15        Q      Well, I believe you had testified
16   among the standard questions asked of an
17   interviewee was what he or she was planning to do
18   with the apartment.
19            And so my more specific question
20   was, did you or any other board member ask
21   Ms. Mullinix what she planned to do with the
22   apartment if she bought it?
23        A      I believe we did and I believe
24   that she responded she would have renovated it.
25        Q      Was there any discussion, if you

# EXHIBIT F

# RUBIN AND RUDMAN LLP

## COUNSELLORS AT LAW

50 ROWES WHARF • BOSTON, MASSACHUSETTS 02110-3319

TELEPHONE: (617) 330-7000 • FACSIMILE: (617) 439-9556 • EMAIL: FIRM@RUBINRUDMAN.COM

Matthew A. Berlin
Direct Dial: (617) 330-7177
E-mail: mberlin@rubinrudman.com

February 11, 2004

<u>VIA FACSIMILE AND HAND DELIVERY—RECEIPT REQUESTED</u>

Larry C. Kenna, Esq.
Choate Hall & Stewart
Exchange Place
Boston, MA 02109

**Re: Estate of Lawrence Bogorad**

Dear Larry:

In furtherance of our conversation yesterday afternoon, I had understood that Kathleen Mullinix had already signed a contract to renovate her apartment, albeit subsequent to Lawrence Bogorad's death and after being advised by the named Executors of the Estate not to expect reimbursement. I learned from my clients this morning that she has not yet signed a contract. This being the case I want to make it absolutely clear that based on the information presented to date my unequivocal advice to Leonard Bogorad and Kiki Bogorad-Gross is that they cannot honor this claim consistent with their fiduciary duty. Any actions Ms. Mullinix may take in reliance on Lawrence Bogorad's alleged previous commitment would be misplaced, and she should not take on any financial commitments or otherwise based on a belief that the Estate will reimburse her. I understand from you that in Ms. Mullinix's view the renovations were an integral part of her joint undertaking with Lawrence Bogorad. Please communicate to her that presently the named Executors do not concur that the renovations or any part of them or the carrying costs of the co-op are the Estate's responsibility and any commitments she may make in that regard would be at her own risk.

As I indicated yesterday, I will be out of town until February 25th, and will be happy to discuss this matter further upon my return.

Sincerely,

Matthew A. Berlin

RUBIN AND RUDMAN LLP

Larry C. Kenna, Esq.
February 11, 2004
Page 2


cc Leonard Bogorad
   Kiki Bogarod-Gross
   Thomas Whitney, Esq.

# EXHIBIT G

1997 Edition -Electronic Format

AIA Document A101-1997

# Standard Form of Agreement Between Owner and Contractor
## where the basis of payment is a STIPULATED SUM

AGREEMENT made as of the 17th day of March in the year of 2004
*(In words, indicate day, month and year)*

BETWEEN the Owner:
*(Name, address and other information)*
Kathleen P. Mullinix
1050 Fifth Avenue / Apt. 15B
New York, NY 10028

and the Contractor:
*(Name, address and other information)*
McGraime Woodworking Inc.
5-15 48th Avenue
Long Island City, NY 11101

The Project is:
*(Name and location)*
The Renovation of the Mullinix Residence
1050 Fifth Avenue / Apt.15B
New York, NY 10028

The Architect is:
*(Name, address and other information)*
Heather Aman Design
347 West 36th Street / Suite 1501
New York, NY 10018

The Owner and Contractor agree as follows.

THIS DOCUMENT HAS IMPORTANT LEGAL CONSEQUENCES. CONSULTATION WITH AN ATTORNEY IS ENCOURAGED WITH RESPECT TO ITS COMPLETION OR MODIFICATION. AUTHENTICATION OF THIS ELECTRONICALLY DRAFTED AIA DOCUMENT MAY BE MADE BY USING AIA DOCUMENT D401.

AIA Document A201-1997, General Conditions of the Contract for Construction, is adopted in this document by reference. Do not use with other general conditions unless this document is modified.

This document has been approved and endorsed by The Associated General Contractors of America.

## ARTICLE 1 THE CONTRACT DOCUMENTS
The Contract Documents consist of this Agreement, Conditions of the Contract (General, Supplementary and other Conditions), Drawings, Specifications, Addenda issued prior to execution of this Agreement, other documents listed in this Agreement and Modifications issued after execution of this Agreement; these form the Contract, and are as fully a part of the Contract as if attached to this Agreement or repeated herein. The Contract represents the entire and integrated agreement between the parties hereto and supersedes prior negotiations, representations or agreements, either written or oral. An enumeration of the Contract Documents, other than Modifications, appears in Article 8.

## ARTICLE 2 THE WORK OF THIS CONTRACT
The Contractor shall fully execute the Work described in the Contract Documents, except to the extent specifically indicated in the Contract Documents to be the responsibility of others.

## ARTICLE 3 DATE OF COMMENCEMENT AND SUBSTANTIAL COMPLETION



©1997 AIA®
AIA DOCUMENT A101-1997
OWNER-CONTRACTOR AGREEMENT

The American Institute of Architects
1735 New York Avenue, N.W.
Washington, D.C. 20006-5292


© 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1967, 1974, 1977, 1987, © 1997 by The American Institute of Architects. Reproduction of the material herein or substantial quotation of its provisions without written permission of the AIA violates the copyright laws of the United States and will subject the violator to legal prosecution. WARNING: Unlicensed photocopying violates US copyright laws and will subject the violator to legal prosecution. This document was electronically produced with permission of the AIA and can be reproduced in accordance with your license without violation until the date of expiration as noted below. User Document: mullinix aia contract - 3-16-04.aia -- 3/17/2004. AIA License Number 1135086, which expires on 12/31/2004.

