UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| KATHLEEN P. MULLINIX,<br><br>Plaintiff,<br><br>v.<br><br>KIKI BOGORAD-GROSS and<br>LEONARD P. BOGORAD, as They<br>Are Executors of the Will of<br>Lawrence Bogorad,<br><br>Defendants. | Civil Action<br>No. 04-12684-WGY |

## AFFIDAVIT OF LEONARD BOGORAD

I, Leonard Bogorad, first being duly sworn, hereby depose and state:

1. I was born on February 10, 1950, to Lawrence Bogorad and Rosalyn Bogorad. My mother suffers from Alzheimer's disease and lives at the Fairlawn Nursing Home in Lexington, Massachusetts. My father passed away on December 28, 2003 while on a family vacation in Puerto Vallarta, Mexico. I was appointed co-executor of his will by a decree of a Justice of the Middlesex County, Massachusetts, Probate and Family Court. I am a Defendant in the above-captioned matter as Executor of my father's will. Except where otherwise indicated, I make this affidavit from facts within my personal knowledge and I believe all matters set forth herein to be true.

2. I received my Bachelor's Degree from Harvard University in 1971. I received a Master's Degree in city planning from the University of Pennsylvania in 1973. After graduating from the University of Pennsylvania I worked for two and a half years in New Haven, Connecticut for a firm called Cogen, Holt and Associates, which later became Connecticut

{B0517717; 4}

Conference of Municipalities. I then moved back to Boston for two and a half years to work for the Metropolitan Area Planning Commission. Thereafter I moved to Washington, D.C. to work for Real Estate Research Corporation. Over fifteen years ago I moved to my current real estate consulting firm, Robert Charles Lesser & Co., LLC, where I currently serve as a managing director. My responsibilities include participating in managing the company and various consulting engagements

3.  I married Cynthia Bogorad ("Cindy") in 1979. We have two children, David Bogorad ("David") and Sarah Bogorad ("Sarah"). David is 19 years old and currently attends college in New Orleans. Sarah is 23 years old and currently lives in New York.

4.  During the last five years of my father's life, I saw him approximately five times per year, spoke with him every few weeks and communicated with him frequently via e-mail. When we spoke, we discussed various issues, such as my children, my mother, his health and any upcoming Bogorad family trips.

5.  My father called me during the summer of 2001. Sarah was to start Oberlin College as a freshman in the fall of 2001. My father said he wanted to help out with Sarah's and (in the future) David's college expenses. He said he wanted to contribute $10,000 a year for each grandchild in college. I told him that it was a very generous offer, but it was not necessary. He responded that he "really wanted to do it." Shortly thereafter I received a $10,000 check made payable to Oberlin College for the 2001-2002 school year. My father also contributed $10,000 in 2002 for the 2002-2003 school year. He did not contribute in 2003, the year he died. My father did not leave specific instructions in his will directing that the $10,000 college payments should continue. Consequently, the Estate did not make the $10,000 payment for Sarah's 2003-2004 school year. Even though my father said he was going to contribute $10,000

annually to each grandchild's college tuition, the Estate never made a payment for David's college tuition because David entered college in the fall of 2004.

6. On December 19, 2002, my father emailed Kiki and me stating his desire to include Mullinix in his estate plan. In the email my father confirmed that he would send my sister and me the necessary paperwork to sign in our capacities as executors of his estate after we (my father, my sister and me) returned from the annual Bogorad family vacation, which that year we spent in Southeast Asia.

7. On or around February 16, 2003, I spoke to both my father and the plaintiff, Kathleen P. Mullinix ("Mullinix"), about her plans to sell her apartment on East 87th Street in New York City and move to and buy a new apartment on Fifth Avenue. Mullinix said she decided to move to Fifth Avenue because her son, who works in the real estate industry, advised her that a property on Fifth Avenue would increase in value faster than her apartment on 87th Street. Neither Mullinix nor my father ever mentioned my father as a reason for deciding to sell her 87th Street apartment and buying the Fifth Avenue apartment, until Mullinix made this claim after my father died.

