UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| KATHLEEN P. MULLINIX,<br><br>Plaintiff,<br><br>v.<br><br>KIKI BOGORAD-GROSS and<br>LEONARD P. BOGORAD, as They<br>Are Executors of the Will of<br>Lawrence Bogorad,<br><br>Defendants. | Civil Action<br>No. 04-12684-WGY |

## AFFIDAVIT OF JAMES C. GROSS, ESQ.

I, James C. Gross, first being duly sworn, hereby depose and state:

1. I am the husband of Kiki Bogorad-Gross ("Kiki"), a Defendant in her capacity as Executor of the Estate of Lawrence Bogorad in the above-captioned matter. Except where otherwise indicated, I make this affidavit from facts within my personal knowledge and I believe all matters set forth herein to be true.

2. I attended the University of Rochester from 1968-1972 and graduated with a Bachelor of Arts with a major in history. I then attended Boston University Law School from 1973-1976. After I graduated from law school, I worked for the Federal Energy Regulatory Commission in Washington, D.C. from 1977 to 1979. In 1979 I clerked for the Honorable Thomas Lawless, Chief Judge of the United States Bankruptcy Court for the District of Massachusetts in Boston, Massachusetts. In 1981 I completed my clerkship and obtained a position as an associate at the law firm of Friedman and Atherton. I became a partner at Friedman and Atherton. In 1989 I left Friedman and Atherton to found the law firm of Kleiman,

Lyons, Schindler & Gross, now located at 21 Custom House Street, Boston, Massachusetts. I am currently still a partner with that firm, concentrating in bankruptcy and reorganization cases. My law firm, specifically, my partner, Thomas Bailey, handled the sale of my late father-in-law's home in Lexington, Massachusetts.

3. I have served as co-counsel to both the Estate of Lawrence Bogorad and to the Defendants in this case.

4. I married Kiki in 1978. Kiki and I have two children, Daniel and Ben. Daniel, born in 1983, is twenty-three (23) years old. Ben, born in 1986, is nineteen (19) years old. Daniel graduated from the University of Rochester in 2005. Ben is currently a sophomore at Clark University.

5. I first met the late Professor Bogorad ("Laurie") in July 1976 when I began dating his daughter, Kiki.

6. Over the years, I developed a close relationship with Laurie. In the last three years of his life, he came over to our house in Newton once every couple of weeks for dinner. It was his routine habit to speak with me, and we often talked about, among other things, financial matters. For example, after Laurie sent an email to Kiki notifying her that he intended to change his will to include Ms. Mullinix, the plaintiff in this action ("Mullinix"), Laurie and I discussed the matter. Laurie told me that he was going to include Mullinix in his will, and he expressed his hope that that was okay with everyone. I told him that it was his money and the he should do whatever he wanted to do with it.

7. Laurie never mentioned or discussed with me any alleged promises to Mullinix that are the subject of this action.

{B0517716; 3}

8.  Daniel was preparing to attend his first year of college at the University of Rochester in the fall of 2001. In the summer of 2001, Laurie mentioned first to Kiki, and then to me, that he wanted to help pay for Daniel's college tuition. Laurie offered $10,000. At first, Kiki and I refused, telling him that it was not necessary. Laurie insisted, however, and we acquiesced. Laurie handed me the first check in either July or August of 2001 when he came over for dinner. Laurie said he made the check payable directly to the University of Rochester for tax purposes. I sent the check to the University of Rochester.

9.  Thereafter, in the summers of 2002 and 2003, Laurie handed me a check for $10,000, made payable to the University of Rochester for Daniel's college tuition, which I then sent to the University of Rochester. No payments were made in 2004, the year after Laurie passed away.

10. Laurie died in the early morning hours of December 28, 2003 while on a family vacation in Puerto Vallarta, Mexico. There was a flurry of activity as we rushed back to the hotel to find Laurie's passport and take care of other administrative matters. My brother-in-law, Len, secured flights home to Boston that same afternoon for our immediate family and for Mullinix, with a layover in Houston, Texas. Len and his wife Cindy stayed behind to deal with the U.S. State Department and to prepare Laurie's body to be transported back to the United States.

11. Kiki could not secure five seats together on the plane ride from Houston to Boston, so Kiki sat with Mullinix on the plane ride, and I sat approximately ten (10) rows behind them. I was not privy to the conversations between Kiki and Mullinix during the flight from Texas to Boston.

12. When we got home to Newton that evening, Kiki told me that Mullinix had told her on the plane that Laurie had agreed to pay for the renovations to her Fifth Avenue apartment. This was the first time I had heard of this arrangement and I thought both that it was a very strange time for Mullinix to raise the issue at that time and that it was strange that Laurie has never raised the subject with me during our regular visits in 2003.

13. On January 2, 2004, Len and I decided we should go take a look at the papers in Laurie's home office to determine what needed to be done with respect to Laurie's estate plan. Mullinix was staying at the Lexington Home at that time. Mullinix sat with Len and me in Laurie's home office, located on the second floor of the Lexington home, as we proceeded to go through Laurie's old style desk with long 4 file drawers, which were all filled with papers.

14. As I sifted through Laurie's various financial papers, it became clear to me that he had kept everything. I found a lot of old bank accounts and old bank records. Mullinix occasionally handed me miscellaneous records to examine. A lot of the documents we found were outdated and not relevant to his estate plan. At some point, I decided to take some of the updated records home to examine.

15. The three of us made small talk while we sat in the office looking through Laurie's paperwork. In the middle of the conversation, Mullinix brought up the topic of some kind of arrangement whereby Laurie was going to pay for the renovations to her Fifth Avenue apartment. Len and I looked at each other. Although I do not recall my exact response, I do recall that I was noncommittal: I did not say one way or the other whether the Estate could or would pay the bills for the renovations to her apartment.

16. Mullinix did not mention anything about monthly maintenance fees, capital gains taxes or storage fees in that conversation.

{B0517716; 3}

17.     That day I decided to take a couple of Laurie's file folders home to examine. These folders contained, among other things, documentation of Laurie's investments and bank accounts. These folders did not contain any documentation of Laurie's alleged promises to Mullinix.

18.     On a subsequent trip to the Lexington home, while we were moving the furniture out of the house, I decided to take the remaining financial documents from Laurie's home office. I took three or four garbage bags filled with Laurie's old financial documents. When I got home and over the next week or so, I proceeded to look at every document in the garbage bags. I was particularly interested in information relevant to Rosalyn's accounts, such as the arrangement at the nursing home and how Rosalyn's expenses had been paid. I threw away anything that was old and irrelevant, such as investment accounts that Laurie had in 1980 and which had long ago been closed.

19.     Based on my examination of Laurie's financial records, it is my belief that Laurie kept virtually all financial records and paperwork. He was also very organized about his estate planning. I did not find any document evidencing Laurie's alleged promises to Mullinix.

20.     Subsequent to Len's conversation with Mullinix on January 25, 2004, I was home alone and called Mullinix on behalf of Kiki and Len to discuss the notion of the Estate paying for the renovations. I was very negative about the Estate's obligation to pay for the costs of the renovations to her Fifth Avenue apartment. I clearly remember indicating to Kathy that there was no commitment from the Estate to pay for the renovations. Mullinix voiced no response to my statements.

{B0517716; 3}

Signed under the pains and penalties of perjury this 23rd day of May 2006.

/s/ James Gross
James Gross

Certificate of Service

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non registered participants on May 25, 2006.

/s/ Lisa M. Hodes

{B0517716; 3}