UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| KATHLEEN P. MULLINIX,<br><br>Plaintiff,<br><br>v.<br><br>KIKI BOGORAD-GROSS and LEONARD P. BOGORAD, As They Are Executors of the Will of Lawrence Bogorad,<br><br>Defendants. | Civil Action No. 04-12684-WGY |

**PLAINTIFF KATHLEEN P. MULLINIX'S STATEMENT OF MATERIAL FACTS IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT**

Pursuant to Fed. R. Civ. Proc. 56(c) and Local Rule 56.1, Plaintiff, Kathleen P. Mullinix, submits the following Statement of Undisputed Material Facts As To Which There Is No Genuine Dispute Issue To Be Tried, with references to supporting evidence, in support of its Motion for Partial Summary Judgment.

1.     Lawrence Bogorad and Kathleen P. Mullinix (collectively, the "couple") had a long-term romantic involvement and publicly revealed their romantic relationship sometime in early 1998. *See* Deposition of Kiki Bogorad-Gross ("Bogorad-Gross Dep.") at 64.

2.     The couple, Mr. Bogorad and Ms. Mullinix, traveled together and attended family functions together.  *See* Deposition of Leonard P. Bogorad ("Bogorad Dep.") at 79; Bogorad-Gross Dep. at 92-92.

3.     Mr. Bogorad remained married to his wife Rosalyn Bogorad throughout his relationship with Ms. Mullinix.  Rosalyn Bogorad became incapacitated and incompetent because of Alzheimer's Disease in the 1990's.  Bogorad-Gross Dep. at 20-24.

1

4.    After March 1998, the couple began living together, both at Mr. Bogorad's home at 2 White Pine Lane, Lexington, Massachusetts (hereinafter, the "Lexington home"), and in Ms. Mullinix's apartment at 975 Park Avenue, New York City.  Complaint (the "Compl."), attached hereto as Exhibit 1, ¶ 9; Affidavit of Kathleen P. Mullinix ("Mullinix Aff."), filed herewith, ¶ 3.

5.    The couple lived as though husband and wife.  *Id.*

6.    After Ms. Mullinix and her husband separated, Ms. Mullinix and her husband sold the apartment at 975 Park Avenue, and Ms. Mullinix purchased a cooperative apartment located at 170 East 87th Street in New York City (hereinafter, the "East 87th Street apartment").  Compl. ¶ 10; Mullinix Aff. ¶ 4.

7.    On or about July 1, 1999, the couple moved in together to the East 87th Street apartment. Compl. ¶ 11.

8.    Mr. Bogorad paid the monthly maintenance fees on the East 87th Street apartment during the entire time Ms. Mullinix owned it by reimbursing Ms. Mullinix for those payments.  See Compl. ¶ 12; Mullinix Aff. ¶ 4.

9.    Mr. Bogorad paid for renovations to the East 87th Street apartment, which included refinishing the floors and some electrical work.  Mullinix Aff. ¶ 4.  Mr. Bogorad never had an ownership interest in the East 87th Street apartment.  *Id.*

10.    In or around the fall of 2002, the couple began discussing Ms. Mullinix selling the East 87th Street apartment and purchasing another apartment closer to Fifth Avenue in New York City.  Id. ¶ 13; Mullinix Aff. ¶¶ 5-6.

11.    In or around November 2002, Ms. Mullinix looked at an apartment located at 1050 5th Avenue in New York City (hereinafter, the "Apartment") which was for sale.  Compl. ¶ 14; Mullinix Aff. ¶ 7.

4083588v2

12.     Mr. Bogorad wanted to look at the Apartment with Ms. Mullinix, but Ms. Mullinix declined because she felt the Apartment was too expensive, and it needed extensive renovations. Ms. Mullinix was not interested in pursuing purchasing the Apartment because it was too expensive. Mr. Bogorad told Ms. Mullinix that he would pay for the cost of the renovations. Compl. ¶ 14; Ms. Mullinix's Response to Defendants' First Set of Interrogatories to Plaintiff, Response No. 3 ("Int. Res. No. 3"), attached hereto as Exhibit 2; Mullinix Aff. ¶¶ 7-8.

13.     Mr. Bogorad advised Ms. Mullinix to separate her thinking about purchasing the Apartment from the cost of the renovations because he would pay for the renovations and would continue to pay for the maintenance fees as he had done for the East 87th Street apartment. Int. Res. No. 3; Mullinix Aff. ¶¶ 8-10.

14.     Mr. Bogorad told Ms. Mullinix that if she were to use all of the proceeds from the sale of the East 87th Street Apartment, she could on her own fund the 50% down-payment (typically required by co-operative buildings) if she purchased an apartment in the range of $1 million to $1.5 million. Mullinix Aff. ¶ 10.

15.     Mr. Bogorad said that if Ms. Mullinix purchased the Apartment and paid for the mortgage, he would pay for the renovations, monthly maintenance fees (as he had for the East 87th Street apartment), one-half the storage costs and one-half the tax consequences of selling the East 87th Street apartment. Compl. ¶¶ 13, 17-18; Mullinix Aff. ¶¶ 10-11.

16.     In or around February 2003, Ms. Mullinix entered into a contract for the sale of the East 87th Street apartment. Compl. ¶ 18; Int. Res. No. 3.

17.     Ms. Mullinix and the purchasers of the East 87th Street apartment closed on the sale on or around March 31, 2003. Compl. ¶ 19; Int. Res. No. 3.

3

18.    Mr. Bogorad offered to pay the storage charges of the couple's belongings and Ms. Mullinix suggested that the couple split them evenly.  Mullinix Aff. ¶ 10.  Mr. Bogorad reiterated his promise to pay for half of the storage charges and tax consequences after the sale. *Id.* ¶ 11.

19.    On or about February 7, 2003, after having learned that the price of the Apartment had been reduced, the couple visited the Apartment together.  Compl. ¶ 16.

20.    The couple never discussed the possibility that Mr. Bogorad contribute any funds to the *purchase* of the Apartment.  .  Mr. Bogorad told Ms. Mullinix that he wanted her to own the Apartment outright and advised her that all payments related to the Apartment should be made by her, and that he would reimburse her for certain of those payments, so as to ensure that there would be no question as to who owned the Apartment.  Mullinix Aff. ¶ 12.

21.    Mr. Bogorad explicitly stated that Ms. Mullinix would purchase the Apartment and pay the mortgage and he would only pay for the renovations, maintenance fees, storage costs and tax consequences. *Id.*

22.    Ms. Mullinix and Mr. Bogorad met with an attorney to prepare a contract for the purchase of the Apartment.  Int. Res. No. 3.

23.    Ms. Mullinix's attorney called the seller's attorney, who indicated that Ms. Mullinix should assemble all of her financial information and meet him in his office a few days later, so that he could meet both Ms. Mullinix and a competing bidder individually and make a recommendation to his client. *Id.*

24.    On or about February 10, Ms. Mullinix met with the seller's attorney.  That same day, the seller's attorney called Ms. Mullinix's lawyer to indicate that Ms. Mullinix's offer had been accepted. *Id.*

25.    Mr. Bogorad did not provide any funds toward the purchase price of the Apartment and his financial information was never seen or considered by the seller or the seller's attorney when accepting Ms. Mullinix's offer.  Mullinix Aff. ¶ 13.

