UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| KATHLEEN P. MULLINIX,<br><br>          Plaintiff,<br><br>          v.<br><br>KIKI BOGORAD-GROSS and LEONARD P.<br>BOGORAD, As They Are Executors of the Will of<br>Lawrence Bogorad,<br><br>          Defendants. | )<br>)<br>)<br>)<br>)<br>)  Civil Action No. 04-12684-WGY<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

**AFFIDAVIT OF KATHLEEN P. MULLINIX IN SUPPORT OF PLAINTIFF'S
MOTION FOR PARTIAL SUMMARY JUDGMENT**

Kathleen P. Mullinix hereby deposes and states as follows:

1.     I make this affidavit in support of the Plaintiff's Motion for Partial Summary

Judgment, submitted herewith, based upon my personal knowledge and belief.

2.     I began a romantic relationship with Lawrence Bogorad ("Laurie") in or about

November, 1975. Except for a brief period in or about March 1998, we maintained

the relationship from November 1975 until Laurie's death on December 28, 2003.

3.     After March 1998 we began living together, at both Laurie's home in Lexington,

Massachusetts and my apartment on 975 Park Avenue in New York City. We lived

as if husband and wife.

4.     My ex-husband and I sold the 975 Park Avenue apartment and I purchased an

apartment on East 87th Street in New York City. Laurie was instrumental in my

decision to purchase the East 87th Street apartment and advised me on financial

matters relating to the purchase. Laurie paid for renovations to the East 87th Street apartment, which included refinishing the floors and some electrical work. He also paid the monthly maintenance fee for the East 87th Street apartment during the entire time we lived there (which was the entire time I owned it) by reimbursing me for the payments I made. Laurie never had an ownership interest in the East 87th Street apartment.

5.    I was not interested in selling the East 87th Street apartment, but Laurie insisted that we discuss the option after a neighbor expressed interest in purchasing the East 87th Street apartment in around the fall of 2002. I only pursued discussions with my neighbor because Laurie insisted that I do so.

6.    Laurie told me that he wanted me to sell the East 87th Street apartment so that I could find an apartment in a safer area. Laurie worried about me living so close to the intersection of 86th Street and Lexington Avenue. He expressed his desire that I have a safe apartment, because he wanted to make sure that I would be in a safe place should anything happen to him. Laurie told me that he wanted me to sell the East 87th Street apartment and to buy an apartment between Park and Fifth Avenue, a much safer area.

7.    In or around November 2002 a real estate broker and I began to look at apartments on the market. My real estate broker told me about a co-operative apartment at 1050 Fifth Avenue (the "Apartment"), but she and I agreed it was out of my price range and I did not even look at it. On the day before Thanksgiving 2002, however, my son Brendan and I visited the Apartment to compare it with other apartments I had seen.

8.     The Apartment was not suitable to live in without necessary, extensive renovations. Laurie wanted to go look at the Apartment, but I declined because it was too expensive and needed significant renovations. Laurie told me that I should not consider the costs of renovations and maintenance fees in making my decision about the Apartment, because he would pay for both.

9.     I told Laurie that I did not want to buy the Apartment because it was too expensive and the renovations and maintenance fees were too costly. Laurie stated that if I bought the Apartment, he would pay for the costs of renovations and the monthly maintenance fees.

10.    Laurie explained to me that I could use the proceeds from the sale of the East 87th Street apartment to fund the 50% down-payment (typically required by co-operative buildings) for an apartment in the range of $1 million to $1.5 million. Laurie proposed that I purchase the Apartment, using the proceeds from the sale of the East 87th Street apartment for the down payment, be responsible for the mortgage payments, and he pay for the renovations, the monthly maintenance fees, one-half the storage costs (he offered to pay for the entire cost of storage but I suggested we spilt the costs and he agreed) and one-half the tax consequences of selling the East 87th Street apartment. Laurie committed to these payments so that I would sell the East 87th Street apartment and purchase the Apartment.

11.    Laurie reiterated his commitment to pay for one-half the storage costs and one-half the tax consequences after the sale of the East 87th Street apartment in March 2003.

12.    The possibility that Laurie contribute any funds to the *purchase* of the Apartment was never even discussed. He made it clear that I would purchase the Apartment and pay

the mortgage and he would only pay for the renovations, maintenance fees, storage costs and tax consequences. Laurie told me that he wanted me to own the Apartment outright and he advised me that all payments related to the Apartment should be made by me, and that he would reimburse me for certain of those payments, so as to ensure that there would be no question as to who owned the Apartment.

13.     Laurie did not contribute any money toward the purchase of the Apartment. I purchased the Apartment entirely with my own funds. I alone took out a mortgage on the Apartment. Laurie's financial information was not considered by the seller's attorney when I made my formal offer to purchase the Apartment. The financial statements submitted to the co-operative board of the Apartment were prepared with only my information because I was to be the sole owner of the Apartment.

14.     I would not have made a formal offer to purchase the Apartment, and ultimately purchased the Apartment, if Laurie had not committed to pay for the renovations, maintenance fees, storage costs and tax consequences.

15.     The Apartment has always been in my name. Laurie never owned an interest in the Apartment, nor did he ever intend to or want to. Laurie explicitly told me that he wanted me to own the Apartment so that I would have a safe place to live if something were to happen to him.

16.     Laurie did not commit to pay for the renovations, maintenance fees, storage costs and tax consequences based upon any agreement that he would have an ownership interest in the Apartment. There was never any agreement that Laurie would have any interest whatsoever in the Apartment. Laurie never requested and I never promised that I would convey the Apartment to Laurie at any point in time. I never promised to

hold the Apartment for his benefit or to convey the Apartment to a third party for his benefit.

17.    Laurie and I planned the renovations for the Apartment together, with him arranging for an architect and numerous visits to showrooms. Laurie was much more involved than I in negotiating the contract for the architect. He negotiated, understood and approved the contract I signed with the architect, Heather Aman, who estimated that the renovations would cost approximately $400,000 (excluding the windows that were required by the co-operative board and the replacement of the non-functioning heating/air conditioning units).

18.    Laurie and I had reviewed and approved the final Contract Bidding document from Ms. Aman just days prior to leaving on our vacation to Mexico with Laurie's family in December 2003, and we had authorized Ms. Aman to send the Contract Bidding document out to general contractors.

19.    Laurie clearly and unambiguously stated that he would pay for the renovation costs, as we had agreed upon prior to my selling the East 87th Street apartment and purchasing the Apartment.

    Signed under the pain of penalties of perjury this 5th day of June 2006.


                                _/s/ Kathleen P. Mullinix____
                                Kathleen P. Mullinix


4087165v2

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on June 5, 2006.


/s/ Sara E. Solfanelli

4087165v2