UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

―――――――――――――――――――――――――

KATHLEEN P. MULLINIX,            )
                                 )
            Plaintiff,           )
                                 )
            v.                   )    Civil Action No. 04-12684-WGY
                                 )
KIKI BOGORAD-GROSS and LEONARD P. )
BOGORAD, As They Are Executors of the Will of )
Lawrence Bogorad,                )
                                 )
            Defendants.          )
                                 )

―――――――――――――――――――――――――

**PLAINTIFF KATHLEEN P. MULLINIX'S MEMORANDUM IN OPPOSITION TO
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND
IN SUPPORT OF PLAINTIFF'S CROSS-MOTION FOR SUMMARY JUDGMENT**

Plaintiff, Kathleen P. Mullinix ("Mullinix" or the "Plaintiff"), by her attorneys, Choate,

Hall & Stewart, LLP, respectfully submits this memorandum in opposition to Defendants'

Motion for Summary Judgment ("Defendants' Motion") and in support of Plaintiff Kathleen P.

Mullinix's Cross-Motion for Summary Judgment on all counts in her complaint. The Defendants

have failed to offer any evidence to dispute the established fact that Lawrence Bogorad ("Mr.

Bogorad") entered into an enforceable contract with Ms. Mullinix, which the Defendants, Kiki

Bogorad-Gross and Leonard P. Bogorad, as executors of Mr. Bogorad's estate, breached by

refusing to honor his commitments. Additionally, the undisputed material facts establish that

Ms. Mullinix reasonably relied on Mr. Bogorad's promises and, as a result, suffered an injury.

## INTRODUCTION

Ms. Mullinix filed this action when the Defendants refused to honor Mr. Bogorad's

obligations to her concerning renovations to her apartment. Although the circumstances may

1

seem unusual, this case boils down to simple contract law:  Mr. Bogorad entered valid and binding agreements with Ms. Mullinix.  Mr. Bogorad induced Ms. Mullinix to sell her apartment in New York City and to buy another apartment, which would – and did – require considerable financial commitments.  It is undisputed that the *only* reason Ms. Mullinix sold her apartment and bought a new one was because Mr. Bogorad committed to pay for the renovations to the new apartment, as well as for the apartment's monthly maintenance fees, one-half the storage costs while the new apartment was being renovated, and one-half the tax consequences from the sale of her condominium.  Ms. Mullinix's legal detriment – taking action she was otherwise not legally obligated to take – provided adequate consideration to Mr. Bogorad's promises.

The Defendants contend that: (1) Mr. Bogorad's promises were "vague and ambiguous"; (2) Mr. Bogorad's promises were merely promises to make gifts, and not binding commitments; and (3) Ms. Mullinix did not suffer any injury by relying upon Mr. Bogorad's "ambiguous" promises.  The Defendants simply have not offered *any* legal or factual evidence to support their arguments.  In fact, the *only* evidence in this case demonstrates that Mr. Bogorad intended to fulfill, and indeed had begun to fulfill, his obligations under his agreement with Ms. Mullinix.

Additionally, the Defendants do not offer evidence to dispute that: (1) Mr. Bogorad promised to pay for the renovations to Ms. Mullinix's apartment, and the other costs described above, if Ms. Mullinix purchased the new apartment; (2) it was reasonable and foreseeable that Ms. Mullinix would rely on his promises; (3) Ms. Mullinix *did* rely on those promises when she purchased the new apartment; and (4) Ms. Mullinix had to pay from her own funds for each of the items for which Mr. Bogorad promised to pay.  Thus, based upon the undisputed material facts, the Defendants' Motion must be denied and Ms. Mullinix is entitled to summary judgment on the basis of breach of contract or promissory estoppel.

2

## SUMMARY OF FACTS[1]

In early 1998, Mr. Bogorad and Ms. Mullinix ("the couple") publicly disclosed their long-standing relationship and began living together, traveling together and attending family functions together. Plaintiff Kathleen P. Mullinix's Responses to the Defendants' Statement of Undisputed Material Facts and Additional Undisputed Material Facts ¶¶ 43-46. (hereinafter, "SF ¶ __"). In the early 1990s Mr. Bogorad's wife became increasingly incapacitated and incompetent because of Alzheimer's Disease. SF ¶ 47. The couple lived as if they were husband and wife, residing in both Mr. Bogorad's home in Lexington, Massachusetts and Ms. Mullinix's apartment in New York City. *Id.* ¶¶ 44-45.

### I. The Sale of the East 87th Street Condominium

On July 1, 1999, Ms. Mullinix purchased and moved into a condominium on East 87th Street in New York City (the "Condominium"). *Id.* ¶ 48. Mr. Bogorad spent three to four days a week living in the Condominium with Ms. Mullinix, and the rest of the week in his Lexington home. *Id.* ¶ 49. During the entire time Ms. Mullinix owned the Condominium, Mr. Bogorad paid the monthly maintenance fees for the Condominium. *Id.* ¶ 50. Mr. Bogorad had also paid for renovations to the Condominium, which included refinishing the floors and some electrical work. *Id.* ¶ 51. Mr. Bogorad never had an ownership interest in the Condominium. *Id.* ¶ 52.

In August or September of 2002, Jeffrey Ascherman, M.D. approached Ms. Mullinix about purchasing her Condominium. *Id.* ¶ 53. Ms. Mullinix told him that the Condominium was not for sale. *Id.* Over the next few days, however, Mr. Bogorad told Ms. Mullinix that he wanted her to sell the Condominium. *Id.* ¶ 54. Mr. Bogorad explained that because he was getting older and had experienced health problems, he was concerned with her future. *Id.* ¶ 55.

---

[1] Ms. Mullinix refers the Court to *Plaintiff's Statement Containing (a) Response To Defendants' Statement Of Undisputed Material Facts and (b) Additional Undisputed Facts* (hereinafter, "SF __ "), filed herewith.

4090018v4

He wanted to make sure she had a safe and comfortable place to live in the event something happened to him, and said that he would like her to move between Park Avenue and Fifth Avenue ("Park and Fifth").  *Id.*

Because Mr. Bogorad insisted that Ms. Mullinix inquire further about selling the Condominium, a couple of months later Ms. Mullinix called the Aschermans and said she would like to discuss the possible sale of the Condominium to them.  *Id.* ¶¶ 55-56.  Consequently, Dr. Ascherman and his wife visited the Condominium several times between October 2002 and February 2003.  *Id.* ¶ 56.

Mr. Bogorad spoke again to Ms. Mullinix during this same time period about his desire for her to move between Park and Fifth because it was a safer neighborhood.  *Id.* ¶ 57.  Mr. Bogorad brought up the issue with Brendan, Ms. Mullinix's son.  *Id.* ¶ 58.  He also suggested that the couple talk with Judith Durham-Smith, the realtor who assisted the couple when Ms. Mullinix purchased the Condominium.  *Id.* ¶ 59.  Thereafter, the couple spoke with Brendan and Ms. Durham-Smith, who both agreed with Mr. Bogorad that an apartment between Park and Fifth would be a much better location.  *Id.* ¶ 60.

Between Thanksgiving and Christmas 2002, Ms. Mullinix met with the Aschermans several times to negotiate a price for the Condominium.  *Id.* ¶ 61.  Mr. Bogorad was very enthusiastic about Ms. Mullinix selling the Condominium and encouraged her to continue discussions with the Aschermans regarding price.  *Id.*  When she and the Aschermans could not agree upon a price, Ms. Mullinix informed Mr. Bogorad that she did not want to go forward with the sale, but Mr. Bogorad told her that she was making a mistake.  *Id.* ¶ 62.

The couple then went away on vacation and returned January 11, 2003.  Several times during the trip, Mr. Bogorad reiterated to Ms. Mullinix his desire for her to sell the Condominium and move.  *Id.* ¶ 63.  When the couple returned from their trip, Ms. Mullinix

4

resumed discussions with the Aschermans about the possible sale of the Condominium. *Id.* ¶ 64. On February 5, 2003, Ms. Mullinix entered into a contract for the purchase and sale of the Condominium with the Aschermans. *Id.* ¶ 65. Ms. Mullinix and the Aschermans subsequently closed on that sale on March 31, 2003.[2] *Id.* ¶ 66.

## II.    The Purchase of the 1050 Fifth Avenue Apartment

Simultaneous to Ms. Mullinix's discussions with Mr. Bogorad and the Aschermans regarding the sale of the Condominium, Ms. Mullinix and Ms. Durham-Smith began looking at apartments that were on the market. *Id.* ¶ 70. They went out a couple of times, and saw several apartments, including an apartment at 1050 Fifth Avenue different from the one Ms. Mullinix ultimately purchased. *Id.* ¶ 71. Subsequently, Brendan Mullinix saw a listing for the apartment Ms. Mullinix eventually purchased and told her about it. She felt it was out of her price range and opted not to visit it at that time. *Id.* ¶ 72.

