UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| KATHLEEN P. MULLINIX, <br><br> Plaintiff, <br><br> v. <br><br> KIKI BOGORAD-GROSS and LEONARD P. BOGORAD, As They Are Executors of the Will of Lawrence Bogorad, <br><br> Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) Civil Action No. 04-12684-WGY |

**PLAINTIFF KATHLEEN P. MULLINIX'S RESPONSE
TO DEFENDANTS' STATEMENT OF UNDISPUTED MATERIAL FACTS
PURSUANT TO LOCAL RULE 56.1**

Plaintiff, Kathleen P. Mullinix, hereby responds, pursuant to Local Rule 56.1, to

Defendants' Statement of Undisputed Material Facts.

1.      Plaintiff, Mullinix, is an individual who resides at 1050 Fifth Avenue, Apartment 15B, New York, New York 10028 (the "Apartment"). Complaint, ¶ 2. The Apartment is located in a cooperative building in New York City's fashionable Upper East Side, located at the corner of Fifth Avenue and East 86th Street. Mullinix, 91:16-19. In 1994 Mullinix started a business called Synaptic and served as its Chief Executive Officer until she sold her interest in 2002. Mullinix 28:14-29:7. Thereafter, Mullinix worked as an independent biotechnology consultant, which included writing a business plan for a science-based neutraceutical company. Mullinix, 29:14-18; 30:17-22.

**Response:**      Disputed in part. That the Apartment is located in "New York City's

fashionable Upper East Side" is not supported by the record citations provided. Ms. Mullinix

also disputes that she started Synaptic in 1994 and that she sold her interest in 2002. In 1987 Ms.

Mullinix started Neurogenetic, which changed its name to Synaptic in 1993. Mullinix 28:16-

1

29:2. Further, Synaptic was sold to a pharmaceutical company in 2003, not 2002, and Ms.

Mullinix's stock was liquidated. COOP-00054.

2.    Defendant Kiki Bogorad-Gross ("K. Bogorad-Gross" or "Kiki") is an individual who resides at 80 Highland Avenue, Newton, Massachusetts 02460. Complaint, ¶ 3.

**Response:**    Undisputed.

3.    Defendant Leonard Bogorad ("L. Bogorad" or "Len") is an individual who resides at 5121 Worthington Drive, Bethesda, Maryland 20816. Complaint, ¶ 4.

**Response:**    Undisputed.

4.    Lawrence Bogorad ("Bogorad") died on December 28, 2003. Complaint, ¶ 5. Kiki and Len, the Defendants in this action, are Bogorad's daughter and son. Id.

**Response:**    Undisputed.

5.    The Defendants were appointed executors of the will of Bogorad by decree of a Justice of the Probate and Family Court Department of the Massachusetts Trial Court for Middlesex County. Complaint, ¶ 5.

**Response:**    Undisputed.

6.    As of 1997, a romantic relationship existed between Bogorad and Mullinix, who were both married to other individuals. Complaint, ¶ 8; Mullinix 16:1-4; 50:23-51:16.

**Response:**    Undisputed, except insofar as Defendants imply that the couple's

relationship began in 1997, rather than 1975. Affidavit of Kathleen P. Mullinix, dated June 19,

2006 ("Mullinix Aff. #2") ¶ 2.

7.    In 1997, following Mullinix's disclosure of her illicit affair with Bogorad, she and her husband, Joseph Mullinix, divorced in New York. Mullinix 35:3-8; 38:17-39:1. The couple sold their marital apartment at 975 Park Avenue, New York, New York, and Mullinix purchased a condominium apartment located at 170 East 87th Street in New York City ("87th Street Apartment"). Complaint, ¶ 10; Mullinix, 39:21-40:15. Mullinix paid the mortgage and utilities for the 87th Street Apartment out of her own resources. Mullinix 61:9-62:1.

**Response:**    Disputed in part. Characterization of the loving relationship shared by

Ms. Mullinix and Mr. Bogorad as an illicit affair is inaccurate and is unsupported by the record

citations provided. Undisputed that Park Avenue Apartment was sold and that Ms. Mullinix

2

purchased the 87th Street Apartment.  Undisputed that Ms. Mullinix paid the mortgage and

utilities out of her own resources.

8.    After Mullinix and her husband divorced, Bogorad remained married to his wife,
Rosalyn Bogorad ("Rosalyn") until the day he died, December 28, 2003.  Mullinix 16:1-4;
50:23-51:16.  At no time did Bogorad initiate any divorce proceedings against Rosalyn, whom he
had married in 1943.  Mullinix 50:23-51:16; L. Bogorad, 13:12-14.

**Response:**    Undisputed, except to note that not all statements are supported by the

record citations provided.

9.    Rosalyn began showing symptoms of Alzheimer's disease in the early 1990's.
L. Bogorad 13:21-14:12.  In 1998 Rosalyn required 24-hour care and was admitted to a nursing
facility in Natick, Massachusetts.  K. Bogorad-Gross 20:20-24.  Rosalyn currently resides at the
Fairlawn nursing home in Lexington, Massachusetts.  K. Bogorad-Gross 19:21-24; L. Bogorad
Aff.,¶ 1; K. Bogorad-Grass Aff., ¶ 5.  Bogorad visited Rosalyn every week until his death.
K. Bogorad-Gross 23:12-13; L. Bogorad 22:8-10.

**Response:**    Undisputed.

10.    Prior to Mullinix's divorce, Bogorad and Mullinix split the costs of shared
expenses, such as dinner.  Mullinix 59:23-60:2.  After Mullinix's divorce in 1997, Bogorad and
Mullinix lived as if they were husband and wife and Bogorad "picked up the tab wherever we
went."  Complaint, ¶ 9; Mullinix 51:22-23, 58:17-21, 59:21-22.  Over the course of their
relationship, Bogorad displayed his characteristic generosity by making gifts to Mullinix and
taking her on various vacations.  Mullinix 44:20-45:19, 59:21-22.

**Response:**    Disputed, insofar as Defendants imply that any of the payments Mr.

Bogorad made in connection with Ms. Mullinix's apartments were "gifts."  Defendants point to

no evidence in the record -- because there is none -- stating that any such payments were

intended as a gift to Ms. Mullinix.

11.    Bogorad displayed similar generosity with his children and grandchildren, often
footing the bill for major expenses incurred on the family vacations.  L. Bogorad 133:5-13,
134:15-135:4.  Bogorad also provided each of his grandchildren $10,000 per year for college
expenses.  L. Bogorad 50:21-51:9,52:15-57:22; K. Bogorad-Gross 36:18-38:1.  As his son
testified,

> Q.    What do you recall your father saying during that
> conversation?

