UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| KATHLEEN P. MULLINIX, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Civil Action |
| v. | ) | No. 04-12684-WGY |
| | ) | |
| KIKI BOGORAD-GROSS and | ) | |
| LEONARD P. BOGORAD, as They | ) | |
| Are Executors of the Will of | ) | |
| Lawrence Bogorad, | ) | |
| | ) | |
| Defendants. | ) | |

## AFFIDAVIT OF LISA M. HODES FILED IN SUPPORT OF DEFENDANTS' OPPOSITIONS TO PARTIAL SUMMARY JUDGMENT AND CROSS MOTION FOR SUMMARY JUDGMENT

Lisa M. Hodes, being duly sworn, deposes and states as follows:

1.      I am an associate of the firm Sullivan & Worcester LLP, counsel to Defendants Kiki Bogorad-Gross and Leonard Bogorad, as Executors of the Will of Lawrence Bogorad.  I make this affidavit on personal knowledge in Defendants' oppositions to Plaintiff's Motion for Partial Summary Judgment and Plaintiff's Cross Motion for Summary Judgment.

2.      Annexed to this affidavit as Exhibit A is a true and accurate copy of portions of the deposition transcript of Kathleen P. Mullinix, taken on March 1, 2006.

3.      Annexed to this affidavit as Exhibit B is a true and accurate copy of portions of the deposition transcript of Kiki Bogorad-Gross, taken on January 20, 2006.

4.      Annexed to this affidavit as Exhibit C is a true and accurate copy of portions of the deposition transcript of Leonard Bogorad, taken on January 19, 2006.

{B0532852; 1}

5.     Annexed to this affidavit as Exhibit D is a true and accurate copy of the letter dated August 3, 2003 from Kathleen Mullinix to Heather Aman, that was produced in discovery in this case, and is Exhibit 8 to the Mullinix Deposition.

6.     Annexed to this affidavit as Exhibit E is a true and accurate copy of the Agreement between Kathleen Mullinix and Heather Aman, dated July 25, 2003, that was produced in discovery in this case, and is Exhibit 9 to the Mullinix Deposition.

7.     Annexed to this affidavit as Exhibit F are true and accurate copies of five invoices, dated November 3, 2003, November 24, 2003, January 30, 2004, May 17, 2004, and August 2, 2004, from Heather Aman Design to Kathleen Mullinix, that were produced in discovery in this case, and are Exhibit 10 to the Mullinix Deposition.

8.     Annexed to this affidavit as Exhibit G is a true and accurate copy of the Statement of Assets and Liabilities as of December 31, 2002 of Kathleen P. Mullinix, that was produced in discovery in this case, is part of Exhibit 5 to the Mullinix Deposition and was undesignated as confidential by an order of this Court on June 9, 2006.

9.     Annexed to this affidavit as Exhibit H is a true and accurate copy of the Financial Statement of Kathleen P. Mullinix, dated February 27, 2003, that was produced in discovery in this case, is part of Exhibit 5 to the Mullinix Deposition and was undesignated as confidential by an order of this Court on June 9, 2006.

10.     Annexed to this affidavit as Exhibit I is a true and accurate copy of a letter from Kathleen P. Mullinix to the Board of Directors of 1050 Fifth Avenue, Inc., dated March 11, 2003, that was produced in discovery in this case, is part of Exhibit 5 to the Mullinix Deposition and was undesignated as confidential by an order of this Court on June 9, 2006.

{B0532852; 1}

11.    Annexed to this affidavit as Exhibit J is a true and accurate copy of the section labeled Personal Information Regarding the Applicant of the application of Kathleen P. Mullinix to the Board of Directors of 1050 Fifth Avenue, Inc., dated February 21, 2003, that was produced in discovery in this case, is part of Exhibit 5 to the Mullinix Deposition and was undesignated as confidential by an order of this Court on June 9, 2006.

Signed under the pains and penalties of perjury this 30th day of June, 2006.


/s/  Lisa M. Hodes
Lisa M. Hodes

<u>Certificate of Service</u>

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non registered participants on June 30, 2006.

/s/  Lisa M. Hodes

- 3 -

{B0532852; 1}

# EXHIBIT A

00001

1                          Vol. 1

2

          UNITED STATES DISTRICT COURT
3           DISTRICT OF MASSACHUSETTS

4               C.A. NO. 04-12684-WGY

5

     KATHLEEN P. MULLINIX,
6            Plaintiff,
                vs.
7     KIKI BOGORAD-GROSS and LEONARD P.
      BOGORAD, as They Are Executors of the
8     Will of Lawrence Bogorad,
                Defendants.

9

10

11        DEPOSITION OF KATHLEEN P. MULLINIX,

12   taken pursuant to Notice under the applicable

13   provisions of the Federal Rules of Civil

14   Procedure on behalf of the Defendants, before

15   Simonne J. Elwood, R.P.R. and a Notary Public

16   in and for the Commonwealth of Massachusetts,

17   at the office of Sullivan & Worcester LLP, One

18   Post Office Square, Boston, Massachusetts,
     commencing on Wednesday, March 1, 2006 at
19   8:41 a.m.

20      NEAL A. SALLOWAY - COURT REPORTERS
           FIVE CARDIGAN ROAD
21

22       WEST PEABODY, MA 01960

23  781-581-3993 - 978-535-0313 - FAX 978-536-3142

00070

1    it?"  And I said, "Well, I don't know.  Maybe

2    we should talk about it."

3        And so I think they called me back.  I

4    think the husband called me back the next day

5    or something, and I don't remember.  I think

6    maybe he and his wife came to look at the

7    apartment, or the wife came alone because she

8    hadn't come that day that he came to the

9    door.  I just don't remember.  And so he

10    asked me what I would consider selling it

11    for.

12  Q    Did you answer?

13  A    No.  I had no idea.  So I called my son

14    and --

15  Q    Which one?

16  A    Brendan.

17  Q    He's the one in the real estate business?

18  A    That's right.  And I said, "This is nuts.

19    Should I suggest a price to him?"  And he

20    looked around at the apartments that had sold

21    in the neighborhood or something, and he

22    said -- he thought like $1.2 million would be

23    a very good price.  I had paid $800,000 for

**Mullinix, Kathleen  03-01-06**                    **Page 70**

00074

1  A    Yeah.

2  Q    And, ultimately, did you agree on a price?

3  A    Yes.

4  Q    And what did you agree on?

5  A    1.325.

6  Q    During the course of that process of

7    discussions with the Aschermans, did you go

8    back to your son, Brendan, and seek his

9    advice?

