UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| KATHLEEN P. MULLINIX, ) | |
| Plaintiff, ) | |
| ) | Civil Action |
| v. ) | No. 04-12684-WGY |
| ) | |
| KIKI BOGORAD-GROSS and ) | |
| LEONARD P. BOGORAD, as They ) | |
| Are Executors of the Will of ) | |
| Lawrence Bogorad, ) | |
| ) | |
| Defendants. ) | |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' OPPOSITION
TO PLAINTIFF'S CROSS-MOTION FOR SUMMARY JUDGMENT[1]**

Pursuant to Fed. R. Civ. P. 56 and LR 56.1, Defendants Kiki Bogorad-Gross

("K. Bogorad-Gross") and Leonard Bogorad ("L. Bogorad"), as Executors of the Will of

Lawrence Bogorad (collectively, "Defendants"), by their attorneys, Sullivan & Worcester LLP,

hereby oppose the cross motion for summary judgment of the Plaintiff, Kathleen P. Mullinix

("Mullinix" or "Plaintiff").  Plaintiff's motion merely asserts conclusory and unreliable

statements of alleged facts in support of her weak recitations of blackletter law.  The fact remains

that Plaintiff's only evidence of the alleged contracts is her own testimony, the credibility of

which should be determined by a trier of fact.  Accordingly, this Court should deny Plaintiff's

cross motion for summary judgment and grant Defendants' Motion for Summary Judgment.

---

[1] This Memorandum also serves as Defendants' Reply Brief to Plaintiff's opposition to Defendants' Motion for
Summary Judgment.

## STATEMENT OF FACTS

**I.    According to Plaintiff, she and Bogorad lived as husband and wife after their secret affair became public.**

According to the Plaintiff, she and Bogorad met in December, 1968, when Plaintiff was a postdoctoral fellow in Bogorad's graduate science lab at Harvard.  Mullinix 8:2-14.[2]  Plaintiff claims that she and Bogorad began a long-term illicit affair in 1975.  Mullinix 10:18 - 11:10; 11:11 - 12:8; 14:11-21; 21:4-18.  At that time, Plaintiff was married to Joseph Mullinix and Bogorad was married to Rosalyn Bogorad ("Rosalyn"), to whom he remained married until he died.  Mullinix 16:1-4; 50:23 - 51:16; L. Bogorad 13:12-14.  Bogorad never disclosed the affair to Rosalyn and he never took any steps to terminate the marriage.  Mullinix 34:22 - 35:2.  Plaintiff disclosed the affair to her husband in 1997 and they divorced shortly thereafter.  Mullinix 35:3-8; 38:17 - 39:1.[3]

The Defendants, the daughter and son of Bogorad and Rosalyn, first learned that Bogorad had a new companion in 1997 after Bogorad had heart surgery.  K. Bogorad-Gross 59:5-10; 59:17 - 63:7; L. Bogorad 35:5-9.  Subsequently, Plaintiff began appearing regularly at Bogorad family functions.  K. Bogorad-Gross 92:20 - 93:17.[4]  According to Plaintiff, "our understanding

---

[2] The relevant portions of the referenced deposition transcripts are appended to the Affidavit of Lisa M. Hodes ("Hodes Aff."), which was filed with Defendants' Motion for Summary Judgment.  Any new references are appended to the Hodes Aff. filed herewith.

[3] Rosalyn began showing symptoms of Alzheimer's disease in the early 1990's.  L. Bogorad 13:21 - 14:12.  By 1998 she required 24-hour care and was admitted to a nursing facility in Natick, Massachusetts; she currently resides at Fairlawn Nursing Home in Lexington, Massachusetts.  K. Bogorad-Gross 19:21-24; 20:20-24; L. Bogorad Aff., ¶ 1; K. Bogorad-Gross Aff., ¶ 5.  Bogorad visited Rosalyn two or three times a week until his death.  K. Bogorad-Gross 23:12-13; L. Bogorad 22:8-10.

[4] Although initially uncomfortable, the Defendants accepted the relationship because their father appeared happy and Rosalyn was no longer able to be a companion to him; thus, they maintained a friendly relationship with Plaintiff because they believed their father considered her to be part of the "family".  K. Bogorad-Gross 88:3-15; 91:6 - 92:2; L. Bogorad 36:17 - 37:2.

{B0531364; 1}

was that we were man and wife except we weren't married."  Complaint, ¶ 9; Mullinix, 51:22-23.[5]  After Plaintiff's divorce in 1997, Bogorad "picked up the tab wherever we went."  Mullinix 58:17-21; 59:21-22.  In 1998 the Plaintiff alleges that she and Bogorad discussed that they would marry after Rosalyn died: "[I]t was part of our agreement to be committed to each other as married people and that's the way we would live. . . . that we considered ourselves to be man and wife, that I was committed to him forever and he to me.  Mullinix 60:11-13; 60:17-23.[6]

## II.    Bogorad paid for furniture, renovations and the monthly maintenance fees for the 87th Street Apartment as gifts to Plaintiff.