1

KPM 0060

3.1    The date of commencement of the Work shall be the date of this Agreement unless a different date is stated below or provision is made for the date to be fixed in a notice to proceed issued by the Owner.
*(Insert the date of commencement if it differs from the date of this Agreement or, if applicable, state that the date will be fixed in a notice to proceed.)*
The targeted Commencement of Work Date is April 07, 2004 or as soon as notification that all required approvals / permits have been granted and received.

If, prior to the commencement of the Work, the Owner requires time to file mortgages, mechanic's liens and other security interests, the Owner's time requirement shall be as follows:

3.2    The Contract Time shall be measured from the date of commencement.

3.3    The Contractor shall achieve Substantial Completion of the entire Work not later than days from the date of commencement, or as follows:
*(Insert number of calendar days. Alternatively, a calendar date may be used when coordinated with the date of commencement. Unless stated elsewhere in the Contract Documents, insert any requirements for earlier Substantial Completion of certain portions of the Work.)*
Four months from the Date of Commencement of Work which shall be extended, if applicable, by additional work (approved change orders) or by delays related to work performed by Contractors outside of this Contract.

, subject to adjustments of this Contract Time as provided in the Contract Documents.
*(Insert provisions, if any, for liquidated damages relating to failure to complete on time or for bonus payments for early completion of the Work.)*

## ARTICLE 4 CONTRACT SUM
4.1    The Owner shall pay the Contractor the Contract Sum in current funds for the Contractor's performance of the Contract. The Contract Sum shall be Three hundred Fifty thousand Dollars ($ 350,000.00 ), subject to additions and deductions as provided in the Contract Documents.

4.2    The Contract Sum is based upon the following alternates, if any, which are described in the Contract Documents and are hereby accepted by the Owner:
*(State the numbers or other identification of accepted alternates. If decisions on other alternates are to be made by the Owner subsequent to the execution of this Agreement, attach a schedule of such other alternates showing the amount for each and the date when that amount expires)*

4.3    Unit prices, if any, are as follows:
See attached Addendum A:
McGralme Woodworking Inc.'s Proposal dated February 23, 2004, 2 pages

See attached Addendum B:
McGralme Woodworking Inc.'s Phased Payment Schedule dated March 17, 2004, 1 page

Note: Phased payments to be wired to McGraime Woodworking Inc.'s Citibank Account.

## ARTICLE 5 PAYMENTS
5.1    PROGRESS PAYMENTS
5.1.1    Based upon Applications for Payment submitted to the Architect by the Contractor

THIS DOCUMENT HAS IMPORTANT LEGAL CONSEQUENCES. CONSULTATION WITH AN ATTORNEY IS ENCOURAGED WITH RESPECT TO ITS COMPLETION OR MODIFICATION. AUTHENTICATION OF THIS ELECTRONICALLY DRAFTED AIA DOCUMENT MAY BE MADE BY USING AIA DOCUMENT D401.

AIA Document A201-1997, General Conditions of the Contract for Construction, is adopted in this document by reference. Do not use with other general conditions unless this document is modified.

This document has been approved and endorsed by The Associated General Contractors of America.

©1997 AIA®
AIA DOCUMENT A101-1997
OWNER-CONTRACTOR AGREEMENT

The American Institute of Architects
1735 New York Avenue, N.W.
Washington, D.C. 20006-5292

© 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1967, 1974, 1977, 1987, © 1997 by the American Institute of Architects. Reproduction of the material herein or substantial quotation of its provisions without written permission of the AIA violates the copyright laws of the United States and will subject the violator to legal prosecution. WARNING: Unlicensed photocopying violates US copyright laws and will subject the violator to legal prosecution. This document was electronically produced with permission of the AIA and can be reproduced in accordance with your license without violation until the date of expiration as noted below. User Document: multiinix aia contract - 3-16-04.aia -- 3/17/2004. AIA License Number 1135086, which expires on 12/31/2004.

2

KPM 0061

and Certificates for Payment issued by the Architect, the Owner shall make progress payments on account of the Contract Sum to the Contractor as provided below and elsewhere in the Contract Documents.

**5.1.2** The period covered by each Application for Payment shall be one calendar month ending on the last day of the month, or as follows:

**5.1.3** Provided that an Application for Payment is received by the Architect not later than the ~~every three weeks~~ day of a month, the Owner shall make payment to the Contractor not later than the ~~day of the month~~. If an Application for Payment is received by the Architect after the application date fixed above, payment shall be made by the Owner not later than seven (7) days after the Architect receives the Application for Payment.

**5.1.4** Each Application for Payment shall be based on the most recent schedule of values submitted by the Contractor in accordance with the Contract Documents. The schedule of values shall allocate the entire Contract Sum among the various portions of the Work. The schedule of values shall be prepared in such form and supported by such data to substantiate its accuracy as the Architect may require. This schedule, unless objected to by the Architect, shall be used as a basis for reviewing the Contractor's Applications for Payment.

**5.1.5** Applications for Payment shall indicate the percentage of completion of each portion of the Work as of the end of the period covered by the Application for Payment.

**5.1.6** Subject to other provisions of the Contract Documents, the amount of each progress payment shall be computed as follows:

.1 Take that portion of the Contract Sum properly allocable to completed Work as determined by multiplying the percentage completion of each portion of the Work by the share of the Contract Sum allocated to that portion of the Work in the schedule of values, less retainage of    percent (  %). Pending final determination of cost to the Owner of changes in the Work, amounts not in dispute shall be included as provided in Subparagraph 7.3.8 of AIA Document A201-1997.