8. The first time I heard about Mullinix's demands was a few days after my father died. I stayed in Mexico for two extra days to take care of administrative matters with the U.S. State Department. When I returned to Washington, my sister, Kiki, told me that Mullinix said on the plane that she would be in trouble because my father was going to pay for the renovations to her Fifth Avenue apartment. That was the first time I had heard about my father's alleged plans to pay for the renovations.

9. On January 2, 2004 I spoke to Mullinix about her demands. My brother-in-law, James Gross, and I were going through my father's papers in his office at his Lexington,

{B0517717; 4}

Massachusetts home. Mullinix sat with us as we sifted through the various financial documents. Out of the blue she mentioned that she was going to renovate her Fifth Avenue apartment and that my father planned to pay for the renovations. She did not mention his alleged plan to pay for her monthly maintenance fees, half of her storage costs or half of the capital gains taxes incurred as a result of the sale of her apartment on East 87th Street. To my best recollection, neither Jim nor I responded to her comments. I did not find any evidence of my father's alleged promises to Mullinix in any of his papers or financial documents in his home office.

10. Subsequently, Kiki, Jim, Cindy and I consulted Matthew Berlin from Rubin & Rudman, counsel to my father's estate and co-trustee of his 1997 estate planning trust, about Mullinix's demands.

11. On January 25, 2004, Mullinix called my house from the Lexington home to discuss payment for the renovations and her ability to stay at my father's Lexington home. I took notes of this conversation because I thought her motive was to set her claims up for litigation. At first, both Cindy and I were on the phone because Mullinix wanted to first discuss my wife's breast cancer. Mullinix offered to help Cindy secure an appointment with Dr. Clifford Hudis, Chief of the Breast Cancer Medicine Service, at Memorial Sloan Kettering Cancer Center in New York. After we discussed Cindy and Dr. Hudis, Mullinix asked to speak to me alone.

12. During our private conversation on January 25, 2004, Mullinix stated that she would like to stay in the Lexington home until the completion of the renovations. She also said that it would be great if the Lexington home could be sold in the spring. Mullinix then stated that she and my father had an agreement with respect to her Fifth Avenue Apartment, and claimed that my father said that he would pay for $400,000 of the renovations. Mullinix also stated that she entered into the real estate transaction knowing that the apartment on Fifth

Avenue was not liveable and the apartment required a "gut renovation". She seemed frustrated that Jim told her the bills could not be paid by the Estate, if at all, because executors had not been named. In an exasperated tone Mulllinix expressed concern that the renovation bills were not being addressed and asked how I wanted to handle the bills as she received them. I responded that we had consulted an attorney on this issue and that as future executors we had been advised that it would be a violation of our fiduciary duties to approve payment of the bills. Mullinix then wondered out loud whether she should sell the apartment, but then said that she had decided that that notion was ridiculous. She ended the call by saying that we should talk with her attorney, Thomas Whitney at the law firm Choate, Hall & Stewart.

13.     I had no knowledge whatsoever of my father ever telling Mullinix she could live in his Lexington home until the renovations to her Fifth Avenue apartment were completed. I <u>never</u> told Kathy that she could remain in the Lexington home until the renovations to her apartment were completed or that we "certainly wouldn't want to put you out of the house until your apartment is ready." In fact, it is my best recollection that Kathy moved out of the Lexington home at least one month prior to the closing. We did not ask her to leave at this time. She chose to do this on her own.

14.     Mullinix never paid rent, utilities, the phone bill or for the upkeep of the Lexington Home while she lived there.

15.     Mullinix never asked me whether the estate could or would pay for alternate housing for her pending the completion of the renovations.

Signed under the pains and penalties of perjury this 22nd day of May, 2006.

/s/ Leonard Bogorad
Leonard Bogorad

Certificate of Service

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non registered participants on May 25, 2006.

/s/ Lisa M. Hodes

{B0517717; 4}