26.    Ms. Mullinix executed the Contract for Sale for the Apartment on or about February 7, 2003, and closed on the purchase on or about June 10, 2003.  Compl. ¶¶ 18, 22.

27.    Ms. Mullinix's application to the Apartment's cooperative board was prepared with only her financial information.  Mullinix Aff. ¶ 13.

28.    Ms. Mullinix purchased the Apartment entirely with her own funds, and Ms. Mullinix took out a mortgage on the Apartment solely in her name.  Mullinix Aff. ¶ 13.

29.    The Apartment, from the closing date, has always been in Ms. Mullinix's name.  Mullinix Aff. 15.

30.    Mr. Bogorad never owned an interest in the Apartment, nor did Mr. Bogorad want to or intend to own such an interest.  *Id.*  It was never in his name or transferred to or from his name to or from Ms. Mullinix.

31.    The couple never intended that Mr. Bogorad have an ownership interest in the Apartment; to the contrary, Mr. Bogorad explicitly wanted Ms. Mullinix to own the Apartment entirely.  *Id.*  Mr. Bogorad did not commit to pay for the renovations, maintenance fees, storage costs and tax consequences based upon any agreement that he would have an ownership interest in the Apartment.  There was never any agreement that Mr. Bogorad would have any interest whatsoever in the Apartment.  Mr. Bogorad never requested and Ms. Mullinix never promised that she would convey the Apartment or any partial or total interest in the Apartment to him at any point in time.  Ms. Mullinix never promised to hold the Apartment for Mr. Bogorad's benefit or to convey the Apartment to a third party for his benefit.  *Id.* ¶ 16.

32.     When speaking about the Apartment to his family, Mr. Bogorad referred to Ms. Mullinix as purchasing the Apartment, never including himself as buying the Apartment with her. Bogorad-Gross Dep at 148, 169-70.

33.     The couple planned for renovations to the Apartment together, meeting with architects, discussing the plans and shopping for ideas. *Id.*; Compl. ¶¶ 23-24, 27.

34.     Prior to the completion of the renovation project to the Apartment, Mr. Bogorad passed away unexpectedly while on vacation with Ms. Mullinix, the Defendants and the Defendants' children. Compl. ¶ 30.

35.     Prior to Mr. Bogorad's death, he had negotiated and confirmed Ms. Mullinix's contract with the architect Heather Aman. Mullinix Aff. ¶ 18.

36.     The couple had reviewed and approved the architectural design plans from Ms. Aman just days prior to leaving on their vacation, and had authorized Ms. Aman to send those plans out to general contractors for bidding. *Id.*; Compl. ¶ 29.

37.     Mr. Bogorad clearly and unambiguously told Ms. Mullinix that he would pay for the renovation costs. This commitment was made prior to Ms. Mullinix selling the East 87th Street apartment and purchasing the Apartment. Mullinix ¶ 19.

<div style="margin-left: 40%;">

Respectfully submitted,

KATHLEEN P. MULLINIX,
By her attorneys,

/s/ Sara E. Solfanelli
Larry C. Kenna (BBO # 267760)
Michelle L. Dineen Jerrett (BBO #634930)
Sara E. Solfanelli (BBO #658018)
CHOATE, HALL & STEWART LLP
Two International Place
Boston, Massachusetts 02110
Tel: (617) 248-5000

</div>

Date:   June 5, 2006

6

CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on June 5, 2006.

/s/ Sara E. Solfanelli

7

# Exhibit 1

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

FILED
IN CLERKS OFFICE

2004 DEC 22 P 1: 52

U.S. DISTRICT COURT
DISTRICT OF MASS.

|  |  |
|---|---|
| KATHLEEN P. MULLINIX, | ) |
| Plaintiff, | ) |
| v. | ) |
| KIKI BOGORAD-GROSS and LEONARD P. BOGORAD, As They Are Executors of the Will of Lawrence Bogorad, | ) |
| Defendants. | ) |

Civil Action No. _____

04  12684 WGY

## COMPLAINT AND DEMAND FOR JURY TRIAL

### INTRODUCTION

1.      This is an action by Kathleen P. Mullinix, an individual, to recover damages for the defendants' breach of contract.

### PARTIES

2.      The Plaintiff, Kathleen P. Mullinix (hereinafter, "Ms. Mullinix" or the "Plaintiff"), is an individual resident of the State of New York, residing at 1050 Fifth Avenue, Apartment 15B, New York, NY 10028.

3.      The Defendant Kiki Bogorad-Gross is an individual resident of the Commonwealth of Massachusetts, residing at 80 Highland Avenue, Newton, Massachusetts 02460.

4.      The Defendant Leonard P. Bogorad is an individual resident of the State of Maryland, residing at 5121 Worthington Drive, Bethesda, Maryland 20816.

3775948v2

5.      Lawrence Bogorad ("Mr. Bogorad") died on December 28, 2003. The

Defendants Kiki Bogorad-Gross and Leonard P. Bogorad are Mr. Bogorad's daughter and son,

and have been appointed executors of the will of Mr. Bogorad by decree of a Justice of the

Probate and Family Court, Middlesex County, MA.

## JURISDICTION AND VENUE

6.      This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)

because the action is between citizens of different states and the amount in controversy exceeds

$75,000.

7.      Pursuant to 28 U.S.C. § 1391(a) and (c), venue is appropriate in the United States

District Court for the District of Massachusetts because the defendants are subject to personal

jurisdiction in Massachusetts, because the Estate of Lawrence Bogorad is being administered in

Massachusetts, and because a substantial part of the events and omissions giving rise to the

claims below took place in Massachusetts.

## FACTS

8.      In or about November 1975, Ms. Mullinix and Mr. Bogorad began a relationship.

Except for a brief period in or about March 1998, Ms. Mullinix and Mr. Bogorad (hereinafter the

"couple") maintained the relationship from November 1975 until Mr. Bogorad's death on

December 28, 2003.

9.      After March 1998, the couple began living together, both at Mr. Bogorad's home

at 2 White Pine Lane, Lexington, Massachusetts (hereinafter, the "Lexington home"), and in Ms.

Mullinix's apartment at 975 Park Avenue, New York City. The couple considered themselves to

be, and lived as if, in a marital relationship with one another.

-2-

10.     After Ms. Mullinix and her husband separated, Ms. Mullinix and her husband sold the apartment at 975 Park Avenue, and Ms. Mullinix purchased a co-operative apartment located at 170 East 87th Street in New York City (hereinafter, the "East 87th Street apartment"). Mr. Bogorad was instrumental in Ms. Mullinix's decision to purchase the East 87th Street apartment and advised Ms. Mullinix on financial matters relating to the purchase.

11.     On or about July 1, 1999, the couple moved in together to the East 87th Street apartment. Mr. Bogorad paid the monthly maintenance fees on the East 87th Street apartment during the entire time Ms. Mullinix owned it.