Ms. Mullinix decided to view the apartment Brendan saw listed so that she could compare it to the other apartment she had seen in the same building. *Id.* ¶ 73. On the day before Thanksgiving 2002, Ms. Mullinix first saw the apartment located at 1050 Fifth Avenue in New York City (hereinafter, the "Apartment"). *Id.* The Apartment required extensive renovations to be livable (in addition to the mandatory replacement of the windows and air conditioning units) on top of its high listing price; thus, Ms. Mullinix determined she was not interested in pursuing a purchase of the Apartment. *Id.* ¶¶ 74-75. Mr. Bogorad told Ms. Mullinix that he wanted to see the Apartment, but Ms. Mullinix declined because the Apartment was too expensive. *Id.* ¶ 76. Mr. Bogorad advised Ms. Mullinix that she should not consider the cost of renovating the

---

[2] Under an agreement with the Aschermans, the couple continued to occupy the Condominium until April 8, 2003, at which point their furniture was moved to a storage facility and the couple returned to the Lexington Home. SF ¶¶ 67, 68. Once the couple decided to sell the Condominium, they determined that they would have to store many of their belongings. Mr. Bogorad offered to pay the storage costs and Ms. Mullinix suggested that the couple split

4090018v4

Apartment and the monthly maintenance fee when determining whether she could purchase the Apartment, because he would pay for the renovations (including the architect's fee) and would continue to pay for the maintenance fees as he had done for the Condominium. *Id.* ¶ 78.

Mr. Bogorad further explained to Ms. Mullinix that she could use the proceeds from the sale of the Condominium to fund the 50% down-payment (typically required by co-operative buildings) for an apartment in the range of $1 million to $1.5 million. *Id.* He assured her that he would pay for the monthly maintenance fees and any renovations, and she would only be responsible for her mortgage payment. *Id.* Mr. Bogorad told Ms. Mullinix that she should seriously consider the Apartment because it was in a great location, and expressly stated that Ms. Mullinix could use the proceeds of the sale of the Condominium for the cash down payment, that he would pay the monthly maintenance fee as he had done with the Condominium, and that he would pay for the renovations. *Id.* ¶¶ 77, 78, 81. Mr. Bogorad told Ms. Mullinix that she would then only be responsible for the mortgage payments. *Id.* Despite Mr. Bogorad's request to view the Apartment with her, Ms. Mullinix declined, at that time believing it was too expensive. *Id.* ¶ 76.

On February 7, 2003, after having learned that the price of the Apartment had been reduced, the couple visited the Apartment together. Ms. Mullinix continued to believe that the cost of the Apartment and the renovations would be too expensive. *Id.* ¶¶ 79, 80. During their first visit to the Apartment together, Mr. Bogorad told Ms. Mullinix that he wanted her to purchase it and would feel very reassured if she were living there in case anything happened to him. *Id.* ¶ 79.

---

them evenly. *Id.* ¶ 69. Once the Condominium was sold and the couple made arrangements to store their belongings, Mr. Bogorad reiterated his promise to pay for one-half of the storage costs. *Id.*

4090018v4

While in the Apartment, Mr. Bogorad and Ms. Mullinix began discussing the economics of the purchase and the necessary renovation with Ms. Durham-Smith.  Ms. Durham-Smith indicated that the seller's broker thought the renovation would cost approximately $300,000, but Mr. Bogorad stated that he thought it was an unrealistically low estimate.  *Id.* ¶ 82.  Ms. Durham-Smith inquired whether the couple was purchasing the Apartment together, but Mr. Bogorad said that he wanted the Apartment to be owned solely by Ms. Mullinix.  *Id.* ¶ 83.  Mr. Bogorad told Ms. Durham-Smith that he was paying for the renovations.  *Id.*  Mr. Bogorad persuaded Ms. Mullinix, by reiterating his commitments, to make an offer to purchase the Apartment.  *Id.* ¶ 81.

In the couple's presence, Ms. Durham-Smith called the seller's broker and learned that another offer had been made, and possibly accepted, on the Apartment.  *Id.* ¶ 84.  Mr. Bogorad told Ms. Mullinix that she should increase her offer.  *Id.* ¶ 85.  Ms. Mullinix again expressed her concern about the cost of the Apartment and Mr. Bogorad told Ms. Mullinix that, once in this price range, spending an additional $100,000 or $200,000 was trivial.  *Id.* ¶ 86.  Mr. Bogorad was very involved in the negotiation process and convinced Ms. Mullinix that she had to purchase the Apartment.  *Id.*  Ms. Durham-Smith called the seller's broker and conveyed the increased offer.  *Id.* ¶ 87.  After multiple telephone calls between Ms. Durham-Smith and the seller's broker, during which Ms. Durham-Smith learned that the other prospective buyers had increased their bid, Ms. Mullinix was told that she should submit a signed contract.  *Id.* ¶ 88.  Mr. Bogorad wanted to meet with an attorney as quickly as possible to prepare a formal offer.  *Id.* ¶ 89.  When the attorney Ms. Mullinix intended to use was unavailable, Ms. Durham-Smith recommended Alan Kroll, and the couple met with him that afternoon to prepare a contract.  *Id.*

Mr. Kroll called the seller's attorney, who indicated that Ms. Mullinix should assemble all of her financial information and meet him in his office a few days later, so that he could meet both prospective buyers individually and make a recommendation to his client.  *Id.* ¶ 90.  Mr.

Bogorad was thrilled about the progress and reassured Ms. Mullinix throughout the weekend that the seller's attorney would recommend her. *Id.* ¶ 91. On or about February 10, Ms. Mullinix met with the seller's attorney. Later that day, the attorney called Mr. Kroll and indicated that Ms. Mullinix's offer had been accepted. *Id.* ¶ 92.

### III.    Mr. Bogorad and Ms. Mullinix's Oral Agreement

Despite the fact that Ms. Mullinix did not want to purchase the Apartment because of the costs involved, Mr. Bogorad convinced her to do so by committing to her that he would: (1) split evenly with her the tax consequences that resulted from the sale of the Condominium by reimbursing her for one-half of that amount upon completion of her 2003 taxes; (2) pay the monthly maintenance fees for the Apartment by reimbursing her on a monthly basis; (3) pay for the cost of the renovations to the Apartment (including the architect's fee), by reimbursing her for the cost of the work and for the architect's fee as she incurred those costs and fees; and (4) split evenly with her the costs she incurred for storing the belongings from the Condominium until the completion of the renovations to the Apartment, by reimbursing her for one-half of the total storage costs, once a final amount was determined. *See id.* ¶¶ 77-81, 83, 86, 113-116, 119. Mr. Bogorad also assured Ms. Mullinix that they would live together in his home in Lexington, Massachusetts until such time as the renovations to the Apartment were complete. *Id.* ¶ 98.

Mr. Bogorad's commitment to pay for the monthly maintenance fees (as he had paid with respect to Ms. Mullinix's Condominium), the cost of the renovations, and to split the total storage fee cost and the tax consequences was an integral part of the couple's decision to have Ms. Mullinix purchase the Apartment. *See id.* ¶¶ 77-81, 83, 86, 113-116, 119. Ms. Mullinix would not have sold the Condominium and purchased the Apartment if Mr. Bogorad did not make those promises. *See id.* Because he had upheld his commitment to pay the monthly maintenance fee for the Condominium, had paid for the renovations to the Condominium, and

8

had always followed through on his commitments to Ms. Mullinix throughout their long-term relationship, Ms. Mullinix believed that he would perform his promises. *Id.* ¶ 116. Ms. Mullinix executed the Contract for Sale for the Apartment on or about February 7, 2003, and closed on the purchase on or about June 10, 2003. *Id.* ¶ 93.

## IV.    Mr. Bogorad Played a Central Role in Planning the Renovation Project

Almost immediately after Ms. Mullinix's offer was accepted, the couple began planning the renovations.[3] From that point forward, they spent a significant amount of time investigating various options for the design and materials for the renovation. *Id.* ¶ 97. Mr. Bogorad told Ms. Mullinix that he thought she should identify construction people and/or architects in New York City to look at the Apartment and to give advice about design and costs. *Id.* ¶ 99. Mr. Bogorad arranged a meeting with his friends Raynor and Ranne Warner. *Id.* ¶ 100. Not only is Mr. Warner an architect, but also the Warners were working on a development project and referred Mr. Bogorad and Ms. Mulllinix to the Siematic showroom in Boston to view kitchen cabinets. *Id.* ¶ 101. Mr. Bogorad's daughter, one of the defendants, arranged for the couple to visit the Siematic showroom and several other showrooms at the Boston Design Center, where she worked. *Id.* The couple went to several design centers and showrooms in New Jersey, New York, and Massachusetts to look at potential materials for the Apartment's kitchen and bathroom; Mr. Bogorad even went alone to a showroom to look at cabinets that he had seen in one of the brochures that the couple had collected. *Id.* ¶¶ 101, 102.