3

4089592v3

A.    Just that he wanted to give us a gift and help pay – he knew college was expensive these days and wanted to help us bear the burden or whatever. And he wanted to make a gift of $10,000, as I said, for each of our kids for each year they were in college. And you know, obviously, we said that is not necessary, you know, but he was not the [sic] kind of guy. He was very generous and if he wanted to give you a present, he was going to give you a present.

L. Bogorad 52:15-53:3. Bogorad's will did not specifically instruct that these payments be made after he died, so his estate has not made any of these payments.[1] L. Bogorad 55:6-12; K. Bogorad-Gross 38:14-18.

**Response:**    Disputed in part. That "Bogorad's will did not specifically instruct that these payments be made after he died, so his estate has not made any of these payments" is not supported by the record citations provided. Ms. Mullinix lacks sufficient knowledge to admit or deny whether Mr. Bogorad's estate has made any such payments. Further, apart from the first sentence, the footnote text stating that "L. Bogorad's son, David, entered college in the fall of 2004. Neither Bogorad nor the Estate has contributed any money towards David's education even though '[Bogorad] said he was going to'" is not supported by the record citations provided. Once again, Ms. Mullinix lacks sufficient knowledge to admit or deny whether Mr. Bogorad's estate has made any such payments.

12.    Bogorad spent the weekdays at his home in Lexington, Massachusetts ("Lexington Home"), which remained his residence until his death, and visited Mullinix in New York City most weekends. Mullinix 41:15-20, 42:8-10. During the week Bogorad worked out of his office at Harvard University, where he was a professor. K. Bogorad-Gross 16:8-22; L. Bogorad 59:14-20.

**Response:**    Disputed, insofar as Defendants imply that the "weekend" constitutes only Saturdays and Sundays. Mr. Bogorad and Ms. Mullinix "were together, except, typically, maybe three days in the middle of the week." Mullinix 42:8-10.

---

[1]  L. Bogorad's son, David, entered college in the fall of 2004. Neither Bogorad nor the Estate has contributed any money towards David's education even though "[Bogorad] said he was going to." L. Bogorad 52:15-53:3.

4

13.    Commencing in approximately 1999, Bogorad gave Mullinix $870 every month to cover the cost of the monthly maintenance fee for the 87th Street Apartment.  Complaint, ¶¶ 11-12; Mullinix 58:13-14; 55:6-8.

**Response:**    Undisputed, except to the extent that Defendants imply the $870 monthly payment was a "gift."  Mr. Bogorad offered to pay the monthly maintenance fee for the Condominium and Ms. Mullinix agreed.  Mullinix Dep. 55:16-21.  As agreed, Mr. Bogorad paid the monthly maintenance costs for the Condominium by reimbursing Ms. Mullinix on a monthly basis.  Complaint ¶ 11; Mullinix Dep. 54:17-55:8.

14.    Mullinix did not declare any of the $870 monthly payments from Bogorad to her on her federal, New York State or New York City income tax returns.  Mullinix 62:2-20.

**Response:**    This statement is not material to any issue in this case.

15.    Bogorad did not receive consideration in exchange for paying the $870 monthly maintenance fee.  Mullinix, 55:16-23.  As Plaintiff testified,

> A.    Laurie said, "I want to pay the maintenance."
>
> Q.    So he offered to do it?
>
> A.    Uh-huh.
>
> Q.    And you agreed?
>
> A.    Yeah.
>
> Q.    And what, if anything, did you do or promise to do in exchange for that payment?
>
> A.    Nothing.

Id.

**Response:**    Disputed that "Bogorad did not receive consideration in exchange for paying the $870 monthly maintenance fee" on the basis that the statements are not supported by the record citations provided.  "Consideration" is a legal term about which Ms. Mullinix never testified during her deposition, and about which she lacks sufficient knowledge to admit or deny.  Undisputed that the remainder of the statement is supported by the record citations provided.

5

16.    In the fall of 2002, a neighbor approached Mullinix about selling her 87th Street Apartment. Complaint, ¶ 13; Mullinix 66:19-67:14. Bogorad, Mullinix's real estate agent and Mullinix's son, Brendan Mullinix, all recommended that Mullinix sell the 87th Street Apartment. Mullinix 68:13-69:7, 70:13-71:8, 74:6-13, 75:9-12, 77:2-78:12.

**Response:**    Disputed in part. Brendan Mullinix did not recommend that Ms. Mullinix sell the 87th Street Apartment. Brendan Mullinix only suggested to his mother that she follow up with Mr. Ascherman to inquire what price he had in mind for the apartment, and afterwards commented that it would be a favorable price for the apartment. Mullinix 69:5-7; 70:22-23; 74:11-12.

17.    In November 2002 Mullinix toured the Apartment, located three long blocks and one short block from the 87th Street Apartment on Manhattan's Upper East Side. Complaint, ¶ 14; Mullinix 91:16-19. The Apartment, which was listed at around $2.4 million, required extensive renovations. Complaint, ¶ 14; Mullinix 93:4-8.

**Response:**    Undisputed, except to note that the Apartment was listed at around $2.4 million in November 2002, but by February 7, 2003 the asking price had been reduced to approximately $1.5 million. Mullinix 115:22-23; 117:8-10.

18.    Mullinix told Bogorad the Apartment was too expensive and Bogorad responded that he wanted to give her money for the renovations and the monthly maintenance fees "as I have been." Complaint, ¶¶ 14 & 17; Mullinix Dep. 104:18-105:3, 105:4-9.

**Response:**    Disputed in part. Mr. Bogorad did not state that he "wanted to give her money" for the renovations and monthly maintenance fees, but rather stated affirmatively and unequivocally that he "would pay" for the renovation costs and for the monthly maintenance fees for the Apartment. Complaint ¶¶ 14, 17; Mullinix Aff. #2 ¶ 16.

19.    By November 2002, Bogorad had already suffered from bladder cancer, had a quadruple bypass operation and suffered from various other physical ailments. Mullinix 206:5-18.

**Response:**    Undisputed that by November 2002 Mr. Bogorad had suffered from bladder cancer and had a quadruple bypass operation. Ms. Mullinix disputes that Mr. Bogorad

suffered from "various other physical ailments" on the basis that the statement is far too ambiguous to admit or deny.

20.    In December 2002 Bogorad changed his estate plan to provide Mullinix with a 1/6 interest in the 1997 Lawrence Bogorad Revocable Trust. Mullinix 150:15-151:20, 152:11-14, 190:9-16; K. Bogorad-Gross Aff., ¶ 6; L. Bogorad Aff., ¶ 5. That trust is currently worth nearly $2 million. Berlin Aff., ¶ 5.