10  A    He thought 1.1 or 1.2 was a reasonable thing

11    to do, you know, that that would be a good

12    price for the apartment.  Yeah.  I talked to

13    him.  I talk to Laurie.

14  Q    Your son, Brendan, is in the real estate

15    business in New York, correct?

16  A    Well, he works for a real estate investment

17    trust in New York, but he doesn't do

18    business -- I mean, his business is not in

19    New York.

20  Q    Am I correct that when you first spoke with

21    your son, Brendan, about the possible sale of

22    the 87th Street condo, he did some

23    investigation or research, is that right?

**Mullinix, Kathleen  03-01-06**                    **Page 74**

00075

1 A    Yes, which I could have done on line, but I

2      didn't.  He did.

3 Q    And he advised you that -- I think you said

4      something in the neighborhood of 1.2 million

5      would be a fair price?

6         MS. JERRETT:  Objection.

7 A    He said --

8 Q    Is that right?

9 A    He said, "If you can sell the apartment for

10     1.1 or 1.2, that would be -- that would be

11     not a bad thing to do.  You should think

12     about it."

13 Q    And at the end of the discussions, you

14     received $1,325,000, correct?

15 A    Right.

16 Q    I believe you testified that Professor

17     Bogorad made statements to the effect that he

18     didn't like 86th and Lexington?

19 A    Right.

20 Q    What did he say was wrong with it?

21 A    It's a -- He thought the crowd was rough.

22     There are -- There are a lot of homeless

23     people who actually hang out on the corner of

00090

1 Q    Did he get anything in exchange for it to

2        your knowledge?

3 A    You'd have to ask him that.  I don't know.

4 Q    Well, he is, as we lawyers say, unavailable.

5 A    Right.

6 Q    Okay.  Let's go back to November of 2002.

7        You looked at an apartment on the 11th floor

8        of 1050 Fifth Avenue, is that correct?

9 A    And I also, in November, the date before

10       Thanksgiving saw the apartment that I

11       eventually bought and --

12 Q    You anticipated my next question.  When did

13       you first take a look at Apartment 15B?

14 A    Yeah.  The day before Thanksgiving.

15 Q    And was that just you and Ms. Durham

16       together?

17 A    No, it was not Ms. Durham.  That's what I

18       forgot.  She had gone off to California for

19       Thanksgiving.  She wasn't around.  And my

20       son, Brendan, had seen that apartment on the

21       internet, and he called and said, "Did you

22       see that apartment?"  And I said, "No."  And

23       he said, "You should go look at it."  Because

00091

1    I had told him that I liked this apartment

2    that was on the 11th or whatever it was

3    floor.  And so I think -- I think what I did

4    was call the -- I think I called the -- God,

5    I don't remember; whatever broker was

6    representing the seller.  It was in the -- on

7    the internet thing and asked if I could come

8    see it.

9  Q   And I take it the response was in the

10    affirmative because you went to see it on the

11    Wednesday before Thanksgiving 2002, correct?

12  A   Right.

13  Q   First of all, how did you get there; did you

14    just walk down the street?

15  A   I walked.

16  Q   The distance from your 87th Street apartment

17    to 86th and Fifth is about three long and one

18    short block, correct?

19  A   Yeah.

20  Q   And did you meet with anyone there, that is

21    to say, a broker?

22  A   Yes, the broker.

23  Q   And do you recall who that was?

00129

1    of his client, was going to meet with me and

2    whoever the other people were on Monday

3    morning.

4  Q    So is there anything else that you recall

5    transpiring that day, February 7th, 2003,

6    concerning Apartment 15B?

7  A    I signed the contract.

8  Q    You signed a contract that day?

9  A    Yeah.

10  Q    And was that done at Mr. Kroll's office while

11    you were still there?

12  A    Correct.

13  Q    Who prepared the document for you to sign?

14  A    Mr. Kroll.

15  Q    And while you were there, correct?

16  A    Yes.

17  Q    When did you leave his office?

18  A    6:00ish.

19  Q    And was Professor Bogorad with you the entire

20    time?

21  A    Yes.  Yes, he was.

22  Q    And that contract document identified you as

23    the sole purchaser or prospective purchaser

00130

1    of Apartment 15B, correct?

2         MR. JERRETT:  Objection.

3  A    That's correct.

4  Q    And did anything else transpire, or have we

5        now exhausted your recollection on February

6        7th, 2003 concerning Apartment 15B?

7  A    That's correct.

8  Q    So 6:00ish, and I take it 6:00 p.m. or so,

9        you and Professor Bogorad left Mr. Kroll's

10       office, is that correct?

11 A    Yes.

12 Q    Do you recall what you did then?

13 A    Yes.  We went -- We went home, and then we

14       had dinner at an Indian restaurant down the

15       street.

16 Q    In the upper east side?

17 A    Yep.

18 Q    Did he stay around the entire weekend?

19 A    Uh-huh.  Yes.

20 Q    When did he leave New York that -- When did

21       he next leave New York?

22 A    Either Sunday night or Monday morning.  I

23       don't remember which.

**Mullinix, Kathleen  03-01-06**                    **Page 130**

00140

1    wanted to figure out which of the two

2    prospective buyers was more likely to pass

3    the Board.

4  Q    And you're referring in that instance to the

5    Board of the co-op, correct?

6  A    Yeah.

7  Q    Was there any discussion -- Well, first of

8    all, did Mr. Brog say to you, in words or

9    substance, anything at all about the other

10    prospective buyers?

11  A    No, nothing.

12  Q    Nothing at all?

13  A    No.

14  Q    Do you know if the other prospective buyers

15    were individual, a couple?

16  A    I have no idea.

17  Q    Was there any discussion between you and Mr.

18    Brog concerning your finances or the

19    financing of the purchase of the apartment?

20  A    No.

21  Q    Did any money ever come up as a topic?

22  A    No, but I had -- What had I done?  I had --

23    Oh, God.  I think I had -- I had made a list

**Mullinix, Kathleen  03-01-06**                **Page 140**

00141

1    of accounts I had that I brought, I think.  I

2    think I -- But we didn't talk about finance.

3    We just chatted.

4  Q   Did you give him that list?

5  A   Yeah.

6  Q   And you said accounts.  Are you talking like

7    banks, securities, things of that nature?

8  A   Right.

9  Q   Did you have any discussion with Mr. Brog

10    concerning, you know, the 1050 Fifth Avenue

11    co-op or its Board or anything along those

12    lines?

13  A   No.  He told me that he had been Mr.

14    Maricca's lawyer for 20 years; that was the

15    seller; 20 or more or something like that;

16    context kind of thing.  M-A-R-I-C-C-A.  That

17    was the seller.