After Plaintiff divorced her husband in 1997, Plaintiff purchased an apartment on East 87th Street, located between Lexington Avenue and Third Avenue in Manhattan ("87th Street Apartment").  Complaint ¶ 10; Mullinix 39:21 - 40:15.  Plaintiff paid the mortgage and utilities for the 87th Street Apartment out of her own resources.  Mullinix 61:9 - 62:1.  She claims, however, that Bogorad reimbursed her for the $870 monthly maintenance fee because he wanted to do so.  Complaint, ¶¶ 11-12; Mullinix 55:13-18; 58:13-14; 55:6-8.  Mullinix 55:13-18.  Plaintiff did not do or promise to do anything in exchange:

A.    Laurie said, "I want to pay the maintenance."

Q.    So he offered to do it?

A.    Uh-huh.

---

[5] From July, 1999, until his death in December, 2003, Bogorad spent the weekdays at his Lexington Home, which remained his residence, and visited Plaintiff in New York City most weekends.  Mullinix, 41:15-20; 42:8-10; L. Bogorad 72:13 - 73:11.

[6] Over the course of their relationship, Bogorad displayed his characteristic generosity by showering Plaintiff with gifts and vacations.  Mullinix 44:20 - 45:19; 59:21-22; L. Bogorad 78:8-18; 79:13-16; K. Bogorad-Gross 113:8-19.  Bogorad displayed similar generosity with his children and grandchildren, often footing the bill for major expenses incurred on the family vacations.  L. Bogorad 133:5-13; 134:15 - 135:4.  Bogorad also provided each of his grandchildren $10,000 per year for college expenses.  L. Bogorad 50:21 - 51:9, 52:15 - 57:22; K. Bogorad-Gross 36:18 - 38:1.  No payments were made, however, after Bogorad died, although two of his grandchildren were in college.  L. Bogorad 55:6-12; K. Bogorad-Gross, 38:14-18.  His estate has not made these payments, nor are there any claims for these expenses.  L. Bogorad 57:10-22.

{B0531364; 1}

Q.    And you agreed?

A.    Yeah.

Q.    And what, if anything, did you do or promise to do in exchange for that payment?

A.    Nothing.

Mullinix 55:16-23 (emphasis added).  Plaintiff did not declare any of the $870 monthly payments from Bogorad to her on her federal, New York State or New York City income tax returns.  Mullinix 62:2-20.

**III.    The Plaintiff sold the 87th Street Apartment after she received an enticing offer for a handsome profit.**

In early 2002, a neighbor approached Plaintiff about selling the 87th Street Apartment. Complaint ¶ 13; Mullinix 66:19 - 67:14.  Plaintiff consulted her son Brendan Mullinix ("Brendan"), the Vice President of a New York real estate investment trust, who recommended that Plaintiff sell that apartment and buy an apartment on Fifth Avenue because, according to Brendan, an apartment on Fifth Avenue would appreciate faster than an apartment on 87th Street. Mullinix 19:8-21; L. Bogorad 104:6-10; 142:4 - 143:20; K. Bogorad-Gross 168:16-20.  Plaintiff also conferred with Bogorad and Judith Durham ("Durham"), her real estate agent, both of whom recommended that she sell the 87th Street Apartment.  Mullinix 68:13 - 69:7; 70:13 - 71:8; 74:6-13; 75:9-12; 77:2 - 78:12.  In February 2003 she did so for $1.325 million.  Mullinix 74:2-5.

**IV.    Bogorad paid for the monthly maintenance fees and part of the renovations for the Apartment as gifts to the Plaintiff.**

Plaintiff engaged Durham to find a new apartment.  Mullinix 79:1-2.  In November 2002, Plaintiff toured the Apartment, located three long blocks and one short block from the 87th Street Apartment.  Mullinix 91:16-19; Complaint ¶ 14.  The Apartment, which was listed at around

$2.4 million, needed renovations. Complaint, ¶ 14; Mullinix 93:4-8. Plaintiff discussed the Apartment with Bogorad after she toured it, lamenting that it was too expensive and claiming that Bogorad told her he wanted to pay for the renovations. Complaint, ¶ 14; Mullinix 104:18 - 105:3; 109:20 - 110:1. Later, in January 2003, Plaintiff toured the Apartment a second time and reported to Bogorad. Mullinix 103:6 - 104:13. Plaintiff claims that Bogorad repeated that he wanted to pay for the renovations "and, obviously, I'll pay for the maintenance as I have been." Complaint, ¶ 17; Mullinix 105:4-9.

In February 2003, Plaintiff and Bogorad toured the Apartment. Complaint ¶ 16; Mullinix 115:2-5. In a private conversation with Bogorad, Plaintiff again lamented that the Apartment was still too expensive and claims that Bogorad repeated that he wanted to pay for the renovations and the monthly maintenance fees. Mullinix 118:8-14; 118:16 - 119:9. Plaintiff also claims that Bogorad reiterated that he wanted to pay for half of the capital gains tax incurred in connection with the sale of the 87th Street Apartment and half of the storage costs Plaintiff would incur until the renovations were completed. Complaint, ¶ 18.