.2 Add that portion of the Contract Sum properly allocable to materials and equipment delivered and suitably stored at the site for subsequent incorporation in the completed construction (or, if approved in advance by the Owner, suitably stored off the site at a location agreed upon in writing), less retainage of    percent (  %);

.3 Subtract the aggregate of previous payments made by the Owner; and

.4 Subtract amounts, if any, for which the Architect has withheld or nullified a Certificate for Payment as provided in Paragraph 9.5 of AIA Document A201-1997.

**See 5.1.8**

~~5.1.7~~ The progress payment amount determined in accordance with Subparagraph 5.1.6 shall be further modified under the following circumstances:

.1 Add, upon Substantial Completion of the Work, a sum sufficient to increase the total payments to the full amount of the Contract Sum, less such amounts as the Architect shall determine for incomplete Work, retainage applicable to such work and unsettled claims; and

*(Subparagraph 9.8.5 of AIA Document A201-1997 requires release of applicable retainage upon Substantial Completion of Work with consent of surety, if any.)*

*THIS DOCUMENT HAS IMPORTANT LEGAL CONSEQUENCES. CONSULTATION WITH AN ATTORNEY IS ENCOURAGED WITH RESPECT TO ITS COMPLETION OR MODIFICATION. AUTHENTICATION OF THIS ELECTRONICALLY DRAFTED AIA DOCUMENT MAY BE MADE BY USING AIA DOCUMENT D401.*

*AIA Document A201-1997, General Conditions of the Contract for Construction, is adopted in this document by reference. Do not use with other general conditions unless this document is modified.*

*This document has been approved and endorsed by the Associated General Contractors of America.*



©1997 AIA®
AIA DOCUMENT A101-1997
OWNER-CONTRACTOR AGREEMENT

The American Institute of Architects
1735 New York Avenue, N.W.
Washington, D.C. 20006-5292

© 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1967, 1974, 1977, 1987, © 1997 by The American Institute of Architects. Reproduction of the material herein or substantial quotation of its provisions without written permission of the AIA violates the copyright laws of the United States and will subject the violator to legal prosecution. WARNING: Unlicensed photocopying violates US copyright laws and will subject the violator to legal prosecution. This document was electronically produced with permission of the AIA and can be reproduced in accordance with your license without violation until the date of expiration as noted below. User Document: multi.rtx aia contract - 3-16-04.aia – 3/17/2004. AIA License Number 1135086, which expires on 12/31/2004.

**3**

.2    Add, if final completion of the Work is thereafter materially delayed through no fault of the Contractor, any additional amounts payable in accordance with Subparagraph 9.10.3 of AIA Document A201-1997.

**5.1.8**   Reduction or limitation of retainage, if any, shall be as follows:
*(If it is intended, prior to Substantial Completion of the entire Work, to reduce or limit the retainage resulting from the percentages inserted in Clauses 5.1.6.1 and 5.1.6.2 above, and this is not explained elsewhere in the Contract Documents, insert here provisions for such reduction or limitation.)*

<u>Upon Substantial Completion of the job, the retainage of 10% shall drop to 5%. If specific items of punchlisted work persist in delaying Final Completion, the Owner shall, at her discretion, make partial payment of the final retainage payment. Nonetheless, three times the value of the uncompleted work should be retained until total completion of the job.</u>

**5.1.9**   Except with the Owner's prior approval, the Contractor shall not make advance payments to suppliers for materials or equipment which have not been delivered and stored at the site.

**5.2    FINAL PAYMENT**
**5.2.1**   Final payment, constituting the entire unpaid balance of the Contract Sum, shall be made by the Owner to the Contractor when:

.1    the Contractor has fully performed the Contract except for the Contractor's responsibility to correct Work as provided in Subparagraph 12.2.2 of AIA Document A201-1997, and to satisfy other requirements, if any, which extend beyond final payment; and

.2    a final Certificate for Payment has been issued by the Architect.

**5.2.2**   The Owner's final payment to the Contractor shall be made no later than 30 days after the issuance of the Architect's final Certificate for Payment, or as follows:

**ARTICLE 6 TERMINATION OR SUSPENSION**
**6.1**   The Contract may be terminated by the Owner or the Contractor as provided in Article 14 of AIA Document A201-1997.

**6.2**   The Work may be suspended by the Owner as provided in Article 14 of AIA Document A201-1997.

**ARTICLE 7 MISCELLANEOUS PROVISIONS**
**7.1**   Where reference is made in this Agreement to a provision of AIA Document A201-1997 or another Contract Document, the reference refers to that provision as amended or supplemented by other provisions of the Contract Documents.

**7.2**   Payments due and unpaid under the Contract shall bear interest from the date payment is due at the rate stated below, or in the absence thereof, at the legal rate prevailing from time to time at the place where the Project is located.
*(Insert rate of interest agreed upon, if any.)*
<u>Prime Rate</u>

*Usury laws and requirements under the Federal Truth in Lending Act, similar state and local consumer credit laws and other regulations at the Owner's and Contractor's principal place of business, the location of the Project and elsewhere may affect the validity of this provision. Legal advice should be obtained with respect to deletions or modifications, and also regarding requirements such as written disclosures or waivers.)*

**7.3**   The Owner's representative is:
*(Name, address and other information.)*

© 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1967, 1974, 1977, 1987, © 1997 by The American Institute of Architects. Reproduction of the material herein or substantial quotation of its provisions without written permission of the AIA violates the copyright laws of the United States and will subject the violator to legal prosecution. WARNING: Unlicensed photocopying violates US copyright laws and will subject the violator to legal prosecution. This document was electronically produced with permission of the AIA and can be reproduced in accordance with your license without violation until the date of expiration as noted below. User Document: mullintx.ala.contract - 3-16-04.ala -- 3/17/2004. AIA License Number 1135086, which expires on 12/31/2004.                      4



THIS DOCUMENT HAS IMPORTANT LEGAL CONSEQUENCES. CONSULTATION WITH AN ATTORNEY IS ENCOURAGED WITH RESPECT TO ITS COMPLETION OR MODIFICATION. AUTHENTICATION OF THIS ELECTRONICALLY DRAFTED AIA DOCUMENT MAY BE MADE BY USING AIA DOCUMENT D401.