12.     Mr. Bogorad paid for renovations to the East 87th Street apartment, which included refinishing the floors and some electrical work. In addition, Mr. Bogorad paid for one-half of the cost of purchasing new furniture for the East 87th Street apartment and Ms. Mullinix paid the other one-half of the cost.

13.     In the fall of 2002, a neighbor from the East 87th Street apartment inquired of Ms. Mullinix whether she was interested in selling her apartment. Mr. Bogorad encouraged Ms. Mullinix to pursue those discussions. He told her that he wanted her to purchase an apartment closer to 5th Avenue. At around that time, Mr. Bogorad told Ms. Mullinix about changes in the tax laws relating to capital gains and committed to pay Ms. Mullinix one half of the capital gains tax she incurred when she sold the East 87th Street apartment.

14.     In or around November 2002, Ms. Mullinix looked at an apartment located at 1050 5th Avenue in New York City (hereinafter, the "Apartment") which was for sale. Mr. Bogorad wanted to look at the Apartment with Ms. Mullinix but Ms. Mullinix declined because she felt the Apartment was too expensive, and would need extensive renovations. Mr. Bogorad told Ms. Mullinix that he would pay for the cost of the renovations.

-3-

15.    In or around January 2003, Ms. Mullinix entered into a contract for the sale of the East 87th Street apartment. The couple again discussed the issue of capital gains tax consequences and Mr. Bogorad committed to pay for one-half of the tax consequences.

16.    On or about February 7, 2003, after having learned that the price of the Apartment had been reduced, the couple visited the Apartment together. Ms. Mullinix continued to believe that the cost of the Apartment and the renovations was too expensive.

17.    Mr. Bogorad wanted Ms. Mullinix to purchase the Apartment and urged her to do so. Mr. Bogorad reiterated his commitment to pay for the cost of the renovations. Mr. Bogorad also told Ms. Mullinix that he would pay for the monthly maintenance fees for the Apartment, just as he had done with the East 87th Street apartment.

18.    Despite the fact that Ms. Mullinix did not want to purchase the Apartment because of the costs involved, Mr. Bogorad convinced her to do so by committing to her that he would (i) split evenly with her the tax consequences that resulted from the sale of the East 87th Street apartment by reimbursing her for one-half of that amount upon completion of her 2003 taxes; (ii) pay the monthly maintenance fees for the Apartment by reimbursing her on a monthly basis; (iii) pay for the cost of the renovations to the Apartment, by reimbursing her for the cost of the work and for the architect's fee as she incurred those costs and fees; and (iv) split evenly with her the costs she incurred for storing the belongings from the East 87th Street apartment until those belongings could be moved to the Apartment upon completion of the renovations, by reimbursing her for one-half of the total storage costs, once a final amount was determined. Mr. Bogorad's commitment to pay for the monthly maintenance fees, as he had paid with respect to Ms. Mullinix's East 87th Street apartment, the cost of the renovations, and to split the total storage fee cost and the tax consequences was an integral part of the couple's decision to have

-4-

Ms. Mullinix purchase the Apartment. Ms. Mullinix executed the Contract for Sale for the Apartment on February 7, 2003.

19.    On or about March 31, 2003, Ms. Mullinix sold her East 87th Street apartment. At that time, Mr. Bogorad again reminded Ms. Mullinix of his commitment to pay for one-half of the taxes on the gain from the sale of the East 87th Street apartment that was not exempt from tax.

20.    On April 7, 2003, the couple moved their furniture and other belongings from the East 87th Street apartment into storage. Mr. Bogorad again committed to pay for one-half of the storage costs.

21.    After April 7, 2003, the couple lived full-time in the Lexington home. The couple planned to remain in the Lexington home until the renovations to the Apartment were complete. On more than one occasion, Mr. Bogorad stated that they could stay in the Lexington home until the renovations were complete.

22.    Ms. Mullinix closed on the purchase of the Apartment on June 10, 2003. Mr. Bogorad was instrumental in determining the type of mortgage Ms. Mullinix obtained for the Apartment. Ms. Mullinix relied on Mr. Bogorad and trusted his advice on such financial matters.

23.    In or around May 2003, Mr. Bogorad contacted Raynor Warner, an architect and long-time friend, about the renovations needed to the Apartment, and sought Mr. Warner's recommendation on an architect who worked in New York. Mr. Warner traveled to New York City on at least one occasion to meet with the couple regarding the renovations. Mr. Bogorad paid Mr. Warner $1787.00 for his services in connection with the renovations to the Apartment.

24.    Thereafter, and based in part on the recommendation of Mr. Warner, the couple hired Heather Aman of Heather Aman Designs for the architecture component of the renovation

-5-

plans. On or about July 25, 2003, Ms. Mullinix and Ms. Aman signed a contract for architectural

design services to the Apartment. Ms. Mullinix paid a $1500.00 retainer to Ms. Aman and later

paid another $1500.00 retainer to Ms. Aman. Mr. Bogorad reimbursed Ms. Mullinix for both of

these payments.

25.    In discussing the scope of the renovation project with Ms. Aman, the couple

realized that the cost of the renovation project, including the architect's fee, would be

approximately $400,000.00. Mr. Bogorad committed to paying for the renovation project and

the architect's fee, up to that amount.

26.    The architecture plans were designed for the couple and their needs. To

accommodate Mr. Bogorad the master bathroom was designed to include a walk-in shower with

interior seat with controls for the shower accessible from the seat. In addition, the architecture

plans included special lighting in the Apartment to accommodate Mr. Bogorad.

27.    The couple discussed the plans and shopped for ideas beginning in February 2003

when Ms. Mullinix committed to purchasing the Apartment. Mr. Bogorad was an active

participant in the planning phase of the renovations.

28.    In November 2003, Ms. Mullinix paid Ms. Aman $7500.00 for thirty percent

(30%) job completion.

29.    In December 2003, Ms. Aman presented the final architecture design plans to the

couple for approval. The couple approved the plans and authorized Ms. Aman to send the plans

out to bid to three (3) different contractors. Mr. Bogorad was an active participant in the

approval process for the architecture design plans.

30.     On or about December 24, 2003, the couple went to Mexico with Mr. Bogorad's children and grandchildren for an annual holiday vacation. Mr. Bogorad died on December 28, 2003.

31.     After Mr. Bogorad's death, Ms. Mullinix and the Defendant Kiki Bogorad-Gross discussed Mr. Bogorad's commitment to pay for the cost of the renovations to the Apartment. Ms. Bogorad-Gross told Ms. Mullinix that the family "certainly would want to do what [Mr. Bogorad] wanted," or words to that effect.

32.     On or about March 17, 2004, Ms. Mullinix executed a contract with McGraime Woodworking, Inc. for the renovations to the Apartment. Ms. Mullinix was required to pay McGraime a $35,000.00 deposit and an additional $52,500.00 upon demolition.

33.     After Mr. Bogorad's death, Ms. Mullinix continued to live in the Lexington house. In or around February 2004, the Defendant Leonard Bogorad assured Ms. Mullinix that she would be permitted to remain in the Lexington home until the renovations to the Apartment were completed.