---

[3] On or about February 27, 2003, Ms. Mullinix executed a document acknowledging that as a prospective purchaser of the Apartment, she was responsible for replacing all the windows so that they conformed to the building's master plan. SF ¶ 94. In addition, the couple had to replace the through-the-wall air conditioning units with units that also provided a heating mechanism. *Id.* ¶ 95. The couple discussed that it would be less expensive for them to arrange for these renovations directly rather than through a general contractor, so they arranged for the replacement of the windows and air conditioning / HVAC units on their own, which was separate from the larger renovation project they anticipated. These projects were completed during the fall of 2003 by Skyline Windows, LLC and Hamilton Air. Ms. Mullinix paid for this work and Mr. Bogorad reimbursed her. *Id.* ¶ 96.

9

By May 2003, the couple estimated that the renovations would cost approximately $400,000, excluding the windows that were required by the co-operative board and the replacement of the heating/air conditioning units. *Id.* ¶ 103. Mr. Bogorad told Ms. Mullinix that they could take their time with the planning and the renovations because they could stay in the Lexington Home until the Apartment was ready. *Id.* ¶ 98.

In or around June or July 2003, Mr. Warner traveled to New York City to look at the Apartment and to begin working on the design. *Id.* ¶ 104. On or about July 11, 2003, Mr. Warner prepared a proposal outlining the scope of his schematic design services for renovations to the Apartment. *Id.* Mr. Warner suggested that the couple hire Heather Aman, an architect based in New York City, to take primary responsibility for the job and that he would act as an advisor to the project. *Id.* ¶ 105. Thereafter, the couple met with Mr. Warner, Ms. Aman and Brendan Mullinix to discuss the renovation plans. *Id.* ¶ 106. Prior to the meeting, and based upon the original projections and schematic from Mr. Warner, Ms. Aman estimated her fees based upon a total construction cost of approximately $300,000. *Id.* When Ms. Aman actually saw the Apartment and discussed the project with the couple, however, she estimated that the construction costs would be greater than $300,000 and informed them that her fee increases with the cost of the renovations. *Id.*

Mr. Bogorad seemed particularly concerned about the corresponding increase in the architectural design service fee. *Id.* ¶ 107. Ms. Aman discussed the increase of the architectural design fee with Mr. Bogorad. *Id.* Mr. Bogorad was much more involved than Ms. Mullinix in these discussions and in the negotiation of the contract with Ms. Aman. *Id.* Mr. Bogorad understood that the entire renovation project, including the Ms. Aman's fee, would cost approximately $400,000. *Id.* Throughout the entire process of planning the renovation and negotiating Ms. Aman's contract, Mr. Bogorad reiterated his promise to pay for each of the

10

renovation costs, including Ms. Aman's fee. Mr. Bogorad negotiated the contract that Ms. Mullinix executed with Ms. Aman. *Id.* ¶ 108. On July 25, 2003, Ms. Mullinix and Ms. Aman signed a contract for architectural design services to the Apartment and Ms. Mullinix paid $1,500 as a retainer for the project. *Id.* Mr. Bogorad reimbursed Ms. Mullinix for this payment. *Id.* Ms. Mullinix later paid an additional $1,500 retainer to Ms. Aman and Mr. Bogorad likewise reimbursed Ms. Mullinix for this payment. *Id.*

Mr. Bogorad was an active participant in the planning phase of the renovations to the Apartment. *Id.* ¶¶ 97-109. The couple planned for renovations to the Apartment together, meeting with architects, discussing the plans and shopping for ideas. *Id.* Mr. Bogorad negotiated and understood Ms. Mullinix's contract with Ms. Aman, which provided for approximately $400,000 in costs for the renovations. *Id.* ¶¶ 107, 108. In addition, Mr. Bogorad arranged for and paid Mr. Warner, the architect with whom the couple first met to discuss the renovations. *Id.* ¶ 109. Pursuant to Mr. Bogorad and Ms. Mullinix's agreement, Mr. Bogorad not only began reimbursing Ms. Mullinix for the renovation expenses, but also was reimbursing her for each of the monthly maintenance fees for the Apartment, just as he had done with the Condominium. *Id.* ¶ 110.

Unfortunately, before the renovations were finished and the Apartment was suitable to live in, Mr. Bogorad passed away unexpectedly while on vacation with Ms. Mullinix, the Defendants and the Defendants' children. *Id.* ¶ 112. Prior to Mr. Bogorad's death, however, he had negotiated and confirmed Ms. Mullinix's contract with Ms. Aman. *Id.* ¶¶ 107, 108. The couple had reviewed and approved the architectural design plans from Ms. Aman just days prior to leaving on their vacation, and had authorized Ms. Aman to send those plans out to general contractors for bidding. *Id.* ¶ 111. The couple anticipated reviewing the bids and settling on one of them upon their return. *Id.* The claims at issue in this case arise from the commitments

11

relating to the renovations of the Apartment that Mr. Bogorad made to Ms. Mullinix during his lifetime.

## ARGUMENT

### I.    Summary Judgment Standard.

In ruling on the Defendants' Motion, the Court must view the summary judgment record in the light most favorable to the non-moving party, which in this instance is Ms. Mullinix, and draw all reasonable inferences in her favor.  Fed. R. Civ. P. 56; *see United States v. Diebold*, 369 U.S. 645, 655 (1962).  Although Ms. Mullinix bears the burden of proof on her contract claims, it remains the burden of the moving party, the Defendants, to establish the absence of a genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986); *see also* Fed. R. Civ. P. 56(e).  The Defendants' Motion ignores the existing evidence that disputes their unsupported assertions that Mr. Bogorad made vague promises for no consideration in return. Finally, even viewing the evidence in the light most favorable to the Defendants, Ms. Mullinix is entitled to summary judgment.

### II.    Applicable Law.

Massachusetts choice of law analysis applies in this diversity action in the Federal District Court of Massachusetts.  *Lexington Ins. Co. v. General Acc. Ins. Co. of America*, 338 F.3d 42 (1st Cir. 2003).  Ms. Mullinix refers the Court to her Motion for Partial Summary Judgment, which explains why Massachusetts' choice of law analysis makes New York law applicable to this action.[4]  Additionally, the Court should consider the Supreme Judicial Court of Massachusetts' observation that "[w]here relevant contacts and considerations are balanced, or nearly so, we are inclined to resolve the choice by choosing that law 'which would carry out and

---

[4] The Defendants' Motion concedes that New York law should apply to the instant case.  *See* Defendants' Motion at 12.

validate the transaction in accordance with intention, in preference to a law that would tend to defeat it.'" *Bushkin Assocs., Inc. v. Raytheon Co.*, 393 Mass. 622, 636 (1985) quoting *Boston Safe Deposit & Trust Co. v. Paris*, 15 Mass. App. Ct. 686, 691 (1983). The Defendants' Motion emphasizes that Mr. Bogorad "wanted" to pay for Ms. Mullinix's renovations, among other things, and does not dispute the evidence that Mr. Bogorad promised to and began to make such payments after Ms. Mullinix purchased the Apartment; thus, the Court should apply the law that carries out and validates Mr. Bogorad's transaction in accordance with his intentions.

### III.    Mr. Bogorad And Ms. Mullinix Had A Valid And Enforceable Agreement.

The Defendants' Motion not only complicates a simple breach of contract and estoppel case, but also ignores that the Defendants have offered *no* factual evidence to dispute Ms. Mullinix's evidence that Mr. Bogorad entered into an unambiguous, valid and enforceable oral agreement. Viewing the evidence in a light most favorable to Ms. Mullinix, a reasonable jury could find by a preponderance of the evidence that Mr. Bogorad made unambiguous and specific promises in exchange for consideration (Ms. Mullinix's sale of the Condominium and purchase of the Apartment); thus, the Defendants' Motion must be denied. *See Fleming v. Ponziani*, 24 N.Y.2d 105, 110 (1969) (plaintiff seeking to enforce a contract claim must prove by a preponderance of the evidence that there is a valid contract). Furthermore, the undisputed evidence establishes that Ms. Mullinix performed her obligation by purchasing the Apartment, that Mr. Bogorad's promises are unambiguous and that the Defendants' refusal to honor such promises constitutes a breach. Therefore, Ms. Mullinix is entitled to summary judgment.