**Response:**    Undisputed that the statements are supported by the record citations

provided. Disputed to the extent the Defendants imply that Mr. Bogorad's changes to his estate

plan to provide Ms. Mullinix with a 1/6 interest in the 1997 Lawrence Bogorad Revocable Trust

relate in any way to Mr. Bogorad's commitments respecting the Apartment. Mr. Bogorad first

discussed with Ms. Mullinix his desire to change his estate plan to provide her an interest in or

around December 2000. Mullinix Aff. #2 ¶ 58. In December 2002, just prior to leaving on a

vacation with Mr. Bogorad's family, Mr. Bogorad changed his estate plan as he had been

discussing with Ms. Mullinix for at least two years. *Id.*; Mullinix 147-151.

21.    When the listing price of the Apartment was reduced substantially in February 2003, Mullinix took Bogorad to see it. Complaint, ¶ 16; Mullinix 115:2-5. Their visit lasted approximately an hour and a half. Mullinix 116:5-7.

**Response:**    Undisputed so far as Mr. Bogorad and Ms. Mullinix went to visit the

Apartment together after the price reduction; however, Mr. Bogorad insisted that they look at the

Apartment and flew down to New York City immediately so that he could see it with Ms.

Mullinix. Mullinix Aff. #2 ¶ 27.

22.    Mullinix has testified that, in a private conversation with Bogorad, Mullinix said that the Apartment was still too expensive. Mullinix 118:8-14. She has also testified that Bogorad repeated that he wanted to give her money for the renovations and the monthly maintenance fees. Mullinix 118:16-119:9. Finally, Mullinix has testified that Bogorad also said that he wanted to give Mullinix money for half of the capital gains tax incurred in connection with the sale of the 87th Street Apartment and half of the storage costs Mullinix would incur until the renovations were completed. Complaint, ¶ 18; Mullinix 181:12-182:1.

**Response:**    Disputed.  Ms. Mullinix did not testify that Mr. Bogorad "wanted to give her money" for the renovations and monthly maintenance fees, but rather testified that he stated affirmatively and unequivocally that "I'll do the renovation, and I'll pay the maintenance." Mullinix 118:16-119.  Additionally, Ms. Mullinix did not testify that Mr. Bogorad "wanted to give her money" to pay for the half of the capital gains tax or the storage costs, but rather testified affirmatively and unequivocally that he told her he "would" pay these costs.

23.    Mullinix was asked to interview with the seller's attorney on February 10, 2003. Mullinix 122:15-125:6, 127:11-15.  During that interview, Mullinix provided a list of her financial accounts, but she never mentioned Bogorad as her partner or as a source of any money to purchase or renovate the Apartment.  Mullinix 140:17-141:3.

**Response:**    Disputed, insofar as the Defendants infer that Ms. Mullinix intentionally withheld such information.  The topics of how Ms. Mullinix would finance the apartment and Ms. Mullinix's personal relationship never arose during the February 10, 2003 meeting. Mullinix Dep. 140:17-141:3.  In fact, the seller's attorney and Ms. Mullinix did not discuss the apartment at all, including without limitation any possible renovation to it, but instead "just chatted."  Mullinix Dep. 139:21-22; 140:21-141:3.

24.    Mullinix's offer of $1.4 million to purchase the Apartment was accepted. Mullinix 122:15-125:6, 127:11-15, 142:2-5.

**Response:**    Undisputed.

25.    In early June 2003 Mullinix interviewed with the Cooperative Board of 1050 Fifth Avenue.  Mullinix 213:5-13.  Mullinix never mentioned Bogorad as one of her financial resources for the purchase and occupancy of the Apartment:

> Q:    Did Ms. Mullinix ever at that interview or subsequently inform you, in words or substance, that she intended to rely upon wealth or finances from any other person in connection with her purchase and occupancy at 1050 Fifth Avenue?
>
> A:    No.

Ring 27:3-9.

8

**Response:**     Disputed, insofar as Defendants imply that Ms. Mullinix never informed

other people that Mr. Bogorad had committed to pay for the monthly maintenance fees, as he had

paid with respect to Ms. Mullinix's East 87th Street apartment, the cost of the renovations, and to

split the total storage fee cost and the tax consequences.  Disputed that Ms. Mullinix ever

intended to rely upon Mr. Bogorad as a financial resource to purchase the Apartment.  *See*

Plaintiff's Motion for Partial Summary Judgment, dated June 5, 2006.  Undisputed that Ms.

Mullinix met with the Cooperative Board of 1050 Fifth Avenue in June 2003 and that she did not

inform them of her financial arrangement with Mr. Bogorad.

26.     The Cooperative Board also asked Mullinix if she expected overnight guests:

> Q:     Did you, Ms. Ring, or any other board member ask
>          Ms. Mullinix at her interview how often she had or
>          intended to have overnight guests?
>
> A:     Yes.
>
> Q:     And what did she respond?
>
> A:     My recollection is that she responded she did not have
>          guests.

Ring 25:2-9.  Mullinix knowingly omitted Bogorad's name from both her oral interview and
written Cooperative Application.  Mullinix 177:10-23.

**Response:**     This statement is not material to any issue in this case.

27.     On or about March 31, 2003, Mullinix sold the 87th Street Apartment for
$1.325 million.  Complaint, ¶¶ 15 & 19; Mullinix 74:2-5.  At the time of the sale, Mullinix had
$700,000 in equity in the 87th Street Apartment.  Mullinix 186:16-187:10.

**Response:**     Disputed.  Ms. Mullinix had a mortgage on the 87th Street Apartment for

approximately $600,000 and, thus, did not have $700,000 in equity, but rather approximately

$200,000.  Mullinix Aff. #2 ¶ 21.  Furthermore, this statement is not material to any issue in this

case.

9

28.     Mullinix executed the sales contract for the Apartment on February 7, 2003. Complaint, ¶ 18.  Mullinix closed on the purchase of the Apartment on June 10, 2003. Complaint, ¶ 22.  Mullinix took sole title to the shares evidencing her ownership in the 1050 Fifth Avenue Cooperative and the proprietary lease to the Apartment.  Mullinix 7:15-20.

**Response:**     Undisputed.

29.     In or around May 2003, Bogorad contacted long-time friend and architect, Raynor Warner, to recommend an architect in New York City to renovate the Apartment.  Complaint, ¶ 23; Mullinix 216:10-28.  Warner met with Mullinix and Bogorad at least once in New York City to discuss the renovations.  Complaint, ¶ 23.  Bogorad paid Warner's bill, which was addressed only to Mullinix, directly.  Mullinix did not report that payment as taxable income. Complaint, ¶ 23; Mullinix 221:18-21.

**Response:**     Undisputed, but it is not material to any issue in this case whether Ms.

Mullinix reported, or should have reported, these payments as taxable income.