18  Q   Have you told us everything you can recall

19    about your meeting with Mr. Brog?

20  A   Yeah.

21  Q   What happened next after that meeting in

22    respect of Apartment 15B?

23  A   In the afternoon, I think it must -- I don't

**Mullinix, Kathleen  03-01-06**          **Page 141**

00148

1    one of our summer vacations in New York, and

2    he said, "You know, here's how I'm thinking

3    about my estate." And he explained what his

4    thinking was.

5  Q    And what did he explain?

6  A    He said that the way he thought about things,

7    he had -- he had been the, you know, he had

8    worked and so that the money he and his wife

9    had accumulated, he had, essentially, what

10    you call it, earned that money, but it was

11    for both of them because she didn't work, and

12    so the way he contemplated what he wanted to

13    do was that half of whatever the estate was

14    was his wife, and that would go to the

15    children, and the other half of it was his,

16    and he wanted to divide that three ways.

17  Q    Did he give you any understanding as to what

18    the magnitude of his estate was?

19        MS. JERRETT: Objection. During which

20    time?

21        MR. VARN: At or about this time.

22  A    No. He had told me when he was in an endless

23    process of doing -- setting up that trust

**Mullinix, Kathleen  03-01-06**                    **Page 148**

00149

1    that he -- I think Chicago and Harvard are

2    the beneficiaries, he thought about that

3    forever, and I knew that there was a

4    $1 million going into that trust.

5 Q    Apart from that, did you have any

6    understanding of, basically, what he was

7    worth?

8 A    No.  I -- I had a basic understanding of how

9    much money he had from conversations that we

10    had in 1998.

11 Q    Okay.  And what was your understanding from

12    those 1998 conversations?

13 A    He said he had approximately $5 million.

14 Q    Now, if I understand correctly, in 2000, he

15    told you he wanted to make you a beneficiary,

16    in essence, one-sixth, correct?

17 A    Yeah.

18 Q    And you referred to his trust which made

19    provision for two universities, and I think

20    you used the words, "endless process"?

21 A    Yes.

22 Q    When, to the best of your recollection, did

23    that endless process begin?

00176

1   Q    Now, at some point, you -- Actually, I want

2        to go back to March of 2003 for just a

3        second, and would you take a look, please, at

4        Exhibit 5 and, in particular, if you go to

5        the page that has the stamp 32 at the bottom,

6        it starts with 15, so it's not too --

7   A    Yeah.  I see 32.

8   Q    And do you see there's some references

9        towards the bottom to a few individuals

10       identified as personal references; do you see

11       that?

12  A    Yes.

13  Q    Ms. Heller, Mr. Keating, Mr. Lee, Mr. Zorn

14       and Mr. Arnold.  Do you see that?

15  A    Uh-huh.

16  Q    Are those personal references that you

17       supplied, you know, of people that you

18       expected would vouch for you, basically?

19  A    Yes.

20  Q    Up at the top of that page, do you see this

21       document is a part of a preprinted form in

22       which information is typed in; do you see

23       that?

00177

1  A    Yes.

2  Q    And do you see in the second line, it says,

3       "Names and Relationship of proposed occupants

4       of the Apartment and ages of children, if

5       any, and schools attending."; do you see

6       that?

7  A    Yes.

8  Q    And your name is typed in after that?

9  A    That's correct.

10  Q    There's no reference to Professor Bogorad

11       there, correct?

12  A    That's correct.

13  Q    Why not?

14  A    Because we -- We were advised that since we

15       weren't married, putting Laurie's name on was

16       not -- was not a smart thing to do because

17       people on the Board, somebody might say,

18       "Well, these people aren't married."  So I

19       didn't, and the apartment was -- he was not

20       to have any ownership interest in the

21       apartment.  His financials were not offered

22       as securing my ability to pay in any way, so

23       we didn't do it.

00178

1 Q    Who gave you the advice you just referred to?

2 A    My broker.

3 Q    Ms. Durham?

4 A    Correct.  Who received that advice from her

5    supervisor.

6 Q    At Stribling?

7 A    Yeah.

8 Q    When did Ms. Durham give you that advice?

9 A    Just before she submitted the application.

10 Q    .Did you have any discussion with Professor

11    Bogorad on that subject matter of basically

12    not disclosing that he would occupy the

13    apartment?

14 A    Yes.

15 Q    And what discussion did you have with him?

16 A    I told him what Ms. Durham said, and he said,

17    "Whatever.  Do whatever.  It doesn't matter."

18 Q    Did you have any discussion with Ms. Durham,

19    in words or substance, to the effect that,

20    "Well, what's going to happen when the co-op

21    finds out that I'm not the only occupant of

22    this apartment?"

23        MS. JERRETT:  Objection.

**Mullinix, Kathleen  03-01-06**          **Page 178**

00179

1　A　　No.

2　Q　　Let me see if I understand correctly.  Your

3　　　　testimony is that on the basis of the advice

4　　　　from Ms. Durham, a real estate broker in New

5　　　　York, the decision was made not to tell the

6　　　　whole truth to the Co-Op Board, is that

7　　　　correct?

8　　　　　　MS. JERRETT:  Objection.

9　A　　I wouldn't say that.

10　Q　　Is it not a fact that the decision was made

11　　　　to mislead the Co-Op Board into the proposed

12　　　　occupancy of Apartment 15B if you were

13　　　　permitted to purchase it?

14　　　　　　MS. JERRETT:  Objection.

15　A　　No.

16　Q　　You intended, did you not, that Mr. Professor

17　　　　Bogorad would spend three or four nights a

18　　　　week in that apartment after you got it fixed

19　　　　up to your satisfaction, correct?

20　A　　Yes.

21　Q　　But the decision was made to not disclose

22　　　　that intention to the Co-Op Board as part of

23　　　　the application out of concern that they

**Mullinix, Kathleen  03-01-06**　　　　　　　　**Page 179**

00180

1    might reject it, is that correct?

2  A    That's correct.

3        MR. VARN:  Let's take five minutes.

4        (Break takes place at 1:51 p.m.)

5        (Back on the record at 1:59 p.m.)

6        MR. VARN:  Let's go back on the

7    record.

8  Q    Ms. Mullinix, as of the spring of late winter

9    spring of 2003 when you were pursuing a

10    purchase of Apartment 15B, were you expecting

11    that any aspect of the costs associated with

12    that transaction would be paid by Professor

13    Bogorad?

14  A    What transaction?

15  Q    Apartment 15B?

16  A    I'm not sure.  What do you mean?

17  Q    I'll rephrase it in a way to try to clear it

18    up a little bit.