Ultimately, Plaintiff offered $1,400,000[7] for the Apartment and interviewed with the seller's attorney. Mullinix 122:15 - 125:6; 127:11-15. During that interview, Plaintiff provided a list of her financial accounts, but she never mentioned Bogorad as her partner or as a source of any money to purchase or renovate the Apartment. Mullinix 140:17 - 141:3. The next day Plaintiff learned that the seller had accepted her offer. Mullinix 142:2-5. Plaintiff claims that she expressed panic to Bogorad about the finances and Bogorad told her not to worry. Mullinix 143:19 - 144:9. Thereafter, she learned that, just weeks after Plaintiff and Bogorad first

---

[7] The Apartment is now worth approximately $2,100,000. See Defendant's Motion for Reconsideration, Exh. A; Hodes Aff., Exh. D.

discussed renovations, Bogorad had changed his estate plan to provide her with a 1/6 interest in his 1997 revocable trust.[8]  Mullinix 150:15 - 151:20; 152:11-14; 190:9-16; see also L. Bogorad 65:21 - 69:20; K. Bogorad-Gross Aff., ¶ 6; L. Bogorad Aff., ¶ 5.

In early June 2003 Plaintiff interviewed with the Cooperative Board.  Mullinix 213:5-13. They asked Plaintiff about her source of wealth.  Ring 25:2-9.  Plaintiff never mentioned Bogorad as one of her financial resources for the purchase or occupancy of the Apartment.[9]  Ring 27:3-9.  Instead she responded that she had sold her interest in a technology company.  Ring 25:2-9.[10]  The Cooperative Board also asked Plaintiff if she expected overnight guests.  She replied that "she did not have guests."[11]  Ring 25:2-9.  Plaintiff knowingly omitted Bogorad's name from both her oral interview and written Cooperative Application.  Mullinix 177:10-23.

---

[8] That trust is currently worth nearly $2 million.  Berlin Aff., ¶ 5.  By November 2002, Bogorad had already suffered from bladder cancer and had a quadruple bypass.  Mullinix 206:5-18.

[9]

| | Q. | Did Ms. Mullinix ever at that interview or subsequently inform you, in words or substance, that she intended to rely upon wealth or finances from any other person in connection with her purchase and occupancy at 1050 Fifth Avenue? |
| --- | --- | --- |
| | A: | No. |

Ring 27:3-9.

[10] In fact, Plaintiff had served as the Chief Executive Officer of a technology company she founded.  Mullinix 28:14 - 29:7.  Subsequently, Plaintiff worked as an independent biotechnology consultant, which included writing a business plan for a science-based neutraceutical company, for which she received $450,000 in compensation. Mullinix 29:14-18; 30:17-22.

[11]

| | Q. | Did you, Ms. Ring, or any other board member ask Ms. Mullinix at her interview how often she had or intended to have overnight guests? |
| --- | --- | --- |
| | A: | Yes. |
| | Q: | And what did she respond? |
| | A: | My recollection is that she responded she did not have guests. |

Ring 25:2-9.

{B0531364; 1}

In February 2003, Plaintiff began researching costs for mandatory and discretionary renovations to the Apartment. Mullinix 167:1-13.[12] Plaintiff then determined that her discretionary renovations would cost approximately $450,000. Mullinix 169:11 - 170:4. To help her, Bogorad referred her to Raynor Warner ("Warner"), a close friend and architect. Complaint, ¶ 23; Mullinix 216:10-23; K. Bogorad-Gross 155:19 - 156:15. Bogorad paid Warner's bill, which was addressed only to Plaintiff, but Plaintiff did not report it as income. Complaint, ¶ 23; Mullinix 221:18-21; K. Bogorad-Gross 156:22 - 157:7. Warner referred Plaintiff to Heather Aman, an interior designer in New York City, and Plaintiff signed a contract with Aman on July 25, 2003. Complaint, ¶ 24; Mullinix 216:10-12; 218:12-21. Bogorad was not a party to the contract between Aman and Plaintiff. However, Bogorad reimbursed Plaintiff for Aman's bills; again, she never declared these payments on any of her income tax returns. Mullinix 201:17 - 203:18; 225:11-16.

**V.      The Plaintiff manipulatively portrays Bogorad's gifts to her as a contract.**

On December 28, 2003, Bogorad passed away while on a Bogorad family vacation to Mexico. Complaint, ¶ 30. Plaintiff flew back to Boston with K. Bogorad-Gross and her family. K. Bogorad-Gross 134:16-17; L. Bogorad 97:4-21. Plaintiff and K. Bogorad-Gross sat next to each on the second leg of the return flight. K. Bogorad-Gross Aff., ¶ 12. As both grieved Plaintiff realized Bogorad had not yet given her money for the majority of her renovation expenses:

> "Oh no! What am I going to do? Laurie was going to pay for the renovations."

---

[12] The Cooperative Board required Plaintiff to install new windows and the Apartment's heating system was broken. Mullinix 167:14 - 168:6.

{B0531364; 1}

K. Bogorad-Gross 136:22 - 137:24; K. Bogorad-Gross Aff., ¶ 12.  Still attempting to cope with the reality of her father's unexpected death, K. Bogorad-Gross replied only that they would "figure it out."  K. Bogorad-Gross 135:11-15; 137:4-24; L. Bogorad 100:8-14; K. Bogorad-Gross Aff., ¶ 12.