AIA Document A201-1997, General Conditions of the Contract for Construction, is adopted in this document by reference. Do not use with other general conditions unless this document is modified.

This document has been approved and endorsed by The Associated General Contractors of America.

©1997 AIA®
AIA DOCUMENT A101-1997
OWNER-CONTRACTOR AGREEMENT

The American Institute of Architects
1735 New York Avenue, N.W.
Washington, D.C. 20006-5292

**7.4**    The Contractor's representative is:
*(Name, address and other information)*

**7.5**    Neither the Owner's nor the Contractor's representative shall be changed without ten days written notice to the other party.

**7.6**    Other provisions:

## ARTICLE 8 ENUMERATION OF CONTRACT DOCUMENTS

**8.1**    The Contract Documents, except for Modifications issued after execution of this Agreement, are enumerated as follows:

**8.1.1**    The Agreement is this executed 1997 edition of the Standard Form of Agreement Between Owner and Contractor, AIA Document A101-1997.

**8.1.2**    The General Conditions are the 1997 edition of the General Conditions of the Contract for Construction, AIA Document A201-1997.

**8.1.3**    The Supplementary and other Conditions of the Contract are those contained in the Project Manual dated  , and are as follows:

| Document | Title | Pages |
|----------|-------|-------|
|          |       |       |

**8.1.4**    The Specifications are those contained in the Project Manual dated as in Subparagraph 8.1.3, and are as follows:
*(Either list the Specifications here or refer to an exhibit attached to this Agreement.)*

| Section | Title | Pages |
|---------|-------|-------|

Mullinix Residence Specifications dated January 12, 2004

**8.1.5**    The Drawings are as follows, and are dated December 15, 2003 unless a different date is shown below:
*(Either list the Drawings here or refer to an exhibit attached to this Agreement.)*

| Number | Title | Date |
|--------|-------|------|
| A-01 | General Notes | |
| A-02 | Plot Plan and Riser Diagrams | |
| A-03 | Demolition Plan | |
| A-04 | New Construction Plan | |
| A-05 | Bathroom Plans and Elevations | |
| A-06 | Kitchen Details | |
| A-07 | Bathroom Plans and Elevations | |
| A-08 | Bathroom Plans and Elevations | |
| A-09 | Foyer Elevations | |
| A-10 | Living Room Elevations | |
| A-11 | Dining Room Elevations | |
| A-12 | Master Bedroom Elevations | |
| A-13 | Bathroom Plans and Elevations | |
| A-14 | Millwork Details Schedules | |
| E-01 | Electrical and Lighting Plan | |

*THIS DOCUMENT HAS IMPORTANT LEGAL CONSEQUENCES. CONSULTATION WITH AN ATTORNEY IS ENCOURAGED WITH RESPECT TO ITS COMPLETION OR MODIFICATION. AUTHENTICATION OF THIS ELECTRONICALLY DRAFTED AIA DOCUMENT MAY BE MADE BY USING AIA DOCUMENT D401.*

*AIA Document A201-1997, General Conditions of the Contract for Construction, is adopted in this document by reference. Do not use with other general conditions unless this document is modified.*

*This document has been approved and endorsed by the Associated General Contractors of America.*



©1997 AIA®
AIA DOCUMENT A101-1997
OWNER-CONTRACTOR AGREEMENT

The American Institute of Architects
1735 New York Avenue, N.W.
Washington, D.C. 20006-5292

© 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1967, 1974, 1977, 1987, © 1997 by The American Institute of Architects. Reproduction of the material herein or substantial quotation of its provisions without written permission of the AIA violates the copyright laws of the United States and will subject the violator to legal prosecution. WARNING: Unlicensed photocopying violates US copyright laws and will subject the violator to legal prosecution. This document was electronically produced with permission of the AIA and can be reproduced in accordance with your license without violation until the date of expiration as noted below. User Document: mullinix aia contract - 3-16-04.aia — 3/17/2004. AIA License Number 1135086, which expires on 12/31/2004.

5

8.1.6    The Addenda, if any, are as follows:

Number                          Date                              Pages

Addendum A:
McGraime Woodworking Inc. Proposal dated February 23, 2004. 2 pages

Addendum B:
McGraime Woodworking Inc. Phased Payment Schedule dated March 17, 2004. 1 page

Portions of Addenda relating to bidding requirements are not part of the Contract Documents unless the bidding requirements are also enumerated in this Article 8.

8.1.7    Other documents, if any, forming part of the Contract Documents are as follows:
*(List here any additional documents that are intended to form part of the Contract Documents. AIA Document A201-1997 provides that bidding requirements such as advertisement or invitation to bid, Instructions to Bidders, sample forms and the Contractor's bid are not part of the Contract Documents unless enumerated in this Agreement. They should be listed here only if intended to be part of the Contract Documents.)*
1050 Fifth Avenue, Inc. Alterations Agreement

This Agreement is entered into as of the day and year first written above and is executed in at least three original copies, of which one is to be delivered to the Contractor, one to the Architect for use in the administration of the Contract, and the remainder to the Owner.