34.     Despite this commitment, the Defendants sold the Lexington home in or around late June 2004 and Ms. Mullinix was required to vacate the home. As a result, Ms. Mullinix was forced to rent a furnished apartment until the renovations to the Apartment were completed.

35.     On or about August 20, 2004, Ms. Mullinix sent a demand letter to counsel for the Defendants, outlining in great detail her relationship with Mr. Bogorad and the issues arising in this litigation. The Defendants have refused to honor Mr. Bogorad's contracts, despite the fact that Ms. Mullinix has incurred costs and expenses that Mr. Bogorad agreed to pay.

-7-

## CLAIMS

### COUNT I
### (Breach of Contract)

36.    Ms. Mullinix hereby repeats and incorporates by reference the allegations set forth in Paragraphs 1 through 35 of this Complaint.

37.    Mr. Bogorad committed to pay the cost of the renovations and the architect's fee, up to $400,000.00.  Mr. Bogorad's commitment is a valid and binding contract between Mr. Bogorad and Ms. Mullinix.

38.    The Defendants have breached their obligations to Ms. Mullinix under the contract by, *inter alia*, refusing to pay Ms. Mullinix any and all amounts representing the cost of the renovations and the architect's fee.

39.    As a result of the Defendants' breach of the contract, Ms. Mullinix has suffered, and continues to suffer, monetary damages and harm in an amount, to be determined at trial, not less than $400,000.00.

### COUNT II
### (Breach of Contract)

40.    Ms. Mullinix hereby repeats and incorporates by reference the allegations set forth in Paragraphs 1 through 39 of this Complaint.

41.    Mr. Bogorad committed to pay the monthly maintenance fees for the Apartment. Mr. Bogorad's commitment is a valid and binding contract between Mr. Bogorad and Ms. Mullinix

42.    The Defendants have breached their obligations to Ms. Mullinix under the contract by, *inter alia*, refusing to pay Ms. Mullinix the amount of the monthly maintenance fees

-8-

paid to date that were not previously paid by Mr. Bogorad, and by refusing to pay the future monthly maintenance fees for the Apartment as such fees become due.

43.    As a result of the Defendants' breach of the contract, Ms. Mullinix has suffered monetary damages and harm in an amount, to be determined at trial, not less than $23,000, and will continue to suffer monetary damages and harm in the future as future monthly maintenance fees for the Apartment become due, in an amount of approximately $1800 per month.

### COUNT III
### (Breach of Contract)

44.    Ms. Mullinix hereby repeats and incorporates by reference the allegations set forth in Paragraphs 1 through 43 of this Complaint.

45.    Mr. Bogorad committed to pay one-half of the cost of the storage fees incurred on account of the couple's storage of their furniture and belongings pending the renovation of the Apartment.  Mr. Bogorad's commitment is a valid and binding contract between Mr. Bogorad and Ms. Mullinix.

46.    The Defendants have breached their obligations to Ms. Mullinix under the contract by, *inter alia*, refusing to pay Ms. Mullinix one-half of the total amount of storage fees paid from April 7, 2003 until November 19, 2004, the date on which Ms. Mullinix removed those belongings from the storage facility.

47.    As a result of the Defendants' breach of the contract, Ms. Mullinix has suffered, and continues to suffer, monetary damages and harm in an amount, to be determined at trial, not less than $4,900.00.

-9-

## COUNT IV

### (Breach of Contract)

48.    Ms. Mullinix hereby repeats and incorporates by reference the allegations set forth in Paragraphs 1 through 47 of this Complaint.

49.    Mr. Bogorad committed to pay one-half of the capital gains tax consequences incurred by Ms. Mullinix relating to the sale of the East 87th Street apartment. Mr. Bogorad's commitment is a valid and binding contract between Mr. Bogorad and Ms. Mullinix.

50.    The Defendants have breached their obligations to Ms. Mullinix under the contract by, *inter alia*, refusing to pay Ms. Mullinix one-half of the total tax representing the gain on the sale of the East 87th Street apartment that was not exempt from taxation.

51.    As a result of the Defendants' breach of the contract, Ms. Mullinix has suffered, and continues to suffer, monetary damages and harm in an amount, to be determined at trial, not less than $18,000.00.

## COUNT V
### (Breach of Contract)

52.    Ms. Mullinix hereby repeats and incorporates herein the allegations set forth in Paragraphs 1 through 51 of the Complaint.

53.    Mr. Bogorad promised Ms. Mullinix that she would live in the Lexington home until such time as the renovations to the Apartment were complete. Mr. Bogorad's commitment is a valid and binding contract between Mr. Bogorad and Ms. Mullinix.

54.    The Defendants knew about this contract and the Defendant Leonard Bogorad assured Ms. Mullinix after Mr. Bogorad's death that she could remain in the Lexington home until the renovations to the Apartment were completed.

3775948v2

55. The Defendants have breached their obligations to Ms. Mullinix under the contract by, *inter alia*, selling the Lexington home and forcing Ms. Mullinix to vacate that home and rent other living quarters during the pendency of the renovations to the Apartment.

56. As a result of the Defendants' breach of the contract, Ms. Mullinix has suffered monetary damages and harm in an amount, to be determined at trial, not less than $18,000.00.

### COUNT VI
### (Estoppel)

57. Ms. Mullinix hereby repeats and incorporates by reference the allegations set forth in Paragraphs 1 through 56 of this Complaint.

58. Mr. Bogorad committed to pay for the cost of the renovations to the Apartment, and the architect's fee, up to $400,000.00.

59. Mr. Bogorad's commitment was made to induce Ms. Mullinix to sell her East 87th Street apartment and to purchase the Apartment. Mr. Bogorad expected, or should reasonably have expected, Ms. Mullinix to rely on his commitment.

60. In reasonable reliance on Mr. Bogorad's commitment, Ms. Mullinix sold her East 87th Street apartment, purchased the Apartment and began making the necessary preparations for renovations, including hiring an architect and shopping for various components of the renovations. By his commitment to pay for the cost of the renovations to the Apartment, Mr. Bogorad induced Ms. Mullinix to sell her East 8th Street apartment, purchase the Apartment and to enter into contracts obligating her to pay the architect's fee and the costs of renovating the Apartment.

61. As a result of her reasonable reliance on Mr. Bogorad's commitment, Ms. Mullinix has suffered damages of approximately $400,000.00. Injustice can be avoided only by

enforcement of Mr. Bogorad's commitment to pay for the cost of the renovations to the Apartment, up to $400,000.00.

<div align="center">

**COUNT VII**
**(Estoppel)**

</div>

62.     Ms. Mullinix hereby repeats and incorporates by reference the allegations set forth in Paragraphs 1 through 61 of this Complaint.

63.     Mr. Bogorad committed to pay the monthly maintenance fees for the Apartment.

64.     Mr. Bogorad's commitment was made to induce Ms. Mullinix to sell her East 87th Street Apartment and to purchase the Apartment. Mr. Bogorad expected, or should reasonably have expected, Ms. Mullinix to rely on his commitment with respect to payment of the monthly maintenance fees.