#### A.    Mr. Bogorad made a promise in exchange for consideration.

In traditional terms, the elements of a binding contract are an (1) offer; (2) acceptance; and (3) consideration. *See Gelbman v. Valleycrest Prod., Ltd.*, 732 N.Y.S.2d 528, 531 (N.Y. Sup. Ct. 2001). The Defendants concede that Mr. Bogorad offered to pay for the Apartment's

13

renovations, the monthly maintenance fee, one-half the tax consequences of the sale of the Condominium and one-half the costs to store the couple's belongings while the renovations took place. *See* SF ¶¶ 18, 22, 118, 120. The remaining element, which Ms. Mullinx must prove by a preponderance of the evidence, is that his promises were made in exchange for consideration. Even viewing the evidence in a light most favorable to the Defendants, for purposes of Ms. Mullinix's Cross-Motion, there was consideration to support Mr. Bogorad and Ms. Mullinix's agreement.[5]

Consideration exists, and a promise is enforceable, if the promisee suffers a legal detriment. 2 SAMUEL WILLISTON & RICHARD A. LORD, A TREATISE ON THE LAW OF CONTRACTS § 7:4 (4th ed. 1999); *Weiner v. McGraw-Hill, Inc.*, 443 N.E.2d 441, 464 (N.Y. 1982). It is a sufficient legal detriment if the promisee "promises or performs any act, regardless of how slight or inconvenient, which [s]he is not obligated to promise or perform so long as [s]he does so at the request of the promisor and in exchange for the promise."[6] WILLISTON & LORD, at § 7:4; *see also Weiner*, 443 N.E.2d at 464 quoting *Hamer v. Sidway*, 27 N.E. 256 (N.Y. 1891) ("[i]t is enough that something is promised, done, forborne or suffered by the party to whom the promise is made as consideration for the promise made to him"); *Holt v. Feigenbaum*, 419 N.E.2d 332, 336 (N.Y. 1981) ("a promisee who had incurred a specific, bargained for legal detriment may

---

[5] "The issue of adequate consideration for a contract is generally one of fact. . . . The value of the consideration is not crucial as long as it is acceptable to the parties, and the general rule is that the slightest consideration may sufficiently support the most onerous contractual obligation." *Daniel Goldreye, Ltdr v. Van de Wetering*, 630 N.Y.2d 18, 24 (N.Y.A.D. 1995). The pleadings, discovery responses and affidavits show undisputedly that Ms. Mullinix sold her Condominium and purchased the Apartment in exchange for Mr. Bogorad's promises, thus, providing consideration for his promises. Because the existence of consideration remains undisputed, Ms. Mullinix is entitled to summary judgment. In any event, because Ms. Mullinix has provided evidence that there was consideration, which constitutes, at the very least, a disputed material fact, summary judgment in favor of the Defendants is inappropriate.

[6] Even if the detriment results in positive outcome for the promisee, it is still a *legal* detriment. A classic example is where a promisor promises to pay the promisee to stop smoking; although there is a physical and financial benefit to the promisee, the promisee was not obligated to perform such an act and, therefore, it constitutes a legal detriment. *See Hamer v. Sidway*, 27 N.E. 256 (N.Y. 1891) (plaintiff's consideration was self-denial of tobacco and liquor; court explained that it would "not ask whether the thing which forms the consideration does in fact benefit the promisee or a third party, or is of any substantial benefit to anyone").

enforce a promise against a promisor, notwithstanding the fact that the latter may have realized

no concrete benefit as a result of the bargain").  Mr. Bogorad promised to pay for specific items

in exchange for Ms. Mullinix purchasing the Apartment, a purchase that she resisted and had a

legal right not to make.  Mr. Bogorad and Ms. Mullinix spent several months discussing whether

or not she should sell the Condominium and purchase a new apartment.  SF ¶¶ 53-70.  During

those discussions, Mr. Bogorad persuaded her to sell the Condominium, despite her desire not to

sell.  *Id.*  Ms. Mullinix was strongly opposed to purchasing the Apartment because she believed

it was too expensive and needed extensive renovations; Mr. Bogorad, on numerous occasions,

asked her to purchase the Apartment and promised to pay for the renovations, among other

things, if she did.  *Id.* ¶¶ 53-86, 113-116.  Thus, Mr. Bogorad requested that Ms. Mullinix sell the

Condominium and buy the Apartment in exchange for his promises to make certain payments.[7]

Ms. Mullinix did what Mr. Bogorad requested -- she sold the Condominium and purchased the

Apartment.  This amounts to a sufficient legal detriment and, thus, adequate consideration.

　　　The Defendants do not and cannot offer *any* evidence that disputes this exchange of

promises between Mr. Bogorad and Ms. Mullinix.  The undisputed facts establish that there was

---

[7] The Defendants shamelessly attempt to analogize this case to those where courts invalidate contracts between lovers for violating public policy.  These cases undermine the Defendants' argument and, in fact, lend considerable support to Ms. Mullinix's claims.  Ms. Mullinix and Mr. Bogorad exchanged unambiguous promises, which were wholly unrelated to offering "companionship" or "love and affection," and therefore completely distinguishable from cases cited by the Defendants.  *See Rose v. Elias*, 576 N.Y.S.2d 258 (N.Y. App. Div. 1991) (no consideration where defendant specifically stated that his promise was in exchange for *only* "love and affection"); *Trimmer v. Von Bomel*, 434 N.Y.S.2d 82 (Sup. Ct. 1980) (no *implied* contract that entitled plaintiff to payment for "companion" services rendered during the relationship because there was no evidence of an express agreement); *Pfeiff v. Kelly*, 623 N.Y.S.2d 965 (N.Y. App. Div. 1995) (court refused to enforce a contract because the couple had *expressly recited as the only consideration* their four-year relationship; the fact that the couple were living together unmarried to each other *did not* lead the court to conclude that illicit sexual relations formed the primary consideration).  The Defendants' citation of such cases illustrates their fundamental misunderstanding of Ms. Mullinix's claims – she is not seeking compensation for providing "companionship," but rather is seeking Mr. Bogorad's estate to honor the oral commitments he made specifically relating to renovations of the Apartment.  Their romantic relationship explains why Ms. Mullinx *trusted* Mr. Bogorad, and why it was reasonable and foreseeable that she relied on him to fulfill his promises.  The pleadings, discovery responses and affidavits clearly state that their intimacy in no way served as consideration for their agreement.  *See Van Brunt v. Rauschenberg*, 799 F.Supp. 1467, 1471 (S.D.N.Y. 1991) ("an express agreement between unmarried persons living together is as enforceable as though they were not living together . . . provided that illicit sexual relations were not part of the consideration of the contract").

consideration to support Mr. Bogorad's promises; thus, Ms. Mullinix's Cross-Motion for

Summary Judgment should be granted.[8]

### B.    Mr. Bogorad's promises were specific and unambiguous.

The Defendants' Motion argues that the contract's material terms are impermissibly

vague and ambiguous, a claim which surely rises out of a misunderstanding of the definitions of

both "vague" and "ambiguous."  Ambiguity is found where a term has two or more separate and

distinct meanings, such as where two parties agree to meet at 10:00 without defining "morning"

or "night."  *See* E. ALLAN FARNSWORTH, CONTRACTS § 7.8 (4th ed. 2004).  On the other hand, a

word is vague to the extent that it defines "not a neatly bounded class but a distribution about a

central norm."  *Id.*  Mr. Bogorad's explicit, repeated promises were neither vague nor

ambiguous.

New York courts have invalidated contracts for being vague and ambiguous where there

was a promise to pay "the money . . . if she had it" or "when she got it," *see Soderholm v. Kotsy*,

676 N.Y.S.2d 850, 852 (Justice Ct. 1998), or to support a plaintiff's "sumptuous" lifestyle, *see*

*Trimmer*, 434 N.Y.S.2d at 83.  Such promises lack the required clarity of intention or use a vague

term, like "sumptuous," which has no distinct meaning.  Although the Defendants rely on these

two particular cases to support their argument, both are easily distinguishable and actually

illustrate the clarity and specificity of Mr. Bogorad's promises.

Mr. Bogorad stated that he would pay for all of the renovations to the Apartment.  *See* SF

¶¶ 83, 113.  He played an active role in planning out exactly what the renovations would entail,

participated in choosing the materials to be used, hired the architect and negotiated Ms.

Mullinix's contract with the architect.  *Id.*  ¶¶ 95-109.  Both Ms. Mullinix and Mr. Bogorad had a

---

[8] In the alternative, Ms. Mullinix has offered sufficient evidence to show that a triable issue of material fact –
whether or not there was consideration – still exists.

4090018v4

definite understanding of what the renovations would be and how much they would cost. Mr.

Bogorad not only said on numerous occasions that he would reimburse Ms. Mullinix for up to

$400,000 of expenses related to the renovations, but also actually began to perform his promise

in that exact fashion. *Id.* ¶¶ 108, 110. Ms. Mullinix made her first two payments to the architect,

pursuant to the contract Mr. Bogorad negotiated, and each time Mr. Bogorad immediately

reimbursed Ms. Mullinix for those payments. *Id.* There was nothing vague or ambiguous about

Mr. Bogorad's promise to reimburse Ms. Mullinix for the costs of renovations to the Apartment.[9]

Similarly, Mr. Bogorad's promise to pay the monthly maintenance fees was neither vague

nor ambiguous. Mr. Bogorad had reimbursed Ms. Mullinix for the monthly maintenance fee of

the Condominium; thus, the terms of such an agreement were quite clear as the couple had

already been parties to that arrangement for several years. The meaning of the terms used were

obvious to both Ms. Mullinix and Mr. Bogorad within the context of their discussions.