30.     Warner referred Mullinix to Heather Aman, an interior designer in New York City.  Complaint, ¶ 24; Mullinix 216:10-12.  Aman was hired by Mullinix on or about July 25, 2003 as the architect for the renovations to the Apartment.  Complaint, ¶ 24.  Discussions with Aman revealed that the renovations to the Apartment would cost approximately $400,000. Complaint, ¶ 25.

**Response:**     Disputed, insofar as Defendants infer that Warner referred Heather Aman

only to Ms. Mullinix.  Warner recommended Aman to both Ms. Mullinix and Mr. Bogorad, who

together decided to hire her.  Complaint, ¶ 24.

31.     Bogorad was not a party to the contract between Aman and Mullinix.  However, Bogorad gave Mullinix money to reimburse her for Aman's bills.  Mullinix 201:17-203:18. Mullinix did not declare these payments as income on any of her income tax returns.  Mullinix Dep. 225:11-16.

**Response:**     Disputed.  Mr. Bogorad did not "give" Ms. Mullinix money.  He

committed to pay for the renovations, including the architect's fee, up to $400,000.  Mullinix

Aff. #1 ¶¶ 9, 25.  He reimbursed Ms. Mullinix after she paid Ms. Aman's bills.  Mullinix Aff. #2

¶ 52.  It is not material to any issue in this case whether Ms. Mullinix reported, or should have

reported, these payments s taxable income.

32.     On or about December 24, 2003, Mullinix accompanied Bogorad, the Defendants, and the Defendants' children on an annual holiday vacation in Mexico.  Complaint, ¶ 30. Bogorad died in Mexico on December 28, 2003.  Id.

**Response:**     Undisputed.

33.     Mullinix and K. Bogorad-Gross, both very sad and distraught, flew back to Boston together.  Mullinix 231:19-232:1.  On the return flight Mullinix claimed to K. Bogorad-Gross that Bogorad said he was going to pay for the renovations.  Mullinix 230:22-231:5; K. Bogorad-Gross 136:22-137:24; K. Bogorad-Gross Aff., ¶ 12.  K. Bogorad-Gross had never previously heard any statements from Bogorad or Mullinix, either orally or in writing, to that effect even though Mullinix and Bogorad had discussed the Apartment with K. Bogorad-Gross and other family members on numerous previous occasions.  K. Bogorad-Gross 116:8-117:3, 145:13-24, 147:13-19, 149:14-20, 151:19-152:3; K. Bogorad-Gross Aff., ¶¶ 13, 14.

**Response:**     Disputed in part.  It is undisputed that Ms. Mullinix and Bogorad-Gross

were both "saddened and distraught", but that they were "very sad and distraught" is not

supported by the record citations provided.  It is undisputed that Ms. Mullinix told Bogorad-

Gross about Mr. Bogorad's commitment to pay for the renovations on the return flight from

Mexico.  Undisputed that Mr. Bogorad had discussed the Apartment with Bogorad-Gross and

other family members on numerous previous occasions.  K. Bogorad-Gross 116:8-117:3, 145:13-

24, 147:13-19, 149:14-20, 151:19-152:3; K. Bogorad-Gross Aff. ¶¶ 13, 14.

34.     On January 2, 2004, Mullinix met with L. Bogorad and James Gross ("Gross"), the husband of K. Bogorad-Gross, who were sorting through Bogorad's files at the Lexington Home.  Mullinix 233:20-235:14; L. Bogorad 84:13-24; Gross Aff. ¶¶ 13-17.  Mullinix turned to L. Bogorad and Gross and claimed that she and Bogorad "had an agreement that [Bogorad] was going to pay for the renovations on the apartment up to $400,000, and he also paid the maintenance on the apartment both at 87th Street and at Fifth Avenue."  Mullinix 233:20-235:14; L. Bogorad 84:19-24; Gross Aff. ¶ 15.

**Response:**     Disputed to the extent that Defendants imply Ms. Mullinix's statements of

fact were untrue.  The rest of the facts are undisputed.

35.     Mullinix has admitted under oath that she did not have any of Bogorad's alleged promises in writing.  Mullinix 230.20-235:14.  Despite being a sophisticated businesswoman, Mullinix never asked Bogorad to commit to anything in writing.  Mullinix 234:13-235:5. L. Bogorad never told Mullinix that the Estate would pay for the renovations or the monthly maintenance fees.  Mullinix 233:20-235:14.

11

**Response:**    Undisputed that the contract between Ms. Mullinix and Mr. Bogorad had

not been reduced to writing, and that Ms. Mullinix did not ask Mr. Bogorad to put the contract in

writing. However, the evidence in this case consists of several checks made payable to Ms.

Mullinix by Mr. Bogorad as part performance of the contract, reimbursing Ms. Mullinix for

monthly maintenance fee payments, payments for the renovations, and payments to architects.

Undisputed that Ms. Mullinix and Mr. Bogorad did not discuss whether his Estate would pay for

the renovations or the monthly maintenance fees.

36.    Later, Mullinix and L. Bogorad spoke again by telephone. Mullinix began the
conversation by offering to help L. Bogorad 's wife, Cynthia Bogorad, obtain an appointment
with a renowned physician in New York. Mullinix 237:2-12; L. Bogorad 122:22-123:13.
Mullinix then asked L. Bogorad how the estate wanted to handle the bills for the renovations.
Mullinix 241:7-242:8; L. Bogorad 86:14-96:7. L. Bogorad told Mullinix the estate would not
pay for the renovations because it would violate the Defendants' fiduciary duties as executors of
Bogorad's estate to pay any bills in connection with the Apartment. L. Bogorad 95:18-96:7;
234:3-14. Mullinix and L. Bogorad also talked about the Defendants' plans to sell the Lexington
Home. Mullinix 239:3-9.

**Response:**    Disputed in part. Disputed insofar as Defendants infer that immediately

after offering to obtain an appointment for Cynthia Bogorad, Ms. Mullinix asked how the estate

wanted to handle the renovation payments. Undisputed that after Ms. Mullinix spoke with both

Cynthia and L. Bogorad about obtaining an appointment, she spoke alone with L. Bogorad for

approximately fifteen minutes about various issues, including his opinion regarding whether he

viewed Mr. Bogorad's commitment to Ms. Mullinix as a debt of the estate. Mullinix 239:3-

241:14. Ms. Mullinix had previously discussed Cynthia Bogorad's treatment with her and L.

Bogorad in December 2003. Ms. Mullinix lacks sufficient knowledge to confirm what is meant

by she "later" spoke with L. Bogorad on the phone. Undisputed that, in a phone conversation,

Ms. Mullinix offered to try to obtain an appointment with a renowned oncologist for Cynthia

Bogorad and that she was "very helpful in terms of obtaining access to a doctor in New York" to

advise on Cynthia Bogorad's case. Mullinix 236:2-4; 237:19-238:2; L. Bogorad 123:9-11.