19        As of late winter or early spring of

20    2003, you had entered into a contract, and

21    you were taking steps to purchase Apartment

22    15B, correct?

23  A    Yeah.

# EXHIBIT B

00001
1                    Volume: I
                     Pages: 207
2                    Exhibits: 1-13

3
        UNITED STATES DISTRICT COURT
4
        DISTRICT OF MASSACHUSETTS
5
        CIVIL ACTION No. 04-12684-WGY
6

7

8
        --------------------------------X
9  KATHLEEN P. MULLINIX,
           Plaintiff,
10     Vs.

11  KIKI BOGORAD-GROSS and LEONARD P.
      BOGORAD, as They are Executors
12  of the Will of Lawrence Bogorad,
           Defendants.
13  --------------------------------X

14

15    DEPOSITION of:  KIKI BOGORAD-GROSS
      Date:  Friday, January 20, 2006
16    Time:  10:00 a.m.
      Location:  Choate, Hall & Stewart, LLP
17          Two International Place
            Boston, MA  02110
18

19

20  --- REPORTER: Evelyn M. Slicius, CSR, RPR ---

21

22       K. L. GOOD & ASSOCIATES
        Registered Professional Reporters
23          P.O. BOX 367
        Swampscott, Massachusetts 01907
24    Tel. 781-598-6405  *  Fax. 781-598-0815

00048

1  Q.  Did he make statements to that effect to you?

2  A.  I believe so.  I'm not sure he said that

3      exactly, but that was the gist of it.

4  Q.  How close in proximity timewise did you and your

5      father look at these apartments?

6  A.  It was probably, you know, it was a short

7      concentrated period of time.

8  Q.  And after he made the decision not to purchase

9      you either of those apartments did he continue

10     talking about a possible sale of his house?

11 A.  I don't think so.

12 Q.  Those are the four issues that you identified as

13     financial matters with the caveat about the

14     house sale.  Do you recall, during the last five

15     years of your father's life, having any

16     additional discussions with him about financial

17     matters?

18 A.  I don't think so other than what my brother

19     spoke about yesterday about giving the money to

20     the University of Chicago and Harvard

21     University, that was in his legal documents, but

22     that was a wish of his.

23 Q.  You recall speaking with your father about that

24     as well?

**Bogorad-Gross Kiki 01-20-06**                    **Page 48**

00190

1  the sale of her East 87th Street apartment, do

2  you have any information that your father did

3  not make such an agreement or promise?

4 A.  No, I have no information either way.

5 Q.  Same thing Ms. Mullinix's claim that he did,

6  and you have no information that he didn't?

7 A.  Right.

8 Q.  Trying again to expedite this, with respect to

9  those four claims, do you believe that

10  Ms. Mullinix is lying?

11  MR. VARN:  Objection.

12 A.  I have no way of knowing.

13 Q.  Do you believe that she is lying?

14  MR. VARN:  Objection.

15 A.  I have no way of knowing.

16 Q.  I'm not asking whether you know, I'm asking what

17  you believe.

18 A.  Could you rephrase the question please, restate

19  the question.

20 Q.  Is it because I've lumped it together?

21 A.  No, the lumping together I understand, that is

22  fine.

23 Q.  With respect to her four claims, do you believe

24  that Ms. Mullinix is lying?

00191

1          MR. VARN:  Objection.

2  A.  Lying lying about what?  The claims?

3  Q.  With respect to the four claims, do you believe

4      that Ms. Mullinix is lying about what she says

5      your father committed to do or promised to do?

6          MR. VARN:  Objection.

7  A.  I have no way of knowing.

8  Q.  Again, I'm not asking what you know, I'm asking

9      what you believe.

10         MR. VARN:  Objection.  You pre-suppose

11     that she has formed an opinion on the subject,

12     that is the problem with the question.

13 Q.  Have you formed an opinion on the subject?

14 A.  I don't believe that she's lying that he said

15     that he would do it, I just don't know that that

16     was his intention.

17 Q.  And when you say you "don't know that that was

18     his intention," what do you mean by that?

19 A.  I suspect that if he were -- if he had lived, he

20     would have paid for it as a gift.  But I also

21     believe that because he provided for her in his

22     estate documents, that that was the equivalent,

23     that they were one and the same.

24 Q.  And when you say that he provided for her in the

# EXHIBIT C

00001

1                            Volume: I
                            Pages: 254
2                          Exhibits: 1-15

3
         UNITED STATES DISTRICT COURT
4
         DISTRICT OF MASSACHUSETTS
5
         CIVIL ACTION No. 04-12684-WGY
6

7

8
    --------------------------------X
9  KATHLEEN P. MULLINIX,
             Plaintiff,
10     Vs.

11  KIKI BOGORAD-GROSS and LEONARD P.
       BOGORAD, as They are Executors
12  of the Will of Lawrence Bogorad,
             Defendants.
13  --------------------------------X

14

15    DEPOSITION of:  LEONARD P. BOGORAD
       Date: Thursday, January 19, 2006
16    Time: 10:00 a.m.
       Location: Choate, Hall & Stewart, LLP
17          Two International Place
            Boston, MA  02110
18

19

20  --- REPORTER: Evelyn M. Slicius, CSR, RPR ---

21

22        K. L. GOOD & ASSOCIATES
          Registered Professional Reporters
23          P.O. BOX 367
          Swampscott, Massachusetts 01907
24    Tel. 781-598-6405  *  Fax. 781-598-0815

00026

1    those sounded reasonable.  And he had legal

2    advice and he seemed to understand this better

3    than I did.  And certainly whatever he wanted to

4    do was fine with me.

5  Q.  Do you recall, roughly, when that conversation

6    occurred?

7  A.  I don't, I'm sorry.

8  Q.  Was it before the e-mail communication regarding

9    including Ms. Mullinix in his estate plan?

10  A.  I'm not sure.

11  Q.  What do you recall him telling you about this

12    Charitable Remainder Trust?

13  A.  Basically that it was -- I guess it was the

14    money from the IRA, I believe, or IRAs, that

15    would otherwise -- if the tax had not been paid

16    on it originally and, therefore, there would be

17    a lot of tax due on these, and that it made more

18    sense to contribute the principal to Harvard

19    University and the University of Chicago; and

20    that the heirs, or I think Kiki and I

21    personally, I can't remember the structure

22    exactly, would receive interest or income on

23    those, on that principal, and that this would be

24    better for all concerned than just including it

**Bogorad, L. 01-19-06**                    **Page 26**

00027

1    in the estate. It seemed reasonable to me. But

2    I never heard of that before.

3  Q.  Other than those statements that you've just

4    alluded to, do you recall anything additional

5    that your father told you about this Charitable

6    Remainder Trust?

7  A.  I don't recall. I'm sure it was a longer

8    conversation, but that's all I remember about

9    it.