After her discussion with K. Bogorad-Gross, the Plaintiff twice approached L. Bogorad. On January 2, 2004, Plaintiff met with L. Bogorad and James Gross, Esq., the husband of K. Bogorad-Gross, who were sorting through Bogorad's files at the Lexington Home, and claimed that she and Bogorad "had an agreement that [Bogorad] was going to pay for the renovations on the apartment up to $400,000, and he also paid the maintenance on the apartment both at 87th Street and at Fifth Avenue."  Mullinix, 233:20 - 235:14; L. Bogorad Aff., ¶ 9; Gross. Aff ¶¶ 13-16.  Despite being a sophisticated businesswoman, Plaintiff did not have any of Bogorad's alleged promises in writing.  Mullinix 233:20 - 235:14; L. Bogorad 84:13-24. Plaintiff admits that L. Bogorad never told her that the Estate would pay for the renovations or the monthly maintenance fees.  Mullinix 233:20 - 235:14.

Plaintiff and L. Bogorad spoke again by telephone a few weeks later.  L. Bogorad 86:14-17.  During the conversation, Plaintiff asked L. Bogorad how the estate wanted to handle the bills for the renovations, who replied that it would violate the Defendants' fiduciary duties as executors of Bogorad's estate to pay any bills in connection with Plaintiff's Apartment.[13] L. Bogorad 86:14 - 96:7; 234:3-14; Mullinix 241:14-19; 242:1-5.

Prior to their conversations with Plaintiff, the Defendants had no knowledge of any of the Plaintiff's alleged discussions with Bogorad concerning any of the alleged Contracts.

---

[13] Subsequent to Plaintiff's conversation with K. Bogorad-Gross on the flight home from Mexico, the Defendants sought legal advice from the estate's lawyer.  L. Bogorad 96:8-24.  The estate's lawyer stated that any payments to the Plaintiff would violate the Defendants' fiduciary duties.  L. Bogorad 95:20-24.

L. Bogorad Aff., ¶ 8, 13; K. Bogorad-Gross Aff., ¶ 13, 14.  Although it was not unusual for

Bogorad to be "close to the vest" about personal aspects of his relationship with Plaintiff,

L. Bogorad 44:1-13; K. Bogorad-Gross 25:19 - 26:2; Bogorad usually discussed important

financial matters with K. Bogorad-Gross.  K. Bogorad-Gross 26:3-19; 51:22 - 52:8.[14]  In fact, on

several occasions K. Bogorad-Gross had discussed the renovations to the Apartment with her

father, but he never mentioned the alleged Renovations Contract to her or to his son, L. Bogorad,

even though Bogorad and L. Bogorad discussed Plaintiff's purchase of the Apartment over

brunch in 2003.  K. Bogorad-Gross 116:8 - 117:3; 145:13-24; 147:13-19; 149:14-20; 151:19 -

152:3; L. Bogorad 101:13-17; 103:14 - 104:6; 107:22 - 108:4; 135:5-13; 137:3-19.  A thorough

search of Bogorad's papers and personal effects has not unearthed a scrap of paper, or bit or byte

of electronic data, memorializing any of the alleged "Contracts".  L. Bogorad Aff., ¶ 9; Gross

Aff., ¶¶ 13, 14, 17 and 19.

## VI.    The Plaintiff received notice that the Estate would not pay for the renovations, but proceeded with the renovations anyway.

In a letter dated February 11, 2004, the estate's lawyer notified Plaintiff that the estate

would not pay any of her claims because payment would violate the Defendants' fiduciary

duties.  Mullinix Dep. Exh. 15 (Hodes Aff., Exh. F); see also L. Bogorad 233:9-15.  Despite that

express notice, on March 17, 2004, Plaintiff entered into a $350,000 contract with McGraime

Woodworking to perform discretionary renovations to the Apartment.  Complaint ¶ 32; Mullinix

Dep. Exh. 6 (Hodes Aff., Exh. G).

---

[14] For example, Bogorad informed K. Bogorad-Gross of changes to his estate plan, certain insurance policies and large purchases, such as a new car and computer.  K. Bogorad-Gross Aff., ¶ 8.

{B0531364; 1}

**VII.    After Bogorad died the Defendants gratuitously allowed the Plaintiff to reside in the Lexington Home until it was sold.**

Plaintiff alleges that Bogorad told her she could live at the Lexington Home until the renovations to the Apartment were completed.  Complaint, ¶¶ 21, 53.  The Defendants had no knowledge of this alleged discussion and there is no evidence that it ever occurred.  L. Bogorad 72:19-23; 74:9-19.  After Bogorad died, the Defendants never promised Plaintiff that she could live in the Lexington Home until the renovations were completed or that the estate would pay for alternate housing.  L. Bogorad 220:22 - 221:7. [15]  In fact, in the telephone conversation with L. Bogorad on January 25, 2004, Plaintiff recommended that the Lexington Home be sold that spring.  L. Bogorad 146:22 - 148:24.  In her emails to K. Bogorad-Gross, Plaintiff communicated her intent to cooperate with the Defendants in connection with the sale.  Mullinix Depo. Exhs. 16-21 (Hodes Aff., Exhs. H-M); L. Bogorad 230:13 - 232:10.