*Kathleen P. Mullinix*
OWNER *(Signature)*

*[signature]*
CONTRACTOR *(Signature)*

*Kathleen P. Mullinix*
*(Printed name and title)*

*Gary McGraime*
*(Printed name and title)*

THIS DOCUMENT HAS IMPORTANT LEGAL CONSEQUENCES. CONSULTATION WITH AN ATTORNEY IS ENCOURAGED WITH RESPECT TO ITS COMPLETION OR MODIFICATION. AUTHENTICATION OF THIS ELECTRONICALLY DRAFTED AIA DOCUMENT MAY BE MADE BY USING AIA DOCUMENT D401.

AIA Document A201-1997, General Conditions of the Contract for Construction, is adopted in this document by reference. Do not use with other general conditions unless this document is modified.

This document has been approved and endorsed by The Associated General Contractors of America.



©1997 AIA®
AIA DOCUMENT A101-1997
OWNER-CONTRACTOR AGREEMENT

The American Institute of Architects
1735 New York Avenue, N.W.
Washington, D.C. 20006-5292

© 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1967, 1974, 1977, 1987, © 1997 by The American Institute of Architects. Reproduction of the material herein or substantial quotation of its provisions without written permission of the AIA violates the copyright laws of the United States and will subject the violator to legal prosecution. WARNING: Unlicensed photocopying violates US copyright laws and will subject the violator to legal prosecution. This document was electronically produced with permission of the AIA and can be reproduced in accordance with your license without violation until the date of expiration as noted below. User Document: mullinix aia contract - 3-16-04.aia ~ 3/17/2004. AIA License Number 1135086, which expires on 12/31/2004.

6

212 736 0480

**ADDENDUM B: McGraime Woodworking Inc. Phased Payment Schedule**

## MCGRAIME WOODWORKING INC.
5-15 48th Avenue Long Island City NY 11101
(718) 472-3201  Fax (718) 472-3257

March 17, 2003

I.      Deposit  – $ 35,000.00

II.     Payment on Demolition – $ 52,500.00

II.    Tri-weekly  Progress  Payments  as per AIA  Documents  G702  /  G703  (10% retainage)

III.    Payment on Substantial Completion [1] (5% retainage)

IV.     Final Payment [2] on Satisfaction of Punch List

Notes: [1]      Substantial Completion is the completion of work less the final punch list (i.e. minor adjustments, touch-ups and installation of fixtures or accessories outside of this Contract and provided by others but not yet received).

[2]      Less retainage of three times the value of work remaining, if any, due to long lead time or conditions beyond our control.

The above phased payments are to be wired into McGraime Woodworking Inc.'s Citibank Account as follows:

Citibank N.A.
170 West 72nd Street, NY, NY 10023
ABA#: 021-000089
Acct#: 01307282 (McGraime Woodworking Inc.)

KPM 0066

## Addendum A:   McGraime Woodworking Inc Proposal dated 2-23-04

**MCGRAIME WOODWORKING INC.**

5-15 48th Avenue Long Island City NY 11101

(718) 472-3201 • Fax (718) 472-3257

SUBMITTED TO:     Heather Aman
                              Heather Aman Design

            RE: Mullinix Residence Proposal

DATE            February 23, 2004

### PROPOSAL REVISED

| | |
|---|---|
| JOB NAME/NO. Mullinix Residence | |
| JOB LOCATION 1050 Fifth Avenue / Apt. 15B, New York NY 10028 | |
| ARCHITECT/DESIGNER Heather Aman Design | DATE OF PLANS December 15, 2003 |
| APPROXIMATE STARTING DATE | Immediately On Approval |
| APPROXIMATE COMPLETION DATE | Four Months |

| | | |
|---|---|---:|
| I. | Demolition and Removal | $    6,500.00 |
| II. | Construction | 29,250.00 |
| III. | Plumbing (See Addendum) includes Fixtures  $ 14,830.00 | 29,030.00 |
| IV. | Electrical and Lighting includes fixtures except custom Edison Price  $ 6,924.00 | 31,724.00 |
| V. | Masonry, Stone and Tile | 35,308.00 |
| VI. | Carpentry (Oak and painted doors, trim and molding) Includes door hardware | 30,000.00 |
| VII. | Wood Flooring as specified | 13,975.00 |
| VIII. | Millwork (See Addendum) | 50,000.00 |
| IX. | Appliance FBO (See Addendum) | 2,509.00 |
| X. | Painting | 30,000.00 |
| XI. | Wallpaper and liner installation (wallpaper FBO) | 8,950.00 |
| XII. | Specialty, Glass showers, grilles, mirrors, electrostatic spray (See Addendum) | 9,500.00 |
| XIII. | General Conditions: supervision, shop drawings, site maintenance & trash removals | 17,500.00 |
| X1V. | Add Options (See Addendum) | 13,885.00 |

|  |  |  |
|---|---|---:|
| | Net Cost | $    308,131.00 |
| | Profit and overhead (15%) | 46,219.65 |
| | Sub Total | 354,350.65 |
| | Discount | 4,350.65 |
| | Total | $    350,000.00 |

Notes: (1)     Drawings and samples will be provided for approval.
          (2)     A Certificate of Capital Improvement will be provided to exempt the above from sales tax.