65.     In reasonable reliance on Mr. Bogorad's commitment, Ms. Mullinix sold her East 87th Street apartment and purchased the Apartment. By his commitment to pay the monthly maintenance fees for the Apartment, Mr. Bogorad induced Ms. Mullinix to sell her East 87th Street apartment, to purchase the Apartment, and to enter into contracts obligating her to pay the architect's fee and the cost of renovating the Apartment.

66.     As a result of her reasonable reliance on Mr. Bogorad's commitment, Ms. Mullinix has suffered damages not less than $23,000 and will continue to suffer damages in the future in an amount equal to the monthly maintenance fees. Injustice can be avoided only by enforcement of Mr. Bogorad's commitment to pay the monthly maintenance fees for the Apartment.

<div align="center">

-12-

</div>

## COUNT VIII
### (Estoppel)

67.    Ms. Mullinix hereby repeats and incorporates by reference the allegations set forth in Paragraphs 1 through 66 of this Complaint.

68.    Mr. Bogorad committed to pay one-half of the storage fees incurred as a result of the couple's decision to store their furniture and belongings pending the renovation of the Apartment.

69.    Mr. Bogorad's commitment to pay for one-half of the storage fees for the couple's belongings was made to induce Ms. Mullinix to sell her East 87th Street apartment, purchase the Apartment, and place her belongings in storage during the renovations to the Apartment. Mr. Bogorad expected, or should reasonably have expected, Ms. Mullinix to rely on his commitment with respect to payment for one-half of the total storage costs for their belongings.

70.    In reasonable reliance on Mr. Bogorad's commitment, Ms. Mullinix sold her East 87th Street apartment, purchased the Apartment, placed her belongings in storage and entered into a contract obligating her to pay the entire storage fee. By his commitment to pay for one-half of the storage costs, Mr. Bogorad induced Ms. Mullinix to sell her East 87th Street apartment, place her belongings in storage and enter into a contact to pay the entire storage fee.

71.    As a result of her reasonable reliance on Mr. Bogorad's commitment, Ms. Mullinix has suffered damages of at least $4,900.00. Injustice can be avoided only by enforcement of Mr. Bogorad's commitment to pay one-half of the total storage costs.

-13-

## COUNT IX

### (Estoppel)

72.    Ms. Mullinix hereby repeats and incorporates by reference the allegations set forth in Paragraphs 1 through 71 of this Complaint.

73.    Mr. Bogorad committed to pay for one-half of the capital gains tax consequences incurred by Ms. Mullinix relating to the sale of her East 87th Street apartment.

74.    Mr. Bogorad's commitment was made to induce Ms. Mullinix to sell her East 87th Street apartment. Mr. Bogorad expected, or should reasonably have expected, Ms. Mullinix to rely on his commitment with respect to payment for one-half of the capital gains tax consequences relating to sale of the East 87th Street apartment.

75.    In reasonable reliance on Mr. Bogorad's commitment, Ms. Mullinix sold her East 87th Street apartment.  By his commitment to pay for one-half of the capital gains tax consequences, Mr. Bogorad induced Ms. Mullinix to sell her East 87th Street apartment and use the proceeds from that sale to purchase the Apartment.

76.    As a result of her reasonable reliance on Mr. Bogorad's commitment, Ms. Mullinix' federal and state tax liabilities increased by $36,296 total due to a long term capital gain.  Injustice can be avoided only by enforcement of Mr. Bogorad's commitment to pay for one-half of these capital gains tax consequences incurred by Ms. Mullinix as a result of the sale of the East 87th Street apartment.

### COUNT X
### (Estoppel)

77.    Ms. Mullinix hereby repeats and incorporates herein the allegations set forth in Paragraphs 1 through 76 of the Complaint.

-14-

78.     Mr. Bogorad committed to Ms. Mullinix that she could live in the Lexington home until such time as the renovations to the Apartment were complete.

79.     Mr. Bogorad's commitment was made to induce Ms. Mullinix to sell her East 87th Street apartment, purchase the Apartment, move her belongings into storage, and enter into contracts obligating her to pay for the cost of the renovations to the Apartment. Mr. Bogorad expected, or should reasonably have expected, Ms. Mullinix to rely on his commitment that she could live in the Lexington home until such time as the renovations to the Apartment were complete.

80.     In reasonable reliance on Mr. Bogorad's promise, Ms. Mullinix sold her East 87th Street apartment, purchased the Apartment, moved her belongings into storage, and entered into the contracts referred to above. By his commitment to permit Ms. Mullinix to live in the Lexington home until the renovations to the Apartment were complete, Mr. Bogorad induced Ms. Mullinix to sell her East 87th Street apartment, use the proceeds from that sale to purchase the Apartment, move her belongings into storage, and enter into the contracts referred to above.

81.     In or around January and February 2004, the Defendants knew about this commitment and the Defendant Leonard Bogorad assured Ms. Mullinix after Mr. Bogorad's death that she could remain in the Lexington home until the renovations to the Apartment were completed.

82.     In reasonable reliance on the Defendants' promise, Ms. Mullinix remained in the Lexington home. Thereafter the Defendants informed Ms. Mullinix that they were selling the Lexington home and that she would have to move out. Since the renovations to the Apartment were not complete at that time and the Apartment was not habitable, Ms. Mullinix was forced to rent a furnished apartment until the renovations to the Apartment were completed.

-15-

83.    As a result of her reasonable reliance on Mr. Bogorad's and the Defendants'

commitments, Ms. Mullinix has suffered damages in excess of $18,000.00, the amount of money

Ms. Mullinix was forced to spend for alternative housing arrangements pending the completion

of the renovations to the Apartment.

### PRAYERS FOR RELIEF

WHEREFORE, Ms. Mullinix respectfully requests that this Court:

(a)    enter judgment in favor of Ms. Mullinix and against the Defendants under each
       Count of the Complaint;

(b)    order the Defendants to make all payments to Ms. Mullinix consistent with and
       pursuant to the terms of her contracts with Mr. Bogorad;

(c)    award Ms. Mullinix monetary damages in an amount to be determined plus
       interest and costs, under each Count of the Complaint; and

(d)    grant such other and further relief as the Court deems just and appropriate.

### JURY DEMAND

Ms. Mullinix demands a trial by jury on all matters in the Complaint triable by a jury.

Respectfully submitted,

KATHLEEN P. MULLINIX,
By her attorneys,

Larry C. Kenna (BBO # 267760)
Michelle L. Dineen Jerrett (BBO #634930)
CHOATE, HALL & STEWART
Exchange Place
53 State Street
Boston, Massachusetts 02109
Tel: (617) 248-5000

Date: *December 22, 2004*

-16-

# Exhibit 2

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

KATHLEEN P. MULLINIX,

      Plaintiff,

      v.

KIKI BOGORAD-GROSS and LEONARD P.
BOGORAD, As They Are Executors of the Will of
Lawrence Bogorad,

      Defendants.