Moreover, Mr. Bogorad in fact had been reimbursing Ms. Mullinix for the monthly maintenance

fees for the Apartment for the months of July, August, September, October and November 2003.

*Id.* ¶ 110. The Defendants' argument that the terms of these agreements are ambiguous and

vague is totally without merit.

The record does not support summary judgment in favor of the Defendants because Mr.

Bogorad and Ms. Mullinix's agreement was clear and unambiguous. The terms used by the

parties are undisputed and create a valid agreement that the Defendants have breached; thus, the

Court should grant summary judgment in favor of Ms. Mullinix.

---

[9] Mr. Bogorad's promises to reimburse Ms. Mullinix for one-half the tax consequences and the storage fees are equally clear and unambiguous. Mr. Bogorad explained the effect the new tax code would have on Ms. Mullinix's sale of the Condominium and fully understood the amount of money involved; likewise, there is nothing vague about splitting the total amount of storage costs, an agreement the couple reached after Mr. Bogorad offered to pay for the total cost of storage.

**C.    The statute of frauds does not prevent the enforcement of Mr. Bogorad's promise to pay for the monthly maintenance fees.**

The statute of frauds was created to prevent frauds and perjuries, *McCormack v. Grumman American Aviation Corp.*, 488 N.Y.S.2d 661, 663 (N.Y. App. Div. 1985), not to enable defendants to interpose it as a bar to a contract fairly, and admittedly, made, *Morris Cohon & Co. v. Russell*, 245 N.E.2d 712, 715 (N.Y. 1969); *Concordia Gen. Contracting v. Peltz*, 782 N.Y.S.2d 848, 850 (N.Y. App. Div. 2004); WILLISTON &. LORD, at § 29:4.  Nor was it intended to protect "one who has induced another to incur expense and alter his position to his damage." *M. H. Metal Prod. Corp. v. April*, 167 N.E. 201, 202 (N.Y. 1929).

There is no danger of fraud or perjury in this case.  It is undisputed that Mr. Bogorad promised to pay for the maintenance fees for the Apartment, and his intention to honor that promise is undoubtedly evidenced by his payments up to the time of his passing.  Unfortunately, the defendants have refused to honor this commitment and now attempt to disregard the unequivocal intention of their late father by invoking the statute of frauds.  The statute, however, was never intended to serve as a trump card to bar enforcement of a fair and undisputedly assented-to agreement.  *See Cohon & Co.*, 245 N.E.2d at 715; *Concordia Gen. Contracting*, 782 N.Y.S.2d at 850; WILLISTON & LORD, at § 29:4.  It should not be used as one here.[10]

---

[10] The statute of frauds may also be avoided if an agreement contains a termination contingency or if it is enforceable under the theory of promissory estoppel.  *See* discussion *infra* section IV.  If an agreement contains a termination contingency, and that contingency may possibly occur within one year of the making of the agreement, it avoids the statute of frauds.  *See N. Shore Bottling Co. v. C. Schmidt & Sons, Inc.*, 239 N.E.2d 189, 190 (N.Y. 1968) (agreement outside the statute of frauds where plaintiff was the exclusive distributor of Schmidt beer in the county "for as long as Schmidt sold beer in the" county).  Mr. Bogorad's past conduct and Ms. Mullinix's statements indicate the existence of such a contingency in the couple's agreement.  Under a similar arrangement, Mr. Bogorad paid the monthly maintenance fee for the Condominium and ceased paying those fees when Ms. Mullinix sold it and moved. SF ¶ 50, 68.  The reason for this is obvious: an unequivocally understood condition of their agreement was that he would pay the maintenance fees only so long as Ms. Mullinix owned and occupied the Condominium.  The same condition existed for the couple's agreement relating to the Apartment.  Thus, the statute of frauds does not preclude enforcement of Mr. Bogorad's promise to pay the monthly maintenance fee.

18

**D.    The Defendants and Ms. Mullinix agree that his commitments are not**
        ***inter vivos* gifts.**

The Defendants allege that Mr. Bogorad made unenforceable promises to give gifts.  In order to establish a gift, there must be (1) donative intent; (2) delivery; and (3) acceptance.  *See Rettig v. Holler*, 781 N.Y.S.2d 627 (N.Y. Sup. Ct. 2003).  As an initial matter, the Defendants argue as though Ms. Mullinix is claiming a valid *inter vivos* gift; she is not.  Ms. Mullinix does not contend that Mr. Bogorad's promises to make certain payments are enforceable gifts, but rather that they constitute a valid enforceable contract or, in the alternative, are enforceable under the theory of promissory estoppel.  However, the Defendants' misunderstanding leads them to argue that Mr. Bogorad's promises were merely to make gifts, and they must therefore establish, by clear and convincing evidence, the first element necessary to support that he was attempting to give Ms. Mullinix a gift: donative intent.  *See id.*

The Defendants do not and cannot offer any evidence that contradicts the fact that Mr. Bogorad *promised* and *assured* Ms. Mullinix that he absolutely would pay for the renovations, among other things.  SF ¶¶ 81, 83, 113, 114.  The Defendants misconstrue Mr. Bogorad's oral promises so it appears that he said he "wanted" to pay; the evidence before the Court, which must be viewed in the light most favorable to Ms. Mullinix, establishes that Mr. Bogorad stated that he "*will* pay" for the renovations, among other things.  In fact, Mr. Bogorad had affirmatively begun fulfilling his obligations prior to his death, reimbursing Ms. Mullinix for the first installments of architectural fees and monthly maintenance fees.  SF ¶¶ 108, 110.  There is not a single shred of evidence that supports that Mr. Bogorad intended his payments to be gifts.[11]

---

[11] The Defendants focus on previous exchanges between Mr. Bogorad, Ms. Mullinix, themselves and his grandchildren in an attempt to argue that his promises to pay were unenforceable gifts.  *See* Defendants' Motion at 4 n. 5; Affidavits of Leonard Bogorad, Kiki Bogorad-Gross and James Gross.  Any exchanges between Mr. Bogorad and the Defendants or his grandchildren are completely irrelevant to this case.  The nature of such exchanges has no bearing whatsoever on the agreement between Mr. Bogorad and Ms. Mullinix, and certainly is not evidence of Mr. Bogorad's intentions relating to his commitments to pay for the renovations, monthly maintenance fee, one-half the

19

To the contrary, the only evidence before the Court is that he *did not* intend to make a gift of those payments; thus, even viewing the evidence in the light most favorable to the Defendants, Ms. Mullinix is entitled to summary judgment.[12]

### IV.    Mr. Bogorad's Promises Are Enforceable Under The Theory of Estoppel.

Even if the Court were to find that there was no consideration for Mr. Bogorad's promises (which there was), the Defendant's Motion cannot be granted because the record supports Ms. Mullinix's claims under promissory estoppel.  "In New York, promissory estoppel has three elements: 'a clear and unambiguous promise; a reasonable and foreseeable reliance by the party to whom the promise is made; and an injury sustained by the party asserting the estoppel by reason of his reliance'"  *Arcadian Phosphates, Inc. v. Arcadian Corp.*, 884 F.2d 69, 73 (2d Cir. 1989), quoting *Esquire Radio & Elecs., Inc. v. Montgomery Ward & Co.*, 804 F.2d 787, 793 (2d Cir. 1986).  As discussed above, Mr. Bogorad's promises were decidedly clear and unambiguous,[13] and Ms. Mullinix reasonably and foreseeably relied upon such promises when she purchased the Apartment, which required extensive renovations.  Finally, Ms. Mullinix had to pay from her own funds for each of Mr. Bogorad's commitments when the Defendants refused

---

tax consequences and one-half storage fees.  Moreover, the Defendants surely are not arguing that they would not have sent their children to college but for the generosity of their late father.

The Defendants' Motion also relies on Ms. Mullinix's failure to declare payments she received from Mr. Bogorad on her income tax returns as evidence that such payments were not consideration for a contract, since consideration for a contract is taxable as ordinary income.  *See* Defendants' Motion at 17.  Not only is this argument ludicrous, because Ms. Mullinix's familiarity with the United States Tax Code has nothing to do with whether she incurred a legal detriment, but also cuts directly against them.  Mr. Bogorad failed to declare his payments as "gifts" and file any gift tax returns.  Thus, Ms. Mullinix and Mr. Bogorad's tax treatment of any past payments are entirely inconsequential.

[12] At the very least, disputed issues of material fact – Mr. Bogorad's intentions – remain in dispute and the Defendants' Motion must be denied.  *See Ingram v. Cunningham*, 692 N.Y.S.2d  130, 131 (N.Y. App. Div. 1999) (whether party had requisite "donative intent" is a triable issue of fact).