37.    On February 11, 2004, the estate's lawyer sent Mullinix a letter stating that the estate would not pay any of her claims because payment would violate the Defendants' fiduciary duties as executors of Bogorad's will. L. Bogorad 233:9-15; Hodes Aff., Exh. F.

**Response:**    Undisputed that these facts are supported by the record citation provided,

but disputed that honoring Mr. Bogorad's contracts would violate the Defendants' fiduciary

duties.

38.    On or about March 17, 2004, Mullinix executed a $350,000 contract with McGraime Woodworking, Inc. for the renovations to the Apartment. Complaint, ¶ 32; Hodes Aff., Exh. G. Mullinix paid McGraime a $35,000 deposit and an additional $52,500.00 upon demolition. Complaint, ¶ 32.

**Response:**    Undisputed.

39.    After Bogorad's death, the Defendants permitted Mullinix to live in Bogorad's Lexington home pending the completion of the renovations to the Apartment. Complaint, ¶ 33. While she lived at the Lexington Home, Mullinix never paid rent, utilities, the phone bill or any of the general upkeep of the house. Mullinix 244:8-245:4.

**Response:**    Disputed. This statement is patently untrue. Despite the Defendants'

commitment to permit Ms. Mullinix to remain in the Lexington home until the renovations to her

Apartment were completed, they sold the house before the renovations were completed. K.

Bogorad-Gross Aff. ¶ 19; Complaint ¶ 34. As a result, Ms. Mullinix was forced to rent and live

in a furnished room from June 2004 until the renovations to the Apartment were completed.

Complaint, ¶ 34. Disputed that Ms. Mullinix never paid any of the general upkeep of the house,

on the basis that it is not supported by the record citations provided. Undisputed that Ms.

Mullinix did not pay rent or for utilities at the Lexington Home.

40.    The Defendants sold Bogorad's Lexington home in or around June 2004, which required Mullinix to vacate the home. She rented a furnished apartment until the renovations to the Apartment were completed. Complaint, ¶ 34. At no time did Mullinix complain about the sale of the Lexington home and, in fact, offered to assist in preparing the house for sale. L. Bogorad 230:13-232:10; Hodes Aff., Exhs. H-N.

13

**Response:**    Undisputed, but L. Bogorad and K. Bogorad-Gross had assured Ms. Mullinix that she could live in the Lexington house until the renovations to the Apartment were completed.  Complaint, ¶ 33; Mullinix Aff. #2 ¶ 57.

41.    On or about August 20, 2004, Mullinix sent a demand letter to Defendants' counsel outlining her relationship with Bogorad and her claims against his estate.  Complaint, ¶ 35.

**Response:**    Undisputed.

42.    Bogorad and Mullinix never discussed:  (1) who would pay the renovations costs, maintenance fees, and half of the capital gains taxes and storage costs if Bogorad or Mullinix died; (2) whether Bogorad's alleged commitments were to survive his death; (3) whether Bogorad would continue to pay the renovations costs, maintenance fees, and half of the capital gains taxes and storage costs if they ceased to be a couple; or (4) the time period to which Bogorad was committing to pay the monthly maintenance fees.  Mullinix 183:8-135:6.

**Response:**    Undisputed, but this statement is not material to any issue in this case.

## ADDITIONAL UNDISPUTED MATERIAL FACTS

43.    Lawrence Bogorad and Kathleen P. Mullinix (collectively, the "couple") had a long-term romantic involvement and publicly revealed their romantic relationship sometime in early 1998.  *See* Deposition of Kiki Bogorad-Gross ("Bogorad-Gross Dep.") at 64; Complaint ("Compl.") ¶ 9.

44.    As of March 1998, the couple began living together, both at Mr. Bogorad's home at 2 White Pine Lane, Lexington, Massachusetts (hereinafter, the "Lexington home"), and in Ms. Mullinix's apartment at 975 Park Avenue, New York City.  Compl. ¶ 9; Affidavit of Kathleen P. Mullinix, dated June 5, 2006 ("Mullinix Aff. #1") ¶ 3.

45.    As of March 1998, the couple lived as though husband and wife.  Mullinix Aff. #1 ¶ 3; Mullinix Dep. 60:11-13.

46.    As of March 1998, the couple traveled together and attended family functions together.  Deposition of Leonard P. Bogorad ("Bogorad Dep.") at 79; Bogorad-Gross Dep. at 92.

14

47.     Mr. Bogorad remained married to his wife, Rosalyn Bogorad, during his entire relationship with Ms. Mullinix. Bogorad-Gross Dep. at 20-24. In the 1990s Rosalyn Bogorad became incapacitated and incompetent because of Alzheimer's Disease. Bogorad-Gross Dep. at 20-24. In or around 1998, Mrs. Bogorad became institutionalized where she remains today. Defendants' Motion for Summary Judgment at 3 n.2.

48.     On July 1, 1999, Ms. Mullinix purchased and moved into a condominium apartment on East 87th Street in New York City (the "Condominium"). Compl. ¶¶ 10, 11; Mullinix Aff. #1 ¶ 4.

49.     Mr. Bogorad lived with Ms. Mullinix in the Condominium three to four days a week, and spent the remainder of the week in his Lexington home. Mullinix Dep. 41:19-20; 42:8-9; Compl. ¶ 11.

50.     Mr. Bogorad paid the monthly maintenance fees on the Condominium during the entire time Ms. Mullinix owned it by reimbursing Ms. Mullinix for those payments. Compl. ¶ 12; Mullinix Aff. #1 ¶ 4.

51.     Mr. Bogorad paid to refinish the floors of the Condominium, and also paid for electrical work done at the Condominium. Mullinix Aff. ¶ 4.

52.     Mr. Bogorad never had an ownership interest in the Condominium. Mullinix Aff. #1 ¶ 4.

53.     In August or September of 2002, Jeffrey Ascherman, M.D. approached Ms. Mullinix about purchasing the Condominium from her. Mullinix Dep. 67:1-14. Ms. Mullinix told him that the Condominium was not for sale. *Id.* at 67:13-17; Mullinix Aff. #2 ¶ 5.

54.     Mr. Bogorad told Ms. Mullinix that he wanted her to sell the Condominium. Mullinix Dep. 71:4-5; 72:17-19.73:15-18; Mullinix Aff. #2 ¶¶ 6, 17-20.

15

55.    Mr. Bogorad encouraged Ms. Mullinix to inquire further about selling the Condominium. Mullinix Aff. #2 ¶¶ 8, 17-19. He explained that because he was getting older and had experienced health problems, he was concerned with Ms. Mullinix's future. Mullinix Aff. #2 ¶ 7. Mr. Bogorad wanted to make sure she had a safe and comfortable place to live in the event something happened to him. Mr. Bogorad expressed his desire for Ms. Mullinix to live between Park Avenue and Fifth Avenue. *Id.*

56.    Ms. Mullinix called the Aschermans and said she would like to discuss possibly selling the Condominium to them. Mullinix Dep. 73:5-8. Dr. Ascherman and his wife visited the Condominium several times between October 2002 and February 2003. *Id.* at 67:12-14; 70:5-9.