10  Q.  And just so I'm clear, other than those two

11    communications you referenced -- the first being

12    the e-mail communication regarding including

13    Kathleen Mullinix in his estate plan, and the

14    second communication which may have been before

15    or after regarding the Charitable Remainder

16    Trust -- can you recall any other time that you

17    and your father spoke about his estate plan?

18  A.  That's all I recall.

19  Q.  And other than those two occasions and the

20    periodic occasion where you would discuss who

21    was paying for a dinner bill or various expenses

22    relating to trips, can you recall any other

23    instance where your father spoke with you about

24    financial matters?

**Bogorad, L. 01-19-06**                    **Page 27**

# EXHIBIT D

**Kathleen P. Mullinix**
**1050 Fifth Avenue, Apt. 15B**
**New York, NY 10028**

kathleenpmullinix@yahoo.com

August 3, 2003

Heather Aman Design
347 West 36th Street, Suite 1501
New York, NY 10018

Dear Heather,

I enclose two signed copies of the Agreement between Heather Aman Designs and me for your services with respect to the remodeling and renovation of my apartment. Note that I have added "the foyer" to the scope, and initialed the change. We had discussed adding the same, but the change did not make it into the current document. In addition, I enclose a check in the amount of $1500.00 as a retainer for the project.

Please initial the change and return one signed copy to me.

I am very excited about the project; I look forward to working with you as we see a wonderful transformation of the space that will be my new home.

With best regards,

*Kathy*

KPM 0182

# EXHIBIT E

HEATHER AMAN

July 25, 2003

Ms. Kathleen Mullinix
1050 Fifth Avenue, Apt. 15B
New York, NY 10028

Dear Kathy,

It was a pleasure meeting with you last week to discuss the renovation of your new home. I am happy to submit a proposal for Architectural Design Services for your Project. The following shall constitute the Agreement between Kathleen Mullinix ("Owner") and Heather Aman Design ("HAD").

**Project Description:** *KPM Foyer*
The Project is to consist of the remodeling and renovation of Apartment 15B at 1250 Fifth Avenue and will encompass the Kitchen, Bathrooms, Bedrooms, Living and Dining Rooms, Closets, and Attendant Plumbing and Electrical Work.

**Proposed Scope of Architectural Design Services (divided by phase)**
Note: The percentages herein will be used to estimate payments for services

**A. Schematic Design**
    To be performed by Raynor Warner and the Casali Group, Inc.

**B. Design Development (25%)**
    1. Dimensional issues resolved
    2. Plans and interior elevations drawn to scale
    3. Final fixtures, fittings, appliances and materials determined
    4. Critical system and code issues resolved
    5. Arrangement for expediting services and asbestos inspection

**C. Construction Documents (45%)**
    1. Preparation of detailed drawings and specifications for the negotiation of the construction contract
    2. Submissions to the Managing Agent and the NYC Department of Buildings to obtain permit

**D. Negotiation of Contract (5%)**
    1. Invitation to bidders including site walk-throughs
    2. Analysis of contractor bids and final selection of contractor
    3. Coordination of Owner/Contractor contract documents

**E. Construction Administration (25%)**
    1. Site meetings as required to review contractor's work
    2. Administration of the construction contract
    3. Review and certification of contractors' requests for payment

**Notes:**
1. Owner will approve pertinent drawings and documents at the end of each phase.

347 WEST 36TH STREET, SUITE 1501, NEW YORK, NY 10018
T 212.736.0480    F 212.216.9317

KPM 0069

2. Regarding construction costs, it is recognized that neither the Owner nor HAD can control the cost of labor, materials or equipment or the contractor's methods of determining bid prices.

3. During construction, HAD shall have access to all areas where work is in preparation or progress.

4. HAD does not have control over or charge of and shall not be responsible for construction means, methods, techniques, sequences or procedures or for safety precautions and programs in connection with the Project since these are solely the contractor's responsibility under the Contract for Construction (separate document).

5. The drawings, specifications and other documents prepared by HAD for this Project are for use solely with respect to this Project. HAD retains all common law, statutory and other reserved rights, including copyright. The Owner shall be permitted to retain copies of HAD drawings, specifications and other documents for information and reference in connection with the Owner's use and occupancy of the Project.

6. The services of engineers, expeditors, asbestos inspectors or special consultants required by the Owner or by the unique demands of the Project, such as acoustical, audio-visual, HVAC, security, etc. shall be retained directly by the Owner at a cost separate from HAD compensation.

7. The project is a renovation which may uncover unanticipated asbestos or asbestos-related material. Both the Owner and HAD recognize that the uncovering of such material may require the retention of separate experts to identify and rectify such finding. Such experts shall be retained directly by the Owner at a cost separate from HAD compensation. Neither the Owner nor HAD may seek claims against each other should asbestos or related materials be found.

8. This agreement may be terminated by either party upon seven days written notice. In the event of termination, HAD shall be compensated for services performed prior to termination. Drawings and documents developed by HAD will not be unreasonably withheld from Owner at termination

9. Claims, disputes or other matters in question between the Owner and HAD arising from this agreement shall be subject to and decided by arbitration in accordance with the Construction Industry Arbitration Rules of the American Arbitration Association currently in effect.

The Fee for Architectural Design Services outlined above is $30,000. Invoices will be issued monthly or at the end of each phase, at the discretion of HAD, and will be based on percentage of completion. A retainer of $1,500 is required to start and will be credited to Owner's final payment.

Reimbursable expenses, including but not limited to express mail, messenger services and blueprinting will be billed to you at cost.

Should you request substantial changes or substantial revisions to work previously approved the additional work will be billed at a rate of $120 per hour.

I look forward to working with you on this project. If you are in agreement with the terms outlined in this proposal, please sign below and return the original to me. If you have questions or wish to discuss any of the above, please call me.