The Lexington Home was sold in May 2004.  Mullinix 244:8-10; K. Bogorad-Gross Aff., ¶ 19.  Plaintiff never voiced any objection or discontent to the Defendants about moving out of the Lexington Home.  Mullinix Depo. Exhs. 16-21 (Hodes Aff., Exhs. H-M); L. Bogorad Aff., ¶ 13; K. Bogorad-Gross Aff., ¶ 20; L. Bogorad 147:21 - 148:3.  Similarly, Plaintiff never requested that the Estate pay for temporary housing pending the completion of the renovations to her Apartment.  Mullinix Depo. Exhs. 16-21 (Hodes Aff., Exhs. H-M); L. Bogorad Aff., ¶ 15; K. Bogorad-Gross Aff., ¶ 22; L. Bogorad 221:8-24.

---

[15] Plaintiff continued to live rent-free at the Lexington Home after Bogorad died.  See Mullinix Depo. Exhs. 16-21; (Hodes Aff., Exhs. H-M).  While she lived at the Lexington Home, Plaintiff never paid rent, utilities, the phone bill or any of the general upkeep of the house.  Mullinix 244:8 - 245:4.

**ARGUMENT**

## I.    The Plaintiff Misstates the Standard of Review.

The Plaintiff bundled her opposition to Defendants' Motion for Summary Judgment with her Cross Motion for Summary Judgment. As the movant in her cross motion, the Plaintiff bears the initial burden of showing that there are no material facts genuinely in dispute and that she is entitled to judgment as a matter of law.  See Fed. R. Civ. P. 56(c).  However, throughout the cross motion, the Plaintiff unabashedly shirks her role as the movant and avers that this Court must draw all reasonable inferences in her favor.  See Pl.'s Cross Mot. Summ. J. 12. "Cross-motions for summary judgment do not alter the basic Rule 56 standard, but rather simply require [courts] to determine whether either of the parties deserves judgment as a matter of law on facts that are not disputed." Regan v. United States, 421 F. Supp. 2d 319, 325 (D. Mass. 2006).  That is, "[t]he court must rule on each party's motion on an individual and separate basis, determining, for each side, whether a judgment may be entered in accordance with the Rule 56 standard." Bienkowski v. Northeastern Univ., 285 F.3d 138, 140 (1st Cir. 2002).  Plaintiff argues that the Defendants failed to offer any evidence to dispute the allegedly enforceable contracts between Bogorad and the Plaintiff, thus attempting to shift the Court's attention from the fact that Plaintiff, who has the burden of proof, has not produced and cannot produce any evidence of any enforceable oral contract.

As alleged by the Plaintiff, Bogorad wanted to give her money for her renovations, monthly maintenance fees, half of the storage costs and half of the tax consequences of the sale of the 87th Street Apartment.  However, when the facts are construed in a light most favorable to the Defendants (and as a matter of law), Bogorad's gifts to the Plaintiff do not constitute

- 11 -

enforceable oral contracts.[16]  Accordingly, this Court should deny the Plaintiff's cross motion for summary judgment.

## III.    The Plaintiff Misstates Her Burden of Proof.

The Plaintiff mistakenly relies upon <u>Fleming v. Ponziani</u>, 24 N.Y.2d 105 (1969), for the proposition that she must prove her claims by a preponderance of the evidence.  <u>See</u> Pl.'s Cross Mot. Summ. J. 13.  <u>Fleming</u> is not applicable to this case.  At issue in <u>Fleming</u> was whether the defendant had the burden of persuading the jury as to the plaintiff's knowledge and understanding of a release the defendant had allegedly procured in bad faith.  <u>See</u> <u>Fleming</u>, 24 N.Y.2d at 109-13.  The court found that the defendant had the burden to prove by the preponderance of the evidence that the release, signed by the plaintiff while hospitalized with no explanation as to its terms, was valid at its inception.  <u>See</u> <u>id.</u> at 112-13.

As stated in Defendants' Motion for Summary Judgment, Plaintiff must prove her claims by clear and convincing evidence.  <u>See</u> <u>In re Gorden's Estate</u>, 8 N.Y.2d 71, 76 (1960) (reciting general rule that claims against a decedent's estate require clear and convincing proof ).[17] Plaintiff seeks to circumvent her burden of proof because her claims remain undocumented, unsupported and uncorroborated.  The evidence produced in discovery, including the parties' depositions and Bogorad's financial records, even taken in the light most favorable to Plaintiff, fall far short of "clear and convincing" proof of any of the alleged contracts.  At best, the

---

[16] Alternatively, there is a genuine dispute of material fact as to whether Bogorad's desire to give the Plaintiff money for the Apartment-related expenses constituted gifts or legally enforceable promises.

[17] <u>In re Gordon's Estate</u> is instructive.  In that case, a companion filed a claim against her paramour's estate for oral promises to, <i>inter alia</i>, (1) compensate her for services rendered at her paramour's inn, and (2) marry her.  <u>See</u> <u>id.</u> at 73.  The Court of Appeals of New York rejected witness testimony—the only evidence that the decedent said the claimant worked for him as an employee—as insufficient under the "clear and convincing" standard and found that there was no basis for a claim against the decedent's estate.  <u>See</u> <u>id.</u> at 74-75 ("[i]f during the lifetime of Mr. Gorden claimant was not accorded the rights and privileges which she would have had as his wife, she cannot get them by filing a claim against his estate after he is dead.").

Plaintiff has only proffered evidence that she and Bogorad lived as though they were married and gave each other gifts pursuant to that loving and intimate relationship.