We Propose hereby to furnish material and labor — complete in accordance with above specifications

Three hundred fifty thousand dollars and 00/100                                    Dollars  $ 350,000.00

Payment Schedule     (1)  Deposit $ 35,000.00          (2) Payment on Demolition $ 52,500.00

                     (3)   Tri-weekly Progress Payments as per AIA G702 and G703

(4)  Retainage reduced to 5% on Substantial Completion          (5)  Final Payment on Satisfaction of Punch List

All material is guaranteed to be as specified. All work to be completed in a workmanlike manner according to standard practices. Any alteration or deviation from above specifications involving extra costs will be executed only upon written orders, and will become an extra charge over and above the proposal. All agreements contingent upon strikes, accidents or delays beyond our control.

Authorized Signature

Note:    This proposal may be withdrawn by us if not accepted within 15 days.

Acceptance of Proposal. I have read this document and accepted the prices, specifications and conditions stated. I understand that upon signing, this proposal becomes a binding contract. You are authorized to do the work as specified. Payment will be made as outlined.

Signature _____          Date _____

KPM 0067

Addendum A:  McGraime Woodworking Inc. Proposal dated 2-23-04

**MCGRAIME WOODWORKING INC.**
5-15 48ᵗʰ Avenue Long Island City NY 11101
(718) 472-3201 Fax (718) 472-3257

February 23, 2004

<u>MULLINIX:  Add Options and Appliances Addendum</u>

| | | |
|---|---|---:|
| Kitchen Pionite lower and full height doors and exteriors | $ | 3,550.00 |
| Kitchen valence below upper cabs | | 1,075.00 |
| Kitchen Chemetal Upper doors and exteriors | | 2,750.00 |
| M Bedroom cabs and base in Oak | | 4,000.00 |
| Bed #2 HVAC and base in Oak | | 1,200.00 |
| Closet #1 add receptacles x 3 | | 360.00 |
| Sm Bath 3/8" bronze trim strip | | 500.00 |
| M Bath toe kick heater and GFI | | 450.00 |
| | $ | 13,885.00 * |

| | | |
|---|---|---:|
| Appliances FBO | | |
| Installation of all appliances | $ | 1,600.00 |
| Provide Meile 36" hood DA329 including facia and filters | | 929.00 |
| | $ | 2,509.00 * |

* Above cost is net (add 15% profit and overhead)

KPM 0068

# EXHIBIT H

**Solfanelli, Sara E.**

| | |
|---|---|
| **From:** | Kathleen Mullinix [kathleenpmullinix@yahoo.com] |
| **Sent:** | Thursday, March 11, 2004 7:02 AM |
| **To:** | kikibg@hotmail.com; lbogorad@rclco.com |
| **Subject:** | Transition |

Dear Kiki and Len,

I'm writing to share some thoughts with you as you prepare to dispose of the house in Lexington. As we have discussed, I would like to spend time here, most likely several days each week, until my home in New York is ready. I also plan to do everything that I can to help to make the transition is as smooth as possible. With that in mind, I have some suggestions.

It seems to me that it would be helpful if I consolidated my things in order to make more of the space in the house readily accessible. I propose to try to confine my things to the bedroom and the small room on the first floor. I will move my things out of the small bedroom on the second floor and will continue to use the office desk, but will arrange my things in the room to be as organized as possible. As you know, I brought many of my personal things with me when I moved here last April. Many of those things are in the small room downstairs. In addition, there are many things of my mother's in that same room that I brought here after her death last March. I will organize those things to make them as consolidated as possible. That should facilitate the work of the painters. I also have a few things in the basement, including my golf clubs and some of our outside furniture that we brought from New York. I hope that those things will not interfere with the organization of that space.

I would like to keep those many of your father's clothes that have sentimental value. I have, however, been emotionall unable to go through his clothes and would like them to remain in place in the closets and drawers until I can work wit them. As I mentioned to Kiki, I would like to keep some of his books, especially his old scientific texts and the books that he edited.

I will be away for ten days, beginning on March 18. I think that it is a good time for me to arrange to forward the mail to Kiki, with the hope that I could pick up my mail from Kiki from time to time.

I look forward to receiving your thoughts on these suggestions. I reiterate my offer to be of assistance in any aspect of this process on which you think I could be helpful.

Best regards,

Kathy

Do you Yahoo!?
Yahoo! Search - Find what you're looking for faster.

KPM 0140

# EXHIBIT I

Dineen Jerrett, Michelle L.

| | |
|---|---|
| **From:** | Kiki Gross [kikibg@hotmail.com] |
| **Sent:** | Wednesday, May 12, 2004 6:39 AM |
| **To:** | kathleenpmullinix@yahoo.com |
| **Subject:** | Various |

Sorry, Kathy, I started this yesterday and got interrupted....

Thanks for the Mother's Day Greetings. Hope you got back to NY ok and then went out to dinner or something. And yes, it is good to be past that toddler stage, although breakfast in bed, even though it was usually cold, was kind of a nice treat.

I don't feel as if I need to be at Dad's office when they go through things - I'm sure I wouldn't know what was important. If there are personal things that are left, I'd like a chance to see them, I guess. You probably have things that you'd want more than me. Thanks for asking, though. It's kind of hard to think about that space not being his (or relating to us)- so many years of waiting downstairs in the car flashing the lights! (Sorry!)

In terms of the house, I'll be clearing things out over the next few weekends I guess - there's so much. Please let us know if there's anything you want. I will keep an eye out for your bracelet. We are planning on closing on the last Friday of June - I think that's the 25th. I was hoping to have another weekend, but I guess that's not going to happnen. I hope this will work for you. If you need help with anything, please let us know.