Civil Action No. 04-12684-WGY

## PLAINTIFF'S RESPONSES AND OBJECTIONS
## TO DEFENDANTS' FIRST SET OF INTERROGATORIES

Plaintiff Kathleen P. Mullinix ("Ms. Mullinix") responds as follows to Defendants' First Set of Interrogatories to be Answered under Oath by Plaintiff (the "Interrogatories").

### GENERAL OBJECTIONS

1.    Ms. Mullinix objects to the "Definitions" and "Instructions" set forth in the Interrogatories to the extent that those definitions and instructions purport to impose obligations upon her greater than or inconsistent with the obligations imposed by the Federal Rules of Civil Procedure.

2.    Ms. Mullinix objects to each specific interrogatory set forth in the Interrogatories to the extent that it seeks information protected by the attorney-client privilege, the work product privilege or any other privilege. Ms. Mullinix relies upon and asserts any such privilege, and any production of privileged information is inadvertent and is not to be deemed as a waiver thereof.

matter on which he or she is expected to testify; (c) the substance of all facts and opinions to which he or she is expected to testify; and (d) a summary of the grounds for each such opinion.

**Response to Interrogatory No. 2:**

Subject to and without waiving the General Objections set forth above, Ms. Mullinix states that discovery has just begun and that she has neither confirmed that expert testimony will be a part of her presentation, nor identified a suitable expert witness. Ms. Mullinix will amend this Response when necessary in accordance with Federal Rules of Civil Procedure, and with the scheduling order entered in this case.

**Interrogatory No. 3:**

Please describe the sequence of events Concerning the sale of the East 87th Street Apartment, including (a) a full and complete description of each Communication on this topic including the date it occurred, (b) the identity of each and every Person with whom You had any Communication Concerning, or who was involved in, the sale of the East 87th Street Apartment, and (c) the identity of each Document Concerning any of the foregoing.

**Response to Interrogatory No. 3:**

Ms. Mullinix objects to Interrogatory No. 3 on the grounds that it is over broad, unduly burdensome, and neither relevant to the subject matter of this action nor reasonably calculated to lead to the discovery of admissible evidence. Ms. Mullinix further objects to the Interrogatory to the extent it seeks information protected by the attorney-client privilege, the work-product doctrine and other applicable privileges. Subject to and without waiving these objections and the General Objections set forth above, Ms. Mullinix states that the following is her best present recollection of the details asked for by these Interrogatories: In August or September of 2002, Jeffrey Ascherman, M.D., who lived in the same building on East 87th Street as the couple, rang the doorbell on a Saturday morning. Although the couple had never seen or met Dr. Ascherman before, they invited him inside. Dr. Ascherman asked if the couple if they would consider selling the apartment because he thought the apartment next door to theirs might come on the

3

market and if he could buy both of them, he would combine them and have much more space for his family than he had at the time. Ms. Mullinix told him that the apartment was not for sale, and he left. At that time, Mr. Bogorad told Ms. Mullinix that he thought it might be an interesting idea to sell the East 87th Street Apartment. Mr. Bogorad told Ms. Mullinix that he was not entirely comfortable with her being so close to 86th and Lexington Avenue.

The next time the couple was with Ms. Mullinix's sons, Mr. Bogorad described Dr. Ascherman's visit and asked Brendan Mullinix his opinion. Brendan said, and Mr. Bogorad agreed, that Ms. Mullinix should call Dr. Ascherman and inquire further about his interest in purchasing the East 87th Street Apartment. In or around October 2002, after several reminders from Mr. Bogorad, Ms. Mullinix called the Aschermans and said she would like to discuss the possible sale of the apartment to them. Dr. Ascherman may have visited the apartment another time when Mr. Bogorad was present, and Dr. Ascherman and/or his wife visited it several times between October 2002 and February 2003.

Mr. Bogorad talked again to Ms. Mullinix during this same time period about his desire for her to move between Park and Fifth because the neighborhood was safer and he wanted to be assured that she was in a safe place in case anything happened to him. He suggested that the couple talk with Brendan about it again and that Ms. Mullinix talk with Judith Durham, the realtor who assisted the couple when Ms. Mullinix purchased the East 87th Street Apartment. Thereafter, the couple spoke with Brendan who agreed that an apartment between Park and Fifth would be a much better location. In addition, Ms. Mullinix spoke with Ms. Durham and sought her advice about selling the East 87th Street Apartment.

In early November 2002, Ms. Mullinix and Ms. Durham began looking at apartments on the market. They went out a couple of times, and saw several apartments, including an

4

apartment at 1050 Fifth Avenue different from the one Ms. Mullinix ultimately purchased. At around the same time, Ms. Durham discussed with Ms. Mullinix that the apartment she eventually purchased was listed on the market. Both, however, agreed that it was out of Ms. Mullinix' price range and Ms. Mullinix indicated she did not want to look at it.

Just prior to Thanksgiving, Ms. Mullinix spoke again with the Ashermans and they began discussing price in general terms. Mr. Bogorad was very enthusiastic about Ms. Mullinix selling the apartment and encouraged her to continue the discussions with the Aschermans regarding price. At around the same time, Brendan Mullinix viewed the Apartment on the Internet and suggested that Ms. Mullinix go see it to compare it to the other apartment Ms. Mullinix saw in the building. On the day before Thanksgiving, Ms. Mullinix and Brendan saw the Apartment. Ms. Mullinix recognized it needed extensive renovations (in addition to the replacement of the windows and air conditioning units), and given the listing price, determined it was not something she was interested in pursuing. Mr. Bogorad told Ms. Mullinix he wanted to see the Apartment, but Ms. Mullinix declined indicating that the Apartment would be too expensive. Mr. Bogorad advised Ms. Mullinix to separate her thinking about purchasing the Apartment from the cost of the renovations because he would pay for the renovations and would continue to pay for the maintenance fees as he had done for the East 87th Street Apartment. Mr. Bogorad told Ms. Mullinix that if she were to use all of the proceeds from the sale of the East 87th Street Apartment, she could on her own fund the 50% down-payment (typically required by co-operative buildings) if she purchased an apartment in the range of $1 million to $1.5 million. He assured her that he would pay for the monthly maintenance fees and any renovations. Mr. Bogorad told Ms. Mullinix that he thought she should seriously consider the Apartment because it was at a great location, and expressly stated that (1) Ms. Mullinix should apply the proceeds of

the sale of the East 87th Street apartment to supply the cash down payment that was required, (2) he would pay the monthly maintenance fees as he had done with the East 87th Street Apartment, and (3) he would pay for the renovations, so she would only need to pay the mortgage.