[13] The Defendants do not challenge the fact that Mr. Bogorad made promises to Ms. Mullinix; in fact, Kiki Bogorad-Gross, one of the Defendants, stated that she believes Mr. Bogorad did make such promises and that Ms. Mullinix is telling the truth.  SF ¶ 120.

4090018v4

to honor them; thus, a reasonable jury must find that she suffered an injury and the agreement is enforceable under the theory of estoppel.[14]

Ms. Mullinix reasonably and foreseeably relied upon Mr. Bogorad's promises when she purchased the Apartment. Mr. Bogorad was involved in the entire process, from locating the Apartment and encouraging Ms. Mullinix to make the purchase to participating in the renovation plans, selection of materials and negotiation of the architect's contract. Even Ms. Bogorad-Gross stated that she "got the sense" Mr. Bogorad wanted Ms. Mullinix to buy the Apartment, and the realtor was under the impression that he convinced Ms. Mullinix to make the purchase. SF ¶ 118. Mr. Bogorad told Ms. Durham-Smith that he would pay for the renovations. *Id.* ¶ 119. Certainly it was reasonable that Ms. Mullinix, Mr. Bogorad's partner for many years, believed Mr. Bogorad's promises, which would enable her to make the purchase, were sincere. Furthermore, Ms. Mullinix's reliance on Mr. Bogorad's promises to pay for renovations, tax consequences, storage and monthly maintenance fees was reasonable because Mr. Bogorad had consistently paid the monthly maintenance fees and the renovation costs for her previous apartment, demonstrating both his intention to uphold his promises and his desire for Ms. Mullinix to rely upon them. The *only* reason Ms. Mullinix purchased the Apartment was because Mr. Bogorad had persuaded her to do so by promising to pay for the renovations, among other things.[15] SF ¶¶ 114, 115. Ms. Mullinix undertook a "substantial change in position" in reliance upon Mr. Bogorad's promises. *See Schmidt v. McKay*, 555 F.2d 30, 36 (2d Cir. 1977).

---

[14] The Defendants' Motion indicates that an "unconscionable" injury is required to satisfy the last element of promissory estoppel. Ms. Mullinix did suffer an "unconscionable" injury; however, an injury need only be "unconscionable" under promissory estoppel to circumvent the statute of frauds. *See, e.g., Cyberchron Corp. v. Calldata Sys. Dev., Inc.*, 47 F.3d 39, 44 (2d Cir. 1995). The Plaintiff has already established that the statute of frauds is inapplicable here. *See* discussion *infra* section III, part C. Even if the Court were to find Ms. Mullnix's injury was not "unconscionable," Mr. Bogorad's promises are nevertheless enforceable under promissory estoppel.
[15] The Defendants' Motion weakly asserts that, because Ms. Mullinix's son and the realtor agreed that she should move, there is no nexus between her actions and Mr. Bogorad's promises. The fact that others expressed agreement with Mr. Bogorad's campaign to persuade Ms. Mullinix to sell the Condominium and purchase the Apartment does not negate the undisputed facts that illustrate that her actions were taken in total reliance on Mr. Bogorad's

4090018v4

Finally, because Ms. Mullinix relied on these promises and purchased, renovated and moved into the Apartment, she has suffered a financial loss.  Ms. Mullinix purchased the Apartment and entered a contract with an architect based upon Mr. Bogorad's promises to pay for the necessary renovations.  Mr. Bogorad was an active and central participant in planning the renovations, acquiring the architect and negotiating Ms. Mullinix's contract with the architect (the value of which he assured Ms. Mullinix he would reimburse her).  Mr. Bogorad promised to make each of these payments; when the Defendants' refused to uphold Mr. Bogorad's promises, Ms. Mullinix was forced to make these payments from her own funds.  This constitutes an injury under New York law, and Ms. Mullinix is entitled to reimbursement of her out-of-pocket expenses.  *See Arcadian Phosphates, Inc.*, 884 F.2d at 73.  Ms. Mullinix has sustained an injury for which she is entitled to reimbursement under promissory estoppel.  *See id.* at 74 (entering into expenditures and collateral contracts based upon defendant's promises could satisfy reliance and injury elements of promissory estoppel).  The Defendants have refused to honor Mr. Bogorad's obligation and reimburse Ms. Mullinix for the necessary renovations, which she had to pay for from her own funds.

## CONCLUSION

The Defendants have not offered any evidence whatsoever to dispute that Mr. Bogorad made clear and unambiguous promises in exchange for Ms. Mullinix selling the Condominium and buying the Apartment.  The couple's oral agreement is valid and enforceable, and because the Defendants' have refused to honor Mr. Bogorad's obligations they are in breach of contract.  At the very least, the Defendants' Motion must be denied because, viewing the record in the light

---

promises.  The Defendants have offered *zero* evidence to dispute that Ms. Mullinix purchased the Apartment as a direct result of Mr. Bogorad's promises, after he convinced her to do so and explained the ramifications, assisted in the sale and purchase and played an integral role in planning the renovations.  Ms. Mullinix would not have purchased the Apartment, which required the renovations, but for Mr. Bogorad's promises, no matter what her son and realtor may have suggested.

most favorable to Ms. Mullinix, a reasonable jury could find that she suffered a legal detriment at Mr. Bogorad's request and in exchange for his promises.  Furthermore, the record establishes, or at least precludes summary judgment in the Defendants' favor, that Ms. Mullinix reasonably relied upon Mr. Bogorad's clear and unambiguous promises and suffered an injury as a result. For the reasons set forth above, Ms. Mullinix respectfully moves this Court to grant this Cross-Motion for Summary Judgment, Deny the Defendant's Motion, and grant further relief as this Court deems appropriate and just.

> Respectfully submitted,
>
> KATHLEEN P. MULLINIX,
> By her attorneys,
>
> /s/ Sara E. Solfanelli
> Larry C. Kenna (BBO #267760)
> Michelle L. Dineen Jerrett (BBO #634930)
> Sara E. Solfanelli (BBO #658018)
> CHOATE, HALL & STEWART LLP
> Two International Place
> Boston, Massachusetts 02110
> Tel: (617) 248-5000

Date:   June 19, 2006

4090018v4

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on June 19, 2006.

/s/ Sara E. Solfanelli

4090018v4

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____

)
KATHLEEN P. MULLINIX,                              )
                                                   )
            Plaintiff,                             )
                                                   )
                    v.                             )      Civil Action No. 04-12684-WGY
                                                   )
KIKI BOGORAD-GROSS and LEONARD P.                  )
BOGORAD, As They Are Executors of the Will of )
Lawrence Bogorad,                                  )
                                                   )
            Defendants.                            )
                                                   )
_____

**AFFIDAVIT OF JUDITH DURHAM-SMITH IN SUPPORT OF PLAINTIFF'S
OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND
PLAINTIFF'S CROSS-MOTION FOR SUMMARY JUDGMENT**

Judith Durham-Smith hereby deposes and states as follows:

1.      I make this affidavit in support of the Plaintiff's Opposition to Defendants' Motion

        for Summary Judgment and Plaintiff's Cross-Motion for Summary Judgment,

        submitted herewith, based upon my personal knowledge and belief.

2.      I have known Kathleen P. Mullinix, the Plaintiff, more than twelve years.  I was the

        exclusive broker when Ms. Mullinix and her former husband purchased their first

        apartment, at 975 Park Avenue in New York City, New York, and they listed it with

        me when they later divorced.

3.      I was Ms. Mullinix's realtor when she purchased the condominium apartment on East

        87th Street (the "Condominium") in 1999.  I first met Lawrence Bogorad around the

        time Ms. Mullinix purchased the Condominium.

4.      In November 2002, I took Ms. Mullinix to view an apartment at 1050 Fifth Avenue, Apt. 11C, in New York City.  She then went to see another apartment in the same building at 1050 Fifth Avenue, (the "Apartment") with her son.  Ms. Mullinix thought the Apartment was too expensive, and I agreed it was out of her price range.

5.      In January 2003, the price for the Apartment was reduced and I took Ms. Mullinix to the Apartment.  On February 7, 2003, I took Ms. Mullinix and Mr. Bogorad to look at the Apartment together.

6.      The Apartment needed extensive renovations to be livable.

7.      I recall that Mr. Bogorad was very much interested and involved in the negotiation process when Ms. Mullinix made an offer on the Apartment.  I remember that Mr. Bogorad convinced Ms. Mullinix to buy the Apartment.  I do not believe that she would have purchased the Apartment if Mr. Bogorad had not encouraged her to do so.

8.      I understood that Ms. Mullinix was not able to afford both the cost of the Apartment and the cost of the renovations.  I was told by Mr. Bogorad that he would pay for the necessary renovations.


Signed under the pain of penalties of perjury this 18th day of June 2006.


 /s/ Judith Durham-Smith
Judith Durham-Smith

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on June 19, 2006.