57.    Mr. Bogorad spoke to Ms. Mullinix during the time period between October 2002 and February 2003 about his desire for her to move between Park Avenue and Fifth Avenue Mullinix Dep. 134:5-11. Mr. Bogorad said that Park Avenue and Fifth Avenue was a safe area and that he wanted to be assured that Ms. Mullinix was in a safe place in case anything happened to him. *Id.*; Mullinix Aff. #2 ¶ 7.

58.    Mr. Bogorad brought up the possibility of Ms. Mullinix selling the Condominium and moving to a safer area with Brendan Mullinix, Ms. Mullinix's son, to get his opinion. Mullinix Dep. 68:21-23; Mullinix Aff. #2 ¶ 8.

59.    Ms. Mullinix also spoke with Judith Durham-Smith, the realtor who assisted the couple when Ms. Mullinix purchased the Condominium, to get her opinion concerning the potential sale of the Condominium. Mullinix Aff. #2 ¶ 8.

16

60.    Thereafter, the couple spoke with Brendan and Ms. Durham-Smith, and both opined that an apartment between Park Avenue and Fifth Avenue would be a much better location for Ms. Mullinix. Mullinix Aff. #2 ¶ 8.

61.    Between Thanksgiving and Christmas 2002, Ms. Mullinix met with the Aschermans several times to negotiate a price for the Condominium. Mullinix Dep. 71:6-8; 76:14-15; Mullinix Aff. #2 ¶ 17. Mr. Bogorad encouraged Ms. Mullinix to engage in discussions with the Aschermans regarding price. Mullinix Dep. 69:4-7; Mullinix Aff. #2 ¶ 17.

62.    When Ms. Mullinix could not reach an agreement with the Aschermans concerning a price for the Condominium, she told Mr. Bogorad that she did not want to go forward with the negotiations. Mullinix Dep. 73:1-6; Mullinix Aff. #2 ¶ 18. Ms. Mullinix broke off discussions with the Aschermans regarding the possible sale of the Condominium. Mullinix Aff. #2 ¶ 18.

63.    Shortly after breaking off discussions with the Aschermans, Mr. Bogorad told Ms. Mullinix several times during a vacation that he thought she should sell the Condominium and move closer to Fifth Avenue. Mullinix Dep. 73:15-18; Mullinix Aff. #2 ¶ 19.

64.    When the couple returned from their trip in January 2003, the Aschermans and Ms. Mullinix resumed discussions about the sale of the Condominium. Mullinix Dep. 73:15-18; Mullinix Aff. #2 ¶ 20.

65.    In or around February 2003, Ms. Mullinix entered into a contract for the sale of the Condominium. Compl. ¶ 18; Mullinix Aff. #2 ¶ 21.

66.    Ms. Mullinix and the Aschermans closed on the sale on or around March 31, 2003. Compl. ¶ 19; Mullinix Aff. #2 ¶ 21.

17

67.     Under an agreement with the Aschermans, the couple continued to occupy the Condominium until April 8, 2003. Mullinix Aff. #2 ¶ 23.

68.     On April 7, 2003 the furniture in the Condominium was moved to a storage facility and the couple returned to the Lexington Home. Compl. ¶ 20-21; Mullinix Aff. #2 ¶ 23. Mr. Bogorad stopped paying the monthly maintenance fees when Ms. Mullinix stopped living there. Mullinix Aff. #2 ¶ 24.

69.     Mr. Bogorad offered to pay the storage charges and Ms. Mullinix suggested that the couple split them evenly. Mullinix Aff. #1 ¶ 10. Once the Condominium was sold and the couple made arrangements to store their belongings, Mr. Bogorad reiterated his offer to pay for half of the storage charges and Ms. Mullinix accepted his offer. *Id.* ¶ 11; Mullinix Aff. #2 ¶ 25.

70.     At or about the same time as Ms. Mullinix's discussions with Mr. Bogorad and the Aschermans regarding the sale of the Condominium, Ms. Mullinix and Ms. Durham began looking at apartments on the market. Mullinix Dep. 76:13-17; 79:1-2; Mullinix Aff. #2 ¶¶ 10-11.

71.     They looked at several apartments, including an apartment at 1050 Fifth Avenue that was different from the one Ms. Mullinix ultimately purchased. Mullinix Dep. 76:20-21; 82:2-13; Mullinix Aff. #2 ¶ 10; Affidavit of Judith Durham-Smith, dated June 18, 2006 ("Durham-Smith Aff.") ¶ 4.

72.     Brendan Mullinix saw the listing of the apartment she eventually purchased. Ms. Durham and Ms. Mullinix agreed that it was out of Ms. Mullinix's price range and Ms. Mullinix opted not to visit it. Mullinix Aff. #2 ¶ 11; Durham-Smith Aff. ¶ 4.

73.     On the day before Thanksgiving 2002, Ms. Mullinix first saw the apartment located at 1050 Fifth Avenue in New York City that she ultimately would buy (hereinafter, the "Apartment"). Mullnix Dep. 90:12-14. Mullinix Aff. #2 ¶ 12; Durham-Smith Aff. ¶ 4. Ms.

18

Mullinix went to view the Apartment to compare it to the other apartment in the same building. Mullinix Aff. #2 ¶ 12.

74.    The Apartment was a wreck. Mullinix Dep. 93:5. The floor, lighting, air conditioning and heating systems, and ceilings were all in a state of disrepair. Mullinix Dep. 5-17. The Apartment needed extensive renovations to be livable. Durham-Smith Aff. ¶ 6. By contract, the Apartment's windows had to be replaced. Mullinix Dep. 119:21-22.

75.    After her first visit to the Apartment, Ms. Mullinix determined she was not interested in purchasing it. Mullinix Dep. 111:3-10; Mullinix Aff. #2 ¶ 12.

76.    Mr. Bogorad told Ms. Mullinix that he wanted to see the Apartment, but Ms. Mullinix declined because she believed the Apartment was too expensive. Mullinix Dep. 7-10; Mullinix Aff. #2 ¶ 13.

77.    Mr. Bogorad told Ms. Mullinix that she should seriously consider the Apartment because it was in a great location. Mullinix Dep. 118:3-5; Mullinix Aff. #2 ¶ 16.