Agreed and accepted by:                                    Agreed and accepted by:

_Kathleen P. Mullinix_                                     _Heather Aman_
Kathleen Mullinix                                          Heather Aman

KPM 0070

# EXHIBIT F

# HEATHER AMAN DESIGN

November 3, 2003

Ms. Kathleen Mullinix
1050 Fifth Avenue, Apt. 15B
New York, NY 10028

Project: Mullinix Residence
1050 Fifth Avenue, Apt. 15B

---

| | | |
|---|---|---|
| Total Fee for Architectural Services | $ | 30,000 |
| Retainer Received | $ | 3,000 |

Statement of architectural services rendered August 4, 2003 through October 31, 2003

**WORK COMPLETED TO DATE:**    20%

| | | |
|---|---|---|
| Billing for Work Completed @ 20% of $30,000 = | $ | 6,000.00 |
| Less All Fee Payments Received (excluding retainer) | $ | 00.00 |
| **Total Fee Due** | $ | 6,000.00 |
| Reimbursable Expenses | $ | 00.00 |

---

| | | |
|---|---|---|
| **TOTAL PAYMENT DUE** | $ | 6,000.00 |

---

347 WEST 36TH STREET, SUITE 1501, NEW YORK, NY 10018
T 212.736.0480   F 212.216.9317

KPM 0073

# HEATHER AMAN DESIGN

November 24, 2003

Ms. Kathleen Mullinix
1050 Fifth Avenue, Apt. 15B
New York, NY 10028

Project:  Mullinix Residence
          1050 Fifth Avenue, Apt. 15B

---

**Total Fee for Architectural Services**          $     30,000
**Retainer Received**                             $      3,000

Statement of architectural services rendered August 4, 2003 through November 21, 2003

**WORK COMPLETED TO DATE:**     25%

Billing for Work Completed @ 25% of $30,000 =          $   7,500.00
Less All Fee Payments Received (excluding retainer)    $     00.00

**Total Fee Due**                                      $   7,500.00

Reimbursable Expenses                                  $     00.00

---

**TOTAL PAYMENT DUE**                                  $   7,500.00

---

347 WEST 36TH STREET, SUITE 1501, NEW YORK, NY 10018
T 212.736.0480    F 212.216.9317

KPM 0074

# HEATHER AMAN DESIGN

January 30, 2004

Ms. Kathleen Mullinix
1050 Fifth Avenue, Apt. 15B
New York, NY 10028

Project: **Mullinix Residence**
1050 Fifth Avenue, Apt. 15B

---

| | | |
|---|---|---|
| **Total Fee for Architectural Services** | $ | **30,000** |
| **Retainer Received** | $ | **3,000** |

Statement of architectural services rendered November 24, 2003 through January 30, 2004

**WORK COMPLETED TO DATE:    50%**

| | | |
|---|---|---|
| Billing for Work Completed @ 50% of $30,000 = | $ | 7,500.00 |
| Less All Fee Payments Received (excluding retainer) | $ | 7,500.00 |
| **Total Fee Due** | $ | **7,500.00** |
| Reimbursable Expenses | $ | 00.00 |

---

| | | |
|---|---|---|
| **TOTAL PAYMENT DUE** | $ | **7,500.00** |

---

347 WEST 36TH STREET, SUITE 1501, NEW YORK, NY 10018
T 212.736.0480   F 212.216.9317

KPM 0075

# HEATHER AMAN DESIGN

May 17, 2004

Ms. Kathleen Mullinix
1050 Fifth Avenue, Apt. 15B
New York, NY 10028

Project: **Mullinix Residence**
        1050 Fifth Avenue, Apt. 15B

---

|  |  |  |
|---|---|---|
| **Total Fee for Architectural Services** | $ | **30,000** |
| **Retainer Received** | $ | **3,000** |

Statement of architectural services rendered January 30, 2004 through May 14, 2004

**WORK COMPLETED TO DATE:     75%**

| | | |
|---|---|---|
| Billing for Work Completed @ 75% of $30,000 = | $ | 22,500.00 |
| Less All Fee Payments Received (excluding retainer) | $ | 15,000.00 |
| **Total Fee Due** | $ | 7,500.00 |

| | | |
|---|---|---|
| Reimbursable Expenses | | |
| Reprographics | $ | 412.53 |
| Messenger | $ | 70.65 |
| Fedex | $ | 29.26 |
| **Total Reimbursables** | $ | 512.44 |

---

| | | |
|---|---|---|
| **TOTAL PAYMENT DUE** | $ | 8,012.44 |

---

347 WEST 36TH STREET, SUITE 1501, NEW YORK, NY 10018
T 212.736.0480   F 212.216.9317

KPM 0076

# HEATHER AMAN DESIGN

August 2, 2004

Ms. Kathleen Mullinix
1050 Fifth Avenue, Apt. 15B
New York, NY 10028

Project: **Mullinix Residence**
1050 5th Avenue, Apt. 15B

| | |
|---|---|
| Construction Contract | $ 350,295 |
| Total Fee for Architectural Services | $ 30,000 |
| Retainer Received | $ 1,500 |

Statement of architectural services rendered May 17, 2004 through July 30, 2004

### WORK COMPLETED TO DATE:     85%

| | |
|---|---|
| Billing for Work Completed @ 85% of $30,000 = | $ 25,500.00 |
| Less All Fee Payments Received (excluding retainer) | $ 22,500.00 |
| **Total Architectural Fee Due** | **$ 3,000.00** |
| | |
| **Furnishes, Finishes & Equipment (FF&E)** | |
| FF&E purchased to date | $ 21,549.14 |
| Fee @ 15% | $ 3,232.37 |
| Less Furnishings Fee Payments Received | $ 00.00 |
| **Total Furnishings Fee Due** | **$ 3,232.37** |
| | |
| **Reimbursable Expenses** | |
| Ricky's Runners (delivery) | $ 8.95 |
| **Total Reimbursables** | **$ 8.95** |

| | |
|---|---|
| **TOTAL PAYMENT DUE** | **$ 6,241.32** |

347 WEST 36TH STREET, SUITE 1501, NEW YORK, NY 10018
T 212.736.0480   F 212.216.9317

KPM 0077

# EXHIBIT G

**CORNICK, GARBER & SANDLER, LLP**
Certified Public Accountants

**KATHLEEN P. MULLINIX**

**STATEMENT OF ASSETS AND LIABILITIES**

**AS AT DECEMBER 31, 2002**
**(AT MARKET VALUE)**

**ASSETS**

| | |
|---|---:|
| Cash and money market funds | $ 480,551 |
| Investment in marketable securities | 983,025 |
| Due from stockbrokers | 151,382 |
| 2002 income tax refunds receivable | 14,123 |
| Residential property: | |
|   Condominium apartment in New York City | 1,325,000 |
| Jewelry, furnishings, clothing and personal property | 60,000 |
| Interest in employee benefit plans and individual | |
|   retirement accounts | 994,840 |
| **Total assets** | **4,008,921** |

**LIABILITIES**

| | |
|---|---:|
| Mortgage on condominium | 600,261 |
| Bear Stearns Securities Corp. - margin account | 106,819 |
| **Total liabilities** | **707,080** |

| | |
|---|---:|
| **EXCESS OF ASSETS OVER LIABILITIES** | |
|   (BEFORE ESTIMATED INCOME TAXES ON EXCESS | |
|   OF ASSETS OVER THEIR INCOME TAX BASES) | **$3,301,841** |

Attention is directed to the accountants' compilation report relating to this statement.