**IV.    The Court Should Deny Plaintiff's Cross Motion for Summary Judgment in its Entirety.**

      **A.    Bogorad and Plaintiff Did Not Enter Into An Enforceable Oral Contract.**

It is axiomatic that a binding contract requires an offer, acceptance, consideration, mutual assent and an intent to be bound.  See generally Rozsa v. May Davis Group, Inc., 152 F. Supp. 2d 526, 533 (S.D.N.Y. 2001).  The alleged oral contracts fail for lack of consideration, mutual assent and Bogorad's intent to be bound.

      1.    The Alleged Oral Contracts Fail for Lack of Consideration, Mutual Assent and Bogorad's Intent to Be Bound.[18]

The Plaintiff argues that her legal detriment lies in the sale of the East 87th Street Apartment and her purchase of the Apartment, both of which she would not have done but for Bogorad's promises to pay for certain Apartment-related expenses.  In fact, there is credible evidence that other factors played a material role in Plaintiff's decisions to sell the 87th Street Apartment and purchase the Apartment, namely, she stood to sell it to an eager buyer for approximately $500,000 more than she paid for it.  See, Section III, supra.  In addition, Plaintiff purchased the Apartment because her son told her an Apartment on Fifth Avenue would appreciate faster than an Apartment on 87th Street.  See id.

To be enforceable, Bogorad's promise and the Plaintiff's legal detriment must be the motive for each other.  See Glahn v. Clark, 251 A.D. 747, 747 (N.Y. 1937).  Where the motive for the promise is a feeling of moral obligation or a sense of duty, it does not constitute consideration.  See Pershall v. Elliott, 249 N.Y. 183, 188-189 (1928) (finding testator's sense of

---

[18] Defendants hereby incorporate their arguments from Section IV(B) of their motion for summary judgment.

{B0531364; 1}

moral obligation to reimburse daughter-in-law for her deceased husband's expenditures on house did not constitute consideration); Glahn, 251 A.D. at 747.

Glahn is analogous. In Glahn, the court found that a written contract failed for lack of consideration because the promisor did not request the legal detriment suffered by the plaintiff. See Glahn, 251 A.D. at 747. The plaintiff alleged he suffered detriment by refraining from selling stock pursuant to a written promise by the defendant.[19] Id. The court stated that the promise was gratuitous and further failed for lack of consideration because the defendant's motive in making the promise was his desire that the plaintiff not suffer as a result of the defendant's poor financial advice. Id. (citing Pershall, 249 N.Y. at 188).

Likewise, Bogorad did not request that the Plaintiff incur her alleged legal detriment. As discussed above, the evidence demonstrates that Plaintiff's decision to sell the 87th Street Apartment and purchase the Apartment resulted from factors other than Bogorad. Furthermore, Bogorad's alleged promises to Plaintiff were gratuitous and fail for lack of consideration because his motive for making any alleged promises was his love and desire to provide for her.[20] See id. If this Court determines that Bogorad induced the Plaintiff to sell the 87th Street Apartment, then this Court can also find that Bogorad wanted to pay for the renovations, monthly maintenance fees, storage costs and tax consequences because of his sense of duty or moral obligation as a result of his persuasion. Such motive does not constitute consideration. See Pershall, 249 N.Y. at 188; Glahn, 251 A.D. at 747.

Alternatively, the only evidence in this case that Bogorad's promises motivated the Plaintiff to incur her alleged legal detriment, and vice versa, is Plaintiff's uncorroborated

---

[19] The Glahn court does not discuss the substance of the promise.

[20] Notably, receiving a gift is not a sufficient consideration to support a promise by the donor to make another. See Williston on Contracts § 7:4 Consideration and Meaning of Benefit and Detriment.

testimony.  See Foreman v. Foreman, 251 N.Y. 237, 242-43 (1929) (ordering new trial to assess credibility of plaintiff's uncontradicted testimony that decedent promised to convey plaintiff real estate).  Thus, a genuine issue of material fact exists as to whether Bogorad's promises induced the Plaintiff to sell her 87th Street Apartment and purchase the Apartment.

A genuine issue of material fact also exists as to whether Bogorad expressed his assent and intent to be bound by the alleged contracts.  There is no evidence, other than Plaintiff's uncorroborated testimony, that Bogorad expressed his mutual assent to the alleged contract or his intent to be bound to the alleged contract.  As discussed below in Section IV(A)(3), Bogorad's completed payments to the Plaintiff constitute gifts, not partial performance of a contract.

2.     Plaintiff Misconstrues Defendants' Arguments that the Alleged Contracts are Void for Vagueness and Barred by the New York Statute of Frauds.

a.     *Void for Vagueness*

Plaintiff argues that the alleged agreements between she and Bogorad were clear and unambiguous.  However, Plaintiff's only evidence of the clear and unambiguous agreements is her uncorroborated testimony, which should be assessed by a trier of fact.  See Foreman, 251 N.Y. at 242-43.  Plaintiff fails to address the fact that Bogorad and Plaintiff never reached an equivocal "meeting of the minds" on material terms of the agreements, such as (1) who would pay the renovations costs, maintenance fees, and half of the capital gains taxes and storage costs if Bogorad or the Plaintiff died; (2) whether Bogorad's alleged commitments were to survive his death; (3) if Bogorad would continue to pay the renovations costs, maintenance fees, and half of the capital gains taxes and storage costs if they ceased to be a couple;[21] or (4) the time period to which Bogorad was committing to pay the monthly maintenance fee.  Mullinix 183:8-185:6.  It

---

[21] The Plaintiff threatened to break up with Bogorad for another man in 1998.  K. Bogorad-Gross 64:7-65:7.