In terms of the car, I think that Len will be taking it - it will be nice to keep it in the family I think. I would like to take it to the Saab dealer to get it checked out first and then would actually like to "borrow" it for a few weeks after Dan comes home (end of May). I hope that's ok. You're welcome to "borrow" it back when you like if you want to drive it again. If I make an appointment for sometime next week, will that work for you?

Talk to you soon,
Kiki

----- Original Message -----

**From:** Kathleen Mullinix
**To:** kikibg@hotmail.com
**Sent:** Sunday, May 09, 2004 9:51 PM
**Subject:** Various

Dear Kiki,

Happy Mother's Day--I hope that you had a great day. It always seemed so good to me to be beyond the toddlers' crawling into bed with the spilling orange juice and the toast (or other safe item) slipping off the plate.

I have a few things:

1) Maybe you could be on the lookout for a rather heavy linked gold bracelet around the house. I don't seem to have it, the clasp is not the greatest, and it could be anywhere. In the event that it fell on one of the rugs, you might see it. I'm hoping that it is with me somewhere, or mixed up in the bed.

2) The administrator at Harvard has asked about cleaning our your father's office. The plan is that they will send an archivist some time soon who will do whatever he or she does. I don't know what they do but Jay Ballofet said it is not necessary to be present ( I had the impression that they prefer

10/7/04

KPM 0125

that the archivist does his or work alone). After that, we are free to go through the things, take what we want, and they will dispose of the remaining things. Alice Cheung and Maureen Hanson have offered to go through the things with me and identify what belongs to whose work. We are planning to ask people if they want their material, note books, photos, etc. (He took pictures of everyone in the lab. I'm assuming that they are there somewhere.) Please let me know if you and/or Len want to be involved in that process, and I will certainly arrange the schedule around your availability. Of course, at the end of the day, any personal items that remain would be assembled for your examination before things are finally removed.

3) Also in the schedule department, could you tell my by what date I must have all of my things out of the house?

Best regards,
Kathy

---

Do you Yahoo!?
Win a $20,000 Career Makeover at Yahoo! HotJobs

10/7/04

KPM 0126

# EXHIBIT J

**Solfanelli, Sara E.**

| | |
|---|---|
| **From:** | Kathleen Mullinix [kathleenpmullinix@yahoo.com] |
| **Sent:** | Saturday, May 15, 2004 3:08 PM |
| **To:** | kikibg@hotmail.com |
| **Subject:** | House, etc. |

Dear Kiki,

Having emptied my parents' house, I don't envy you your task. I hope your knees hold out better than mine did. I'm also worried about your shoulder.

I'm not sure when I'll be up in Lexington next. I'd planned on being there over Memorial Day but "Grandparents' Day" is on the 27th at Jack's school and Kathleen has asked me to attend. Considering all of the trauma in December, I can't really say no. So that's to be figured out.

With respect to the car, I did not experience a burning smell so that's got to be something new. I would like to take some pictures of the car when I come up. I'd hoped to take pictures at the house so I hope that will be OK.

I would like to have the Japanese print that is in the living room by the stereo. Your father loved that and he had planned to bring it to New York. If no one else wants the two small chairs in the living room or the dining room furniture, I'd be very happy to take those things.

I would so like to have all of his clothes--his jackets with the hoods that he loved, on and on. I know that is ridiculous but if the clothes could stay a bit longer maybe I could have a more settled view of reality and the inevitable. I think that I have the idea that as long as his clothes remain he might come back. I remember that the first thing that I did when I got back from Mexico was to but his comb and brush and his toothbrush back in the bathroom. I'm afraid I'm still there a bit.

I have an Internet connection here at the furnished studio that I have rented on 74th Street while that apartment is being renovated.

That's it for now. My thoughts are with you.

Kathy

---

Do you Yahoo!?
SBC Yahoo! - Internet access at a great low price.

11/14/2005

KPM 0144

**Solfanelli, Sara E.**

**From:**    Kiki Gross [kikibg@hotmail.com]
**Sent:**    Saturday, May 15, 2004 8:37 AM
**To:**      kathleenpmullinix@yahoo.com
**Subject:**  this weekend

Hi Kathy - I wasn't sure if you were going to be in Lexington this weekend but wanted to check in. I was planning on going out and starting to clean out the kitchen - I'll start with old spices, canned goods,etc. If there's anything that you can think of that you want, please let me know. I don't want to throw anything out that's yours.
Is there anything else in the house you'd like - Dad's Harvard chair, etc? Just let me know, k?

We were also planning on taking the Saab to the garage on Monday (will pick up on Sunday) to get it checked out - there also seems to be some burning smell. Hope that's ok.

Did you get your internet connection (Blackberry,etc.) worked out in NY? I hope so.
Talk to you soon,
Kiki

# EXHIBIT K

## Solfanelli, Sara E.

**From:**    Kathleen Mullinix [kathleenpmullinix@yahoo.com]
**Sent:**    Thursday, May 27, 2004 5:04 PM
**To:**      kikibg@hotmail.com
**Subject:** Next week

Dear Kiki,

I'm thinking of you and hoping that you are not too overwhelmed by the process of working on the house.  I found the process of dismantling my parents' house to be very difficult---on many levels.

I plan to drive up to Lexington on Tuesday afternoon and to move my things out of the house over the following few days.  Thank you for offering the furniture  In that regard, it occurs to me that if no one wants the wall unit in the living room, I would be happy to have it.  I don't know if I'll be able to move the furniture out of the house on this trip, but I hope to do that.  In any event, I'll have it moved by the 17th or 18th.  If I can help you on the house in general while I'm there I would be happy to do so.  Just let me know.