Between Thanksgiving and Christmas, Ms. Mullinix met with the Aschermans a couple of times to continue discussions on price. When they could not reach an agreement, Ms. Mullinix informed Mr. Bogorad that she did not want to go forward, but Mr. Bogorad told her he thought she was making a mistake. The couple then went away on vacation and returned January 11, 2003. Several times during the trip, Mr. Bogorad reiterated to Ms. Mullinix his desire for her to sell the East 87th Street Apartment and move. When the couple returned from their trip, the Aschermans and Ms. Mullinix resumed discussions about the possible sale of the East 87th Street Apartment. On or about February 5, 2003, Ms. Mullinix entered into a contract for the purchase and sale of the East 87th Street Apartment with the Aschermans. Ms. Mullinix and the Aschermans subsequently closed on that sale on March 31, 2003. Under an agreement with the Aschermans, the couple continued to occupy the apartment until April 8, 2003, at which point their furniture was moved to a storage facility and the couple returned to the Lexington Home. Once the couple decided to sell the East 87th Street Apartment, they determined that they would have to store many of their belongings. Mr. Bogorad offered to pay the storage charges and Ms. Mullinix suggested that the couple split them evenly. Once the East 87th Street Apartment was sold and the couple made arrangements to store their belongings, Mr. Bogorad reiterated his promise to pay for half of the storage charges.

Shortly after the couple returned from their vacation, Ms. Durham informed Ms. Mullinix that the seller of the Apartment had changed real estate brokers, and reduced the price of the Apartment. Ms. Mullinix still believed the total cost of the Apartment was too much given the

6

needed renovations. Ms. Durham spoke with Ms. Mullinix again in early February 2003, indicated that there was another buyer interested in the Apartment, and suggested Ms. Mullinix make a decision quickly about whether to look at it again. When Ms. Mullinix informed Mr. Bogorad of those developments, he indicated he was coming to New York the next day to look at the Apartment.

On or about February 7, Mr. Bogorad and Ms. Mullinix met Ms. Durham at the Apartment to look at it together. When Mr. Bogorad walked into the living room and looked across the foyer to the dining room, he stated to Ms. Mullinix, in Ms. Durham's presence, "I want you to buy this apartment." At that point, he had not even seen the other rooms. The couple and Ms. Durham walked around the rest of the apartment, and Mr. Bogorad stated to Ms. Mullinix, "Let's go into the bedroom and talk." In the bedroom, Mr. Bogorad repeated that he thought it was a wonderful apartment, he would feel very reassured if Ms. Mullinix were living there in case anything happened to him. He said, "Let's face it, something is going to happen to me, and I want to know that you are in a really nice and safe place." Ms. Mullinix reiterated her belief that it would be too expensive by the time the renovations were done. Mr. Bogorad reiterated, "If you sell your apartment you can put the proceeds from the sale into the purchase and I'll pay for the renovations and the maintenance and all you will need to do is pay the mortgage."

The couple went back into the living room and began discussing the economics of the purchase and necessary renovation with Ms. Durham. Ms. Durham indicated that the seller's broker thought the renovation would cost approximately $250,000, but both Mr. Bogorad and Ms. Durham stated that they thought it was an unrealistically low estimate. Ms. Durham inquired whether the couple would consider purchasing the Apartment together, but Mr. Bogorad

7

indicated that he wanted the Apartment to be owned solely by Ms. Mullinix. Mr. Bogorad indicated, however, that he would pay the maintenance fees and would pay for the renovations. Ms. Durham indicated that they could decide whether or not to include Mr. Bogorad in some way on the co-op application if the offer was accepted.

In the couple's presence, Ms. Durham called the seller's broker and learned that another offer had been made, and possibly accepted, on the Apartment. Mr. Bogorad told Ms. Mullinix he believed she should increase her offer and Ms. Durham indicated that it was worth trying. Ms. Mullinix again expressed her concern about the cost of the Apartment and the needed renovations and Mr. Bogorad responded, "That's silly, if you wind up spending and additional $100,000 or $200,000, it doesn't make that much difference." Ms. Durham called the seller's broker and conveyed the increased offer. After multiple telephone calls between Ms. Durham and the seller's broker, during which Ms. Durham learned that the other prospective buyers had increased their bid, the seller's broker told Ms. Durham that the couple should submit a signed contract. Mr. Bogorad wanted to meet with an attorney as quickly as possible to prepare a contract. The attorney who handled Ms. Mullinix's purchase of the East 87th Street Apartment was out sick that day, so Ms. Durham recommended another attorney, Alan Kroll. The couple met with him that afternoon to prepare a contract. Mr. Kroll called the seller's attorney, Avron Brog, who indicated that Ms. Mullinix should assemble all of her financial information and meet him in his office a few days later, so that he could meet both prospective buyers individually and make a recommendation to his client. Mr. Bogorad was thrilled about the progress and reassured Ms. Mullinix throughout the weekend that the attorney would recommend her. On or about February 10, Ms. Mullinix met with Mr. Brog. That same day, Mr. Brog called Mr. Kroll and

8

indicated that Ms. Mullinix's offer had been accepted. Ms. Mullinix closed on the sale of the Apartment on or about June 10, 2003.

On or about February 27, 2003, Ms. Mullinix executed a document acknowledging that as a prospective purchaser of the Apartment, she was responsible for replacing all old windows with windows conforming to the building's master plan. In addition, the couple was made aware that the building had received approval to replace and enlarge the through-the-wall air conditioning units to be able to replace them with units that also provided a heating mechanism. The couple arranged for the replacement of the windows and air conditioning / HVAC units on their own and hired contractors to perform the work outside of the larger renovation project they anticipated. These projects were completed during the fall of 2003 by Skyline Windows, LLC and Hamilton Air. Ms. Mullinix paid for this work and Mr. Bogorad reimbursed her. The couple agreed that the $400,000 budget for the renovation project did not include the replacement of the windows and air conditioning / HVAC units.

Shortly after Ms. Mullinix's offer was accepted, when Ms. Durham and the couple prepared the Board package, Ms. Durham stated that she believed the couple should include Mr. Bogorad on the application as an occupant of the Apartment. To that end, Ms. Durham asked Mr. Bogorad for a copy of his curriculum vitae to be included in the package, which he supplied. The financial statements were prepared, however, with only Ms. Mullinix's assets as she was to be the sole owner of the Apartment. In reviewing the Board package with her supervisor, Ms. Durham and the supervisor discussed whether to include Mr. Bogorad as an occupant of the Apartment. After that discussion, Mr. Bogorad's name was removed from the Board application package because of the fact that Mr. Bogorad was married.

9

Shortly after Ms. Mullinix's offer was accepted, Mr. Bogorad suggested to Ms. Mullinix that they discuss the renovations with his friends, Raynor and Ranne Warner. Thereafter, in late February, the couple met the Warners at a restaurant in Arlington, MA to discuss the project. Everyone was very enthusiastic about the project; Mr. Warner said he would like to help if that were possible, and Mrs. Warner said that it would be great if the couple could somehow purchase Siematic kitchen cabinets from the same vendor as was doing her development project in Pawtucket, Rhode Island. The four agreed that Ms. Mullinix would take as exact measurements of the Apartment as she could, and Mrs. Warner suggested that they go to the Siematic showroom in Boston. Mr. Bogorad called Ms. Bogorad-Gross and asked her if she could arrange for the couple to get into the Boston Design Center. Ms. Bogorad-Gross made the arrangements and also arranged for them to visit two or three additional showrooms. When they visited the Boston Design Center, the couple met with Ms. Bogorad-Gross briefly in her office and discussed the project. The couple also went back to Siematic two or three additional times after the first visit.