/s/ Sara E. Solfanelli

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____

|  |  |  |
|---|---|---|
| KATHLEEN P. MULLINIX, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Civil Action No. 04-12684-WGY |
| v. | ) | |
| | ) | |
| KIKI BOGORAD-GROSS and LEONARD P. BOGORAD, As They Are Executors of the Will of Lawrence Bogorad, | ) ) ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

_____

**AFFIDAVIT OF KATHLEEN P. MULLINIX IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND PLAINTIFF'S CROSS-MOTION FOR SUMMARY JUDGMENT**

Kathleen P. Mullinix hereby deposes and states as follows:

1.    I make this affidavit in support of the Plaintiff's Opposition to Defendants' Motion for Summary Judgment and Plaintiff's Cross-Motion for Summary Judgment, submitted herewith, based upon my personal knowledge and belief.

2.    I began a romantic relationship with Lawrence Bogorad ("Laurie") in or about November, 1975. Except for a brief period in or about March 1998, we maintained the relationship from November 1975 until Laurie's death on December 28, 2003.

3.    Beginning in 1998, Laurie spent three to four days a week living in my condominium on East 87th Street in New York City (the "Condominium") with me, and the rest of the week in his Lexington, Massachusetts home.

1

4.      During the entire time I owned the Condominium, Laurie paid for the monthly
        maintenance fees for the Condominium by reimbursing me for those fees.

5.      In August or September of 2002, Jeffrey Ascherman, M.D., who owned another
        condominium apartment in the same building, approached me about purchasing the
        Condominium.  He was interested in buying the condominium next door to mine and
        combining the two condominiums to make one large unit for his family.  I told him
        that the Condominium was not for sale.  At that time, I had not even remotely
        considered the possibility of selling the Condominium.

6.      Laurie was with me when Dr. Ascherman came to my Condominium and asked about
        buying it.  After Dr. Ascherman left, Laurie told me that he wanted me to seriously
        consider selling the Condominium.  He did not think the Condominium was in a
        sufficiently safe area because it was so close to the intersection of Lexington Avenue
        and 86th Street.

7.      On numerous occasions around that time, Laurie expressed his desire for me to move
        between Park Avenue and Fifth Avenue ("Park and Fifth") because it was a safer
        neighborhood.  He explained that because he was getting older and had experienced
        health problems, he was concerned with my future.  He wanted to make sure I had a
        safe and comfortable place to live in the event something happened to him, and he did
        not want me to have to move.

8.      Laurie brought up the Aschermans' offer with my son, Brendan, because he wanted
        me to get Brendan's opinion about the possibility of selling the Condominium and
        buying an apartment in a safer neighborhood.  Laurie also suggested that we talk with
        Judith Durham-Smith, the realtor who assisted with the purchase of the

2

Condominium.  They both agreed with Laurie that an apartment between Park and Fifth would be a much safer and better location.

9.    Because Laurie insisted that I inquire further about selling the Condominium, months later I called the Aschermans and said I would like to discuss the possible sale of the Condominium.  Consequently, Dr. Ascherman and/or his wife visited the Condominium several times between October 2002 and February 2003.

10.    Ms. Durham-Smith suggested that I look at apartments on the market to determine if it was economically feasible for me to sell my apartment and purchase one between Park and Fifth.  Simultaneous to my discussions with Laurie and the Aschermans regarding the sale of the Condominium, Ms. Durham-Smith and I looked at various apartments that were on the market.

11.    In early November Ms. Durham-Smith and I visited several apartments that were on the market, including one at 1050 Fifth Avenue.  Brendan told me about another apartment on the market at 1050 Fifth Avenue (the apartment I ultimately bought (the "Apartment")), that he saw listed on the internet.  Ms. Durham-Smith and I agreed that the Apartment was out of my price range.  At that time, I did not even bother to look at the Apartment because it was too expensive.

12.    A short time after first learning about the Apartment, I decided to go see it so that I could compare it to another apartment in the same building.  I first saw the Apartment on the day before Thanksgiving 2002.  The Apartment required extensive renovations (in addition to the mandatory replacement of the windows and air conditioning units) on top of its high listing price.  I decided that it was out of my price range not only

3

with respect to the purchase price, but also because it required major renovations.  I was not interested in purchasing the Apartment.

13.    I told Laurie about the Apartment, including that it was in need of extensive renovations.  Laurie told me that he wanted to see the Apartment, but I thought it would be a waste of our time because it was so expensive and needed so many renovations.  Also, the monthly maintenance fee was twice as much as the monthly maintenance fee for the Condominium.

14.    Laurie explained to me that I should not consider the cost of renovating the Apartment and the monthly maintenance fee when determining whether I could purchase the Apartment, because he would pay for the renovations (including the architect's fee) and would continue to pay for the maintenance fees as he had always done for the Condominium.

15.    Laurie also explained to me that I could use the proceeds from the sale of the Condominium to fund the 50% down-payment (typically required by co-operative buildings) for an apartment in the range of $1 million to $1.5 million.  Laurie proposed that I sell the Condominium and use the proceeds to fund the down-payment for the Apartment and secure a mortgage, and that he would pay for the monthly maintenance fees and for the renovations.

16.    Laurie asked me to seriously consider the Apartment because it was in a great location, and affirmatively, unequivocally and expressly stated that he would pay the monthly maintenance fees as he had done with the Condominium, pay for the renovations, one-half the tax consequences from the sale of the Condominium. Laurie

4

promised and assured me that he would pay for all of the renovations costs and one-half the tax consequences with me.

17.     Between Thanksgiving and Christmas 2002, I met with the Aschermans several times to negotiate a price for the Condominium. Laurie was very enthusiastic about my selling the Condominium and encouraged me to continue the discussions with the Aschermans regarding price.

18.     In or around December 2002, I was unable to reach an agreement on price with the Aschermans, and I told Laurie that I did not want to go forward with the sale. I felt that we were too far apart on the price. Laurie told me I should accept the price the Aschermans were offering and sell the Condominium. I was happy with the Condominium and did not think it was necessary to sell it. I terminated my discussions with the Aschermans regarding the sale of the Condominium. Laurie told me that I was making a mistake.

19.     Laurie and I went away on vacation with his family and returned January 11, 2003. Several times during the trip, Laurie reiterated his desire for me to sell the Condominium and move. He was very insistent that I revisit negotiations with the Aschermans and reach an agreement.

20.     Because of Laurie's conviction that I should sell the Condominium, when we returned from the trip, I resumed discussions with the Aschermans about the possible sale.

21.     On February 5, 2003, I entered into a contract for the purchase and sale of the Condominium with the Aschermans. We subsequently closed on that sale on March

4087348v2

31, 2003.  I had a mortgage on the Condominium for approximately $600,000 and had approximately $200,000 in equity in the Condominium.

22.    When I decided to sell the Condominium, Laurie and I determined that we would have to store many of our belongings since I had not yet secured an apartment into which we would move.  Laurie offered to pay the storage charges and I suggested that we split them evenly.

23.    Under an agreement with the Aschermans, Laurie and I continued to occupy the Condominium until April 8, 2003, at which point our furniture was moved to a storage facility and we returned to Laurie's home in Lexington, Massachusetts (the "Lexington home").

24.    Laurie stopped paying the monthly maintenance fee for the Condominium after I stopped living there.

25.    When I sold the Condominium and we moved our belongings into storage, Laurie reiterated his promise to pay for one-half of the storage costs.

26.    In mid-January, after we returned from our vacation, Laurie and I learned that the price of the Apartment had been reduced.  I visited the Apartment again with Ms. Durham-Smith, but concluded that in spite of the reduction in the price of the Apartment, the renovation requirements would prove to be too costly.  I told Laurie about my visit and he thought it would still be wise to pursue purchasing the Apartment.

27.    On or about February 6, 2003, I learned that another party was about to make an offer on the Apartment.  That evening, I told Laurie about the development and he insisted on coming to New York City early the next morning to see the Apartment.

6

28. On February 7, 2003, Laurie and I visited the Apartment with Ms. Durham-Smith. I continued to believe that the cost of the Apartment and the renovations would be too expensive. I was strongly opposed to purchasing the Apartment.

29. Laurie immediately loved the Apartment and wanted me to purchase it. During that first visit to the Apartment, Laurie reiterated his promise to pay for the cost of the renovations and all related expenses. He convinced me that I should buy the Apartment. Laurie said again that he would pay the monthly maintenance fee for the Apartment, just as he had been doing with the Condominium. He said he would feel very reassured if I were living there in case anything happened to him.

30. While visiting the Apartment, Laurie and I began discussing the economics of the purchase and the necessary renovation with Ms. Durham-Smith. Ms. Durham-Smith indicated that the seller's broker thought the renovation would cost approximately $300,000, but Laurie said that he thought it was an unrealistically low estimate and both Ms. Durham-Smith and I agreed with Laurie's assessment.

31. Ms. Durham-Smith inquired whether Laurie and I were purchasing the Apartment together, but Laurie said that I would be the sole owner of the Apartment.