78.    Mr. Bogorad explained to Ms. Mullinix that she could use the proceeds from the sale of the Condominium to fund the 50% down-payment for an apartment in the range of $1 million to $1.5 million. Mullinix Aff. #1 ¶ 10; Mullinix Aff. #2 ¶ 15. Mr. Bogorad assured Ms. Mullinix that he would pay for the cost of renovations and the monthly maintenance fee as he had always done, and she would be responsible for only the mortgage payment. Mullinix Aff. #2 ¶¶ 14-15; *see* Durham-Smith Aff. ¶¶ 7-8.

79.    On February 7, 2003, after having learned that the price of the Apartment had been reduced, the couple visited the Apartment together. Compl. ¶ 16; Durham-Smith Aff. ¶ 5. During that visit, Mr. Bogorad told Ms. Mullinix that he wanted her to purchase the Apartment

and that he would feel very reassured if she were living there in case anything happened to him. Mullinix Aff. #2 ¶ 29.

80.     At the time of the couple's first visit to the Apartment together, Ms. Mullinix continued to believe that the cost of the Apartment and the renovations were too expensive. Mullinix Dep. 118:11-12; Mullinix Aff. #2 ¶ 28; *see* Durham-Smith Aff. ¶¶ 4-8.

81.     On or about February 7, 2003, Mr. Bogorad reiterated his commitment to pay for the cost of the renovations and the monthly maintenance fees for the Apartment.  Compl. ¶ 17; Mullinix Aff. #2 ¶ 29; *see* Durham-Smith Aff. ¶ 8.

82.     While visiting the Apartment on February 7, 2003, Ms. Durham told Ms. Mullinix and Mr. Bogorad that the renovation would cost approximately $300,000, plus the costs to replace the windows and to repair the heating system.  Mullinix Dep. 119:20-21.  Mr. Bogorad stated that he thought $300,000 was a low estimate.  Mullinix Dep. 120:1-2; Mullinix Aff. #2 ¶ 30.

83.     Mr. Bogorad said that he wanted the Apartment to be owned solely by Ms. Mullinix.  Mullinix Aff. #1 ¶ 12; Mullinix Aff. #2 ¶ 31.  Mr. Bogorad said that he was paying for the renovations.  Durham-Smith Aff. ¶ 8.

84.     On or about February 7, 2003, in the couple's presence, Ms. Durham called the seller's broker and learned that another offer had been made, and maybe accepted, on the Apartment.  Mullinix Dep. 122:10-17; Mullinix Aff. #2 ¶ 32.

85.     Mr. Bogorad told Ms. Mullinix that she should increase her offer.  Mullinix Dep. 122:19-21; Mullinix Aff. #2 ¶ 32; *see* Durham-Smith Aff. ¶ 7.

86.     Mr. Bogorad told Ms. Mullinix that spending another $100,000 or $200,000 to buy the Apartment was a trivial matter.  Mullinix Dep. 123:6-8; Mullinix Aff. #2 ¶ 32; *see*

Durham-Smith Aff. ¶ 7. Mr. Bogorad was very involved in the negotiation process and convinced Ms. Mullinix to purchase the Apartment. Durham-Smith Aff. ¶ 7.

87.    Ms. Durham placed a call to the seller's broker to communicated Ms. Mullinix's increased offer of 1.4 million dollars. Mulinix Dep. 123:16-19. Ms. Durham later learned that the other prospective buyers had increased their bid. Mullinix Dep. 123:12-23.

88.    The seller's broker told Ms. Durham that the couple should submit a signed contract. Mullinix Aff. #2 ¶ 33.

89.    Mr. Bogorad wanted to meet with an attorney as quickly as possible to prepare a contract. Mullinix Aff. #2 ¶ 34. Ms. Durham recommended attorney Alan Kroll. Mullinix Dep. 127:20-23. The couple met with Kroll on the afternoon of February 7, 2003 to prepare a formal offer. *Id.* at 127:11-15; Mullinix Aff. #2 ¶ 34.

90.    Mr. Kroll called the seller's attorney, who indicated that Ms. Mullinix should assemble all of her financial information and meet him in his office a few days later, so that he could meet both prospective buyers individually and make a recommendation to his client. Mullinix Aff. #2 ¶ 35.

91.    Mr. Bogorad was thrilled about the progress and reassured Ms. Mullinix that the seller's attorney would recommend her. Mullinix Dep. 131:6-11; Mullinix Aff. #2 ¶ 36.

92.    On or about February 10, Ms. Mullinix met with the seller's attorney. Mullinix Aff. #2 ¶ 36; Mullinix Dep. 137:5-7. Later that day, the seller's attorney called Mr. Kroll and informed him that Ms. Mullinix's offer had been accepted. Mullinix Dep. 141:23-142: 9; Mullinix Aff. #2 ¶ 36.

93.    Ms. Mullinix executed the Contract for Sale for the Apartment on or about February 7, 2003, and closed on the purchase on or about June 10, 2003. Compl. ¶¶ 18, 22.

21

94.    On or about February 27, 2003, Ms. Mullinix executed a document acknowledging that as a prospective purchaser of the Apartment, she was responsible for replacing all the windows so that they conformed to the building's master plan. Mullinix Aff. #2 ¶ 42.

95.    Ms. Mullinix was required to replace the through-the-wall air conditioning units with units that also provided a heating mechanism. Mullinix Aff. #2 ¶ 42.

96.    The couple arranged for the replacement of the windows and air conditioning / HVAC units and hired contractors to perform the work outside of the larger renovation project they anticipated. Mullinix Aff. #2 ¶ 42. These projects were completed during the fall of 2003 by Skyline Windows, LLC and Hamilton Air. *Id.* Ms. Mullinix paid for this work and Mr. Bogorad reimbursed her. Mullinix Dep. 223:17-20; 224:8-9; Mullinix Aff. #2 ¶ 42.

97.    After June 10, 2003, the couple planned for renovations to the Apartment together, meeting with architects, discussing the plans and shopping for ideas. Bogorad-Gross Dep at 148, 169-70; Compl. ¶¶ 23-24, 27.

98.    Mr. Bogorad and Ms. Mullinix understood that they could take their time with the planning and the renovations because they could live in the Lexington Home until the renovations to the Apartment were complete. Mullinix Dep. 166:11-23; Mullinix Aff. #2 ¶ 47.

99.    Mr. Bogorad told Ms. Mullinix that he thought she should identify construction people and architects in New York City to look at the Apartment and to give advice about design and costs. Mullinix Aff. #2 ¶ 43.

100.    Mr. Bogorad arranged a meeting with his friends Raynor and Ranne Warner. Mullinix Aff. #2 ¶ 44.

22

101.    The Warners were working on a development project and referred Mr. Bogorad and Ms. Mullinix to the Siematic showroom in Boston to view kitchen cabinets. Mullinix Aff. #2 ¶ 44. Kiki Bogorad-Gross arranged for the couple to visit to the Boston Design Center, where she worked, to view various showrooms for kitchen cabinets. K. Bogorad-Gross Dep. 152:17-23; Mullinix Aff. #2 ¶ 45.