**000050**

# EXHIBIT H

# FINANCIAL STATEMENT



Name(s)   Kathleen Mullinix

Address   170 East 87th Street, New York, NY 10128

The following is submitted as being true and accurate statement of the financial condition of the undersigned on the 27th day of February, 2003.

| ASSETS | Applicant | Co-Applicant | LIABILITIES | Applicant | Co-Applicant |
|---|---|---|---|---|---|
| Cash in Banks | 480,551 | | Notes Payable: | | |
| Money Markets Fund-Combined | | | To Banks | | |
| Contract Deposit | | | To Relative | | |
| Investments: Bonds & Stocks | | | To Others | | |
| - see schedule | 983,025 | | Installment Accounts Payable: | | |
| Investment in Own Business | | | Automobile | | |
| Accounts & Notes Receivable | 165,505 | | Other | | |
| Real Estate Owned-see schedule | 1,325,006 | * | Other Accounts Payable | | |
| Year    Make | | | Mortgages Payable on Real | | |
| Automobiles: | | | Estate - see schedule | 600,261 | |
| Personal Property & Furniture | 60,000 | | Unpaid Real Estate Taxes | | |
| Life Insurance | | | Unpaid Income Taxes | | |
| Cash Surrender Value | | | Chattel Mortgages | | |
| Retirement Funds/IRA –total | 994,840 | | Loans on Life Insurance Policies | | |
| 401K | | | (Include Premium Advances) | | |
| KEOGH | | | Outstanding Credit Card Loans | | |
| Profit Sharing/Pension Plan | | | Other Debts - Itemize | 106,819 | Margin Acct. |
| Other Assets | | | TOTAL LIABILITIES | 707,080 | |
| TOTAL ASSETS | 4,008,921 | | NET WORTH | 3,301,841 | |
| COMBINED ASSETS | | | TOTAL LIABILITIES & NET WORTH | 4,008,921 | |

| SOURCE OF INCOME | Applicant | Co-Applicant | | | |
|---|---|---|---|---|---|
| Base Salary | 450,000 | | COMBINED | | |
| Overtime Wages | | | CONTINGENT LIABILITIES | | |
| Bonus & Commissions | | | As Endorser or Co-Maker on Notes | $ | |
| Dividends and Interest Income | | | Alimony | $ | |
| Real Estate Income (Net) | | | Child Support | $ | |
| Other Income – Itemize | | | Are you defendant in any legal action? | $ | |
| TOTAL | 450,000 | | Are there any unsatisfied judgments? | $ | |
| GENERAL INFORMATION | Applicant | Co-Applicant | Have you ever taken bankruptcy? Explain | $ | |
| Personal Bank Accounts at JP Morgan Chase Bank | Redacted | | PROJECTED EXPENSES / MONTHLY | | |
| Savings & Loan Accounts at North Fork Bank | Redacted | | Maintenance | $ | 1,933.93 |
| | | | Apartment Financing | $ | 3,703.93 |
| | | | Other Mortgages | $ | |
| Purpose of Loan Mortgage | | | Bank Loans | $ | |
| | | | Auto Loan | $ | |
| | | | TOTAL | $ | 5,637.86 |

*Contract signed, closing 3/27/2003

COOP00051

000051

# FINANCIAL STATEMENT

PAGE 4



Name (s) _____

Address _____

The following is submitted as being a true and accurate statement of the financial condition of the undersigned on the _____ day of _____ 19_____

| ASSETS | Applicant | Co-Applicant |
|---|---|---|
| Cash in banks | | |
| Money markets Funds | | |
| Contract Deposit | | |
| Investments: Bonds & Stocks | | |
| - see schedule | | |
| Investment in Own Business | | |
| Accounts and Notes Receivable | | |
| Real Estate Owned - see schedule | | |
| Automobiles: Year Make | | |
| Personal Property & Furniture | | |
| Life Insurance | | |
| Cash Surrender Value | | |
| Retirement Funds/IRA | | |
| 401K | | |
| KEOGH | | |
| Profit Sharing/Pension Plan | | |
| Other Assets | | |
| TOTAL ASSETS | | |
| **COMBINED ASSETS** | | |

| LIABILITIES | Applicant | Co-Applicant |
|---|---|---|
| Notes Payable: | | |
| To Banks | | |
| To Relative | | |
| To Others | | |
| Installment Accounts Payable: | | |
| Automobile | | |
| Other | | |
| Other Accounts Payable | | |
| Mortgages Payable on Real Estate - see schedule | | |
| Unpaid Real Estate Taxes | | |
| Unpaid Income Taxes | | |
| Chattel Mortgages | | |
| Loans on Life Insurance Policies (include Premium Advances) | | |
| Outstanding Credit Card Loans | | |
| Other Debts - itemize | | |
| TOTAL LIABILITIES | | |
| NET WORTH | | |
| TOTAL LIABILITIES & NET WORTH | | |

| SOURCE OF INCOME | Applicant | Co-Applicant |
|---|---|---|
| Base Salary | $ | $ |
| Overtime Wages | $ | $ |
| Bonus & Commissions | $ | $ |
| Dividends and Interest Income | $ | $ |
| Real Estate Income (Net) | $ | $ |
| Other Income - itemize | $ | $ |
| TOTAL | $ | $ |

| CONTINGENT LIABILITIES | COMBINED |
|---|---|
| As Endorser or Co-maker on Notes | $ |
| Alimony Payments (Annual) | $ |
| Child Support | $ |
| Are you defendant in any legal action? | |
| Are there any unsatisfied judgment? | |
| Have you ever taken bankruptcy? Explain: | |

| GENERAL INFORMATION | Applicant | Co-Applicant |
|---|---|---|
| Personal Bank Accounts at | | |
| Savings & Loans Accounts at | | |
| Purpose of Loan | | |

| PROJECTED EXPENSES / MONTHLY | |
|---|---|
| Maintenance | $ |
| Apartment Financing | $ |
| Other Mortgages | $ |
| Bank Loans | $ |
| Auto Loan | $ |
| TOTAL | $ |