{B0531364; 1}

is not the responsibility of this Court to flesh out these terms where Bogorad and the Plaintiff

failed to do so.  See Soderholm v. Kosty, 676 N.Y.S.2d 850, 852 (Justice Ct. 1998).  Without a

specification of these material terms, the contracts are vague and unenforceable.

     *b.*      *Statute of Frauds*

     Plaintiff's argument against the application of the New York Statute of Frauds consists of

blanket and conclusory statements of law and fact.  The Defendants are not invoking the New

York Statute of Frauds "to bar enforcement of a fair and undisputedly assented-to agreement"

(there is no fair and undisputedly assented-to agreement in this case).  Rather, Defendants have

properly invoked the New York Statute of Frauds because Bogorad's alleged promise to pay the

Plaintiff's monthly maintenance fees could not be completed within one year or by the end of

Bogorad's or the Plaintiff's lifetime.  See Rubenstein v. Kleven, 163 F. Supp. 237 (D. Mass.),

aff'd, 261 F.2d 921 (1st Cir. 1958) (applying the New York Statute of Frauds).  The New York

Statute of Frauds applies squarely to this case, where, as alleged by Plaintiff, Bogorad would pay

the Plaintiff's monthly maintenance fee "in perpetuity."  Mullinix 229:13-19.

     3.      Bogorad's Payments to the Plaintiff Were Gifts.

     Plaintiff avers that the Defendants cannot offer any evidence to contradict the Plaintiff's

testimony that Bogorad contracted or promised to pay the Plaintiff's Apartment-related expenses.

Aside from the ludicrous notion that lovers contract with each other, Defendants have offered

evidence of Bogorad's generosity with his family, of which Plaintiff contends she was a part.

See, supra, Section II of Statement of Facts.  As stated in Defendants' Motion for Summary

Judgment, Bogorad's completed payments to the Plaintiff with respect to the monthly

maintenance fees and part of the renovations were valid *inter vivos* gifts, see In re Moore's

Estate, 46 N.Y.S.2d 882, 883 (Sur. Ct. 1944), not partial performance of a contract.  Any of

Bogorad's intended gifts that were not delivered before his death are incomplete and, thus, fail to create any legal obligation on his estate.  See id.

> **B.**    **The Performance on Any Alleged Contract is Excused Because It Is Impracticable.**

Plaintiff sued the Defendants because they would not perform on Bogorad's alleged promises to Plaintiff regarding certain Apartment-related expenses.  Plaintiff appears miffed that the Defendants did not and do not accept as true her unsubstantiated, undocumented and uncorroborated word that Bogorad executed with her certain oral contracts to pay approximately $500,000 for certain Apartment-related expenses.  In fact, performance on the alleged contracts between Bogorad and Plaintiff is impracticable because it would result in enormous tax consequences to Bogorad's estate and also constitute a breach of the Defendants' fiduciary duties to Bogorad's beneficiaries.[22]

> 1.    Defendants Have a Fiduciary Duty Not to Pay Unsubstantiated Claims.

Although the Defendants, as executors of Bogorad's estate, have the power to settle claims against the estate, see M.G.L.A. 195 § 5A (1976), the Defendants have a fiduciary duty to all of Bogorad's beneficiaries.  Besides the Plaintiff and the Defendants, Bogorad's beneficiaries include Harvard University and the University of Chicago.  L. Bogorad 26:11 - 27:2; K. Bogorad-Gross 48:18-22; Mullinix 148:22 - 149:4.

Mindful of their legal obligations as executors and the fact that Plaintiff could not produce one scrap of paper to evidence a contract, Defendants rightfully rejected Plaintiff's demands to divest Bogorad's estate of approximately half a million dollars, which does not

---

[22] Plaintiff mocked the Defendants' fiduciary duties in both her deposition and her cross motion for summary judgment.  Plaintiff avers that payment of her claims for approximately $500,000 would not violate the Defendants' fiduciary duties as executors of Bogorad's estate, although she cites no legal authority to support her supposition.

{B0531364; 1}

include the <u>hundreds</u> <u>of</u> <u>thousands</u> <u>of</u> <u>dollars</u> of tax consequences the estate would incur in any distribution to the Plaintiff.

    2.    <u>Performance on the Alleged Contract is Excused Because It Is Impracticable</u>.

In New York, a party can obtain relief if the performance of the contract has become "impracticable." <u>See</u> <u>generally</u> <u>In re Dayton Seaside Assocs. # 2, L.P.</u>, 257 B.R. 123, 139 (S.D.N.Y. 2000). New York courts have adopted the doctrine of impracticability as explained by the Restatement (Second) on Contracts:

> Where, after a contract is made, a party's performance is made impracticable without his fault by the occurrence of an event the non-occurrence of which was a basic assumption on which the contract was made, his duty to render that performance is discharged, unless the language or the circumstances indicate the contrary.