That's all for now- hope all is well with you.

Kathy

Do you Yahoo!?
Friends. Fun. Try the all-new Yahoo! Messenger

11/14/2005                                                                                    KPM 0148

# EXHIBIT L

**From:** Kathleen Mullinix
**To:** kikibg@hotmail.com
**Sent:** Friday, May 28, 2004 3:31 PM
**Subject:** Follow-up

Dear Kiki,

Thanks for your note.  After all that, I have changed my plan and will come up to Lexington on June 8.  It turns out that I have a work obligation that just appeared this morning that requires me to be in New York on Wednesday and Thursday.  I hope that is OK--also gives me more time to figure out how to move the furniture.  I'm so happy that Dan can help with the wall unit-especially if I'll be the beneficiary!  I would like to take the Saab for a bit of a ride at a convenient time-and, of course, to take some pictures.

Yesterday, I wrote you an e-mail, pressed "send"--I thought--and the screen went to "Page cannot be displayed".-and I couldn't find it anywhere!  What I sent you was the streamlined version.  I had said that the archivist would come, do whatever she does on June 2, and then I was hoping that Alice and Maureen Hanson will be able to help identify things for distribution to any former students who want whatever of their work.  I'm thinking that it would be good to get the archivist there, after which there is no particular sense of urgency with the project--although it will be great to finish and I do have the feeling that there are now plans for the space.  I called today and Julia arranged for the archivist--your friend--to come the next week.

I actually went to Jack's school yesterday.  It was wonderful and he was so adorable.  I hadn't realized until Wednesday that there were no parents involved, so I was really glad to be there.

'm so glad to know that Dan is home.

Kathy

---

Do you Yahoo!?
Friends. Fun. Try the all-new Yahoo! Messenger

---

Do you Yahoo!?
Friends. Fun. Try the all-new Yahoo! Messenger

KPM 0150

# EXHIBIT M

**Solfanelli, Sara E.**

| | |
|---|---|
| **From:** | Kathleen Mullinix [kathleenpmullinix@yahoo.com] |
| **Sent:** | Friday, June 11, 2004 1:22 PM |
| **To:** | kikibg@hotmail.com |
| **Subject:** | Weekend |

Dear Kiki,

I have realized that it will be necessary for me to stay here in the house until Sunday.  I want to spend this time in the presence of your father's spirit.  I had planned to leave today but I now know that it is not possible for me to do so.

I have some memory of your saying on Wednesday that someone is coming tomorrow.  That is fine with me, just let me know what to expect.

If I can help out with anything, just let me know.

Kathy

---

Do you Yahoo!?
Friends. Fun. Try the all-new Yahoo! Messenger

KPM 0151

# EXHIBIT N

**Solfanelli, Sara E.**

| | |
|---|---|
| **From:** | Kiki Gross [kikibg@hotmail.com] |
| **Sent:** | Sunday, May 16, 2004 7:57 PM |
| **To:** | Kathleen Mullinix |
| **Subject:** | Re: House, etc. |

Kathy - Thanks for getting back to me. I'm glad that you have rented a place in NY. I hope that it's comfortable. It must be nice to oversee the construction without having to live in it.

Thanks for your concern about the house and my shoulder. I'm trying to not undo any good I've gotten from Physical Therapy. I went through the drawers in Len's room and downstairs this weekend so they are basically emptied. It looked like you things were only on top of the dressers upstairs and separate in the downstairs rooms. Of course you're welcome to do a photo session with the car and house. We are going to be closing on that last Friday on June but the people who are taking most of the furniture (bedroom stuff) will be coming the weekend before. I'm sorry to keep moving things up, but because of the weekends that's how it's working out. Can I let you know about the furniture? The print is all yours.

I can understand your wanting to keep all his clothes - if you want me to go thru things with you I can. If you have any ideas of what you'd like us to do with the things you don't want (what would make you feel best), please let me know.

That's all for now. Have a good week if we don't talk before then.
Kiki

---- Original Message -----
From: Kathleen Mullinix
To: kikibg@hotmail.com
Sent: Saturday, May 15, 2004 3:07 PM
Subject: House, etc.

Dear Kiki,

Having emptied my parents' house, I don't envy you your task. I hope your knees hold out better than mine did. I'm also worried about your shoulder.

I'm not sure when I'll be up in Lexington next. I'd planned on being there over Memorial Day but "Grandparents' Day" is on the 27th at Jack's school and Kathleen has asked me to attend. Considering all of the trauma in December, I can't really say no. So that's to be figured out.

With respect to the car, I did not experience a burning smell so that's got to be something new. I would like to take some pictures of the car when I come up. I'd hoped to take pictures at the house so I hope that will be OK.

I would like to have the Japanese print that is in the living room by the stereo. Your father loved that and he had planned to bring it to New York. If no one else wants the two small chairs in the living room or the dining room furniture, I'd be very happy to take those things.

I would so like to have all of his clothes--his jackets with the hoods that he loved, on and on. I know that is ridiculous but if the clothes could stay a bit longer maybe I could have a more settled view of reality and the inevitable. I think that I have the idea that as long as his clothes remain he might come back. I remember that the first thing that I did when I got back from Mexico was to but his comb and brush and his toothbrush back in the bathroom. I'm afraid I'm still there a bit.

                              

I have an Internet connection here at the furnished studio that I have rented on 74th Street while that apartment is being renovated.

That's it for now.  My thoughts are with you.

Kathy

---

**Do you Yahoo!?**
<u>SBC Yahoo!</u> - Internet access at a great low price.

11/14/2005                                                                                                      KPM 0146