Mr. Bogorad told Ms. Mullinix he thought she should identify construction people and/or architects in New York to look at the apartment and give advice about design and costs. During the time from March 2003 on, the couple spent a significant amount of time investigating various options for the design and materials for the renovation. They went to New Jersey with Brendan Mullinix to look at kitchen cabinets in a kitchen design place and went to a bathroom fixture place; they went to Expo in Burlington many times; they went to several kitchen places around Boston, and Mr. Bogorad went alone to a showroom on Route 9 in Framingham or Wellesley to look at cabinets that he had seen in one of the brochures that the couple had collected; and in March or April, the couple went to the design show at the Javits convention Center in New York.

10

As the spring went on, Ms. Mullinix arranged for several contractors who had been recommended by various acquaintances to come to look at the Apartment. Included among those individuals were Rudy Masupust Construction, Advanced Construction, Edward Dew, Howard Elliot, Todd Swigard, Bill Berg, Ronald Bently, and Joan Craig. In addition, Ms. Mullinix met with Hamilton Air Conditioning and Skyline Windows. By May 2003, the couple estimated that they should be able to get the renovations completed for $400,000, excluding the windows that were required by the co-operative board and the replacement of the heating/air conditioning units. Mr. Bogorad told Ms. Mullinix that they could take their time with the planning and the renovations because they could stay in the Lexington Home until the Apartment was ready. This was discussed by the couple in conversations with Kiki Bogorad-Gross' family over the months.

As the couple reviewed the information provided by the various people who had looked at the Apartment, a consensus was developing that the job would cost at least $400,000, in addition to the replacement of the windows and air conditioners that the couple arranged for independent of a contractor. Mr. Bogorad committed to pay for the renovation up to $400,000, although recognizing that constructions projects always cost more than initially agreed, Mr. Bogorad also told Ms. Mullinix that they would discuss additional costs. The couple also agreed that they would select all of the items for the renovation before the contract went to bid.

In or around June or July 2003, Mr. Warner traveled to New York to look at the Apartment and to think about the design. During this same time period, the couple had several conversations with Mrs. Warner about the kitchen cabinets, although due to delays in Mrs. Warner's project, it became clear that the cabinets for that project would not arrive in time for the couple's renovation project. Thereafter, Mr. Warner visited the couple in Lexington and

11

brought drawings and talked about design concepts. During his work it became clear that, due to

the huge complexities of building anything in New York, it would not be possible for him to run

the project from Boston and he suggested that the couple find a NY architect who would be

primarily responsible for the job and he would act as an advisor. On or about July 11, 2003, Mr.

Warner sent a proposal to Ms. Mullinix outlining the scope of his schematic design services for

renovations to the Apartment. In addition, Mr. Warner contacted an architect friend in New

York who recommended Heather Aman. Mr. Warner spoke with her by phone about the project

about which she was very enthusiastic and arranged for her to meet with the couple, Brendan

Mullinix and him at the Apartment. At Mr. Warner's suggestion, Ms. Mullinix checked out

some of Ms. Aman's work in New York. Thereafter, the couple met with Mr. Warner, Ms.

Aman and Brendan Mullinix to discuss the renovation plans. Prior to the meeting, and based

upon the original projections and schematic from Mr. Warner, Ms. Aman estimated her fees

based upon a total construction cost of approximately $300,000. When Ms. Aman first saw the

Apartment and discussed the project with the couple, however, she discussed with the couple that

the construction costs would be greater than $300,000 and informed them that with the more

costly renovation project, her fee would also increase. Mr. Bogorad questioned her extensively

about this and Ms. Aman explained that her construction estimate was roughly based upon a

square footage calculation and that her fee was based upon the construction costs. Mr. Bogorad

seemed particularly concerned about the corresponding increase in the architectural design

service fee and questioned Ms. Aman about it. Ms. Aman indicted to Mr. Bogorad that when a

construction cost increases by one-third, there is also an increase in the architectural design

services fee. Mr. Bogorad was much more involved in these discussions with Ms. Aman than

Ms. Mullinix was. On or about July 25, 2003, Ms. Mullinix and Ms. Aman signed a contract for

12

architectural design services to the Apartment and Ms. Mullinix paid $1,500 as a retainer for the project. Mr. Bogorad reimbursed Ms. Mullinix for this payment. Ms. Mullinix later paid an additional $1,500 retainer to Ms. Aman and Mr. Bogorad likewise reimbursed Ms. Mullinix for this payment.

During the course of the planning Ms. Aman had sent documents to the couple at the Lexington Home, and sent a final copy of the plans to Lexington via Federal Express. The couple took the plans to Mexico and planned to study them during the trip. On or about December 17, 2003, Ms. Aman sent the renovation plans to bid to three contractors, two of whom Ms. Aman previously had worked with and another with whom Ms. Mullinix had met. A contractor was ultimately selected and a contract was executed in or around March 2004.

Ms. Mullinix further refers the Defendants to her initial disclosures and the documents produced in response to Defendants First Set of Requests for Production of Documents by Plaintiff.

**Interrogatory No. 4:**

Please describe the sequence of events Concerning the purchase of the Fifth Avenue Apartment, including (a) a full and complete description of each Communication on this topic including the date it occurred, (b) the identity of each and every Person with whom You had any Communication Concerning, or who was involved in, the purchase of the Fifth Avenue Apartment, and (c) the identity of each Document Concerning any of the foregoing.

**Response to Interrogatory No. 4:**

Ms. Mullinix objects to Interrogatory No. 4 on the grounds that it is over broad, unduly burdensome and to the extent it seeks information protected by the attorney-client privilege, the work-product doctrine and other applicable privileges. Subject to and without waiving these objections and the General Objections set forth above, Ms. Mullinix refers the Defendants to Response to Interrogatory No. 3.

4006212v3

**Response to Interrogatory No. 13:**

Ms. Mullinix objects to Interrogatory No. 13 on the grounds that it is over broad, unduly burdensome and to the extent it seeks information protected by the attorney-client privilege, the work-product doctrine and other applicable privileges. Subject to and without waiving these objections and the General Objections set forth above, Mullinix refers the Defendants to the Complaint, specifically, paragraphs 18-34. Mullinix further refers the Defendants to documents produced in response to Defendants First Set of Requests for Production of Documents by Plaintiff.

KATHLEEN P. MULLINIX,

As to objections:

Larry C. Kenna (BBO # 267760)
Michelle L. Dineen Jerrett (BBO # 634930)
Sara E. Solfanelli (BBO # 658018)
CHOATE, HALL & STEWART LLP
Two International Place
Boston, Massachusetts 02110
Tel: (617) 248-5000

Dated: November 22, 2005

I HEREBY CERTIFY THAT A TRUE COPY OF
THE ABOVE DOCUMENT WAS SERVED
UPON THE ATTORNEY OF RECORD FOR
EACH OTHER PARTY BY MAIL (HAND) ON:

November 22, 2005

4006212v3

Formatted: Font: 9 pt

Deleted: 4006212v3