32. While Laurie and I were in the Apartment with Ms. Durham- Smith, she called the seller's broker to inform them of my offer. She learned that another offer had been made, and possibly accepted, on the Apartment. Laurie told me that I should increase my offer. I said that I would not get into a bidding contest since the Apartment was already too expensive. Laurie said that I should increase my offer because in the price range of the Apartment, and an additional $100,000 or $200,000 was trivial.

7

33.     Ms. Durham-Smith called the seller's broker and conveyed the increased offer.  After

multiple telephone calls between Ms. Durham-Smith and the seller's broker, during

which Ms. Durham-Smith learned that the other prospective buyers had increased

their bid, we were told that I should submit a signed contract.

34.     Laurie wanted to meet with an attorney as quickly as possible to prepare a formal

offer.  I attempted to reach an attorney who previously had assisted me in real estate

matters, but I learned that he was unavailable that day.  Ms. Durham-Smith

recommended another attorney, Alan Kroll, and Laurie and I met with him that

afternoon.

35.     Mr. Kroll called the seller's attorney, who indicated that I should assemble all of my

financial information and meet him in his office a few days later, so that he could

meet both prospective buyers individually and make a recommendation to his client.

36.     Laurie was thrilled about the progress and reassured me throughout the weekend that

the seller's attorney would recommend me to the seller.  On or about February 10,

2003, I met with the seller's attorney.  Later that same day, the seller's attorney called

Mr. Kroll and indicated that my offer had been accepted.

37.     After we decided that I would purchase the Apartment, and we knew that it needed

extensive renovations before it would be livable, Laurie said that we would live

together in the Lexington home until the renovations to the Apartment were complete.

38.     I would not have purchased the Apartment if Laurie had not made unequivocally

clear to me, while we were in the Apartment on February 7, 2003, that he was going

to continue to pay for the monthly maintenance fee, pay for entire costs of the

renovations, and one-half of the tax consequences of the sale of the Condominium.

39.    It never occurred to me that Laurie would not live up to his promises.  He had upheld

his commitment to pay the monthly maintenance fee for the Condominium, had paid

for the renovations to the Condominium, and had always followed through on his

commitments to me throughout our relationship.  After being in a relationship with

him for so many years, I trusted him and was absolutely certain that he would pay for

all of the things he promised, which is why I relied on his promises, listened to his

advice and bought the Apartment when he asked me to do so.

40.    The sellers executed the Contract for Sale for the Apartment on or about February 10,

2003, and I closed on the purchase on or about June 10, 2003.

41.    Almost immediately after my offer was accepted, Laurie and I began planning the

renovations.

42.    On or about February 27, 2003, I executed a document acknowledging that as a

prospective purchaser of the Apartment, I was responsible for replacing all the

windows so that they conformed to the building's master plan.  In addition, it was

necessary to replace the through-the-wall air conditioning units with units that also

provided a heating mechanism.  Laurie and I discussed that it would be less expensive

for us to hire contractors to perform the work, rather than have the general contractor

who would handle the other renovations find subcontractors to do the work.  We

decided to find contractors on our own for these projects.  Laurie and I arranged for

the replacement of the windows and air conditioning / HVAC units on our own and

hired contractors to perform the work.  These projects were entirely separate from the

larger renovation project we anticipated for the Apartment and were completed

during the fall of 2003 by Skyline Windows, LLC and Hamilton Air. I paid for this

work and Laurie reimbursed me, just as he promised he would.

43.    From June 10, 2003, Laurie and I spent a significant amount of time investigating

various options for the design and materials for the renovation. Laurie told me that he

thought we should identify construction people and/or architects in New York City to

look at the Apartment and to give advice about design and costs.

44.    Laurie arranged a meeting with his friends Raynor and Ranne Warner in Lexington,

Massachusetts in late February 2003. Not only is Mr. Warner an architect, but also

the Warners were working on a major development project in Rhode Island. At that

meeting, we decided that Mr. Warner would help with the renovation project and

Mrs. Warner suggested that we look at kitchen cabinets made by the Siematic

company. The Siematic showroom is located in the Boston Design Center, so Laurie

asked his daughter Kiki, who works at the Boston Design Center, to arrange for us to

visit the showroom.

45.    Kiki arranged for Laurie and me to visit the Siematic showroom in the Boston Design

Center and several other related showrooms at the Center. During the following

months, Laurie and I went to several design centers and showrooms in New Jersey,

New York and Massachusetts to look at potential materials for the kitchen and

bathroom; Laurie even went alone to a showroom to look at cabinets that he had seen

in one of the brochures that we had collected.

46.    By May 2003, Laurie and I estimated that the renovations to the Apartment would

cost approximately $400,000, excluding the windows that were required by the co-

operative board and the replacement of the heating/air conditioning units.

47.  Laurie said that we could take our time with the planning and the renovations because we could stay in the Lexington Home until the Apartment was ready.

48.  In or around June or July 2003, Mr. Warner traveled to New York City to look at the Apartment and to begin working on the design for the renovation.  On or about July 11, 2003, Mr. Warner prepared a proposal outlining the scope of his schematic design services for renovations to the Apartment.  Mr. Warner suggested that Laurie and I hire an architect based in New York City to take primary responsibility for the job.  Mr. Warner recommended Heather Aman, a New York City architect, and said that he would act as an advisor to the project.

49.  Thereafter, Laurie and I met at the Apartment with Mr. Warner, Ms. Aman and my son Brendan to discuss the renovation plans.  Prior to the meeting, and based upon the original projections and schematic from Mr. Warner, Ms. Aman estimated her fees based upon a total construction cost of approximately $300,000.  When Ms. Aman actually saw the Apartment, however, she estimated that the construction costs would be greater than $300,000 and told us that her fee increases with the cost of the renovations.

50.  Laurie was particularly concerned about the corresponding increase in the architectural design service fee.  Laurie talked about the increase of the architectural design fee with Ms. Aman at length.  He was much more involved than I was in those discussions; in fact, Laurie negotiated the contract I ultimately executed with Ms. Aman.

11

51.     Laurie had a very clear understanding of the entire renovation project, including the Ms. Aman's fee.  We decided that all the renovations and Ms. Aman's fee would cost approximately $400,000.

52.     Throughout the entire process of planning the renovation and negotiating Ms. Aman's contract, Laurie reiterated his promise to pay for the renovation costs, including Ms. Aman's fee.  On July 25, 2003, I signed a contract for architectural design services to the Apartment with Ms. Aman.  I paid her $1,500 as a retainer for the project.  Just as Laurie had promised and we had discussed, he reimbursed me for the payment.  I later paid an additional $1,500 retainer to Ms. Aman and Laurie likewise reimbursed me for the payment.

53.     Laurie paid Mr. Warner $1787.00 for his services in connection with his renovations to the Apartment.

54.     Laurie reimbursed me for the monthly maintenance fees for the Apartment for the months of July, August, September, October, and November 2003, in accordance with his promise to pay for the monthly maintenance fee for the Apartment.  Laurie had planned to reimburse me for the December 2003 monthly maintenance fee prior to our trip to Mexico with Laurie's children and grandchildren in December 2003.  Unfortunately, before we left, my sister became very ill and Laurie and I traveled to Massachusetts to be with her in the hospital.  She died two days later.  Laurie and I simply ran out of time prior to leaving on the Mexico trip for him to reimburse me for the December monthly maintenance fee and a few other miscellaneous expenses related to the Apartment for which he had promised to reimburse me.  When we left

on our trip to Mexico, Laurie indicated he would reimburse me for these expenses when we returned from the trip.

55. Laurie was very active in the planning the renovations to the Apartment.  He was involved in every aspect, every step of the way.  We planned the renovations to the Apartment together, meeting with architects, discussing the plans and shopping for ideas.

56. Before Laurie and I left for vacation with his family to Mexico, we reviewed and approved the architectural design plans from Ms. Aman, and we authorized Ms. Aman to send those plans out to general contractors for bidding.  We anticipated reviewing the bids and settling on one of them when we returned.

57. After Laurie's tragic death in Mexico, his son, Leonard, told me that I could continue to live in the Lexington home, as Laurie and I had been doing since I sold the Condominium, until the renovations to the Apartment were complete.  Laurie's daughter, Kiki, expressed similar sentiments.

4087348v2

58.    In or around December 2000, Laurie told me that he had thought about his estate and wanted to include me as a beneficiary.  He explained that, although he earned the money, everything accumulated during his marriage belonged to both him and his wife.  He felt that half of the money was his wife's, so that would go to his children. He said he wanted to divide his half three ways: between me and two universities. Just before we went on vacation to southeast Asia and India in December of 2002, Laurie told me that he had finally gotten around to changing his estate plan and had told Kiki and Leonard because they had to sign some documents related to that change.

Signed under the pain of penalties of perjury this 18th day of June 2006.

    /s/ Kathleen P. Mullinix
    Kathleen P. Mullinix

CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on June 19, 2006.

    /s/ Sara E. Solfanelli

4087348v2