102.    The couple went to several design centers and showrooms in New Jersey, New York and Massachusetts to look at potential materials for the kitchen and bathroom. Mullinix Aff. #2 ¶ 45. Mr. Bogorad even went alone to a showroom to look at cabinets that he had seen in one of the brochures that the couple had collected. Mullinix Aff. #2 ¶ 45.

103.    By May 2003, the couple estimated that the renovations to the Apartment would cost approximately $400,000, excluding the windows that were required by the co-operative board and the replacement of the heating/air conditioning units. Mullinix Aff. #2 ¶ 46.

104.    Mr. Warner traveled to New York City to look at the Apartment and to begin working on the design. Compl. ¶ 23. On or about July 11, 2003, Mr. Warner prepared a proposal outlining the scope of his schematic design services for renovations to the Apartment. Mullinix Aff. #2 ¶ 48.

105.    Mr. Warner suggested that the couple hire New York architect, Heather Aman, to serve as the person primarily responsible for the renovations. Mullinix Aff. #2 ¶ 48. Mr. Warner agreed to act as an advisor to the project. *Id.*

106.    The couple met with Mr. Warner, Ms. Aman and Brendan Mullinix to discuss the renovation plans. Mullinix Aff. #2 ¶ 49. Prior to the meeting, and based upon the original projections and schematic from Mr. Warner, Ms. Aman estimated her fees based upon a total construction cost of approximately $300,000. *Id.* After Ms. Aman saw the Apartment, she

23

estimated that the construction costs would be greater than $300,000 and informed the couple that her fee would be more than originally estimated. Mullinix Aff. #2 ¶ 49.

107.    Mr. Bogorad was concerned initially about the increase in Ms. Aman's price, so Mr. Bogorad and Ms. Aman discussed the fee at length. Mullinix Aff. #2 ¶ 50. Mr. Bogorad was more involved than Ms. Mullinix in these discussions. *Id.* Mr. Bogorad negotiated and understood Ms. Mullinix's contract with Ms. Aman, which provided for approximately $400,000 in costs for the renovations. Mullinix Aff. #2 ¶¶ 50, 51.

108.    On July 25, 2003, Ms. Mullinix and Ms. Aman signed a contract for architectural design services (that Mr. Bogorad had negotiated) to the Apartment and Ms. Mullinix paid a $1,500 retainer for the project. Compl. ¶ 24; Mullinix Aff. #2 ¶¶ 50, 52. Mr. Bogorad reimbursed Ms. Mullinix for this $1,500 payment, as well as for an additional $1,500 retainer fee that she paid to Ms. Aman. *Id.*

109.    Mr. Bogorad paid Mr. Warner $1787.00 for his services in connection with his renovations to the Apartment. Compl. ¶ 23; Mullinix Aff. #2 ¶ 53.

110.    Mr. Bogorad reimbursed Ms. Mullinix for the monthly maintenance fees for the Apartment for the months of July, August, September, October, November 2003. Mullinix Aff. #2 ¶ 54.

111.    The couple had reviewed and approved the architectural design plans from Ms. Aman just days prior to leaving on their vacation, and had authorized Ms. Aman to send those plans out to general contractors for bidding. Mullinix Aff. #2 ¶ 56 . The couple anticipated reviewing the bids and settling on one of them upon their return. *Id.*

112.    On December 28, 2003, Mr. Bogorad passed away unexpectedly while on vacation with Ms. Mullinix, the Defendants and the Defendants' children. Compl. ¶ 30

113.    Ms. Mullinix did not want to purchase the Apartment because of the costs involved. Mr. Bogorad convinced Ms. Mullinix to purchase the apartment by committing to her that he would (1) split evenly with her the tax consequences that resulted from the sale of the Condominium by reimbursing her for one-half of that amount upon completion of her 2003 taxes; (2) pay the monthly maintenance fees for the Apartment by reimbursing her on a monthly basis; (3) pay for the cost of the renovations to the Apartment, by reimbursing her for the cost of the work and for the architect's fee as she incurred those costs and fees; and (4) split evenly with her the costs she incurred for storing the belongings from the Condominium until the completion of the renovations to the Apartment, by reimbursing her for one-half of the total storage costs, once a final amount was determined. Compl. ¶ 18; Mullinix Aff. #2 ¶¶ 28, 29, 38, 39.

114.    The only reason Ms. Mullinix sold her apartment and bought a new one was because Mr. Bogorad committed to pay for the renovations relating to the new apartment, the monthly maintenance fees, one-half the storage costs while the new apartment was being renovated and one-half the tax consequences from the sale of her condominium. Mullinix Aff. #2 ¶¶ 38-39.

115.    Ms. Mullinix would not have purchased the Apartment if Mr. Bogorad did not make these promises. Mullinix Aff. ¶ 38; Durham-Smith Aff. ¶¶ 7-8.

116.    Because he had upheld his commitment to pay the monthly maintenance fee for the Condominium and he had always followed through on his commitments to Ms. Mullinix throughout their long-term relationship, Ms. Mullinix believed that Mr. Bogorad would honor his promises. Mullinix Aff. #2 ¶ 39.

117.    Mr. Bogorad paid the monthly maintenance fee for the Condominium and ceased paying those fees when Ms. Mullinix sold it and moved. Mullinix Dep. 56:1-5; Mullinix Aff. #2 ¶ 24.

118.    Even Ms. Bogorad-Gross stated that she "got the sense" Mr. Bogorad wanted Ms. Mullinix to buy the Apartment.  K. Bogorad-Gross 169:16-18.

119.    Ms. Durham-Smith, remembers that Mr. Bogorad convinced Ms. Mullinix to make the purchase.  Durham-Smith Aff. ¶ 7.  Mr. Bogorad told Ms. Durham-Smith that he was paying for the renovations. *Id.* ¶ 8.

120.    Kiki Bogorad-Gross stated that she believes Mr. Bogorad did make the promises that Ms. Mullinix claims and that Ms. Mullinix is telling the truth.  K. Bogorad-Gross Dep. 190:23-191:16.

Respectfully submitted,

KATHLEEN P. MULLINIX,
By her attorneys,

/s/ Sara E. Solfanelli
Larry C. Kenna (BBO # 267760)
Michelle L. Dineen Jerrett (BBO #634930)
Sara E. Solfanelli (BBO #658018)
CHOATE, HALL & STEWART LLP
Two International Place LLP
Boston, Massachusetts 02110
Tel: (617) 248-5000

Date:   June 19, 2006

26

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on June 19, 2006.

<u>/s/ Sara E. Solfanelli</u>

27