000052

## SCHEDULE OF BONDS AND STOCKS

| Amount of Shares | Description (Extended Valuation in Column) | Marketable Value | Non-Marketable Value |
|---|---|---|---|
| | See attached | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

## SCHEDULE OF REAL ESTATE

| Description and Location | Cost | Actual Value | Mortgage Amount | Maturity Date |
|---|---|---|---|---|
| 170 E. 87th St., W15D New York, NY | 800,000 | 1,325,000 | 600,261 | 3/13/2003 |
| Contract signed Closing 3/27/2003 | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

## SCHEDULE OF NOTES PAYABLE
### Specify any assets pledged as collateral, including the liabilities they secure:

| To Whom Payable | Date | Amount | Due | Interest | Pledged as Security |
|---|---|---|---|---|---|
| Bear Stearns Margin Account | | 106,819 | | 4-1/4% | |
| | | | | | |
| | | | | | |

The foregoing statements and details pertaining thereto, both printed and written, have been carefully read and the undersigned hereby solemnly declares and certifies that the same is a full and correct exhibit of my/our financial condition.

Date _February 27, 2003_ _____   Signature _Kathleen P. Mullins_

Signature _____

Nov 94    COOP00053

# EXHIBIT I

# Kathleen P. Mullinix

170 E. 87th St
New York, NY 10128

212-828-1595
*kmullinix@nyc.rr.com*

March 11, 2003

Board of Directors
1050 Fifth Avenue, Inc.
1050 Fifth Avenue
New York, NY 10128

Dear Ladies and Gentlemen:

The biotechnology company that I founded in 1987, Synaptic Pharmaceutical Corporation, was sold in a transaction that closed in March 2003. In addition to the conversion of my shares of Synaptic stock to cash, I will receive payment for my "in the money' options in the amount of approximately $200,000 later this year.

I have recently started a biotechnology consulting practice focused on advising "start-up" companies in the biotechnology sector. I estimate that in the first year of this business, which started in late January of this year, my income will be approximately $450,000.

The initial project of my consulting practice is with HDMR Discovery, Inc., a drug discovery company that is based on discoveries of scientists at Princeton University. I am acting as "Interim CEO" of the company, a position that involves an analysis of the company's intellectual property and the development of its business and financial strategies. This will be a three phase program that will occupy approximately 25% of my time for six months and that will involve payment to me of approximately $125,000. I plan to start another project during the next month and am assessing my interest in several additional projects that will fill my schedule for the next one to two years.

Additionally, with respect to my financial statement, I note that with the death of my mother last week I have inherited approximately $400,000, which will be additive to my income this year.

I do not plan to take income from my investment portfolio for the foreseeable future but, rather, I plan to continue to work and generate income from my activities in the biotechnology sector.

Sincerely yours,

Kathleen P. Mullinix

000053

COOP00054

# EXHIBIT J

PAGE 2

## PERSONAL INFORMATION REGARDING APPLICANT(s)

DATE: 2/21/03

### APPLICANT

### CO-APPLICANT

Name: Kathleen P. Mullinix

Address: 170 East 87th Street, Apt. W15D

New York, NY 10128

Dates of Residence: July, 1999 to present

Home Phone #: ( 212  828-1595

Office #: (    ) Same

Social Security #: Redacted

Citizenship: USA

Occupation: Biotechnology Consultant

Employer: Self-employed

Address: 170 East 87th Street

New York, NY 10128

Business Phone #: (212)  828-1595

Nature of Business: Consultantcy to Biotechnology Companies

Period of Employment: Sept.2002 to present

Position Held: President

Prior employer and position or residence if less than 3 years: Synaptic Pharmaceutical Corporation 1987-2002 President and CEO

Income estimate for this year: $450,000

Actual income last year: $1,040,194

Educational Background: Ph.D., Columbia University

Postdoctoral Fellowship, Harvard University

B. A. Trinity College

OR SALE OF: 1050 Fifth Avenue          15B          Annabelle P. Mariaca and
ADDRESS                      APT #        Alberto C. Mariaca
                                          SELLER

000031

## ADDITIONAL INFORMATION REGARDING APPLICANTS

Name(s) cooperative stock would be held in: _____ Kathleen P. Mullinix _____

Names and Relationship of proposed occupants of the Apartment and ages of children, if any, and schools attending: _____

_____ Kathleen P. Mullinix _____

Names of anyone in the building known to Applicant: _____ — _____

Are any pets to be maintained in the Apartment, if yes indicated number and kind: _____ No _____

Name of all clubs and society memberships, fraternities and honorary societies to which applicant belongs: Board of Directors

_____ The Jackson Laboratory; American Society of Biological Chemists; American
Society of Cell and Molecular Biology; American Chemical Society

## REFERENCES

### LANDLORD:

_____ The Gotham Condominium/Equity Mgt. Address: _____ 170 East 87th Street
Occupancy from: _____ 7/99 _____ to _____ present _____    New York, NY 10128

Previous Landlord: _____ 975 Park Avenue Corp/
_____ Greenthal    Address: _____ 975 Park Avenue
Occupancy from: _____ 4/94 _____ to _____ 7/99 _____    New York, NY 10028

## PERSONAL REFERENCES:

**APPLICANT**                                          **CO-APPLICANT**

1.  Name Ms. Anne Heller                      1.  Name _____
    Address 20 E. 74th St., NY, NY 10021          Address _____
2.  Name Mr. Dwight M. Keating                1.  Name _____
    _____ 2162 Blairmont Drive                     Address _____
    Address Pittsburgh, PA 15241
3.  Name Mr. Dwight Lee                       1.  Name _____
    Address 530 Fifth Ave., NY, NY 10036          Address _____
4.  _____ Dr. Sandra Panem, Cross Atlantic Partners, 551 Madison Ave., NY,NY 1002

## BUSINESS AND PROFESSIONAL REFERENCES

**APPLICANT**                                          **CO-APPLICANT**

1.  Name Mr. Richard Zorn                     1.  Name _____
    _____ Benchmark Capital Advisors, Inc.         Address _____
    Address 750 Lexington Ave., NY, NY 10022
2.  Name Robert Arnold, Cornick,              1.  Name _____
    _____ Garberst Sandler LLP                     Address _____
    Address 630 Third Avenue, NY, NY 10017
3.  Name _____                                1.  Name _____
    Address _____                                 Address _____

OR SALE OF: _____ 1050 Fifth Avenue _____    15B    Annabelle P. Mariaca and
_____ ADDRESS _____    APT #    Alberto C. Mariaca
                                             SELLER

ev/94