<u>See</u> <u>id.</u> (<u>quoting</u> Restatement (Second) Contracts § 261 (1981)). In New York, performance must be impracticable because of circumstances that were unforeseeable at the time the contract was executed; that is, the party seeking relief could not have assumed the risk. <u>See</u> <u>id.</u>

If this Court determines Bogorad and Plaintiff executed an oral contract supported by adequate consideration, then this Court should find that performance on the alleged contract is impracticable. First, Bogorad set up a very complicated estate plan and, consequently, the estate would incur tax consequences of hundreds of thousands of dollars for any distribution to the Plaintiff. Second, Bogorad's death triggered a series of legal events, such as the appointment of the Defendants as executors of his estate, and created a pool of beneficiaries, to whom fiduciary duties are owed, thereby making any payments to Plaintiff impracticable.

    **D.**    **The Plaintiff Ignores the Elements of Promissory Estoppel.**

To meet the elements of promissory estoppel, the Plaintiff must prove: (1) a clear and unambiguous promise; (2) reasonable and foreseeable reliance by the party to whom the promise

- 18 -

is made; and (3) an injury sustained by the party asserting the estoppel by reason of her reliance. See Van Brunt v. Rauschenberg, 799 F. Supp. 1467, 1473 (S.D.N.Y. 1992). New York law also requires the Plaintiff's injury to be "unconscionable". Lowinger v. Lowinger, 733 N.Y.S.2d 33, 39 (App. Div. 2001); D&N Boening, Inc. v. Kirsch Beverages, Inc., 471 N.Y.S.2d 299 (App. Div.), aff'd, 63 N.Y.2d 449 (1984).

Plaintiff misleads this Court by citing Cyberchron Corp. v. Calldata Sys. Dev., Inc., 47 F.3d 39, 44 (2d Cir. 1995), for the proposition that "an injury need only be 'unconscionable' under promissory estoppel to circumvent the statute of frauds." Pl.'s Cross Mot. Summ. J. 21 n. 14. In fact, in Cyberchron, the Statute of Frauds was not raised as an issue and the Second Circuit found the plaintiff's injury to be unconscionable.[23] See Cyberchron, 47 F.3d at 39. Moreover, other New York courts have required an unconscionable injury where the Statute of Frauds was found inapplicable. See Hoffmann v. Boone, 708 F. Supp. 78, 78-81 (S.D.N.Y. 1989) (finding plaintiffs suffered no unconscionable injury by paying out of pocket for two or three trips to New York, re-printing an art catalogue and foregoing business opportunities).[24]

As set forth in Defendants' Motion for Summary Judgment, Plaintiff cannot meet the requirement that Bogorad made clear and unambiguous promises to Plaintiff. See Defs.' Mot. Summ. J. 19-20. Furthermore, Plaintiff cannot establish justifiable reliance. Plaintiff's representations to the Board of 1050 Fifth Avenue reveal that she never mentioned Bogorad as

---

[23] The Cyberchron court noted that an unconscionable injury is "sometimes" required. See Cyberchron, 47 F.3d at 44. However, other federal courts in New York have found an unconscionable injury to be a critical element of promissory estoppel. See Hoffmann v. Boone, 708 F. Supp. 78, 78-81 (S.D.N.Y. 1989).

[24] In discussing the circumstances that give rise to an unconscionable injury, the Hoffmann court further stated that "[a] change of job or residence … by itself is not sufficient to call promissory estoppel into play." 708 F. Supp. at 82.

{B0531364; 1}

her partner or as a source of finances.  Depo. Tr. Mullinix, 140:17-141:3; see Hodes Aff., Exh. G-J.[25]

It is only by a grotesque mischaracterization of the facts that Plaintiff can assert an unconscionable injury in this case.  See Pl.'s Cross Mot. Summ. J. 21 n. 14.  The only expert appraisal of the Apartment in this case reveals at least $700,000 in appreciation on the Apartment since she purchased the Apartment in 2003.  See Defs.' Mot. Summ. J. 20.  Moreover, Plaintiff does not dispute that she was told, in writing, that the Estate would not pay for renovations five weeks before she entered into a contract to have them done.

## CONCLUSION

For the foregoing reasons, this Court should deny Plaintiff's cross motion for summary judgment and grant Defendants' motion for summary judgment.

Respectfully submitted,

KIKI BOGORAD-GROSS and
LEONARD P. BOGORAD, as
they are the Executors of the Will
of Lawrence Bogorad,
By their attorneys,

June 30, 2006                    /s/  Lisa M. Hodes
                                 Larry L. Varn (BBO # 508130)
                                 Lisa M. Hodes (BBO # 660444)
                                 SULLIVAN & WORCESTER LLP
                                 One Post Office Square
                                 Boston, Massachusetts 02109
                                 (617) 338-2800
                                 lvarn@sandw.com
                                 lhodes@sandw.com

---

[25] Additionally, in her motion, Plaintiff avers that her romantic relationship with Bogorad is the reason she trusted Bogorad and relied on his alleged promises.  This suggests that the Plaintiff stood on unequal footing because the Plaintiff is a woman and Bogorad is a man.  Given the Plaintiff's entrepreneurial background and sharp business acumen, such an inference is morally offensive and factually unwarranted.

{B0531364; 1}

Certificate of Service

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non registered participants on June 30, 2006.

/s/  Lisa M. Hodes

{B0531364; 1}